OSEN LLC
ATTORNEYS AT LAW
WWW.OSENLAW.COM

2 UNIVERSITY PLAZA, SUITE 402, HACKENSACK, NJ 07601   1441 BROADWAY, SUITE 6022, NEW YORK, NY 10018
T. 201.265.6400   F. 201.265.0303                      T.212.354.0111

May 13, 2019

**VIA FEDEX AND ECF**

Honorable Eric N. Vitaliano
United States District Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    **Re:**    *Spetner, et al., v. Palestine Investment Bank,* **Case No. 1:19-cv-00005 (ENV) (RLM)**

Dear Judge Vitaliano:

    Plaintiffs respectfully write in response to Defendant's May 6, 2019 letter to address the arguments Defendant Palestine Investment Bank ("PIB") anticipates presenting in its motion to dismiss the Complaint.

    According to PIB, "Plaintiffs also do not allege any direct payment was made from PIB accounts to FTOs or terrorists, nor do they allege that PIB took any part in raising funds or administering a program to pay the families of terrorists. The Complaint alleges only that PIB provided banking services to its customer, Mr. Salem, who made the alleged 'reward' payments from his PIB accounts to the families of terrorists." Letter at 2.

    While it is true that the Complaint does not focus on "direct payment to … terrorists," that is because the most notorious terrorists involved *were already dead* and the rewards were instead paid directly to their families. *See, e.g.*, Complaint ¶¶ 3-5, 467, 485, 506, 507, 514.[1] It is also technically true that the Complaint does not allege "that PIB took any part in raising funds or administering a program to pay the families of terrorists." Letter at 2. Instead, the Complaint alleges that PIB helped actively facilitate Saddam Hussein's illegal transfer of U.S. dollar-denominated funds (in violation of U.S. sanctions) to accounts controlled by the Arab Liberation Front (effectively Hussein's functionaries in the Palestinian Territories) which were then used to reward and incentivize terrorist attacks, particularly suicide attacks against civilians in Israel. *See, e.g.* Complaint ¶¶ 2-5, 562. These included suicide bombings that injured Plaintiffs in this action. *See, e.g.* Complaint ¶ 514.

    Conspiring with Saddam Hussein's regime to evade U.S. sanctions was not "routine," as PIB suggests, Letter at 3, nor is repeatedly facilitating reward payments to the families of suicide bombers. It is a testament to the futility of Defendant's proposed motion, that it hopes to characterize such outrageous conduct in such anodyne terms.

---

[1]     The Complaint also alleges that PIB processed payments directly to wounded terrorists and those whose houses were destroyed as a deterrent by Israel. Complaint ¶ 485.

**Personal Jurisdiction**

Defendant asserts that the facts set forth in the Complaint would not permit the exercise of specific jurisdiction in this case. To begin with, PIB ignores Congress's express findings in enacting 18 U.S.C. §2333(d) which is one of the provisions under which this Action has been brought. Congress expressly found in enacting §2333(d) that:

> Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and **should reasonably anticipate being brought to court in the United States to answer for such activities.**

Justice Against Sponsors of Terrorism Act ("JASTA"), § 2(a)(6) (emphasis added).

Congress went further, stating:

> The purpose of this Act is to provide civil litigants with **the broadest possible basis, consistent with the Constitution of the United States**, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA, § 2(b) (emphasis added).

Ostensibly, PIB asserts that it is not subject to specific personal jurisdiction in New York because it used an agent to launder the illicit U.S. dollar-denominated funds from Saddam Hussein's regime to the Palestinian Territories and used an agent to clear those U.S. dollar-denominated funds for the relatives of suicide bombers. Complaint ¶¶ 11-12. The fact that PIB *itself* did not transfer the funds through a U.S. correspondent is hardly dispositive of the Court's proper exercise of jurisdiction. New York courts "have defined 'agent' broadly to include not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators." *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 431 (E.D.N.Y. 2012) (citations omitted). Here, Plaintiffs have not only alleged that PIB transferred funds through New York using its agent to evade U.S. sanctions, but have also adequately alleged that the transactions through New York were related to the provision of support to terrorists. *See Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016) (noting that at this stage, plaintiffs' burden is only to "plead facts that, if credited, would establish jurisdiction over Defendant.")

