UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------x

TEMIMA SPETNER, JASON KIRSCHENBAUM,        :
ISABELLE KIRSCHENBAUM, ISABELLE            :
KIRSCHENBAUM FOR THE ESTATE OF MARTIN      :
KIRSCHENBAUM, JOSHUA KIRSCHENBAUM,         :       **AMENDED COMPLAINT**
SHOSHANA BURGETT, DAVID KIRSCHENBAUM,      :       **JURY TRIAL DEMANDED**
DANIELLE TEITELBAUM, NETANEL MILLER, CHAYA :
MILLER, AHARON MILLER, SHANI MILLER, ADIYA :
MILLER, ALTEA STEINHERZ, JONATHAN STEINHERZ, :     **19-cv-5 (ENV)(RLM)**
TEMIMA STEINHERZ, JOSEPH GINZBERG, PETER   :
STEINHERZ, LAUREL STEINHERZ, JACQUELINE    :
CHAMBERS AND LEVANA COHEN AS THE           :
ADMINISTRATORS OF THE ESTATE OF ESTHER     :
BABLAR, JACQUELINE CHAMBERS, LEVANA COHEN, :
ELI COHEN, SARAH ELYAKIM, JOSEPH COHEN,    :
GRETA GELLER, ILANA DORFMAN, REPHAEL KITSIS :
AND TOVA GUTTMAN AS THE ADMINISTRATORS OF  :
THE ESTATE OF HANNAH ROGEN, GILA ALUF,     :
SHABTAI SHATSKY, JOANNE SHATSKY, SHABTAI   :
SHATSKY AND JOANNE SHATSKY FOR THE ESTATE  :
OF KEREN SHATSKY, TZIPPORA SHATSKY SCHWARZ, :
YOSEF SHATSKY, SARA SHATSKY TZIMMERMAN,    :
MIRIAM SHATSKY, DAVID SHATSKY, HILLEL      :
TRATTNER, RONIT TRATTNER, ARON TRATTNER,   :
SHELLEY TRATTNER, HADASSAH DINER, EFRAT    :
FINE, YAEL HILLMAN, CHANA FRIEDMAN EDRI,   :
BELLA FRIEDMAN, REUVEN FRIEDMAN, YEHIEL    :
FRIEDMAN, ZVI FRIEDMAN, ILAN FRIEDMAN,     :
MIRIAM FRIEDMAN SCHREIBER, STEVEN BRAUN,   :
CHAVIVA BRAUN, YEHUDA BRAUN, YONI BRAUN,   :
ELIANA BRAUN PERETZ, ORIELLA BRAUN,        :
MATANYA BRAUN, GINETTE THALER, GINETTE     :
THALER FOR THE ESTATE OF RACHEL THALER,    :
LEOR THALER, MICHAEL THALER, ZVI THALER,   :
ISAAC THALER, MIRIAM BEN-YISHAI, YITZHAK BEN- :
YISHAI, MIRIAM BEN-YISHAI AND YITZHAK BEN-  :
YISHAI FOR THE ESTATE OF SHOSHANA BEN-YISHAI, :
JACOB BEN-YISHAI, ISRAEL BEN-YISHAI, AVIEL BEN- :
YISHAI, CHANA BEN-YISHAI, YAEL BEN-YISHAI,  :
MYRIAM MILLER, CHANA AIDEL MILLER          :
SCHERTZMAN, TOVA MILLER, ILANA SCHERTZMAN  :
COHEN, LESLIE SCHERTZMAN, DONALD           :
SCHERTZMAN, DANIEL SCHERTZMAN, ARIELLE     :
SCHERTZMAN FISHER, ABRAHAMSCHERTZMAN,      :
YEHUDA SCHERTZMAN, CHARLES O. MORGAN, JR.  :
FOR THE ESTATE OF GLORIA KUSHNER, LEONARD  :
MANDELKORN, EZRA KESSLER, HANNAH KESSLER   :
ROSENSTEIN, KLILA KESSLER, YITZHAK ZAHAVY, :
JULIE ZAHAVY, TZVEE ZAHAVY, BERNICE ZAHAVY, :

MARK SOKOLOW, RENA SOKOLOW, JAMIE            :
SOKOLOW FENSTER, LAUREN SOKOLOW              :
MANDELSTAM, ELANA SOKOLOW ROSMAN, ALAN       :
BAUER, YEHONATON BAUER, REVITAL BAUER,       :
BINYAMIN BAUER, DANIEL BAUER, YEHUDA BAUER,  :
LUDWIG BAUER, LUDWIG BAUER FOR THE ESTATE    :
OF ELLA BAUER, PHILLIP BAUER, SHOSHANA       :
ZELCER WEITZMAN, SHMUEL WALDMAN, HENNA       :
NOVACK, MORRIS WALDMAN, EVA WALDMAN,         :
CHANIE BODENSTEIN, SHAINDY WEINBERGER,       :
PHILIP WALDMAN, ABRAHAM WALDMAN, DASSIE      :
WALDMAN DAVIS, LESLYE KNOX, LESLYE KNOX      :
FOR THE ESTATE OF AHARON ELLIS, JORDAN ELLIS, :
MELLO NEE ELLIS, MELLO NEE ELLIS FOR THE     :
ESTATE OF PRINCE ELKANNANN BEN SHALEAK,      :
AMETAI CARTER, REUVEN CARTER, SHAANON        :
CARTER, SHAYRAH CARTER, YOSHAHVYAH           :
CARTER, FRANCINE ELLIS, LYNNE ELLIS,         :
SHEMARIYAH ELLIS, TSAPHRERAH ELLIS, and      :
YIHONADOV ELLIS,                             :
                                             :
              Plaintiffs,                    :
                                             :
     -against-                               :
                                             :
PALESTINE INVESTMENT BANK,                   :
                                             :
              Defendant.                     :
                                             :
-----------------------------------------------------------------------------x

Plaintiffs Temima Spetner, Jason Kirschenbaum, Isabelle Kirschenbaum, Isabelle Kirschenbaum for the Estate of Martin Kirschenbaum, Joshua Kirschenbaum, Shoshana Burgett, David Kirschenbaum, Danielle Teitelbaum, Netanel Miller, Chaya Miller, Aharon Miller, Shani Miller, Adiya Miller, Altea Steinherz, Jonathan Steinherz, Temima Steinherz, Joseph Ginzberg, Peter Steinherz, Laurel Steinherz, Jacqueline Chambers and Levana Cohen as the Administrators of the Estate of Esther Bablar, Jacqueline Chambers, Levana Cohen, Eli Cohen, Sarah Elyakim, Joseph Cohen, Greta Geller, Ilana Dorfman, Rephael Kitsis and Tova Guttman as the Administrators for the Estate of Hannah Rogen, Gila Aluf, Shabtai Shatsky, Joanne Shatsky, Shabtai Shatsky and Joanne Shatsky for the Estate of Keren Shatsky, Tzippora Shatsky Schwarz, Yosef Shatsky, Sara Shatsky Tzimmerman, Miriam Shatsky, David Shatsky, Hillel Trattner, Ronit Trattner, Aron Trattner, Shelley Trattner, Hadassah Diner, Efrat Fine, Yael Hillman, Chana Friedman Edri, Bella Friedman, Reuven Friedman, Yehiel Friedman, Zvi Friedman, Ilan Friedman, Miriam Friedman Schreiber, Steven Braun, Chaviva Braun, Yehuda Braun, Yoni Braun, Eliana Braun Peretz, Oriella Braun, Matanya Braun, Ginette Thaler, Ginette Thaler for the Estate of Rachel Thaler, Leor Thaler, Michael Thaler, Zvi Thaler, Isaac Thaler, Miriam Ben-Yishai, Yitzhak Ben-Yishai, Miriam Ben-Yishai and Yitzhak Ben-Yishai for the Estate of Shoshana Ben-Yishai, Jacob Ben-Yishai, Israel Ben-Yishai, Aviel Ben-Yishai, Chana Ben-Yishai, Yael Ben-

2

Yishai, Myriam Miller, Chana Aidel Miller Schertzman, Tova Miller, Ilana Schertzman Cohen, Leslie Schertzman, Donald Schertzman, Daniel Schertzman, Arielle Schertzman Fisher, Abraham Schertzman, Yehuda Schertzman, Charles O. Morgan, Jr. for the Estate of Gloria Kushner, Leonard Mandelkorn, Ezra Kessler, Hannah Kessler Rosenstein, Klila Kessler, Yitzhak Zahavy, Julie Zahavy, Tzvee Zahavy, Bernice Zahavy, Mark Sokolow, Rena Sokolow, Jamie Sokolow Fenster, Lauren Sokolow Mandelstam, Elana Sokolow Rosman, Alan Bauer, Yehonaton Bauer, Revital Bauer, Binyamin Bauer, Daniel Bauer, Yehuda Bauer, Ludwig Bauer, Ludwig Bauer for the Estate of Ella Bauer, Phillip Bauer, Shoshana Zelcer Weitzman, Shmuel Waldman, Henna Novack, Morris Waldman, Eva Waldman, Chanie Bodenstein, Shaindy Weinberger, Philip Waldman, Abraham Waldman, Dassie Waldman Davis, Leslye Knox, Leslye Knox for the Estate of Aharon Ellis, Jordan Ellis, Mello Nee Ellis, Mello Nee Ellis for the Estate of Prince Elkannann Ben Shaleak, Ametai Carter, Reuven Carter, Shaanon Carter, Shayrah Carter, Yoshahvyah Carter, Francine Ellis, Lynne Ellis, Shemariyah Ellis, Tsaphrerah Ellis, Yihonadov Ellis, by their attorneys, allege the following:

## NATURE OF THE ACTION

1.      This is a complaint for damages arising out of the unlawful conduct of PALESTINE INVESTMENT BANK – a Palestinian bank headquartered in Ramallah-al-Bireh, in the Palestinian Territories.

2.      As set forth below, Saddam Hussein's regime in Iraq conspired with its Palestinian proxy, the Arab Liberation Front ("ALF"); the ALF's Palestinian leader, Rakad Salem; Defendant PALESTINE INVESTMENT BANK; and other co-conspirators, to incentivize and reward suicide attacks on civilians (including U.S. nationals) in Israel between September 2001 and March 2003 (the "relevant period").

3.      In furtherance of the conspiracy, Defendant PALESTINE INVESTMENT BANK knowingly provided substantial and essential benefits, money and financial services on behalf of the Government of Iraq[1] to the families and beneficiaries of terrorists who killed, maimed and injured civilians during the relevant period, or attempted to do so.

4.       Defendant PALESTINE INVESTMENT BANK thereby also provided material

---

[1]      From 1990 until 2003, Iraq was designated a State Sponsor of Terrorism by the United States Department of State, pursuant to section 6(j) of the Export Administration Act of 1979.

3

support to Foreign Terrorist Organizations ("FTOs") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) in order to facilitate acts of international terrorism as defined by 18 U.S.C. § 2331 of the Anti-Terrorism Act ("ATA"); and specifically aided and abetted the FTO Islamic Resistance Movement ("HAMAS") by providing financial services to the Holy Land Foundation ("HLF"), knowing that HLF was, at the time, HAMAS's premier U.S.-based fundraising organization.

5.      Defendant PALESTINE INVESTMENT BANK served as the conduit for Saddam Hussein's regime in Iraq to channel millions of U.S. dollars to Saddam's Iraqi Ba'ath surrogate in Ramallah, the ALF.

6.      The Government of Iraq transferred more than $9.5 million U.S. dollars to one or more accounts at Defendant PALESTINE INVESTMENT BANK between early October 2000 and the beginning of 2002 alone.

7.      With Defendant PALESTINE INVESTMENT BANK's agreement and significant assistance, Saddam Hussein and the ALF established a program to reward the families of Palestinian suicide bombers and suicide gunmen.

8.      These rewards incentivized and encouraged potential terrorists to commit attacks and made the attacks substantially more likely to occur.

9.      Defendant PALESTINE INVESTMENT BANK also maintained a U.S. dollar-denominated account for HLF in Ramallah and both received funds from HLF's offices in the United States and transferred funds on behalf of HLF's Palestinian offices.

10.     HLF was a HAMAS fundraising institution established in Richardson, Texas, to funnel donations from the United States to HAMAS, particularly in the Palestinian Territories.

11.     The U.S. Treasury Department designated HLF a Specially Designated Global

4

Terrorist ("SDGT") in December 2001 for supporting HAMAS's acts of terrorism.

12.     HLF and several of its directors were indicted in 2004 for providing material support to HAMAS and convicted by a federal jury in 2008. The Fifth Circuit upheld the convictions in 2011.

13.     By these aforementioned acts, Defendant PALESTINE INVESTMENT BANK committed acts of international terrorism, violating the prohibitions on providing material support to terrorists and FTOs set forth in the ATA as amended by the AEDPA (*see, e.g.*, 18 U.S.C. §§ 2339A, 2339B), resulting in the killing, attempted killing and maiming of scores of American citizens in Israel and the Palestinian Territories during the relevant period during the Second Intifada,[2] including Plaintiffs, and is civilly liable under § 2333(a) of the ATA to those American citizens (and their estates, survivors and heirs) who have been killed or injured in their person by reason of such acts of international terrorism and foreseeable terrorist attacks.

14.     Defendant PALESTINE INVESTMENT BANK also aided and abetted HAMAS, Palestinian Islamic Jihad ("PIJ"), the Popular Front for the Liberation of Palestine ("PFLP") and the Al Aqsa Martyrs Brigade ("AAMB") – all designated FTOs – by knowingly providing substantial assistance to each of these entities in the form of substantial financial incentives to reward their most murderous operatives.

15.     Defendant PALESTINE INVESTMENT BANK was fully aware of these Foreign Terrorist Organizations' respective terrorist conduct and Defendant PALESTINE INVESTMENT BANK's own significant and integral role in facilitating the terrorist attacks the FTOs committed by making large U.S. dollar-denominated rewards available to the families of these operatives.

16.     Accordingly, Defendant PALESTINE INVESTMENT BANK is civilly liable

---

[2]     The Second Intifada refers to the violent conflict that broke out in September 2000 between the Palestinians and Israel. It is generally considered to have ended in December 2004.

under 18 U.S.C. § 2333(d) of the ATA to those American citizens (and their estates, survivors and heirs) who have been killed or injured in their person by reason of such acts of international terrorism perpetrated by those FTOs at the time each of them was designated.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2338 as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (d) and 18 U.S.C. § 2334(a).

19.     Defendant PALESTINE INVESTMENT BANK is subject to personal jurisdiction in the State of New York pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because it has transacted business itself and through its agents during the relevant period and committed tortious acts within the United States during the relevant period by facilitating transfers of funds through the United States for the benefit of HAMAS and the families and beneficiaries of suicide bombers and suicide gunmen dispatched by the FTOs HAMAS, PIJ, PFLP and AAMB and has purposefully availed itself of New York's financial and legal system, as well as that of the United States as a whole, in the course of committing the wrongful acts alleged herein.

20.     During the relevant period, Defendant PALESTINE INVESTMENT BANK  chose to maintain U.S. dollar-denominated accounts in the Palestinian Territories and purposefully and knowingly directed its agents to use correspondent bank accounts in New York, particularly at Chase Manhattan Bank (via Arab Jordan Investment Bank ("AJIB")) and Bank of New York (via

6

the Palestinian Monetary Authority ("PMA"),[3] Arab Bank Plc, and Palestine International Bank), to facilitate a large volume of U.S. dollar-denominated funds transfers on behalf of HLF; the Government of Iraq; the ALF and its Palestinian leader, Rakad Salem;[4] and the four FTO terrorist groups at issue.

21.    For example, Defendant PALESTINE INVESTMENT BANK provided the ALF and Rakad Salem with U.S. dollar-denominated accounts and permitted them to issue checks against these accounts – ranging in value from $10,000 to $25,000 U.S. dollars – for the benefit of families of suicide terrorists, knowing that those U.S. dollar-denominated checks would, in most cases, be processed via the PMA's clearinghouse in the Palestinian Territories and its correspondent interbank account in New York[5] and ultimately settled through a combination of counterparty correspondent interbank accounts at other U.S. banks, the Clearing House Interbank Payments System ("CHIPS") and the Federal Reserve Bank of New York.

## THE PARTIES

### A.    The Plaintiffs

### 1.    THE BEN YEHUDA STREET BOMBINGS – DECEMBER 1, 2001

22.    In the late evening of December 1, 2001, Nabil Halabiya and Osama Bahar, two

---

[3]    In 1994, as a result of the initial Oslo Accords (discussed further below), the Palestinian Authority created, among other entities, the PMA by promulgating Presidential Decree Number 184. The PMA acts as the central bank of the Palestinian Territories, except that, *first*, the Palestinian Territories are not an independent state; *second*, the PMA does not issue its own banknotes or act as a lender of last resort for any of the currencies used by Palestinian banks; *third*, the people living in the Palestinian Territories have not established their own unit of account or monetary denomination; *fourth*, the PMA does not have a monetary policy in the sense of controlling interest rates or exchange rates; and, *fifth*, the Palestinian Authority is not a member of the International Monetary Fund ("IMF").