**Plaintiffs' Primary Liability Claims Under 18 U.S.C. §2333(a)**

The crux of PIB's argument that Plaintiffs do not set forth a legally sufficient primary liability claim is that "[e]ven if Mr. Salem used funds drawn on his PIB account to 'reward' the

families of suicide terrorists, and PIB knew of Mr. Salem's intent, PIB's routine processing of checks drawn by Mr. Salem to non-terrorist third parties does not satisfy 'the causation element of an ATA claim.'" Letter at p. 3, citing *Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018).

PIB's citation to *Linde* is inapt because, among other things, the Court of Appeals in that case was assessing solely whether a jury that has already found that a defendant knowingly violated the material support statute (in that case §2339B) must nevertheless be instructed on all of the definitional requirements of 18 U.S.C. §2331(1). It was not addressing causation. *Linde* held that "providing routine financial services to members and associates of terrorist organizations" was "not so akin to providing a loaded gun to a child as to ... *compel* a finding that as a matter of law, the services were violent or life-endangering acts that appeared intended to coerce civilians or to influence or affect government." *Linde,* 882 F.3d at 327 (emphasis added). Plaintiffs do not claim that their allegations "*compel* a finding that as a matter of law …." At this juncture, the Complaint need only alleges facts that, if ultimately proven by a preponderance of the evidence, could satisfy those elements. The *allegations* clearly do.

**Aiding & Abetting Liability Under 18 U.S.C. §2333(d)**

The Complaint alleges sufficient facts to satisfy 18 U.S.C. §2333(d) as enacted by Congress through JASTA, which expressly found that *Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983) "provides the proper legal framework for how such liability should function in the context of Chapter 113B of title 18, United States Code." 18 U.S.C. §2333 (note), §2(a)(5). The Court of Appeals followed this directive in *Linde*, 882 F.3d at 329.

The Complaint identifies the terrorist attacks HAMAS, Palestinian Islamic Jihad and the Popular Front for the Liberation of Palestine committed, planned and authorized that killed and injured Plaintiffs and their representatives. *See* Complaint ¶¶ 13-14, 86, 103, 109, 114, 225, 295, 303, 325, 338, 358, 388, 428. PIB argues that because it facilitated payments to the *families* of suicide terrorists *after* the attacks took place it could not have assumed a role in the terror attacks themselves. But that argument ignores *Halberstam* and aiding and abetting principles entirely.

The *Halberstam* plaintiffs alleged that defendant Linda Hamilton was liable for the murder of Michael Halberstam committed by her boyfriend during a botched burglary of Halberstam's house. Hamilton's boyfriend was a serial burglar, and Hamilton acted as his "banker, bookkeeper, recordkeeper, and secretary," helping him "launder the loot and divert attention from [him]." *Id.* at 487. Although her actions were "neutral standing alone" and she denied knowing the criminal nature of her boyfriend's "evening forays," the court found that "it defies credulity that Hamilton did not know that something illegal was afoot." *Id.* at 486. No evidence suggested that she had any knowledge of the murder—she did not even necessarily know about the burglaries. *Id*. at 488 ("It was not necessary that Hamilton knew specifically that Welch was committing burglaries.").

Here, the Complaint alleges that PIB knowingly facilitated reward payments to suicide terrorists' families (including terrorists widely known to be affiliated with specific terrorist

**Letter to Hon. Eric N. Vitaliano, U.S.D.J.**
**May 13, 2019**
**Page 4 of 4**

organizations), a far higher level of awareness and knowledge of its role than Hamilton's role in *Halberstam* and one whose foreseeable risk was incentivizing mass murder.

    We will be prepared to address the relevant issues at the pre-motion conference.

                  Respectfully submitted,

                  /s/ Gary M. Osen

cc:    All Counsel