[4]    Salem's full name is Rakad Mahmud Salamah Salem (a/k/a Abu Mahmud).

[5]    Prior to early 2003, the PMA maintained a correspondent interbank account in New York with Arab Bank, Plc. The PMA used the account for, among other things, settlement of credit and debt balances resulting from its check clearing operations between Palestinian banks. However, on March 26, 2003, the PMA issued Circular 49/2003 to "all banks in Palestine" – including Defendant PALESTINE INVESTMENT BANK – informing the banks that the PMA had switched its New York correspondent interbank account from Arab Bank, Plc to Bank of New York.

HAMAS suicide bombers, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing. A large quantity of nails was packed with each of the bombs. Eleven people were killed, and 188 people were injured.

23.    After the two suicide bombings, HAMAS terrorists detonated a car bomb near the site of the first two attacks.

**The Spetner Family**

24.    Plaintiff Temima Spetner is a citizen of the United States and a resident of the State of Missouri.

25.    On December 1, 2001, Temima was walking down the pedestrian mall in Jerusalem when one of the suicide bombers detonated his explosives approximately 10 yards from where she was standing. Temima was hit by shrapnel on her arms and fingers. While bleeding heavily, and with clothing soaked in blood, Temima began running up the walkway and fell. Someone came to her aid and attempted to stop the bleeding until ambulances arrived at the scene.

26.    As a result of the attack, the femoral artery of Temima's right leg was severed. She was transported to the hospital where doctors operated on her to stop the bleeding. The following day it was determined that Temima's intestines had been punctured by shrapnel, and she underwent another operation to repair her intestines and remove most of the shrapnel. Temima remained in the hospital for ten days.

27.    There is significant scarring on Temima's thigh and the lower part of her abdomen. She continues to experience numbness in her right leg and is highly sensitive to pain in that leg.

28.    Temima has also experienced psychological trauma as a result of the attack.

29.    As a result of the attack, Plaintiff Temima Spetner has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

**The Kirschenbaum Family**

30.    Plaintiff Jason Kirschenbaum is a citizen of the United States and a resident of the State of New York.

31.    Jason Kirschenbaum was on Ben Yehuda Street in Jerusalem on December 1, 2001 when the double suicide bombing took place.

32.    As a result of the first explosion, Jason was thrown to the ground. As he stood up, the second suicide bomber detonated his explosives and Jason was thrown in another direction.

33.    When he got up the second time he felt numb. Jason saw his left arm dangling back and forth and held it because he thought it might fall off. When he began running up the street for help, he felt a sharp pain in his leg and back.

34.    Jason was taken to Shaare Zedek Hospital in Jerusalem where he underwent two operations. Surgeons removed 8 metal bolts from his arm, leg and back.

35.    Jason had to undergo several months of physical therapy for the injuries to his arm, leg and back. He still has scarring where he was branded by the bolts that penetrated his skin.

36.    As a result of the attack, Plaintiff Jason Kirschenbaum has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

37.    Plaintiff Isabelle Kirschenbaum is a citizen of the United States and a resident of the State of New York. She is the mother of Plaintiff Jason Kirschenbaum.

38.    Martin Kirschenbaum was a citizen of the United States and a resident of the State of New York when he died in 2008. He was the father of Plaintiff Jason Kirschenbaum.

39.    Plaintiff Isabelle Kirschenbaum brings this action both individually and as the representative of the Estate of Martin Kirschenbaum.

40.    Isabelle first learned of the double suicide bombing while watching CNN. After

numerous telephone conversations, she ultimately received a telephone call confirming that Jason had been injured in the attack.

41. As a result of the attack, Plaintiff Isabelle Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

42. Martin Kirschenbaum learned of the attack when he and Isabelle Kirschenbaum received the telephone call confirming that Jason had been injured in the attack.

43. As a result of the attack, (before his death) Martin Kirschenbaum experienced severe mental anguish and extreme emotional distress.

44. Plaintiff Joshua Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of Plaintiff Jason Kirschenbaum.

45. Joshua Kirschenbaum was in Tel Aviv at the time of the attack. Martin and Isabelle telephoned Joshua to advise him that his brother Jason had been injured in the attack in Jerusalem. Hours later, he finally located his brother in the emergency room at Shaare Zedek Hospital in Jerusalem.

46. As a result of the attack, Plaintiff Joshua Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

47. Plaintiff Shoshana Burgett is a citizen of the United States and a resident of the State of New York. She is a sister of Plaintiff Jason Kirschenbaum.

48. As a result of the attack, Plaintiff Shoshana Burgett has experienced severe mental anguish and extreme emotional distress.

49. Plaintiff David Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of Plaintiff Jason Kirschenbaum.

50. As a result of the attack, Plaintiff David Kirschenbaum has experienced severe

10

mental anguish and extreme emotional distress.

51.     Plaintiff Danielle Teitelbaum is a citizen of the United States and a resident of the State of New Jersey. She is a sister of Plaintiff Jason Kirschenbaum.

52.     As a result of the attack, Plaintiff Danielle Teitelbaum has experienced severe mental anguish and extreme emotional distress.

**The Miller Family**

53.     Plaintiff Netanel Miller is a citizen of the United States and a resident of the State of Israel.

54.     On the evening of December 1, 2001, Netanel was with friends enjoying ice cream at the pedestrian mall in Jerusalem when one of the HAMAS suicide bombers detonated his explosives a few feet from him. Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

55.     A nut from the bomb lodged in the upper part of Netanel's leg. Other nuts hit him in the back, resulting in burns. His hand and knee were also injured.

56.     Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg. After walking approximately 30 feet, Netanel collapsed on the sidewalk. Only then did Netanel become aware of how much he was bleeding from the wounds he had sustained in his leg. His attempts to use pressure to stop the bleeding were unsuccessful.

57.     Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, Arie and Chaya Miller. Netanel spoke to his father, who had been an Army medic. Arie asked Netanel specific questions about his condition and insisted Netanel seek medical help.

11

58.     Ultimately, Netanel was taken to Shaare Zedek Hospital by ambulance. Since Netanel had lost a great deal of blood, he was given a blood transfusion.

59.     Arie came to the hospital. Chaya arrived an hour or so later after she found someone to stay with her other children at her home.

60.     Netanel was admitted to the hospital and remained there for two days.

61.     Netanel endured the pain in his leg for nearly two years.

62.     The pain in Netanel's leg became so severe that he had to undergo surgery, and the nut that was still lodged in his leg was finally removed.

63.     It is still painful for Netanel to hike, an activity that he has always enjoyed.

64.     Netanel had flashbacks as a result of the attack and underwent psychological counseling.

65.     As a result of the attack, Plaintiff Netanel Miller has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

66.     Plaintiff Chaya Miller is a citizen of the United States and a resident of the State of Israel. She is the mother of Plaintiff Netanel Miller.

67.     Upon learning that her son Netanel had been injured in the bombing and knowing he had suffered as a result of those injuries, plaintiff Chaya Miller experienced great concern and anxiety.

68.     As a result of the attack, Plaintiff Chaya Miller has experienced severe mental anguish and extreme emotional distress.

69.     Plaintiff Aharon Miller is a citizen of the United States and a resident of the State of Israel. He is the brother of Plaintiff Netanel Miller.

70.     Plaintiff Shani Miller is a citizen of the United States and a resident of the State of Israel. She is a sister of Plaintiff Netanel Miller.

71.     Plaintiff Adiya Miller is a citizen of the United States and a resident of the State of Israel. She is a sister of Plaintiff Netanel Miller.

72.     As a result of the attack, Plaintiffs Aharon Miller, Shani Miller, and Adiya Miller have experienced severe mental anguish and extreme emotional distress.

**The Steinherz Family**

73.     Plaintiff Altea Steinherz is a citizen of the United States and a resident of the State of Israel.

74.     Plaintiff Jonathan Steinherz is a citizen of the United States and a resident of the State of Israel. He was the husband of Plaintiff Altea Steinherz at the time of the attack.

75.     On December 1, 2001, Altea Steinherz was nine months pregnant. Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby.

76.     Altea wanted to get home to her daughter who was with a babysitter at the time, but she knew that bombings in Israel were frequently followed by a second bomb intended to kill or injure people fleeing from the first bomb.

77.     A short time later Altea and Jonathan heard another bomb explode. Believing the bombing was now over, they began to walk home.

78.     While walking in the street, they saw a crazed-looking man run past them. Altea thought that he might have been the bomber and insisted that the couple turn around, away from the direction from which the man had come.

79.     As they began to run, Altea fell twice, and she broke her left arm as a result of one of the falls.

13

80.     She experienced severe pain in her arm after the attack and continued to experience pain for many years afterward.

81.     Altea was afraid that, as a result of her falls, her pregnancy might have terminated.

82.     Until her son, Yitzhak, was born 11 days later, Altea and Jonathan feared for the condition of their unborn child.

83.     Altea became less self-confident and more fearful generally. She had sleeping difficulties and underwent psychological counseling.

84.     Jonathan felt tremendous anxiety and stress, had significant difficulty sleeping, and underwent psychological counseling.

85.     As a result of the attack, Plaintiff Altea Steinherz sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

86.     As a result of the attack, Plaintiff Jonathan Steinherz experienced severe mental anguish and extreme emotional distress.

87.     Plaintiff Temima Steinherz is a citizen of the United States and a resident of the State of Israel. She is the daughter of Plaintiffs Altea Steinherz and Jonathan Steinherz.

88.     As a result of the attack, Plaintiff Temima Steinherz has experienced severe mental anguish and extreme emotional distress.

89.     Plaintiff Joseph Ginzberg is a citizen of the United States and a resident of the State of New York. He is the father of Plaintiff Altea Steinherz.

90.     As a result of the attack, Plaintiff Joseph Ginzberg has experienced severe mental anguish and extreme emotional distress.

91.     Plaintiff Peter Steinherz is a citizen of the United States and a resident of the State of New York. He is the father of Plaintiff Jonathan Steinherz.

92.     Plaintiff Laurel Steinherz is a citizen of the United States and a resident of the State of New York. She is the mother of Plaintiff Jonathan Steinherz.

93.     As a result of the attack, Plaintiffs Peter Steinherz and Laurel Steinherz have experienced severe mental anguish and extreme emotional distress.

## 2.     THE SHEFFIELD CLUB BOMBING – MAY 7, 2002

94.     On the night of May 7, 2002, Muhammad Muammar, a HAMAS suicide bomber, entered the third floor of a building in Rishon Letzion's new industrial area that housed the Sheffield Club (social club) and detonated a bomb.

95.     Fifteen people were killed in the attack, and more than 50 others were injured.

**The Bablar Family**

96.     Esther Bablar was a citizen of the United States when she died.

97.     Although Esther initially survived the attack, she died of her injuries the following morning.

98.     Plaintiff Jacqueline Chambers is a citizen of the United States and a resident of the State of Florida. She is a daughter of Esther Bablar.

99.     Plaintiff Levana Cohen is a citizen of the United States and a resident of the State of Florida. She is a daughter of Esther Bablar.

100.     Plaintiffs Jacqueline Chambers and Levana Cohen bring actions both individually and on behalf of the Estate of Esther Bablar.

101.     Esther had spent the month before the bombing in Florida with her youngest daughter, Levana, who had just given birth to Esther's grandchild. The day before the attack she had been in New York visiting her other daughter, Jacqueline.

102.     On the day of the attack, a member of the Bablar family in Israel contacted Esther's

15

sister, Sarah Elyakim, in New York and told her the tragic news. Eventually Esther's daughters were notified and they quickly made arrangements to fly to Israel with their aunt and uncle.

103. As a result of Esther's death, Plaintiff Jacqueline Chambers has experienced emotional pain and suffering, loss of her mother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

104. As a result of Esther's death, Plaintiff Levana Cohen has experienced emotional pain and suffering, loss of her mother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

105. Plaintiff Eli Cohen is a citizen of the United States and a resident of the State of New York. He is the son of Esther Bablar. He is being represented by his legal guardian, Plaintiff Jacqueline Chambers.

106. As a result of Esther's death, Plaintiff Eli Cohen has experienced emotional pain and suffering, loss of his mother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

107. Plaintiff Sarah Elyakim is a citizen of the United States and a resident of the State of New York. She is the sister of Esther Bablar.

108. As a result of Esther's death, Plaintiff Sarah Elyakim has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

109. Plaintiff Joseph Cohen is a citizen of the United States and a resident of the State of New York. He is the brother of Esther Bablar.

110. As a result of Esther's death, Plaintiff Joseph Cohen has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel, and

severe mental anguish and extreme emotional distress.

### 3.    THE PASSOVER MASSACRE AT THE PARK HOTEL IN NETENAYA – MARCH 27, 2002

111.    On March 27, 2002, Abd al-Baset Odeh, a HAMAS suicide bomber, blew himself up near the dining area within the Park Hotel in Netanya. It was the night of the Jewish holiday of Passover, and the hotel dining room was filled with hundreds of people celebrating the Passover Seder with their families and friends.

112.    Thirty people were killed and 140 others were injured.

### The Rogen Family

113.    Hannah Rogen was a citizen of the United States when she died.

114.    Hannah was severely wounded in the attack and died of her wounds six days later, on April 2, 2002.

115.    Hannah Rogen was a Holocaust survivor who immigrated to the United States after World War II. She was attending the Passover Seder at the invitation of a childhood friend, Yulia Talmi, who was also killed in the attack.

116.    Greta Geller is the great niece of Hannah Rogen. She, along with Ilana Dorfman, Rephael Kitsis, and Tova Guttman, bring this action as the court-appointed administrators of the Estate of Hannah Rogen.

### 4.    THE PATT JUNCTION BUS # 32A BOMBING – JUNE 18, 2002

117.    At approximately 7:50 a.m. on June 18, 2002, Muhamad al-Ghoul, a HAMAS terrorist, boarded Bus #32A in the Gilo neighborhood of Jerusalem. Almost immediately, he detonated the large bomb which he carried in a bag stuffed with ball bearings. The blast destroyed the front half of the bus, packed with people on their way to work and a group of schoolchildren. Nineteen people were killed and 74 others were injured.

17

**The Aluf Family**

118.   Boaz Aluf was a citizen of the State of Israel when he died.

119.   Plaintiff Gila Aluf is a citizen of the United States and a resident of the State of Israel. She is the widow of Boaz Aluf.

120.   On the morning of June 18, 2002, Boaz was going to work in the computer department of Jerusalem's Bank Tefahot, and was on Bus #32A when al-Ghoul detonated the bomb.

121.   As a result of Boaz's death, Plaintiff Gila Aluf has experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**5.   THE KARNEI SHOMRON PIZZERIA BOMBING – FEBRUARY 16, 2002**

122.   On February 16, 2002, a Saturday night, Sadiq A'id Mahmud Abd al-Hafez, a suicide bomber dispatched by the PFLP, blew himself up next to a crowded pizzeria in the Yovelim shopping mall in Karnei Shomron. Three teenagers were killed and 28 people were injured, six seriously. Two of the teenagers murdered and several of those injured were U.S. citizens.

**The Shatsky Family**

123.   Keren Shatsky was a citizen of the United States when she died.

124.   On February 16, 2002, 14-year-old Keren Shatsky was sitting in a pizzeria with Plaintiff Chana Friedman and other friends when al-Hafez detonated his bomb. Keren was hit by shrapnel in the back of her neck and was killed as a result of the attack.

125.   Plaintiff Shabtai Shatsky is a citizen of the United States and a resident of the State of Israel. He is the father of Keren Shatsky.

126.   Plaintiff Joanne Shatsky is a citizen of the United States and a resident of the State

of Israel. She is the mother of Keren Shatsky.

127.    Plaintiffs Shabtai Shatsky and Joanne Shatsky bring this action both individually and on behalf of the Estate of Keren Shatsky.

128.    Immediately after the attack, Shabtai learned there had been a bombing at the nearby shopping mall. As a member of the emergency response team he went to the site unaware that Keren had been a victim of the bombing that took place at the pizzeria.

129.    While at the site he learned that Keren's friends had been at the mall, but he returned home. There, he and Joanne made numerous calls to determine Keren's whereabouts. Eventually, they learned that Keren had been killed in the attack.

130.    Shabtai and Joanne went to the morgue and identified Keren's body.

131.    As a result of Keren's death, Plaintiffs Shabtai Shatsky and Joanne Shatsky have experienced emotional pain and suffering, loss of their daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

132.    Plaintiff Tzippora Shatsky Schwarz is a citizen of the United States and a resident of the State of Israel. She is a sister of Keren Shatsky.

133.    Plaintiff Yosef Shatsky is a citizen of the United States and a resident of the State of Israel. He is a brother of Keren Shatsky.

134.    Plaintiff Sara Shatsky Tzimmerman is a citizen of the United States and a resident of the State of Israel. She is a sister of Keren Shatsky.

135.    Plaintiff Miriam Shatsky is a citizen of the United States and a resident of the State of Israel. She is a sister of Keren Shatsky.

136.    Plaintiff David Shatsky is a citizen of the United States and a resident of the State of Israel. He is a brother of Keren Shatsky.

19

137. As a result of Keren's death, Plaintiffs Tzippora Shatsky Schwarz, Yosef Shatsky, Sara Shatsky Tzimmerman, Miriam Shatsky and David Shatsky have experienced emotional pain and suffering, loss of their sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Trattner Family**

138. Plaintiff Hillel Trattner is a citizen of the United States and a resident of the State of Israel.

139. Plaintiff Ronit Trattner is a citizen and resident of the State of Israel. She is the wife of Plaintiff Hillel Trattner.

140. Hillel and Ronit had finished eating at the pizzeria in the Yovelim shopping mall when al-Hafez detonated his explosives.

141. As a result of the explosion, Hillel was struck in the head by shrapnel and sustained nerve damage to his left eye, and a traumatic brain injury ("TBI"). His left eardrum was ruptured, necessitating an operation on that ear. The surgery was only partially successful, and he continues to suffer from hearing loss in his left ear. Hillel further suffered from impaired speech for a period of time.

142. To this day, shrapnel remains lodged in Hillel's brain, and it remains unclear whether the shrapnel will cause further injury to him in the future.

143. The heat of the blast burned Hillel's face and hands. He sustained nerve damage to his fingers and the sole of his foot. Shrapnel remains lodged in his right hand and was removed from his ankle.

144. After the attack, Hillel was taken to the hospital where he remained for ten days before being transferred to a rehabilitation center. But after a bad reaction to the prescribed

medication, he returned to the hospital for an additional two weeks before returning to the rehabilitation center for nearly three months. Hillel's reaction to the medication also caused serious liver damage, requiring him to spend a week in the intensive care unit. He also underwent physical therapy throughout this time.

145.    Hillel no longer has vision in his left eye. He continues to have his eye examined every three months to determine if the damage has spread to his right eye.

146.    The effects of the attack have been very traumatic for Hillel, and he underwent psychological counseling.

147.    As a result of the attack, Plaintiff Hillel Trattner has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

148.    Ronit was seated next to Hillel when al-Hafez detonated his bomb. She sustained burns to her face, legs, and hands. She was also hit with shrapnel, which remains lodged in her legs. She has required additional treatment for the burns and scarring on her feet.

149.    As a result of the attack, Plaintiff Ronit Trattner has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

150.    Plaintiff Aron Trattner is a citizen of the United States and a resident of the State of Israel. He is the father of Plaintiff Hillel Trattner.

151.    Plaintiff Shelley Trattner is a citizen of the United States and a resident of the State of Israel. She is the mother of Plaintiff Hillel Trattner.

152.    On the evening of the attack, Aron and Shelley heard an explosion. Their television showed that there had been a bombing nearby. They attempted to call Hillel on his cell phone, but there was no response.

153.    They went to the location of the bombing and found Hillel's car, but there was no

sign of their son. They eventually learned that Hillel had been transported to the hospital. Once Aron and Shelley located Hillel in the hospital, they could barely recognize him. His face and eye area were horribly swollen. He was unconscious, and they could only recognize him by his wristwatch.

154. As a result of the attack, Plaintiffs Aron Trattner and Shelley Trattner have experienced severe mental anguish and extreme emotional distress.

155. Plaintiff Hadassah Diner is a citizen of the United States and a resident of the State of Israel. She is a sister of Plaintiff Hillel Trattner.

156. Plaintiff Efrat Fine is a citizen of the United States and a resident of the State of Israel. She is a sister of Plaintiff Hillel Trattner.

157. Plaintiff Yael Hillman is a citizen of the United States and a resident of the State of Israel. She is a sister of Plaintiff Hillel Trattner.

158. As a result of the attack, Plaintiffs Hadassah Diner, Efrat Fine, and Yael Hillman have experienced severe mental anguish and extreme emotional distress.

**The Friedman Family**

159. Chana Friedman Edri is a citizen of the United States and a resident of the State of Israel.

160. She and some of her friends went out for pizza in the Yovelim shopping mall on Saturday night. While seated at the table, Chana saw a man (al-Hafez) coming toward the table; he detonated his explosives, and there was a loud explosion.

161. Chana remembers running down the road. A bus driver saw her, and she told him that the mall had been bombed. The bus driver took Chana to a local Magen David Adom (Red Cross) station that drove her to an intensive care unit.

162.    Chana sustained second degree burns and shrapnel wounds in her face, legs, chest and right eye. Her eardrum had also ruptured as a result of the blasts. She had an operation to remove shrapnel from her body that had resulted in a deep hole in her leg. She also had a hole in her arm and hand. It was impossible to safely remove all of the shrapnel from her body.

163.    Chana required outpatient treatments for six months and lost more than a year of school as a result of her injuries.

164.    In addition, three of Chana's friends, including her best friend, Keren Shatsky, were killed in the attack.

165.    She was scared to leave her house, and became very anxious, fearful, withdrawn, and prone to anger.

166.    Chana felt extremely self-conscious walking in public because of the burns that she had sustained on her face.

167.    Chana underwent psychological counseling and continues to experience severe psychological trauma.

168.    As a result of the attack, Plaintiff Chana Friedman Edri has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

169.    Plaintiff Bella Friedman is a citizen of the United States and a resident of the State of Israel. She is the mother of Plaintiff Chana Friedman Edri.

170.    On the night of the attack, Bella received a telephone call from her son Ilan, who had heard there had been a bombing in the neighborhood. Not knowing where Chana was, Bella drove to the mall and ran to the location of the explosion. No one at the scene seemed to know where Chana was. Finally, Bella asked someone to go into the remains of the pizzeria and determine if Chana was inside.

171.    Shortly thereafter, Keren Shatsky's sister informed Bella that Keren had been located and had been sent to a hospital in Kfar Saba. At the time both Keren's sister and Bella thought Keren was injured, not deceased. Since the neighborhood nurse had told the Friedmans that one girl had died at the scene, and knowing that the girls were together, Bella was certain that Chana had been killed.

172.    Bella eventually received a telephone call from Chana letting her know that she had survived.

173.    As a result of the attack, Plaintiff Bella Friedman has experienced severe mental anguish and extreme emotional distress.

174.    Plaintiff Reuven Friedman is a citizen of the United States. He is the father of Plaintiff Chana Friedman Edri.

175.    As a result of the attack, Plaintiff Reuven Friedman has experienced severe mental anguish and extreme emotional distress.

176.    Plaintiff Yehiel Friedman is a citizen of the United States and a resident of the State of Israel. He is a brother of Plaintiff Chana Friedman Edri.

177.    Plaintiff Zvi Friedman is a citizen of the United States and a resident of the State of Israel. He is a brother of Plaintiff Chana Friedman Edri.

178.    Plaintiff Ilan Friedman is a citizen of the United States and a resident of the State of Israel. He is a brother of Plaintiff Chana Friedman Edri.

179.    Plaintiff Miriam Friedman Schreiber is a citizen of the United States and a resident of the State of Israel. She is the sister of Plaintiff Chana Friedman Edri.

180.    As a result of the attack, Plaintiffs Yehiel Friedman, Zvi Friedman, Ilan Friedman and Miriam Friedman Schreiber have experienced severe mental anguish and extreme emotional distress.

**The Braun Family**

181.    Steven Braun is a citizen of the United States and a resident of the State of Israel.

182.    Steven was standing outside a store window near the pizzeria at the Yovelim shopping mall when al-Hafez detonated his explosives. Steven had gone to the shopping mall to buy medicine for his son.

183.    Steven was thrown back as a result of the blast, and immediately felt extreme pain in his legs. His pants had been torn, and both of his legs had been hit by flying shrapnel which resulted in numerous cuts and bruises. In addition to blood, Steven saw pieces from a human body on his right leg. At first, Steven believed his leg had been ruptured, but later realized that the pieces of flesh belonged to the bomber or another victim of the attack.

184.    After the initial shock, Steven attempted to assist other victims, including Hillel Trattner and Ronit Trattner, and the paramedics that arrived on the scene. He personally witnessed the carnage and saw the bodies of dead girls and many maimed and injured survivors.

185.    Following the bombing, Steven was transported to Tel Hashomer hospital where the doctors cleaned and bandaged the wounds on his legs.

186.    As a result of the suicide bombing, Steven suffered from post-traumatic stress disorder ("PTSD"), had trouble sleeping at night, and had nightmares. The suicide bombing also affected his relationship with his wife and children to the extent that he became impatient and yelled at them.

187.    He underwent individual and marital counseling.

188.    As a result of the attack, Plaintiff Steven Braun has sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

189.    Plaintiff Chaviva Braun is a citizen and resident of the State of Israel. She is the wife of Plaintiff Steven Braun.

190.    As a result of the attack, Plaintiff Chaviva Braun has experienced severe mental anguish and extreme emotional distress.

191.    Plaintiff Yehuda Braun is a citizen and resident of the State of Israel. He is a son of Plaintiff Steven Braun.

192.    Plaintiff Yoni Braun is a citizen and resident of the State of Israel. He is a son of Plaintiff Steven Braun.

193.    Plaintiff Eliana Braun Peretz is a citizen and resident of the State of Israel. She is a daughter of Plaintiff Steven Braun.

194.    Plaintiff Oriella Braun is a citizen and resident of the State of Israel. She is a daughter of Plaintiff Steven Braun.

195.    Plaintiff Matanya Braun is a citizen and resident of the State of Israel. He is a son of Plaintiff Steven Braun.

196.    As a result of the attack, Plaintiffs Yehuda Braun, Yoni Braun, Eliana Braun Peretz, Oriella Braun and Matanya Braun have experienced severe mental anguish and extreme emotional distress.

**The Thaler Family**

197.    Rachel Thaler was a citizen of the United States when she died.

198.    Plaintiff Leor Thaler is a citizen of the United States and a resident of the State of Israel. He is a brother of Rachel Thaler.

26

199.    Plaintiff Ginette Thaler is a citizen and resident of the State of Israel. She is the mother of Rachel Thaler and Plaintiff Leor Thaler.

200.    Plaintiff Ginette Thaler brings this action both individually and on behalf of the Estate of Rachel Thaler.

201.    Plaintiff Michael Thaler is a citizen of the United States and a resident of the State of Israel. He is the father of Rachel Thaler and Plaintiff Leor Thaler.

202.    On February 16, 2002, Ginette Thaler brought her 16-year-old daughter, Rachel, to the mall to spend time with some friends. Less than half an hour later, al-Hafez detonated his bomb.

203.    As a result of the bombing, shrapnel lodged in Rachel's skull, and the main artery in her neck was virtually severed, rendering her brain dead. Rachel sustained multiple injuries all over her body, most significantly to her face, head and neck. Her body was covered with first and second degree burns. Rachel never regained consciousness and died 11 days after the attack.

204.    Rachel's 14-year-old brother, Leor, was also at the site of the attack when the explosion occurred. Leor was there with his best friend, who was killed as a result of the bombing.

205.    Leor was hit by nails and bolts. Many nails were lodged in his stomach, and he also received first and second degree burns. His arms and legs were covered with shrapnel wounds. His eardrum was burst and his ear was ripped.

206.    Leor underwent a number of operations, including ones to remove the nails in his stomach and to remove his gallbladder.

207.    Leor continues to suffer from hearing loss and still has shrapnel lodged in his body.

208.    Leor suffered from PTSD that manifested in, among other things, bad dreams and memories. He has undergone counseling.

27

209.    Ginette heard the sound of the bomb when it was detonated. She knew Rachel was at the mall but believed that Leor was at a friend's house.

210.    When she arrived at the scene, she was not permitted to search for her children.

211.    While at the site, she learned that Leor and his friend were at the mall but could not be found. Finally, a few hours later she learned the name of the hospital to which Rachel had been taken. While en route, she was told that Leor had been taken to a different hospital and was in critical condition.

212.    For five days, Ginette traveled back and forth from hospital to hospital to check on the condition of her two children. A few days later Leor was transferred to the hospital that was caring for Rachel.

213.    At the time of the attack, Michael resided in Jacksonville, Florida. At approximately 8:30pm, Michael turned on the website "News from Israel" and learned that there had been a bombing at the mall near where his children lived. He immediately tried to call Ginette, but there was no answer, even though it was after 2:00 in the morning Israel time. This caused Michael great concern and distress.

214.    Thereafter, Ginette contacted Michael and informed him that both Rachel and Leor had been injured in the bombing. He was told Rachel was unconscious and in very serious condition, and that Leor had nails in his body as a result of the blast.

215.    Michael boarded the first flight available to Israel the following morning. While on the airplane he read about the bombing in the newspaper, realizing that the unidentified girl described to be unconscious and the boy who had significant injuries including nails in his body were, in fact, his own children.

216.    Upon his arrival in Israel, Michael immediately went to the hospital to see Rachel.

28

He found her unconscious and hooked up to numerous machines. When he saw Leor, Michael found him badly burned over his face and hands and in poor condition.

217.    Michael remained in Israel to attend Rachel's burial and assist in Leor's slow recovery.

218.    As a result of Rachel's death, Plaintiff Ginette Thaler has experienced emotional pain and suffering, loss of her daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

219.    As a result of the attack, and her son's injuries, Plaintiff Ginette Thaler has experienced severe mental anguish and extreme emotional distress.

220.    As a result of Rachel's death, Plaintiff Leor Thaler has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

221.    As a result of the attack, Plaintiff Leor Thaler has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

222.    As a result of Rachel's death, Plaintiff Michael Thaler has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

223.    As a result of the attack, and his son's injuries, Plaintiff Michael Thaler has experienced severe mental anguish and extreme emotional distress.

224.    Plaintiff Zvi Thaler is a citizen of the United States and a resident of the State of Israel. He is the son of Plaintiffs Ginette Thaler and Michael Thaler, and the brother of Rachel Thaler and Plaintiff Leor Thaler.

225.    As a result of Rachel's death, Plaintiff Zvi Thaler has experienced emotional pain

and suffering, loss of his sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

226.    As a result of the attack, and his brother's injuries, Plaintiff Zvi Thaler has experienced severe mental anguish and extreme emotional distress.

227.    Plaintiff Isaac Thaler is a citizen of the United States and a resident of the State of Florida. He is the brother of Rachel Thaler and Plaintiff Leor Thaler.

228.    Prior to the attack, Isaac maintained a very close relationship with Rachel, Leor and Zvi. When they visited the United States, they spent time together with him.

229.    Isaac learned of the bombing that killed Rachel and injured Leor when his father contacted him by telephone. He flew to Israel to sit by Rachel's bedside and attended her funeral a few days later.

230.    Isaac continues to experience a great feeling of loss since the attack that killed his sister and injured his brother.

231.    As a result of Rachel's death, Plaintiff Isaac Thaler has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

232.    As a result of the attack, and his brother's injuries, Plaintiff Isaac Thaler has experienced severe mental anguish and extreme emotional distress.

**6.    THE JERUSALEM BUS SHOOTING – NOVEMBER 4, 2001**

233.    During rush hour on November 4, 2001, a PIJ terrorist named Hatem Yaqin Ayesh Al-Shweikeh approached Egged Bus #25, which was carrying mostly schoolchildren, in the French Hill neighborhood of Jerusalem.

234.    Al-Shweikeh emptied an entire rifle magazine into the bus, killing two

schoolchildren and wounding more than 40 others, mostly children, before he himself was killed in the attack.

**The Ben-Yishai Family**

235.   Shoshana Ben-Yishai was a citizen of the United States when she died.

236.   Shoshana was shot and killed in the attack.

237.   Plaintiff Miriam Ben-Yishai is a citizen of the United States and a resident of the State of Israel. She is the mother of Shoshana Ben-Yishai.

238.   Plaintiff Yitzhak Ben-Yishai is a citizen of the United States and a resident of the State of Israel. He is the father of Shoshana Ben-Yishai.

239.   Plaintiffs Miriam Ben-Yishai and Yitzhak Ben-Yishai bring this action both individually and on behalf of the Estate of Shoshana Ben-Yishai.

240.   Yitzhak heard news on the radio that there had been an attack on Bus #25. Knowing that Shoshana took that bus, he rushed to the scene. The news report had indicated that people had been only lightly wounded. He attempted to contact Shoshana on her mobile phone, but there was no response. He was permitted to look for Shoshana, but he could not find her.

241.   After hearing about the attack, Miriam telephoned many hospitals, searching for news of her daughter. Someone finally advised Miriam that Shoshana had sustained injuries to her head and been taken to Shaare Zedek Hospital in Jerusalem.

242.   Upon arriving at the hospital, Miriam met Yitzhak and they identified Shoshana's body, which they found on the floor of the hospital morgue, covered by a sheet.

243.   As a result of Shoshana's death, Plaintiff Miriam Ben-Yishai has experienced emotional pain and suffering, loss of her daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

244.    As a result of Shoshana's death, Plaintiff Yitzhak Ben-Yishai has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

245.    Plaintiff Jacob Ben-Yishai is a citizen of the United States and a resident of the State of Israel. He is a brother of Shoshana Ben-Yishai.

246.    Plaintiff Israel Ben-Yishai is a citizen of the United States and a resident of the State of Israel. He is a brother of Shoshana Ben-Yishai.

247.    Plaintiff Aviel Ben-Yishai is a citizen of the United States and a resident of the State of Israel. He is a brother of Shoshana Ben-Yishai.

248.    Plaintiff Chana Ben-Yishai is a citizen of the United States and a resident of the State of Israel. She is a sister of Shoshana Ben-Yishai.

249.    Plaintiff Yael Ben-Yishai is a citizen of the United States and a resident of the State of Israel. She is a sister of Shoshana Ben-Yishai.

250.    As a result of Shoshana's death, Plaintiffs Jacob Ben-Yishai, Israel Ben-Yishai, Aviel Ben-Yishai, Chana Ben-Yishai and Yael Ben-Yishai have experienced emotional pain and suffering, loss of their sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Miller Family**

251.    Plaintiff Myriam Miller is a citizen of the United States and a resident of the State of Israel.

252.    Plaintiff Chana Aidel Miller Schertzman is a citizen of the United States and a resident of the State of Israel. She is a daughter of Plaintiff Myriam Miller.

253.    Plaintiff Tova Miller is a citizen of the United States and a resident of the State of

Israel. She is a daughter of Plaintiff Myriam Miller and the sister of Plaintiff Chana Aidel Miller Schertzman.

254.    Myriam was sitting with Chana Aidel, then age 5, in her lap and Tova, then age 2, in the seat next to her; two Israeli soldiers sat in the seats facing the Millers.

255.    Al-Shweikeh approached the side of the bus the Millers were sitting on and opened fire. Myriam witnessed the terrorist take aim at her and her daughters multiple times but miss.

256.    Instead, bullets struck both soldiers sitting opposite the Millers. As they fell, they pinned Myriam and Chana Aidel to the floor, such that Myriam was unable to reach her toddler, Tova.

257.    Myriam watched helplessly while Tova lay screaming on her seat, covered in broken glass.

258.    Eventually, someone on the bus was able to hide Tova under a seat.

259.    Myriam and Chana Aidel were covered in the blood of the injured soldiers.

260.    Myriam also suffered from cuts from broken glass, and Chana Aidel was badly bruised. All three Millers were examined at the Mt. Scopus Hospital of the Hadassah Medical Center.

261.    Each of the Millers also witnessed the murder of Shoshana Ben-Yishai, a U.S. citizen killed in the attack, and other bus passengers being killed and injured.

262.    Myriam witnessed the terrorist's attempt to murder her and her daughters, and Chana Aidel and Tova each witnessed the terrorist's attempt to murder herself, her sister, and her mother.

263.    Myriam began seeing a psychologist a few months after the attack (and continues to do so). The psychologist diagnosed her with PTSD and concluded that she exhibits the following

33

PTSD symptoms: migraine headaches, panic attacks, generalized anxiety, nightmares, sleep disturbances, and acute reactions to loud noises or any reminders of the attack.

264. Myriam frequently re-experiences the attack in her mind and is often preoccupied by her inability to reach Tova during the attack.

265. Myriam has been unable to work outside the home or use public transportation.

266. Myriam's relationship with her husband, father to Chana Aidel and Tova, was strained due to her and her daughters' symptoms, and ultimately the marriage ended in divorce.

267. As a result of the attack, Plaintiff Myriam Miller has sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

268. Chana Aidel has suffered from nightmares, flashbacks, anxiety, and depression as a result of her experiences in the attack.

269. As a result of the attack, Plaintiff Chana Aidel Miller Schertzman has sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

270. Tova stopped speaking to nearly everyone, including her father, for years following the attack.

271. As a result of the attack, Plaintiff Tova Miller has experienced severe mental anguish and extreme emotional distress.

**The Schertzman Family**

272. Plaintiff Ilana Schertzman Cohen is a citizen of the United States and a resident of the State of Israel.

273. Ilana, then age 15, was sitting on the bus behind her best friend, Shoshana Ben-Yishai. Ilana and Shoshana were leaning on each other, head to head, when Al-Shweikeh opened fire.

274.    Shoshana was shot in the head and killed right in front of Ilana's eyes. Many people on the bus who were seated close to Ilana were shot and their bodies fell near her.

275.    Shrapnel lodged in Ilana's neck, glass penetrated her hand, and her body was soaked with blood. Ilana was taken to the emergency room at Shaare Zedek Medical Center for testing and treatment. She remained in the emergency room for many hours.

276.    Ilana still requires a delicate operation to remove some of the shrapnel remaining in her neck.

277.    The shrapnel in her neck continues to cause her pain. The pain is aggravated by hot weather, which often prevents her from going outside.

278.    Ilana may require injections in her neck for the rest of her life to help relieve pain.

279.    In addition to her physical injuries, Ilana has been traumatized by the attack. She received initial treatment from a board-certified neuro-psychiatrist on the day of the attack. Ilana has also sought treatment for years by a mental health professional and has never fully recovered. She has been diagnosed with PTSD.

280.    For over two years following the attack, Ilana required someone to sleep in the room with her at night, in an attempt to ease her fears.

281.    As a result of the attack that injured her and killed her best friend, Ilana could not focus on her schoolwork. She was unable to complete high school until she was 28.

282.    Ilana also could not drive a car or ride public transportation for years following the attack.

283.    As a result of the attack, Plaintiff Ilana Schertzman Cohen has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

284.    Plaintiff Leslie Schertzman is a citizen of the United States and a resident of the

35

State of Israel. She is the mother of Plaintiff Ilana Schertzman Cohen.

285.    Plaintiff Donald Schertzman is a citizen of the United States and a resident of the State of Israel. He is the father of Plaintiff Ilana Schertzman Cohen.

286.    After the attack, Leslie received a telephone call from Shaare Zedek Medical Center informing her that her daughter had been injured in a terrorist attack. She telephoned Donald, who was working in the United States. She also telephoned her son, Plaintiff Daniel Schertzman.

287.    Leslie went to the hospital to see her daughter. Several hours later she learned that her daughter's best friend, Shoshana, had been killed in the attack. This news caused Leslie to be even more distraught because Shoshana was very close to the Schertzman family. After Leslie learned about Shoshana's death, she went into shock. As a direct result of these events, Leslie sought treatment by a board-certified neuro-psychiatrist upon leaving the hospital.

288.    Leslie has been diagnosed with PTSD. She has suffered panic attacks, sought professional treatment, and can no longer function in the same manner as prior to the attack.

289.    As a result of the attack, Plaintiff Leslie Schertzman has experienced severe mental anguish and extreme emotional distress.

290.    Donald received Leslie's telephone call on the day of the attack, informing him that their daughter had been injured in a terrorist attack.

291.    Donald has been treated by a mental health professional to cope with the emotional pain he has suffered since the attack. In addition to his own emotional distress, Donald has endured watching his wife, his daughter Ilana, and his other children undergo severe trauma as a result of the attack.

292.    As a result of the attack, Plaintiff Donald Schertzman has experienced severe mental anguish and extreme emotional distress.

293.    Plaintiff Daniel Schertzman is a citizen of the United States and a resident of the State of Israel. He is a brother of Plaintiff Ilana Schertzman Cohen.

294.    Daniel received a telephone call on the day of the attack from someone at Shaare Zedek Medical Center informing him that his sister had been injured in a terrorist attack. While en route to the hospital, he received another telephone call from his mother.

295.    Upon arrival, Daniel went to see his sister, who was still in shock. He was unable to believe that his family's dear friend Shoshana had been killed, so Daniel went to see for himself. When he went to the emergency room, he accidentally came upon Shoshana's body. Learning of his sister's injuries in a terrorist attack and seeing his friend's dead body has caused him great emotional distress.

296.    Daniel, like the other members of his family, has sought treatment by a mental health professional.

297.    As a result of the attack, Plaintiff Daniel Schertzman has experienced severe mental anguish and extreme emotional distress.

298.    Plaintiff Arielle Schertzman Fisher is a citizen of the United States and a resident of the State of Israel. She is the sister of Plaintiff Ilana Schertzman Cohen.

299.    Plaintiff Abraham Schertzman is a citizen of the United States and a resident of the State of Israel. He is a brother of Plaintiff Ilana Schertzman Cohen.

300.    Plaintiff Yehuda Schertzman is a citizen of the United States and a resident of the State of Israel. He is a brother of Plaintiff Ilana Schertzman Cohen.

301.    Arielle, Abraham, and Yehuda were notified shortly after the attack that their sister had been injured and that their dear friend Shoshana had been killed in a terrorist attack. These events

37

have upset them greatly and necessitated their receiving treatment from a mental health professional.

302.    As a result of the attack, Plaintiffs Arielle Schertzman Fisher, Abraham Schertzman and Yehuda Schertzman have experienced severe mental anguish and extreme emotional distress.

**7.    THE SUICIDE BOMBING IN NETANYA – MAY 19, 2002**

303.    On May 19, 2002, Usama Adel Ahmad Bashkar, a PFLP suicide bomber, detonated his explosives in an open-air market in Netanya, killing three people and injuring more than 50 others.

**The Kushner Family**

304.    Gloria Kushner was a citizen of the United States and a resident of the State of Florida when she died in 2012.

305.    Charles O. Morgan, Jr. brings this action on behalf of the Estate of Gloria Kushner, as its legal representative.

306.    Gloria was approximately 150 feet away from Bashkar when he detonated his explosives. As the bomb exploded, nails, screws and bolts flew in every direction, and glass shattered on the main street from the buildings surrounding the market.

307.    Gloria was thrown against a vegetable stand, injuring her spine, right knee and right ear. She could not hear out of her right ear. The permanent bridge in her mouth cracked and a shard of glass imbedded itself in her chin.

308.    She had to undergo surgery to remove the resulting lump, and she suffered from headaches and numbness in her fingers due to the injury to her neck.

309.    She suffered from PTSD and had flashbacks and nightmares whenever she heard an ambulance or fire truck. She underwent therapy and was prescribed and took antidepressants.

310.    As a result of the attack, (before she died) Gloria Kushner sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

## 8.    THE BUS STOP SUICIDE BOMBING AT FRENCH HILL – JUNE 19, 2002

311.    On June 19, 2002, Sa'ed Awada, an AAMB suicide bomber, detonated his explosives near a bus stop in French Hill, killing seven people and injuring more than 35 others.

### The Mandelkorn Family

312.    Plaintiff Leonard Mandelkorn is a citizen of the United States and a resident of the State of Israel.

313.    Nurit Mandelkorn is a citizen and a resident of the State of Israel. She is the wife of Plaintiff Leonard Mandelkorn.

314.    Shaul Mandelkorn is a citizen and a resident of the State of Israel. He is the son of Plaintiff Leonard Mandelkorn and Nurit Mandelkorn.

315.    On June 19, 2002, Shaul exited a bus after returning from a school trip to the Golan Heights. After he got off the bus, he headed toward the bus stop just as Awada detonated his explosives.

316.    As a result of the explosion, Shaul was thrown down and covered in blood and shrapnel. He sustained a serious injury to the artery of his right arm. He was hit by shrapnel over his left eye and sustained a hole in his right leg. He also suffered hearing loss and a TBI.

317.    Shaul was taken to the hospital and underwent operations to address his varied injuries. He also had surgery to determine if he had sustained internal injuries as a result of the blast, and it was soon discovered that his lungs had been injured.

318.    Sometime after 8:00pm on the night of the attack, Nurit informed Leonard that their neighbor's son was missing after the bombing. While assisting the neighbor, Leonard received

word that Shaul's name had appeared on a list at the hospital among those injured. Leonard and Nurit drove to the hospital in Jerusalem where they learned that Shaul was in surgery. At that time they learned the extent of Shaul's injuries.

319. Shaul gained consciousness two days after the attack. He underwent physical therapy and received special treatment for his lung injuries.

320. Doctors discovered blood in the retina of Shaul's left eye, greatly limiting the eye's ability to function properly. He continues to be unable to focus accurately in that eye. Shaul remained in the hospital for 40 days. He continued physical therapy after being released.

321. Six months after the attack, additional shrapnel was found in Shaul's right eye. He underwent high-risk surgery in that eye. Although the shrapnel was removed, it remains unclear whether or not difficulties will develop with that eye in the future.

322. Some period after the attack, Shaul began remembering more about it, resulting in additional psychological trauma. He received therapy for the anxiety he experienced as a result of the attack.

323. As a result of the attack, Plaintiff Leonard Mandelkorn has experienced severe mental anguish and extreme emotional distress.

**The Kessler Family**

324. Gila Kessler was a citizen and resident of the State of Israel when she died.

325. Plaintiff Ezra Kessler is a citizen of the United States and a resident of the State of Israel. He is the father of Gila Kessler.

326. Plaintiff Hannah Kessler Rosenstein is a citizen of the United States and a resident of the State of Israel. She is a sister of Gila Kessler.

327. Plaintiff Klila Kessler is a citizen of the United States and a resident of the State of

Israel. She is a sister of Gila Kessler.

328.   On June 19, 2002, 19-year old Gila was waiting at the bus stop when Awada detonated his explosives. As a result of the explosion, Gila sustained severe damage to her brain. However, she was still breathing as she was placed in the ambulance to the hospital.

329.   Gila was pronounced dead upon arrival at the hospital, and despite the doctors' attempts to massage her heart, she never regained consciousness and died as a result of the attack.

330.   As a result of Gila's death, Plaintiff Ezra Kessler has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

331.   As a result of Gila's death, Plaintiff Hannah Kessler Rosenstein has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

332.   As a result of Gila's death, Plaintiff Klila Kessler has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**9.     THE ARIEL BOMBING – OCTOBER 27, 2002**

333.   On October 27, 2002, Muhammad Kazid Faysal al-Bustami, a HAMAS suicide bomber, detonated his explosives at a gas station outside of the West Bank town of Ariel, killing three Israeli soldiers and injuring 15 other people.

**The Zahavy Family**

334.   Plaintiff Yitzhak Zahavy is a citizen of the United States and a resident of the State of Israel.

335.   On October 27, 2002, Yitzhak was waiting with his platoon for a transport pickup

41

at a gas station at the entrance to the town of Ariel.

336.    Al-Bustami emerged and stood approximately 50 meters from Yitzhak.

337.    Three of Yitzhak's fellow soldiers were killed as they (and Yitzhak) unsuccessfully attempted to stop al-Bustami before he detonated his explosives.

338.    Yitzhak suffered shrapnel injuries to his leg and was taken to Meir Hospital.

339.    The emotional effects of the attack continue to affect Yitzhak to the present day.

340.    As a result of the attack, Plaintiff Yitzhak Zahavy has sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

341.    Plaintiff Julie Zahavy is a citizen of the United States and a resident of the State of Israel. She is the wife of Plaintiff Yitzhak Zahavy.

342.    As a result of the attack, Plaintiff Julie Zahavy has experienced severe mental anguish and extreme emotional distress.

343.    Plaintiff Tzvee Zahavy is a citizen of the United States and a resident of the State of New Jersey. He is the father of Plaintiff Yitzhak Zahavy.

344.    Plaintiff Bernice Zahavy is a citizen of the United States and a resident of the State of New Jersey. She is the mother of Plaintiff Yitzhak Zahavy.

345.    As a result of the attack, Plaintiffs Tzvee Zahavy and Bernice Zahavy have experienced severe mental anguish and extreme emotional distress.

10.    **THE JERUSALEM BOMBING – JANUARY 27, 2002**

346.    On January 27, 2002, Wafa Ali Khalil Idris, a female suicide bomber dispatched by Fatah/AAMB, detonated her explosive belt on Jaffa Street in Jerusalem, killing one man and injuring approximately 150 others. Idris was the first female suicide bomber of the Second Intifada.

42

## The Sokolow Family

347.    Plaintiff Mark Sokolow is a citizen of the United States and a resident of the State of New York.

348.    Plaintiff Rena Sokolow is a citizen of the United States and a resident of the State of New York. She is the wife of Plaintiff Mark Sokolow.

349.    Plaintiff Jamie Sokolow Fenster is a citizen of the United States and a resident of the State of New York. She is a daughter of Plaintiffs Mark Sokolow and Rena Sokolow.

350.    Plaintiff Lauren Sokolow Mandelstam is a citizen of the United States and a resident of the State of New York. She is a daughter of Plaintiffs Mark Sokolow and Rena Sokolow.

351.    Plaintiff Elana Sokolow Rosman is a citizen of the United States and a resident of the State of New York. She is a daughter of Plaintiffs Mark Sokolow and Rena Sokolow.

352.    Mark Sokolow and Rena Sokolow were vacationing in Israel where Elana was spending a year in school. On the last day of their trip, January 27, 2002, Mark, Rena, Jamie and Lauren walked to a shoe store near their hotel. Upon exiting the store, they were knocked to the ground by a bomb blast.

353.    After the blast, Mark gathered himself and began looking for Rena and their children. Eventually, he walked to the nearby hospital where he was treated for shrapnel injuries and released the following day.

354.    As a result of the blast, Mark sustained damage to his eardrum and a loss of hearing. He required follow up surgery for a burst eardrum and still experiences ringing in his ears.

355.    After the blast, Rena gathered herself mentally and began looking around for Mark and their children. Instead, she saw Idris' severed head.

43

356.   Rena could not move because of the severe injury to her leg and the agonizing pain. She was hospitalized for ten days and required extensive surgery to be able to walk again. For the first five months following the attack, Rena could not put any weight on the leg. If she needed to get around she would generally use a walker, and hop. If she needed to do extensive walking she would use a wheelchair. She required approximately six months to a year of physical therapy for her leg.

357.   Rena still cannot move her toes or ankle fully, has permanent nerve damage, and experiences numbness in parts of her leg.

358.   Jamie was 12 at the time of the attack. She was hospitalized for a week with shrapnel wounds to her face and eye. She sustained a torn iris and had surgery to remove glass from her eye. She also underwent plastic surgery to repair her face, but she still retains facial scarring from the blast. Jamie also had shrapnel on the left side of her face, above her right eyelid, and on her ankles.

359.   Lauren was 16 at the time of the attack. She was hospitalized for three days with shrapnel wounds on her legs, face and side, and burns on her ankles and face, and lost some of her hearing as a result of a burst eardrum. She also has permanent scars on her face and legs and had to have additional surgery to repair her hearing.

360.   Lauren had nightmares and was easily startled after the attack.

361.   As a result of the attack, Plaintiff Mark Sokolow has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

362.   As a result of the attack, Plaintiff Rena Sokolow has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

363.   As a result of the attack, Plaintiff Jamie Sokolow Fenster has sustained severe

physical injuries and experienced severe mental anguish and extreme emotional distress.

364.    As a result of the attack, Plaintiff Lauren Sokolow Mandelstam has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

365.    As a result of the attack, Plaintiff Elana Sokolow Rosman has experienced severe mental anguish and extreme emotional distress.

## 11.    THE KING GEORGE STREET BOMBING – MARCH 21, 2002

366.    On March 21, 2002, Muhammad Hashaika, an AAMB suicide bomber, got out of a car and detonated explosives. At least two people were killed and more than 80 others were wounded, including a woman pregnant with twins.

**The Bauer Family**

367.    Plaintiff Alan Bauer is a citizen of the United States and a resident of the State of Israel.

368.    Plaintiff Yehonaton Bauer is a citizen of the United States and a resident of the State of Israel. He is a son of Plaintiff Alan Bauer.

369.    Alan and Yehonaton were walking down the street when Hashaika detonated his explosives.

370.    Alan was thrown to the ground and saw smoke everywhere.

371.    Alan finally located Yehonaton, who was on the ground, unconscious. Yehonaton was struck by part of a screw that had been packed with the explosives. The screw passed through his brain from the back to the front of his head.

372.    Alan was struck by two nails that severed two arteries in his left arm. One passed through and the other was lodged in his arm.

373.    Both Alan and Yehonaton were operated on. Alan has had two skin grafts to cover

45

the scarring in his injured area.

374. Yehonaton was hospitalized for three and a half weeks; he was then moved to another hospital where he was hospitalized for an additional three and a half months.

375. For three weeks after the attack, Yehonaton was blind in both eyes and paralyzed on his left side. He also sustained a TBI.

376. His legs are no longer the same size, causing them to atrophy and him to limp.

377. As a result of the attack, Plaintiff Alan Bauer has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

378. As a result of the attack, Plaintiff Yehonaton Bauer has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

379. Plaintiff Revital Bauer is a citizen and resident of the State of Israel. She is the wife of Plaintiff Alan Bauer and the mother of Plaintiff Yehonaton Bauer.

380. Immediately after the attack Alan telephoned Revital informing her that he and Yehonaton had been in an attack. The conversation was unclear and she could not hear all of the information. She had to wait for a further call from the hospital.

381. Half an hour later, she received a telephone call from the hospital informing her where her husband was, but the hospital had no word on the condition of her son.

382. Revital's brother drove her to the hospital and saw Yehonaton prior to his surgery. Since Alan was also undergoing an operation, she spent hours going back and forth between the two operating rooms.

383. Revital had to wait to learn the extent of Yehonaton's brain injuries.

384. As a result of the attack, Plaintiff Revital Bauer has experienced severe mental anguish and extreme emotional distress.

385. Plaintiff Binyamin Bauer is a citizen of the United States and a resident of the State of Israel. He is a son of Plaintiffs Alan Bauer and Revital Bauer and a younger brother of Plaintiff Yehonaton Bauer.

386. Plaintiff Daniel Bauer is a citizen of the United States and a resident of the State of Israel. He is a son of Plaintiffs Alan Bauer and Revital Bauer and a younger brother of Plaintiff Yehonaton Bauer.

387. Plaintiff Yehuda Bauer is a citizen of the United States and a resident of the State of Israel. He is a son of Plaintiffs Alan Bauer and Revital Bauer and a younger brother of Plaintiff Yehonaton Bauer.

388. As a result of the attack, Plaintiffs Binyamin Bauer, Daniel Bauer, and Yehuda Bauer have experienced severe mental anguish and extreme emotional distress.

389. Plaintiff Ludwig Bauer is a citizen of the United States and a resident of the State of Nevada. He is the father of Plaintiff Alan Bauer.

390. Ella Bauer was a citizen of the United States when she died in 2017. She was the mother of Plaintiff Alan Bauer.

391. Ludwig Bauer brings this action both individually and as the legal representative of the Estate of Ella Bauer.

392. As a result of the attack, Plaintiff Ludwig Bauer has experienced severe mental anguish and extreme emotional distress.

393. As a result of the attack, (before she died) Ella Bauer experienced severe mental anguish and extreme emotional distress.

394. Plaintiff Phillip Bauer is a citizen of the United States. He is the brother of Plaintiff Alan Bauer.

395.    As a result of the attack, Plaintiff Phillip Bauer has experienced severe mental anguish and extreme emotional distress.

**12.    <u>SHOOTING RAMPAGE AT JERUSALEM BUS STOP – JANUARY 22, 2002</u>**

396.    On January 22, 2002, at approximately 4:30 p.m. local time in Jerusalem, Sa'id Ibrihim Ramadan, an AAMB operative, opened fire at a crowded bus stop on the corner of Jaffa Street and Lunz Street, killing two people and injuring more than 40 others, before he himself was killed in the attack.

**<u>The Zelcer Weitzman Family</u>**

397.    Plaintiff Shoshana Zelcer Weitzman is a citizen of the United States and a resident of the State of New York.

398.    On January 22, 2002, Shoshana was standing at the bus stop on Jaffa Road in Jerusalem with her friend when the terrorist opened fire. Shoshana was standing under the awning at the bus stop while her friend was talking on her cell phone.

399.    When the shooting began, Shoshana crouched down in the bus shelter. Then she ran toward the alley behind the bus stop and found herself standing in front of Ramadan, looking straight at his face. As she began to run away, the terrorist shot her. Shoshana initially felt pain in her left thigh because a bullet had ricocheted off the pavement and lodged itself in her lower back, knocking her to the ground. Shoshana was also hit by shrapnel all over her body, including some that injured her Achilles tendon.

400.    Shoshana was sent by ambulance to the hospital, where she underwent x-rays and waited as the area around the bullet was irrigated for hours. Eventually, the bullet was removed. However, there was too much shrapnel to remove it all from her body.

401.    As a result of the injury to her Achilles tendon, Shoshana was immobile for a week.

48

She was still experiencing severe pain and was unable to get out of bed. As time passed, she was gradually able to regain strength in her leg; however, she is still incapable of running due to the pain and fear that the injury will worsen.

402.    In addition to her physical injures, Shoshana has experienced extreme psychological trauma and has been diagnosed with PTSD. She continues to have nightmares and was treated by a therapist for over two years.

403.    As a result of the attack, Plaintiff Shoshana Zelcer Weitzman has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

**The Waldman Family**

404.    Plaintiff Shmuel Waldman is a citizen of the United States and a resident of the State of New Jersey.

405.    On January 22, 2002, as Shmuel boarded the bus in Jerusalem, Ramadan opened fire, striking Shmuel twice in his leg at point blank range, rupturing his leg.

406.    He immediately telephoned his wife, Plaintiff Henna Novak, to inform her of the attack and his condition.

407.    Shmuel was brought to the hospital and remained there for 12 days.

408.    Shmuel underwent many operations to repair the injuries to his leg. Due to the extensive nerve damage to his leg, he has little sensation in his right leg. He cannot walk straight and he has pain in his back.

409.    As a result of the attack, he has suffered from depression, is scared by loud noises, gets angry easily, has had flashbacks of the attack, and panic attacks.

410.    For over three years Shmuel underwent therapy sessions with a psychologist.

411.    As a result of the traumatic experience of the attack, Shmuel felt he could no longer

49

reside in Israel and relocated to New Jersey.

412.    As a result of the attack, Plaintiff Shmuel Waldman has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

413.    Plaintiff Henna Novack is a citizen of the United States and a resident of the State of New Jersey. She is the wife of Plaintiff Shmuel Waldman.

414.    After the attack, Henna met Shmuel at the hospital and found him in extreme pain.

415.    As a result of the attack, Plaintiff Henna Waldman has experienced severe mental anguish and extreme emotional distress.

416.    Plaintiff Morris Waldman is a citizen of the United States and a resident of the State of New York. He is the father of Plaintiff Shmuel Waldman.

417.    Plaintiff Eva Waldman is a citizen of the United States and a resident of the State of New York. She is the mother of Plaintiff Shmuel Waldman.

418.    While en route to the hospital to visit his father, Morris received a telephone call from his daughter informing him that Shmuel had been shot. Morris then telephoned Eva, to inform her of the news.

419.    By 6:00pm that evening, Morris was on a plane to visit Shmuel in Israel. When he arrived, he found his son's leg very swollen and saw him experiencing great pain. Morris closed his business for two weeks to stay in Israel with his son.

420.    Morris continues to experience heightened fear whenever he hears of any type of terrorist attack in Israel.

421.    As a result of the attack, Plaintiffs Morris Waldman and Eva Waldman have experienced severe mental anguish and extreme emotional distress.

422.    Plaintiff Chanie Bodenstein is a citizen of the United States and a resident of the

50

State of Michigan. She is a sister of Plaintiff Shmuel Waldman.

423. On the evening of the attack, Chanie heard sirens and emergency vehicles heading toward the area where Shmuel worked. She attempted to contact him on his cellular telephone, but received no answer. Finally, she learned that he was in the hospital and had been shot.

424. Chanie visited Shmuel the following day, finding him in excruciating pain, extremely pale, and his leg incredibly swollen.

425. After the attack, Chanie became very nervous in crowded areas and when she is near a bus stop.

426. As a result of the attack, Plaintiff Chanie Bodenstein has experienced severe mental anguish and extreme emotional distress.

427. Plaintiff Shaindy Weinberger is a citizen of the United States and a resident of the State of New Jersey. She is a sister of Plaintiff Shmuel Waldman.

428. As a result of the attack, Plaintiff Shaindy Weinberger has experienced severe mental anguish and extreme emotional distress.

429. Plaintiff Philip Waldman is a citizen of the United States and a resident of the State of New Jersey. He is a brother of Plaintiff Shmuel Waldman.

430. Philip and Shmuel are very close. Each time there is another terrorist attack in Israel, Philip re-experiences the distress and anxiety he experienced when he first learned of the attack that injured Shmuel.

431. As a result of the attack, Plaintiff Philip Waldman has experienced severe mental anguish and extreme emotional distress.

432. Plaintiff Abraham Waldman is a citizen of the United States and a resident of the State of New Jersey. He is a brother of Plaintiff Shmuel Waldman.

51

433.    As a result of the attack, Plaintiff Abraham Waldman has experienced severe mental anguish and extreme emotional distress.

434.    Plaintiff Dassie Waldman Davis is a citizen of the United States and a resident of the State of New York. She is a sister of Plaintiff Shmuel Waldman.

435.    As a result of the attack, Plaintiff Dassie Waldman Davis has experienced severe mental anguish and extreme emotional distress.

## 13.    THE HADERA BAT MITZVAH MASSACRE – JANUARY 17, 2002

436.    On January 17, 2002, Abd Al-Salam Sadeq Hasuna, an AAMB terrorist, entered the banquet hall in Hadera and opened fire on the 180 guests with an assault rifle, killing five people, and injuring more than 30 others, before he himself was killed in the attack.

**The Ellis Family**

437.    Aharon Ellis was a citizen of the United States and a resident of the State of Israel when he died.

438.    Plaintiff Leslye Knox is a citizen of the United States and a resident of the State of Georgia. She was the common law wife of Aharon Ellis.

439.    Leslye and Aharon had been together for six years prior to the attack.

440.    Plaintiff Leslye Knox brings this action both individually and on behalf of the Estate of Aharon Ellis.

441.    In the middle of the night on January 17-18, 2002, Leslye received a telephone call waking her up and informing her that Aharon, who had been performing as a singer at a Bat Mitzvah reception, had been killed in the attack. She was completely devastated when she learned the news.

442.    As a result of Aharon's death, Plaintiff Leslye Knox has experienced emotional

pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

443.    Plaintiff Jordan Ellis is a citizen of the United States and a resident of the State of Georgia. He is the son of Aharon Ellis and Plaintiff Leslye Knox.

444.    As a result of Aharon's death, Plaintiff Jordan Ellis has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

445.    Plaintiff Mello Nee Ellis is a citizen of the United States and a resident of the State of Israel. She is the mother of Aharon Ellis.

446.    Prince Elkannann Ben Shaleak was a citizen of the United States and a resident of the State of Israel when he died in 2015. He was the husband of Plaintiff Mello Nee Ellis and the father of Aharon Ellis.

447.    Plaintiff Mello Nee Ellis brings this action both individually and on behalf of the Estate of Prince Elkannann Ben Shaleak.

448.    Mello Nee and Prince Elkannann learned of the attack that killed their son when Prince Elkannann's friend heard the news and went to their home and woke them in the middle of the night. They listened to the radio all night long to confirm the details of the attack.

449.    As a result of Aharon's death, Plaintiff Mello Nee Ellis and Prince Elkannann Ben Shaleak (before he died) experienced emotional pain and suffering, loss of their son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

450.    Plaintiff Ametai Carter is a citizen of the United States and a resident of the State of Georgia. He is a son of Plaintiff Leslye Knox and a step-son of Aharon Ellis.

451.    Plaintiff Reuven Carter is a citizen of the United States and a resident of the State of Georgia. He is a son of Plaintiff Leslye Knox and a step-son of Aharon Ellis.

452.    Plaintiff Shaanon Carter is a citizen of the United States and a resident of the State of Georgia. He is a son of Plaintiff Leslye Knox and a step-son of Aharon Ellis.

453.    Plaintiff Shayrah Carter is a citizen of the United States and a resident of the State of Georgia. She is a daughter of Plaintiff Leslye Knox and a step-daughter of Aharon Ellis.

454.    Plaintiff Yoshahvyah Carter is a citizen of the United States and a resident of the State of Georgia. He is a son of Plaintiff Leslye Knox and a step-son of Aharon Ellis.

455.    For the six years prior to his death, Aharon Ellis served as the father of Plaintiffs Ametai Carter, Reuven Carter, Shaanon Carter, Shayrah Carter and Yoshahvyah Carter.

456.    As a result of Aharon's death, Plaintiffs Ametai Carter, Reuven Carter, Shaanon Carter, Shayrah Carter and Yoshahvyah Carter have experienced emotional pain and suffering, loss of their stepfather's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

457.    Plaintiff Francine Ellis is a citizen of the United States and a resident of the State of Israel. She is a sister of Aharon Ellis.

458.    Plaintiff Lynne Ellis is a citizen of the United States and a resident of the State of Israel. She is a sister of Aharon Ellis. She is being represented by her legal representative, Plaintiff Tsaphrerah Ellis.

459.    Plaintiff Shemariyah Ellis is a citizen of the United States and a resident of the State of Israel. He is a brother of Aharon Ellis.

460.    Plaintiff Tsaphrerah Ellis is a citizen of the United States and a resident of the State of Chicago. She is a sister of Aharon Ellis.

461.    Plaintiff Yihonadov Ellis is a citizen of the United States and a resident of the State of Israel. He is a brother of Aharon Ellis. Yihonadov identified Aharon's body at the morgue.

462.    As a result of Aharon's death, Plaintiffs Francine Ellis, Lynne Ellis, Shemariyah Ellis, Tsaphrerah Ellis and Yihonadov Ellis have experienced emotional pain and suffering, loss of their brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

## B.    The Defendant

463.    Defendant PALESTINE INVESTMENT BANK was established in Gaza City, Gaza, on August 10, 1994 as a public shareholding company and started its banking operations in March 1995. Since 1997, Defendant PALESTINE INVESTMENT BANK's shares have been listed on the Palestine Exchange.

464.    By 2017, Defendant PALESTINE INVESTMENT BANK held $443.3 million U.S. dollars in assets and had approximately 250 employees.

465.    During the relevant period, Defendant PALESTINE INVESTMENT BANK's main branch was in Ramallah-Al-Bireh, and it had local branches in Ramallah, Bethlehem, Nablus, Hebron and Gaza.

466.    Defendant PALESTINE INVESTMENT BANK currently has 19 branches in Gaza and the West Bank and a branch in Bahrain, and the bank offers dollar clearing services through its correspondent account at Bank of New York Mellon.

## FACTUAL ALLEGATIONS

## I.    THE SECOND INTIFADA

467.    The Second Intifada (also called the "al-Quds" or "al-Aqsa Intifada"), which broke out in September 2000, was marked by spasms of extreme violence and almost unprecedent levels of terrorism perpetrated by Palestinian terrorists and directed primarily at Israeli civilians.

55

468.    In the initial weeks of the Second Intifada, large demonstrations were organized in several Palestinian cities. During this period, a Palestinian mob in Ramallah attacked two off-duty Israeli army reservists, lynched them, and celebrated their deaths – with much of the scene captured on camera.

469.    Soon thereafter, HAMAS, PIJ, the PFLP and the Palestinian Authority's ruling faction, Fatah, all launched attacks on Israeli civilian centers, military installations, vehicles, and civilians through suicide bombings, drive-by shootings, and rocket launchings. For instance, over the four years following the outbreak of the violence, HAMAS launched hundreds of terrorist attacks targeting civilians that resulted in the deaths and injury of hundreds of individuals, including numerous American citizens.

470.    In total, these terrorist attacks killed over 1,000 Israelis, and left thousands severely wounded.

## II.    FOREIGN POWERS' SUPPORT FOR PALESTINIAN TERRORISM DURING THE SECOND INTIFADA

471.    During the Second Intifada, Palestinian terrorist groups competed for their countrymen's adulation by recruiting and dispatching terrorists to murder as many Israeli civilians as possible, often deploying suicide bombers and suicide shooters who would open fire on a crowd and continue firing until they were gunned down by Israeli law enforcement.

472.    The competition to support and gain credit for supporting what much of the Arab world regarded as heroic work was almost as fierce as the rivalries between Palestinian terrorist groups (often powered by the groups' different backers outside of the Palestinian Territories).

473.    As part of the intra-Palestinian competition among terror groups, the State Sponsor of Terrorism Islamic Republic of Iran and its Lebanese terror proxy, Hezbollah, competed with Iraq's Saddam Hussein's Ba'athist regime, the Kingdom of Saudi Arabia and other Arab states to

lavish financial support on Palestinians "resisting occupation" – i.e., blowing up buses and cafes and committing other terrorist attacks in Israel on Israeli civilians, including American citizens.

474.    Some of that financial support went to the Palestinian Authority ("PA") and much of it went to HAMAS, PIJ and other terrorist groups; but the most ostentatious displays of support were made by sending large sums of money to the families of the terrorists who killed themselves or were killed during terrorist attacks – the so-called "martyrs" of the Second Intifada.

475.    These payments, usually denominated in U.S. dollars, ranged from several hundred U.S. dollars to – in the case of some of the payments processed by Defendant PALESTINE INVESTMENT BANK that are at issue here – **$25,000** U.S. dollars per family of a "martyr."

476.    Any of these payments constituted a vast sum of money in the Palestinian Territories. For instance, according to the World Bank, in 1999, prior to the outbreak of the Second Intifada, the Gross National Income ("GNI") per capita in the PA was $1,730 U.S. dollars. By the end of 2003, the GNI per capita in the PA had fallen to $1,070 U.S. dollars.[6]

477.    On or about October 16, 2000, the "Saudi Committee" was established as a private charity registered with the Kingdom of Saudi Arabia.

478.    The Saudi Committee stated that its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled."

479.    The Saudi Committee also established a website to promote its activities.

480.    The website was later revamped, and the Saudi Committee's name removed from the English language version of the website.

481.    However, even the sanitized English version of the website stated that the Saudi

---

[6]    The economic situation in the neighboring Arab countries, in terms of GNI, was even worse. Syria's GNI, for example, was $890 U.S. dollars; Egypt's GNI was $1,290 U.S. dollars; and Jordan's GNI was $1,650 U.S. dollars.

Committee's activities include: "**support of the families of martyrs and wounded**, as well as the handicapped, orphans and prisoners, as well as homeowners whose houses were destroyed and landowners whose land was bulldozed, as well as support of a number of Palestinian social institutions and sponsorship of needy families …"

482.    The Saudi Committee provided a comprehensive "insurance" benefit or "martyr" payment of approximately $5,316 U.S. dollars to the families of Palestinian terrorists who died in the course of the Second Intifada.

483.    The Saudi Committee also made a payment of approximately $1,325 U.S. dollars to terrorists who were injured by Israeli security forces.

484.    Terrorists who were captured as a result of their criminal conduct received a payment of approximately $2,655 U.S. dollars from the Saudi Committee.

485.    During the Second Intifada, the Saudi Committee provided a total of approximately $8 million U.S. dollars as benefits to the families of the so-called "martyrs," which included the families of suicide bombers and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts.

486.    The Lebanon-based *Shahid* Foundation (a/k/a Martyrs Foundation), which was funded by Iran and operated by Hezbollah, coordinated its activities in the Palestinian Territories with the Gaza-based *al-Ansar* society.[7]

487.    The *Shahid* Foundation in Lebanon was designated an SDGT by the U.S. Government on July 24, 2007.

488.    The U.S. Treasury Department noted at that time that the *Shahid* Foundation provided funding to, among others, Palestinian suicide bombers:

---

[7]    *Al-Ansar* was designated an "illegal association" in Israel on October 24, 2003.

The Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah, Hamas, and the Palestinian Islamic Jihad (PIJ). To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hizballah and PIJ members, including suicide bombers in the Palestinian territories.

489.    The *Shahid* Foundation in Lebanon used the *al-Ansar* Society to distribute martyr payments on Iran's behalf.

490.    On its website, *al-Ansar* expressed its goals as explicitly supporting "martyrdom":

Al-Ansar opens its doors to the families of martyrs who seek it in order to register their martyrs, who, with their noble blood, have watered the pure soil of Palestine, drawing thereby the features and portrait of the coming freedom and the coming dawn. Al-Ansar follows their path and shares with their families and their parents the grief, the burden and the hope.

491.    Facing stiff competition from his regional rivals, Saddam Hussein was determined not to be outdone.

492.    Estimates vary, but from the beginning of the Second Intifada until March 2002, Iraq transferred approximately $12 million U.S. dollars to the families of terrorists in the Palestinian Territories. Within a year, that estimate rose to more than $20 million U.S. dollars; according to the ALF, Saddam ultimately paid more than $35 million U.S. dollars to families of Palestinians killed or wounded during the Second Intifada.

493.    While Defendant PALESTINE INVESTMENT BANK also processed payments on behalf of the ALF to the families of those who died by means other than suicide attack (see below), the wounded,[8] and those whose houses were destroyed as a deterrent by Israel, the most prominent recipients of the bank's U.S. dollar-denominated payments were the families of suicide terrorists.

---

[8]    Saddam Hussein paid $1,000 to those wounded in the conflict.

59

494.    In order to encourage suicide attacks and enhance Saddam Hussein's association with this widely respected form of violence, the Iraqi regime instituted its own "martyr payment" system.

495.    Saddam Hussein's system, unlike the "martyr payment" systems of other Arab states (or Hezbollah), linked the amount of payment to the circumstances in which the terrorist at issue died.

496.    At first – from October 2000 until August 2001 – Iraq had no clear stated policy distinguishing between "ordinary" terrorists killed during the conflict and suicide terrorists.

497.    Every family of a dead Palestinian terrorist received $10,000 U.S. dollars, regardless of the circumstances.

498.    For example, the family of HAMAS suicide bomber Hamed Faleh Mustafa Abu Hijla, who blew himself up in a car bombing on January 1, 2001, received a $10,000 U.S. dollar payment for his suicide attack.

499.    In August 2001, Saddam Hussein decided to increase the sum of the financial grant transferred to the families of *suicide* terrorists (whether by bombing or mass shooting) from $10,000 to $15,000 U.S. dollars, whereas the payment for families of terrorists who died under less "heroic" circumstances remained at $10,000 U.S. dollars. Less heroic circumstances might include, for instance, what Palestinian terrorist groups call "work accidents" – premature detonations of explosives – or in fire fights with Israeli forces operating in the Palestinian Territories.

500.    This decision was publicized in the Palestinian media.

501.    For example, on August 15, 2001, one of the leading Palestinian daily newspapers, *Al Hayat al-Jadida*, reported on the benefit increase to the families of suicide terrorists from

60

$10,000 to $15,000 U.S. dollars.

502.    A few days later, another leading Palestinian daily newspaper, *Al Quds*, reported Saddam Hussein's decision to increase the value of his government's incentive payments to the families of Palestinian suicide terrorists:

> The Gaza representative of the Arab Socialist Ba'ath party, which rules Iraq, announced yesterday that president Saddam Hussein decided to allocate the sum of $15,000 for each Palestinian martyr's family….
>
> Al-Za'anin [the Gaza representative] clarified that the last decision by the Iraqi president to increase the grant given to Palestinians who carried out martyrdom attacks ("*Amaliyat Istishadiya*") to $15,000 comes to emphasize the continuation of the national struggle to restore the Palestinian rights.

503.    The families of Palestinian terrorists who died in suicide attacks did in fact begin receiving larger payments for successful suicide attacks on Israeli civilians.

504.    For instance, the family of AAMB operative Nazir Muhammad Mahmud Hamad, who launched a shooting attack at the Afula Central Bus Station on October 4, 2001, received a $15,000 U.S. dollar payment; the family of PIJ operative Nidal Ibrahim Mustafa Abu Shaduf, who committed a suicide attack in the Binyamina train station near Haifa in July 16, 2001, also received a payment of $15,000 U.S. dollars.

505.    Families of terrorists who died under other circumstances, however, continued receiving $10,000 U.S. dollars each.

506.    For instance, the family of PFLP operative Ayman Muhammad Fayiq Jalad, who died on October 24, 2001 in a clash in Tulkarem with Israeli security forces, received a check for $10,000 U.S. dollars in March 2002; the family of Khaled Subhi Ali Sanjaq, a Sergeant in the Palestinian Preventive Security Force and member of AAMB's "suicide bombers unit," was killed on December 2, 2001 during armed clashes with Israeli soldiers. His family received a $10,000 U.S. dollar payment.

507.    On January 31, 2002, the *Los Angeles Times* reported that Saddam Hussein had ordered a memorial be erected in one of Baghdad's main squares in honor of the first Palestinian female suicide bomber, Wafa Idris, referenced earlier in this Complaint, who on January 27, 2002, blew herself up in Jerusalem, killing herself and an Israeli civilian and wounding dozens of people, including Plaintiffs herein.

508.    Her family also received a U.S. dollar-denominated check from the ALF.

509.    In March 2002, Saddam announced another increase in payments – families of suicide terrorists would receive $25,000 U.S. dollars, while the grants to the families of "ordinary" terrorists would remain at $10,000 U.S. dollars.

510.    On occasion, the ALF would question the bona fides of a terrorist who died during a terrorist attack where the organization was not certain the terrorist *intended* to die.

511.    For example, the family of AAMB operative Abd al-Karim Abu Na'isa, who died carrying out a lethal attack at the Afula central bus station on November 27, 2001, was initially denied an enhanced payment.

512.    Saddam Hussein's goal was not only to support suicide attacks against civilians in Israel, but also to assert his leadership within the Arab world. Accordingly, these payments were usually accompanied by great fanfare and were covered in the Palestinian media (and were common knowledge to individuals and entities in the Palestinian Territories, such as Defendant PALESTINE INVESTMENT BANK).

513.    For example, on May 7, 2002, the Palestinian daily *Al-Ayam* reported on Saddam Hussein's payouts to the surviving families of dozens of Palestinian terrorists:

> A delegation representing the Socialist Arab Ba'ath party and Arab Liberation Front yesterday distributed the Iraqi president, Saddam Hussein's grant to martyrs' families from Jenin Refugee Camp during a ceremony that was orchestrated in the Social Youth Center hall in the camp.

Senior member from the Party and the Front said that the families of 79 martyr families, who died as a result of the Occupation Forces' bullets, shells and missiles, were granted the sum of $10,000 to each family. At the same time, six families of martyrs who carried out martyrdom [suicide] attacks against Israeli targets were granted $25,000 each.

The ceremony took place in the presence of hundreds of the camp's residents, representatives from The Emergency and Relief Committee, the Socialist Arab Ba'ath party and the Arab Liberation Front. The Front's representatives conveyed the blessings of the Iraqi president and people to the masses of the Palestinian people and especially to the residents of the Jenin Refugee Camp. An ALF representative said that those residents defended the honor of their people and the honor of the Arab and Islamic nations.

514. These types of ceremonies – focused on incentivizing and glorifying terrorism – were commonplace during the relevant period and often involved family members of suicide terrorists receiving both certificates on behalf of Saddam Hussein as well as dollar-denominated checks issued from Defendant PALESTINE INVESTMENT BANK.[9]

515. For example, ceremonies in Gaza (Khan Yunis) held on July 20, 2002, August 28, 2002, March 20, 2003 and March 30, 2003 honored the families of "martyrs" – with the family members each being called up to the dais to receive both their certificates and their U.S. dollar-denominated checks, drawn on Rakad Salem's account at Defendant PALESTINE INVESTMENT BANK.

516. The events were also widely covered both in print and broadcast media around the world.

517. For example, on July 10, 2002, *The New York Times* reported that Iraq sent large cash payments, using U.S. dollar-denominated banknotes, to the families of Palestinian suicide bombers, further cementing Saddam's popularity among the Palestinians.

---

[9]    On occasion, the recipients would also deposit the payments back into their own accounts at Defendant PALESTINE INVESTMENT BANK.

518.    In a March 13, 2003 article about what was likely the last payment ceremony before U.S. Forces invaded Iraq, the BBC reported: "'Iraq and Palestine are in one trench. Saddam is a hero,' read a banner over a picture of the Iraqi leader and Palestinian leader Yasser Arafat at the ceremony."

519.    The payments were well enough known that, according to an April 4, 2002 CBS article, ALF officer Mahmoud Safi said: "Some people stop me on the street, saying if you increase the payment to $50,000, I'll do it immediately." While he said the comments were made "mostly . . . in jest," he "acknowledged that the support payments for relatives make it easier for some potential bombers to make up their minds."

520.    These payments were made to the family members of terrorists belonging to *all* Palestinian terror factions.

521.    For example, Abd al-Mun'im Ahmad Midraj Daraghima, the father of Ahmad abd al-Mun'im Daraghima, a PIJ suicide bomber who blew himself up on an Israeli kibbutz on October 7, 2001, received a check for $15,000 U.S. dollars.

522.    Fatima Ali Husein Halabiya, the mother of Nabil Mahmud Jamil Halabiya, the above-referenced HAMAS suicide bomber who blew himself up on Ben Yehuda Street in Jerusalem on December 1, 2001, also received a check for $15,000 drawn on Defendant PALESTINE INVESTMENT BANK. Muhammad Ayd Husein Bahar, the father of Osama Muhammad Ayd Bahar, the other HAMAS suicide bomber who blew himself up on Ben Yehuda Street together with Halabiya, also received a check for $15,000 U.S. dollars drawn on Defendant PALESTINE INVESTMENT BANK. *See* **Exhibit A** (including both the checks and receipts issued).

523.    Similarly, the family of Hussein Hasan Muhammad Abu Nasr (a HAMAS

64

operative) received $15,000 U.S. dollars during a ceremony reported in the Palestinian daily newspaper *Al-Hayat al-Jadida* on August 26, 2001.

524.   In March 2002, Mahmud Ayada 'Adi Salah al-Din, the father of Mu'ayed Mahmud Ayada Salah al-Din (a HAMAS operative), received a $25,000 U.S. dollar payment (as part of Saddam Hussein's increased grant level for suicide terrorists).

525.   Wafa Idris, whose family, as described above, received a check from the ALF, acted on behalf of the AAMB.

**III.   SADDAM HUSSEIN'S REGIME CONSPIRED WITH DEFENDANT PALESTINE INVESTMENT BANK (AMONG OTHERS) TO LAUNDER OIL SALES PROCEEDS THROUGH NEW YORK AND CHANNEL SOME OF THAT MONEY TO FINANCE REWARD PAYMENTS TO THE FAMILIES OF PALESTINIAN TERRORISTS.**

**A.   Saddam Hussein's Regime Abused the Oil-for-Food Program to Transfer Funds Through New York That Were Illegally Diverted to Accounts at Defendant PALESTINE INVESTMENT BANK.**

526.   Because Iraq was a designated State Sponsor of Terrorism during the relevant period and was subject to strict economic sanctions, Saddam's regime could not easily transfer large sums of money denominated in U.S. dollars since that would require dollar-clearing and settlement activity in the United States.

527.   U.S. law prohibits most dollar clearing and settlement services performed on behalf of State Sponsors of Terrorism. In some cases involving the evasion of U.S. economic sanctions managed by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), State Sponsors of Terrorism have relied on foreign banks willing to deceive U.S. regulators, such as by removing all information identifying the state as the source of a U.S. dollar-denominated electronic funds transfer through New York.

528.   According to U.S. Congressional investigators, Saddam Hussein illegally diverted money from the U.N. oil-for-food program, meant to serve Iraq's humanitarian needs, to make

these payments.

529.   Funds collected from Iraqi oil sales authorized by the U.N.'s oil-for-food program were processed exclusively from a U.N. account held at BNP Paribas's branch in New York.

530.   As U.N. investigators would later learn, significant Iraqi oil sales revenues deposited in BNP's oil-for-food program account in New York were subsequently diverted through elaborate kickback schemes and secreted into accounts controlled by the Hussein regime.

531.   These kickbacks allowed Saddam Hussein to maintain his grip on power and to transact regime business clandestinely despite severe restrictions imposed on Iraq's economy by U.N. and U.S. sanctions.

532.   Because of Iraq's difficulty in transferring U.S. dollars through the global financial system, most of the money earmarked for Saddam's terror incentive program was syphoned from the oil-for-food program and covertly transferred from the head office of Iraq's state-owned Al-Rafidain Bank in Baghdad to its branch in Amman, Jordan.

533.   From there, portions of the illicit U.S. dollar-denominated funds were deposited into Defendant PALESTINE INVESTMENT BANK's correspondent account at AJIB in Amman and then into Rakad Salem's account at the Al-Bireh branch of Defendant PALESTINE INVESTMENT BANK in the Palestinian Territories.

534.   Because the sums transferred were denominated in U.S. dollars (a/k/a Eurodollar payments),[10] Defendant PALESTINE INVESTMENT BANK used AJIB to clear and settle the

---

[10]   Eurodollar refers to a time- or call-deposit denominated in U.S. dollars that is maintained by a bank outside the United States. However, Eurodollar deposits in foreign banks operate differently than U.S. domestic deposits. For example, among others things, Eurodollar deposits maintained by foreign banks, *first*, are not regulated by the U.S. Federal Reserve; *second*, are not subject to U.S. banking reserve requirements; *third*, do not require payment of U.S. Federal Deposit Insurance Corporation ("FDIC") insurance premiums; and, *fourth*, involve payment transactions in the Eurodollar market that are not typically settled by the physical transfer from one counterparty to another of either U.S. dollar-denominated banknotes or a medium of exchange (coins or precious metals). Instead, although Eurodollar electronic funds transfers might be routed for *clearing* through New York or other global financial centers, these

transfers through New York – albeit without any of the financial institutions involved identifying the source of the funds as Saddam Hussein's regime.

535.    Although Defendant PALESTINE INVESTMENT BANK was (and is) a relatively small financial institution and did not maintain its own correspondent bank account in New York, the bank chose to offer its customers in the Palestinian Territories the option of maintaining U.S. dollar-denominated accounts and it used AJIB as its agent to process U.S. dollar-denominated transfers (through New York) for its customers.

536.    During the relevant period, AJIB's only U.S. dollar-denominated correspondent accounts were two it held in New York: account number "544728163" at Chase Manhattan Bank (now JPMorgan Chase Bank) and account number "8900331283" at Bank of New York.[11]

537.    During the relevant period, AJIB marketed its respective correspondent accounts at Chase Manhattan Bank and Bank of New York in the Bankers' Almanac (a reference book used by banks and others to identify other banks' correspondent accounts) as a service for clearing and settling for U.S. dollar-denominated electronic funds transfers that it offered to other foreign banks like Defendant PALESTINE INVESTMENT BANK.

538.    At all times relevant to this Action, Defendant PALESTINE INVESTMENT BANK knew that it was providing substantial and essential assistance to a State Sponsor of Terrorism (Iraq), the ALF (an organization that had itself committed several terrorist attacks before the relevant period), HLF, and the terrorist groups recruiting future terrorists, and knew that it

---

transactions are ultimately *settled* electronically in New York across the balance sheet of the Federal Reserve Bank of New York (acting as the unofficial lender-of-last resort for foreign banks operating in the Eurodollar market – including Defendant PALESTINE INVESTMENT BANK).

[11]    AJIB might have been able to clear a limited number of low-value U.S. dollar-denominated transfers through its reserve account at the Central Bank of Jordan, but only for electronic funds transfers with other Jordanian commercial banks that also maintained reserve accounts at the Central Bank of Jordan.

constituted a vital mechanism for illegally transferring U.S. dollar-denominated funds for HLF (and therefore HAMAS) and from Saddam Hussein's regime through New York.

539.    Defendant PALESTINE INVESTMENT BANK also settled all checks drawn on Rakad Salem's account through correspondent accounts in New York.[12]

540.    At all times relevant to this Action, Defendant PALESTINE INVESTMENT BANK knew that its U.S. dollar-denominated accounts were being used to finance and incentivize the maiming and mass murder of innocent civilians – including Plaintiffs – through the payments described above.

541.    Defendant PALESTINE INVESTMENT BANK also knew that the U.S. dollar-denominated checks drawn on its accounts were providing a benefit and incentive to operatives of at least four Palestinian terrorist organizations who were able to conduct their acts of terrorism secure in the knowledge that their families would be rewarded financially and would therefore benefit, rather than suffer, from their absence and lost earning potential.

**B.    Defendant PALESTINE INVESTMENT BANK Chose to Offer U.S. Dollar-Denominated Checking through New York Banks.**

542.    Because the PMA does not issue its own banknotes and coins denominated in a Palestinian currency, Defendant PALESTINE INVESTMENT BANK and certain other banks in the Palestinian Territories chose to offer checking accounts to their customers in other currencies.

543.    During the relevant period, the largest volume and value of checks used for payment in the Palestinian Territories were denominated in New Israeli Shekels ("NIS").

544.    For instance, in 2001, nearly 90 percent of checks processed by the PMA's clearinghouse were denominated in NIS – only 6 percent were denominated in U.S. dollars.

---

[12]    The possible exception involved Defendant PALESTINE INVESTMENT BANK customers who deposited checks drawn on the bank's own accounts.

545. Still, some Palestinian banks also chose to offer checking accounts denominated in U.S. dollars, Jordanian dinars and European Union euros.

546. For instance, because of Defendant PALESTINE INVESTMENT BANK's correspondent banking relationship with AJIB, both banks played a central role in settling the PMA's transactions involving funds transfers denominated in Jordanian dinars.

547. Specifically, during the relevant period, Defendant PALESTINE INVESMENT BANK (and its agent AJIB) supported the PMA's clearing and settlement, through the Central Bank of Jordan, of all Jordanian dinar-denominated checks circulating in the Palestinian Territories (except for checks that were issued and deposited by respective customers at the same Palestinian bank).

548. Defendant PALESTINE INVESTMENT BANK also chose to offer checking accounts denominated in U.S. dollars – including Rakad Salem's account for paying the families of terrorists.

549. As with wire transfers, foreign banks must "settle" U.S. dollar-denominated checks through a correspondent account at a bank capable of settling U.S. dollar transactions (or through an intermediate bank acting as the foreign bank's agent with a correspondent bank).

550. To reduce transaction costs, the PMA coordinated U.S. dollar-denominated check clearing and settlement for checks issued among (i.e., drawn on and deposited at) Palestinian commercial banks, including Defendant PALESTINE INVESTMENT BANK.

551. Acting as the Palestinian banks' agent, the PMA settled U.S. dollar-denominated checks in New York using a combination of commercial correspondent interbank accounts at U.S.

banks, CHIPS[13] and the Federal Reserve Bank of New York.

552.    In order to reduce transaction costs, the PMA first "cleared" the checks by setting off countervailing debts among Palestinian banks created as a result of the PMA's clearinghouse operations. Doing so resulted in fewer debts owed among the banks that required settling at the end of each day in New York (settling a U.S. dollar-denominated transaction generally incurs service fees from intermediaries such as SWIFT and CHIPS).[14]

553.    The PMA then coordinated settlement of the balances owed among the Palestinian banks by using its correspondent account in New York.

554.    As mentioned above, the PMA maintained a U.S. dollar-denominated correspondent interbank account at Arab Bank, Plc's New York branch and subsequently, the Bank of New York ("BNY") (through the PMA's own bank, Palestine International Bank). The PMA used the Arab Bank and BNY accounts to transfer U.S. dollars among each of the member Palestinian banks' own New York correspondent accounts[15] in settlement of their net debts and credits from the PMA's check clearing operations.[16]

555.    Defendant PALESTINE INVESTMENT BANK knew that its U.S. dollar-denominated checks were settled in New York, and *directly* communicated with New York banks in relation to these transactions.

556.    For example, in May 2005, as a result of U.S. dollar-denominated check clearing

---

[13]    CHIPS is a Systemically Important Financial Market Utility ("SIFMU") for the U.S. financial system and the primary provider of clearing and settlement services in U.S. dollar-denominated funds for Eurodollar transactions.

[14]    SWIFT is a global private network that enables financial institutions around the world to send and receive information about financial transactions in a standardized message format.

[15]    The Central Bank of Jordan cannot settle a dollar-denominated transaction with BNY in New York. Only another New York bank with CHIPs and FedWire accounts – like JPMorgan Chase – can do so.

[16]    The PMA utilized Arab Bank, Plc until March 29, 2003 and thereafter moved this function to BNY.

operations performed by the PMA's clearinghouse on behalf of Defendant PALESTINE INVESTMENT BANK and the other Palestinian banks, Defendant PALESTINE INVESTMENT BANK accrued a credit in the amount of $649,990 U.S. dollars.

557.    This amount represented the net due to Defendant PALESTINE INVESTMENT BANK based on U.S. dollar-denominated checks drawn on other banks in the Palestinian Territories that, *first*, were deposited by Defendant PALESTINE INVESTMENT BANK's customers; *second*, provisionally credited by Defendant PALESTINE INVESTMENT BANK to their customers' respective U.S. dollar-denominated accounts at Defendant PALESTINE INVESTMENT BANK; *third*, presented by Defendant PALESTINE INVESTMENT BANK to the PMA's clearinghouse for payment; and, *fourth*, cleared and netted through the PMA's clearinghouse operations.

558.    In order to coordinate the payment of the PMA's provisional credit due to Defendant PALESTINE INVESTMENT BANK, the PMA issued a payment order to BNY in the amount of $649,990 U.S. dollars (for the ultimate benefit of Defendant PALESTINE INVESTMENT BANK).

559.    The PMA's payment order was designated for the benefit of AJIB's correspondent interbank account at JPMorgan Chase (account number "8900429755"), for further credit to Defendant PALESTINE INVESTMENT BANK's correspondent interbank account at AJIB in Amman, Jordan (account number "010207200617111").

560.    However, on May 16, 2005, BNY blocked the payment order pursuant to restraining notices issued by a New York court to satisfy an ATA judgment against the PA.[17]

561.    Demonstrating its knowledge and active role in U.S. dollar-denominated check

---

[17]    BNY executed the PMA's payment order by crediting the funds to a blocked account (instead of transferring the funds to Defendant PALESTINE INVESTMENT BANK via CHIPS, JPMorgan Chase and AJIB).

clearing and settlement, Defendant PALESTINE INVESTMENT BANK wrote to BNY directly on July 20, 2005 claiming the following about the blocked funds in New York:

> On or about May 19th, 2005, we were made aware by the PMA that the transfer of the sum of **649,990.000** [sic] US dollars to be credited to our account with our own correspondent bank **Arab Jordan Investment Bank** had been blocked by [Bank of New York].
>
> This is to conform [sic] that transfer order conveyed by [PMA's Palestine International Bank] to [Bank of New York] as stated above concern funds belonging exclusively and entirely to our bank and the transfer was being effected to facilitate normal banking transactions of our own clients.

*See* **Exhibit B**, annexed hereto (emphasis in original).

## IV.   DEFENDANT PALESTINE INVESTMENT BANK MAINTAINED AN ACCOUNT AND TRANSFERRED MONEY FOR HAMAS'S U.S. FUNDRAISER, HOLY LAND FOUNDATION.

### A.   Defendant PALESTINE INVESTMENT BANK Provided Banking Services to Holy Land Foundation Knowing That It Was a HAMAS Institution.

562.   In October 1993, less than one month after the public signing of the Oslo Accords,[18] approximately 20 members of the so-called "Palestine Committee" in the United States gathered in Philadelphia, Pennsylvania, to discuss how to help HAMAS oppose the Oslo Accords.

563.   The FBI learned of the Philadelphia meeting and obtained a warrant from the Foreign Intelligence Surveillance Court to monitor the meeting, which lasted approximately three days.

564.   During the meeting, the participants discussed the problems that the Oslo Accords presented for those opposed to co-existence with Israel, and attendees were admonished not to mention "HAMAS," but rather to refer to it as "Samah," which is HAMAS spelled backwards.

---

[18]   The Oslo Accords were signed by Chairman of the Palestine Liberation Organization ("PLO") Yasser Arafat and Israel's Prime Minister Yitzhak Rabin and his foreign minister, Shimon Peres, in Washington D.C. in September 1993. The agreement included Letters of Mutual Recognition, whereby the Israeli government recognized the PLO as the legitimate representative of the Palestinian people, while the PLO recognized the right of Israel to exist and purportedly renounced terrorism, violence and the desire for the destruction of Israel.

565.    Attendees agreed that they must operate under an ostensible banner of apolitical humanitarian exercise in order to continue supporting HAMAS's vital social recruitment effort by financially supporting institutions, organizations and programs in the West Bank and Gaza controlled by HAMAS.

566.    Attendees identified several charitable societies and zakat committees as "ours."

567.    The Holy Land Foundation emerged from the Philadelphia meeting as the preeminent HAMAS fundraising organization in the United States.

568.    On March 15, 1996, a feature article in *The New York Times* detailed the financing of HAMAS by so-called charitable organizations. The article specifically discussed Israeli government claims that Richardson, Texas-based HLF was a "key fundraising operation" for HAMAS and discussed HAMAS's social infrastructure.

569.    On May 20, 1996, The *Jerusalem Post* reported on proceedings in the High Court of Justice resulting in a decree by the Israeli Government shutting down the Holy Land Foundation's Jerusalem office and authorizing confiscation of all its property.

570.    On May 6, 1997, the Government of Israel designated HLF a HAMAS organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks …."

571.    During the relevant period, Defendant PALESTINE INVESTMENT BANK maintained one or more U.S. dollar-denominated accounts for HLF, including Account No. 41914 at one of the bank's branches in Ramallah.

572.    HLF repeatedly transferred money from the United States to its offices in the Palestinian Territories using HLF's account at Defendant PALESTINE INVESTMENT BANK.

573.    As described above, HLF's electronic funds transfers were routed from Texas to

73

the Palestinian Territories via Chase Manhattan Bank, using the correspondent account of Defendant PALESTINE INVESTMENT BANK's agent, AJIB.

574.    For instance, on August 23, 2001, HLF's Texas entity transferred $5,646 U.S. dollars from its account at BankOne in Richardson, Texas, to HLF's account at Defendant PALESTINE INVESTMENT BANK in Ramallah. A copy of this electronic funds transfer is attached as **Exhibit C**.

575.    Defendant PALESTINE INVESTMENT BANK affirmatively directed HLF transfers through New York, which were habitually routed through AJIB's correspondent bank account at Chase Manhattan Bank in New York.

576.    Because Defendant PALESTINE INVESTMENT BANK was neither on the SWIFT system nor advertising its correspondent accounts in the Bankers' Almanac at that time, and HLF funds transfers repeatedly reached Defendant PALESTINE INVESTMENT BANK's account for HLF in the same exact manner (as specifically described in each transaction message), HLF's offices in Texas likely provided its local bank with specific instructions identifying each bank in the chain to its account at Defendant PALESTINE INVESTMENT BANK. *See* **Exhibit C** ("CHASE MANHATTAN BANK ... NEW YORK, NY"), the beneficiary's bank ("VIA CHASE MANHATTAN FFC [for further credit] ARAB JORDAN INVESTMENT BANK ... FFC PALESTINE INVESTMENT BK, BEERAH BR[ANCH] RAMALLAH ISRAEL") and the beneficiary's account ("41914 HOLYLAND FOUNDATION").

577.    In order to consistently initiate U.S. dollar-denominated transfers with the same routing via CHIPS through Chase Manhattan Bank, SWIFT and AJIB, HLF's Ramallah office must have provided HLF in Texas with payment instructions they received from Defendant PALESTINE INVESTMENT BANK.

74

**B.      The United States Designated the Holy Land Foundation an SDGT in 2001.**

578.    On December 4, 2001, HLF, a U.S.-based organization which provided millions of dollars to HAMAS, was designated an SDGT pursuant to Executive Order 13224 and a Specially Designated Terrorist ("SDT") under Executive Order 12947. HLF's designation was accompanied by an order blocking all its assets.

579.    The U.S. Treasury Press Release announcing HLF's designation stated, *inter alia*:

- The Holy Land Foundation for Relief and Development, headquartered in Richardson, Texas, raises millions of dollars annually that is used by HAMAS. Last year, Holy Land raised over $13 million.

- Holy Land supports HAMAS activities through direct fund transfers to its offices in the West Bank and Gaza that are affiliated with HAMAS and transfers of funds to Islamic charity committees ("zakat committees") and other charitable organizations that are part of HAMAS or controlled by HAMAS members.

580.    According to the press release, "[t]he Holy Land Foundation masquerades as a charity, while its primary purpose is to fund Hamas. This is not a case of one bad actor stealing from the petty cash drawer and giving those stolen monies to terrorists. This organization exists to raise money in the United States to promote terror."

581.    These findings were in part the product of an extensive FBI investigation that culminated in what has come to be referred to as the "Watson Memorandum" – named after former FBI official Dale Watson.

582.    The FBI report observed that HLF was providing material support to HAMAS through various *zakat* committees that were nominally operating as social service organizations in the Palestinian Territories:

> It is the FBI's analysis that the zakat committees receiving HLFRD [Holy Land Foundation] financial support are controlled by HAMAS. GOI [Government of Israel] analysis has also determined that HAMAS activists have been elected or appointed to senior leadership positions on these zakat

75

committees. GOI analysis, as well as open source reporting, has identified that the civilian population is aware that the services being provided by the zakat committees, whether it's the distribution of food, medical services or other social services, are being provided by HAMAS.

583. These large deposits were then often translated into checks written by HLF in the Palestinian Territories to HAMAS *da'wa*[19] institutions in smaller increments.

## IV. THE TERRORIST GROUPS RECEIVING SUPPORT FROM DEFENDANT PALESTINE INVESTMENT BANK AND THEIR DESIGNATIONS

### A. HAMAS

584. HAMAS is a Palestinian terrorist group headquartered in Gaza. It has committed hundreds of terrorist attacks since its founding in 1987, targeting, killing and injuring hundreds of Israelis and Americans, primarily civilians.

585. On January 23, 1995, pursuant to Executive Order 12947, President Clinton designated HAMAS an SDT.

586. This designation made it illegal for any United States person or entity to engage in any unlicensed transactions or dealings involving the property or interests of HAMAS.

587. HAMAS's designation as an SDT has remained in place since January 23, 1995.

588. On October 8, 1997, pursuant to 8 U.S.C. § 1189 and by publication in the Federal Register, the United States Secretary of State designated HAMAS an FTO.

589. As a result of this designation, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to HAMAS.

---

[19] *Da'wa* refers herein to a network of social and political institutions HAMAS operates consisting of mosques, hospitals, religious schools, clinics and other institutions that form the movement's political base in the West Bank and Gaza Strip. These institutions raise substantial funds for HAMAS's political and operational terrorist infrastructure and free up (fungible) money to plan and perpetrate suicide bombings and other terrorist attacks. They also provide income streams to HAMAS operatives, assist HAMAS in recruiting new supporters, generate and disseminate HAMAS propaganda, and compete with the PA in delivering social services and facilitating payments (including "martyr" payments) to families of HAMAS operatives killed, injured or imprisoned as a result of their terrorist activities.

590. HAMAS's designation as an FTO has remained in place since October 8, 1997.

591. On October 31, 2001, pursuant to Executive Order 13224, President George W. Bush designated HAMAS an SDGT.

592. HAMAS's designation as an SDGT has remained in place since October 31, 2001.

**B.  PIJ**

593. PIJ is an international terrorist organization with "cells" or units located throughout the world.

594. PIJ has committed numerous terrorist attacks, including several that have killed and injured American citizens.

595. On January 23, 1995, pursuant to Executive Order 12947, President Clinton designated PIJ an SDT.

596. This designation made it illegal for any United States person or entity to engage in any unlicensed transactions or dealings involving the property or interests of PIJ.

597. PIJ's designation as an SDT has remained in place since January 23, 1995.

598. On October 8, 1997, pursuant to 8 U.S.C. § 1189 and by publication in the Federal Register, the United States Secretary of State designated PIJ an FTO.

599. As a result of this designation, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to PIJ.

600. PIJ's designation as an FTO has remained in place since October 8, 1997.

601. On October 31, 2001, pursuant to Executive Order 13224, President George W. Bush designated PIJ an SDGT.

602. PIJ's designation as an SDGT has remained in place since October 31, 2001.

**C.    PFLP**

603.    PFLP is a secular, Marxist-Leninist international terrorist group that has committed terrorist attacks around the world.

604.    On January 23, 1995, pursuant to Executive Order 12947, President Clinton designated PFLP an SDT.

605.    This designation made it illegal for any United States person or entity to engage in any unlicensed transactions or dealings involving the property or interests of PFLP.

606.    PFLP's designation as an SDT has remained in place since January 23, 1995.

607.    On October 8, 1997, pursuant to 8 U.S.C. § 1189 and by publication in the Federal Register, the United States Secretary of State designated PFLP an FTO.

608.    As a result of this designation, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to PFLP.

609.    PFLP's designation as an FTO has remained in place since October 8, 1997.

610.    On October 31, 2001, pursuant to Executive Order 13224, President George W. Bush designated PFLP an SDGT.

611.    PFLP's designation as an SDGT has remained in place since October 31, 2001.

**D.    AAMB**

612.    AAMB is a Palestinian terrorist group affiliated with the Palestinian political party Fatah.

613.    AAMB has committed numerous terrorist attacks, including several that have killed and injured American citizens.

614.    On March 27, 2002, pursuant to 8 U.S.C. § 1189 and by publication in the Federal Register, the United States Secretary of State designated AAMB an FTO.

78

615.   AAMB was also designated an SDT and SDGT on that date.

616.   AAMB's designations as an FTO, SDT and SDGT have remained in place since March 27, 2002.

## FIRST CLAIM FOR RELIEF

### LIABILITY PURSUANT TO 18 U.S.C. § 2333(a) FOR CONSPIRING TO VIOLATE 18 U.S.C. § 2339A ("PRIMARY LIABILITY")

617.   Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

618.   Saddam Hussein's regime in Iraq conspired with the ALF; its Palestinian leader, Rakad Salem; Defendant PALESTINE INVESTMENT BANK; and other co-conspirators, to incentivize and reward suicide attacks on civilians (including U.S. citizens) in Israel during the relevant period.

619.   To effectuate the conspiracy, the Hussein regime illegally laundered U.S. dollar-denominated funds from the oil-for-food program's account at BNP Paribas in New York and deposited them in regime-controlled accounts in Jordan before transferring them to Defendant PALESTINE INVESTMENT BANK.

620.   At all relevant times, Defendant PALESTINE INVESTMENT BANK knew the aims of the conspiracy and actively participated in furthering the conspiracy's objectives.

621.   These objectives included, among others, incentivizing Palestinians to commit terrorist attacks against civilians in Israel by providing U.S. dollar-denominated checks to injured or imprisoned terrorist operatives and to families of deceased terrorist operatives, with larger payments made to the most committed and successful suicide terrorists.

622.   Defendant PALESTINE INVESTMENT BANK knowingly accepted U.S. dollar-denominated assets from Iraqi regime-controlled banks in Amman and transferred those assets to

Rakad Salem's account with the bank in Ramallah.

623.    Defendant PALESTINE INVESTMENT BANK knew that Rakad Salem was distributing and providing the U.S. dollar-denominated checks drawn on his account with Defendant PALESTINE INVESTMENT BANK to terrorist operatives and their families.

624.    Defendant PALESTINE INVESTMENT BANK knew Rakad Salem was the well-known leader of the ALF, a group well-known for its financial support for terrorist operatives and for distributing checks with certificates describing their purpose in events widely covered by the local and international media.

625.    For the same reasons, Defendant PALESTINE INVESTMENT BANK knew and agreed to serve as the mechanism by which Saddam Hussein's regime in Iraq made U.S. dollar-denominated payments to reward and incentivize suicide terrorist attacks.

626.    As a foreseeable consequence of, and in furtherance of, the conspiracy, HAMAS, PIJ, PFLP, and AAMB operatives committed terrorist attacks against civilians in Israel, including the attacks at issue.

627.    Plaintiffs were injured in those attacks.

628.    By conspiring to provide material support in violation of 18 U.S.C. § 2339A that caused each Plaintiff to be injured in his or her person, Defendant PALESTINE INVESTMENT BANK committed acts of international terrorism as defined in 18 U.S.C. § 2331 and is liable pursuant to 18 U.S.C. § 2333(a) because its conduct involved acts dangerous to human life that were a violation of the criminal laws of the United States, and in so doing Defendant PALESTINE INVESTMENT BANK's conduct objectively appeared to be intended to intimidate or coerce the civilian population of Israel and influence the policy of the Israeli and American governments by intimidation or coercion, and its activities transcended national boundaries in terms of the means

by which they were accomplished.

## SECOND CLAIM FOR RELIEF

### LIABILITY PURSUANT TO 18 U.S.C. § 2333(a) FOR KNOWINGLY PROVIDING MATERIAL SUPPORT IN VIOLATION OF 18 U.S.C. § 2339A ("PRIMARY LIABILITY")

629.    Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

630.    Defendant PALESTINE INVESTMENT BANK provided extraordinary and essential financial services to terrorists and their families including funneling illicit Iraqi payments in U.S. dollar-denominated funds through New York to the Palestinian Territories and making those funds available to the families of suicide terrorists – knowing that the financial support it facilitated would be used in preparation for, or in carrying out, numerous acts of international terrorism which caused direct injury to Plaintiffs.

631.    Defendant PALESTINE INVESTMENT BANK's knowing support was a substantial and foreseeable factor in causing Plaintiffs' injuries.

632.    As set forth more fully above, by providing critical financial services for Saddam Hussein's funding of the ALF payment program for the families of terrorists, Defendant PALESTINE INVESTMENT BANK provided material support for acts of terrorism set forth in this Complaint.

633.    The U.S. dollar-denominated payments Defendant PALESTINE INVESTMENT BANK facilitated, glorified, encouraged and incentivized Palestinian terrorists to commit terrorist attacks of the kind that injured Plaintiffs and rewarded them by paying their families even greater sums if they forfeited their lives in the commission of these acts of terrorism.

634.    Defendant PALESTINE INVESTMENT BANK's facilitation of U.S. dollar-

denominated payments provided moral support to the terrorists who injured (or murdered) Plaintiffs, and Defendant PALESTINE INVESTMENT BANK understood its role in the incentive scheme and knew that terrorists were aware of the scheme and that their respective families did, and would, benefit from Defendant's participation in the terrorism incentive plan.

635.    The nature of the acts encouraged by Defendant PALESTINE INVESTMENT BANK's conduct were extreme and shock the conscience of any civilized society. The amount and duration of material support given by Defendant was substantial, and Defendant, through the dozens of ceremonies in which the ALF officials ritually presented checks drawn on Defendant's accounts, was continually present for the encouragement, exhortation and glorification of mass murder and the maiming of innocent civilians – including Plaintiffs.

636.    By providing material support in violation of 18 U.S.C. § 2339A that has caused each Plaintiff to be injured in his or her person, Defendant PALESTINE INVESTMENT BANK committed acts of international terrorism as defined in 18 U.S.C. § 2331 and is liable pursuant to 18 U.S.C. § 2333(a) because its conduct <u>involved</u> acts dangerous to human life that were a violation of the criminal laws of the United States, and in so doing Defendant PALESTINE INVESTMENT BANK's conduct objectively appeared to be intended to intimidate or coerce the civilian population of Israel and influence the policy of the Israeli and American governments by intimidation or coercion, and its activities transcended national boundaries in terms of the means by which they were accomplished.

### THIRD CLAIM FOR RELIEF

### AIDING AND ABETTING FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d) ("SECONDARY LIABILITY")

637.    Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

638.    Plaintiffs listed in Attacks No. 1 through 9 were injured by acts of international terrorism as defined by 18 U.S.C. § 2331 that were committed, planned and authorized by an FTO so designated at the time each act of terrorism at issue occurred.

639.    Defendant PALESTINE INVESTMENT BANK provided substantial assistance to HAMAS, PIJ, PFLP and AAMB by transferring significant sums of money to the families of their operatives.

640.    Defendant PALESTINE INVESTMENT BANK was fully aware of the terroristic nature of the conduct of each of these designated FTOs, including their campaigns of suicide bombings and other acts of terrorism.

641.    Defendant PALESTINE INVESTMENT BANK's own actions substantially assisted the FTOs by making large financial rewards available to the families of these terrorist organizations' operatives, and its conduct foreseeably aided them in committing acts of terrorism of the kind that injured Plaintiffs.

642.    Defendant PALESTINE INVESTMENT BANK understood the value and importance to designated FTOs, Saddam Hussein's regime in Iraq, and Palestinian terrorists and their families of the bank's role in facilitating large transfers of U.S. dollar-denominated funds to the Palestinian Territories from Iraq and providing a mechanism to make those funds available to the families of deceased terrorists who committed acts of terrorism.

643.    Defendant PALESTINE INVESTMENT BANK also substantially assisted HAMAS by maintaining at least one U.S. dollar-denominated account for HLF and assisting HLF, at the time HAMAS's premier U.S.-based fundraising arm and (later an) SDGT, transfer donations from the United States to HAMAS and its institutions in the Palestinian Territories.

644.    In light of repeated contemporaneous press reports linking HLF to HAMAS and

the Israeli government's designations of HLF for the same reason, Defendant PALESTINE INVESTMENT BANK clearly also understood the value and importance to HAMAS of the bank's role in facilitating HLF's transfers of donations to HAMAS institutions.

645. Defendant PALESTINE INVESTMENT BANK was thus generally aware of its role as part of the overall illegal and tortious activity of the FTOs, the ALF, HLF, and Iraq.

646. Plaintiffs allege that Defendant PALESTINE INVESTMENT BANK knowingly aided and abetted HAMAS, PIJ, PFLP and AAMB and the specific FTO operatives who injured or killed Plaintiffs herein within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *See* Justice Against Sponsors of Terrorism Act ("JASTA"), § 2(b).

647. During the relevant period, Defendant PALESTINE INVESTMENT BANK provided substantial assistance to HAMAS by providing critical and essential banking services to HLF, its U.S.-based fundraising arm.

648. During the relevant period, Defendant PALESTINE INVESTMENT BANK provided substantial assistance to Saddam Hussein's regime (then a designated State Sponsor of Terrorism) and to each of the FTOs described above by facilitating payments to the families of FTO operatives and rewarding them for their relatives' acts of terrorism.

649. The nature of the acts encouraged, which were acts of international terrorism, benefited from access to millions of U.S. dollars provided by Defendant PALESTINE INVESTMENT BANK.

84

650.   The amount of assistance Defendant PALESTINE INVESTMENT BANK provided – millions of U.S. dollars in a community where incomes are a fraction of those in the U.S. – was integral to the acts of terrorism at issue.

651.   Defendant PALESTINE INVESTMENT BANK was present in the Palestinian Territories, where the terrorist groups at issue often operated openly, where HAMAS institutions received HLF donations through the bank, and where events adulating so-called "martyrs" were frequent sights and subjects of extensive media coverage, including martyr payment ceremonies. Many terrorist leaders and "martyrs" were, and remain, local celebrities.

652.   Defendant PALESTINE INVESTMENT BANK knew Saddam Hussein's and the terrorist groups' purposes for the assistance (acts of international terrorism, which are particularly heinous acts), and yet continued to provide that assistance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)  Accept jurisdiction over this action;

(b)  Enter judgment against PALESTINE INVESTMENT BANK and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

(c)  Enter judgment against PALESTINE INVESTMENT BANK and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)  Enter judgment against PALESTINE INVESTMENT BANK and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a); and

(e)  Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated:  August 26, 2019

By: /s/ Dina Gielchinsky, Esq.
   **OSEN LLC**
   Dina Gielchinsky, Esq.
   Ari Ungar, Esq.
   Aaron Schlanger, Esq.
   2 University Plaza, Suite 402
   Hackensack, NJ 07601
   Telephone (201) 265-6400

   1441 Broadway, Suite 6022
   New York, NY 10018
   Telephone (212) 354-0111

   **ZUCKERMAN SPAEDER LLP**
   Shawn P. Naunton, Esq.
   485 Madison Avenue, 10th Floor
   New York, NY 10022
   Telephone (646) 746-8655

   **TURNER & ASSOCIATES, P.A.**
   C. Tab Turner, Esq.
   4705 Somers Avenue, Suite 100
   North Little Rock, AR 72116
   Telephone (501) 791-2277

   **KOHN, SWIFT & GRAF, P.C.**
   Steven M. Steingard, Esq.
   Stephen H. Schwartz, Esq.
   Neil L. Glazer, Esq.
   1600 Market Street, Suite 2500
   Philadelphia, PA 19103
   Telephone (215) 238-1700

   Attorneys for Plaintiffs