UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TEMIMA SPETNER, et al.,

                                        Plaintiffs,

-against-

PALESTINE INVESTMENT BANK,

                                        Defendant.

19-cv-005 (ENV) (RLM)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF
PALESTINE INVESTMENT BANK**

**SQUIRE PATTON BOGGS (US) LLP**
Gassan A. Baloul
Mitchell R. Berger
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

Joseph S. Alonzo
30 Rockefeller Plaza, 23rd Floor
New York, New York 10112
Telephone: (212) 872-9800
Facsimile:  (212) 872-9815

*Counsel for Defendant Palestine Investment
Bank*

November 25, 2019

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..........................................................................................................i

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ......................................................................................................................... 8

I.    PLAINTIFFS' ALLEGATIONS DO NOT STATE A *PRIMA FACIE* CASE FOR EITHER GENERAL OR SPECIFIC PERSONAL JURISDICTION OVER PIB. ........... 8

    A.    PIB is a Palestinian Bank with No U.S. Operations, and had No U.S. Correspondent Accounts during the Relevant Period. ......................................... 11

    B.    Plaintiffs Allege Only that PIB Engaged in Routine Banking Activity ............... 14

    C.    There is No General Jurisdiction over PIB Because PIB Is Not "Essentially at Home" in the United States. ....................................................... 16

    D.    There is No Plausible Basis for Specific Jurisdiction over PIB.......................... 16

II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR ATA PRIMARY LIABILITY.......... 22

    A.    The Amended Complaint Does Not Plausibly Allege that PIB Knew or Intended that its Banking Services Would Be Used to Prepare for or Carry Out the Attacks. ....................................................................................... 24

    B.    The Amended Complaint Does Not Plausibly Allege that PIB Committed an "Act of International Terrorism." .................................................................. 29

        1.    The Amended Complaint Does Not Plausibly Allege that PIB Acted with the Terroristic Intent Required Under 18 U.S.C. §2333(a). ..................................................................................... 30

        2.    The Amended Complaint Fails to Plausibly Allege that PIB Engaged in "Violent Acts or Acts Dangerous to Human Life." ............. 32

    C.    The Amended Complaint Fails to Plausibly Allege that PIB Proximately Caused the Attacks................................................................................. 35

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING LIABILITY UNDER 18 U.S.C. § 2333(d)..................................................... 37

    A.    Plaintiffs Have Not Alleged, and Could Not Plausibly Allege, that PIB Knowingly Provided Substantial Assistance to FTOs in Committing the Attacks. ............................................................................................... 41

    B.    Plaintiffs Have Not Alleged, and Could Not Plausibly Allege, that PIB was "Aware" it was "Assuming a Role" in Violent Terrorist Activity. ............. 43

IV.    PLAINTIFFS' NEW CONSPIRACY CLAIM DOES NOT PLAUSIBLY ALLEGE THAT PIB AGREED WITH ANYONE TO COMMIT OR TO SUPPORT TERRORIST ATTACKS................................................................ 44

i

A.      The Amended Complaint Fails to Plausibly Allege that PIB Conspired to Commit a Terrorist Act. ....................................................................... 44

B.      Plaintiffs' Conspiracy Claim Must be Dismissed Because Plaintiffs Do Not Plausibly Allege the Required Causal Connection. ..................................... 46

C.      Plaintiffs Cannot Escape Their Failure to Allege Personal Jurisdiction by Asserting a Theory of "Conspiracy Jurisdiction." ................................................ 47

V.      SEVEN PLAINTIFFS LACK STANDING BECAUSE THEY ARE NOT U.S. NATIONALS, REQUIRING DISMISSAL OF THEIR CLAIMS ................................. 48

VI.     THE STEINHERZ FAMILY LACKS STANDING BECAUSE THEIR INJURY IS NOT FAIRLY TRACEABLE TO THE ATTACKS OR PIB'S CONDUCT. ........... 50

CONCLUSION ...................................................................................................... 51

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank*,
   731 F.2d 112 (2d Cir. 1984)......................................................................................6, 20

*Applebaum v. National Westminster Bank PLC*,
   07-cv-916 (DLI) (RML) (E.D.N.Y.)..........................................................................1

*In re Arab Bank, PLC Alien Tort Statute Litig.*,
   808 F.3d 144 (2d Cir. 2015).......................................................................................49

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................22, 23, 45

*Ashton v. Al Qaeda Islamic Army (In re Terrorist Attacks on September 11, 2001)*,
   298 F. Supp. 3d 631 (S.D.N.Y. 2018).......................................................................35

*Averbach, et al. v. Cairo Amman Bank*,
   19-cv-00004 (GHW) (S.D.N.Y.) ..............................................................................1

*Ayda Husam Ahmad v. Christian Friends of Israeli Cmtys.*,
   13 Civ. 3376 (JMF), 2014 U.S. Dist. LEXIS 62053 (S.D.N.Y. May 5, 2014),
   *aff'd*, 600 F. App'x. 800 (2d Cir. Apr. 22, 2015)......................................................24

*Bank v. Vivint Solar*,
   No. 18-CV-2555, 2019 U.S. Dist. LEXIS 48033 (E.D.N.Y Mar. 22, 2019) ...........23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 570 (2007)) ...................................................................................22, 23

*Brill v. Chevron Corp.*,
   Case No. 15-cv-04916, 2017 U.S. Dist. LEXIS 4132 (N.D. Cal. Jan. 9, 2017).....................31

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*,
   137 S. Ct. 1773 (2017).........................................................................................10, 17

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)........................................................................................6, 7, 17, 22

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.*,
   770 F.3d 993 (2d Cir. 2014).......................................................................................20

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018).........................................................................................47

*In re Chiquita Brands Int'l, Inc.*,
284 F. Supp. 3d 1284 (S.D. Fla. 2018) ...............................................................24

*Chirag v. MT Marida Marguerite Schiffahrts*,
604 F. App'x 16 (2d Cir. 2015) ..........................................................................8

*Cmty. Fin. Grp. Inc. v. Stanbic Bank Ltd.*,
No. 14-cv-5216, 2015 U.S. Dist. LEXIS 89904 (S.D.N.Y. July 10, 2015).......................9, 18

*Contant v. Bank of Am. Corp.*,
No. 17 Civ. 3139 (LGS), 2019 U.S. Dist. LEXIS 84251 (S.D.N.Y. May 17,
2019) ..........................................................................................................47

*D'Addario v. D'Addario*,
901 F.3d 80 (2d Cir. 2018)...............................................................................35

*Daimler AG v. Bauman*,
571 U.S. 117 (2014).................................................................................10, 16

*In re del Valle Ruiz*,
No. 18-3226 (L), 2019 WL 4924395 (2d Cir. Oct. 7, 2019) .............................16, 17

*Doe v. JPMorgan Chase Bank, N.A.*,
899 F.3d 152 (2d Cir. 2018)............................................................................20

*Ehrenfeld v. Mahfouz*,
489 F.3d 542 (2d Cir. 2007)............................................................................10

*Export-Import Bank of the United States v. Asia Pulp & Paper Co.*,
609 F.3d 111 (2d Cir. 2010)........................................................................6, 20

*Fallman v. Hotel Insider, Ltd.*,
No. 14-cv-10140 (SAS), 2016 U.S. Dist. (S.D.N.Y. Jan. 15, 2016)......................10

*Fields v. Twitter*, (N.D. Cal. 2016),
200 F. Supp. 3d 964, *aff'd*, 881 F.3d 739 (9th Cir. 2018) ...................................37

*Freeman v. HSBC Holdings PLC*,
No. 14 CV 6601 (DLI) (CLP), 2018 U.S. Dist. LEXIS 127289 (E.D.N.Y. July
27, 2018) .....................................................................................................14

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 474 (E.D.N.Y. 2012) ...............................................................28

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 542 (E.D.N.Y. 2012) ...............................................................29

*Goldberg v. UBS AG*,
　660 F. Supp. 2d 410 (E.D.N.Y. 2009) .................................................................42

*Halberstam v. Welch*,
　705 F.2d 472 (D.C. Cir. 1983) ..................................................38, 40, 41, 42, 47

*Honickman, et al. v. Blom Bank*,
　19-cv-00008 (KAM) (E.D.N.Y.) .......................................................................1

*ICO Servs., Ltd. v. Coinme, Inc.*,
　No. 18 Civ. 4276, 2018 U.S. Dist. LEXIS 212081 (S.D.N.Y. Dec. 17, 2018)...................9, 10

*Japan Press Serv., Inc. v. Japan Press Serv., Inc.*,
　No. 11 cv 5875, 2013 U.S. Dist. LEXIS 2163 (E.D.N.Y. Jan. 2, 2013)....................................9

*Jazini v. Nissan Motor Co., Ltd.*,
　148 F.3d 181(2d Cir. 1998)...................................................................................8

*Jesner v. Arab Bank, PLC*,
　138 S. Ct. 1386 (2018) ...............................................................................48, 49

*Johnson v. UBS AG*,
　No. 18-2906, 2019 U.S. App. LEXIS 33286 (2d Cir. Nov. 7, 2019) .....................................10

*Kaplan v. Lebanese Canadian Bank, SAL*,
　08 Civ. 7253 (GBD), 2019 U.S. Dist. LEXIS 162505 (S.D.N.Y. Sept. 20, 2019) ....................................................................................................25

*Kemper v. Deutsche Bank AG*,
　911 F.3d 383 (7th Cir. 2018) ......................................................... *passim*

*Levin v. Am. Document Servs., LLC*,
　No. CV 17-1285 (JFB)(AYS), 2018 U.S. Dist. LEXIS 10015 (E.D.N.Y. Jan. 19, 2018) ....................................................................................9, 10

*Licci v. Lebanese Canadian Bank SAL*,
　20 N.Y.3d 327, 984 N.E.2d 893, 960 N.Y.S.2d 695 (2012)...........................18, 19

*Licci v. Lebanese Canadian Bank, SAL*,
　673 F.3d 50 (2d Cir. 2012)....................................................................................8

*Licci v. Lebanese Canadian Bank, SAL*,
　732 F.3d 161 (2d Cir. 2013).....................................................8, 17, 18, 22

*Linde v. Arab Bank, PLC*,
　882 F.3d 314 (2d Cir. 2018)........................................................ *passim*

v

*MacDermid, Inc. v. Deiter*,
    702 F.3d 725 (2d Cir. 2012)........................................................................9, 10

*MacDermid, Inc. v. Canciani*,
    525 F. App'x 8 (2d Cir. 2013) ................................................................18, 19, 22

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014)..............................................................................23

*Miller, et al. v. Arab Bank, PLC*,
    18-cv-02192 (BMC) (E.D.N.Y.)..............................................................1, 34, 49

*Miller v. Arab Bank*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ...................................................34, 48, 49, 51

*Morris v. Khadr*,
    415 F. Supp. 2d 1323 (D. Utah 2006)................................................................49

*Ocasio v. United States*,
    136 S. Ct. 1423 (2016) ....................................................................................44

*O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on Sept. 11, 2001)*,
    714 F.3d 659 (2d Cir. 2013)...............................................................................8

*O'Sullivan v. Deutsche Bank AG*,
    No. 17 CV 8709-LTS-GWG, 2019 U.S. Dist. LEXIS 53134 (S.D.N.Y. Mar.
    28, 2019) .............................................................................................31, 32, 40

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
    609 F.3d 30 (2d Cir. 2010)..................................................................................8

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*,
    712 F.3d 705 (2d Cir. 2013)..............................................................................23

*Reliance First Capital, LLC v. Mid Am. Mortg., Inc.*,
    No. 18-cv-3528 (SFJ) (ARL), 2019 U.S. Dist. LEXIS 100901 (E.D.N.Y. June
    17, 2019) .......................................................................................................9, 10

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)..............................................................30, 35, 36, 37, 38

*Saperstein v. Palestinian Auth.*,
    No. 04-cv-20225, 2006 U.S. Dist. LEXIS 92778 (S.D. Fla. Dec. 22, 2006)..........49

*Sergeants Benevolent Ass'n Health and Welfare Fund v. Sanofi-Aventis U.S. LLP*,
    806 F.3d 71(2d Cir. 2015)................................................................................35

*Shatsky v. PLO*,
   No. 02-2280 (RJL), 2017 U.S. Dist. LEXIS 94946 (D.D.C. June 20, 2017)
   (appeal pending, *Shatsky v. PLO*, No. 17-7168 (D.C. Cir. filed Dec. 11, 2017))........26, 35, 36

*Siegel v. HSBC Bank USA, N.A.*,
   No. 17-cv-6593, 2018 U.S. Dist. LEXIS 126152 (S.D.N.Y. July 27, 2018),
   *aff'd sub nom. Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir.
   2019) ..................................................................................................................39, 40, 41

*Siegel v. HSBC Holdings PLC*,
   No. 17-cv-6593, 2018 U.S. Dist. LEXIS 8986 (S.D.N.Y. Jan. 19, 2018), *aff'd
   sub nom.*, *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019)........................9

*Sokolow v. PLO*,
   60 F. Supp. 3d 509 (S.D.N.Y. 2014)......................................................... 26, 36, 43

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)..............................................................................50, 51

*SPV OSUS, Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018)...........................................................8, 16, 17

*Stansell v. BGP, Inc.*,
   Case No. 8:09-cv-2501-T-30AEP, 2011 U.S. Dist. LEXIS 39808 (M.D. Fla.
   Mar. 31, 2011)........................................................................................31

*Strauss v. Credit Lyonnais, S.A.*,
   No. 06-CV-702 (CPS), 2006 U.S. Dist. LEXIS 72649 (E.D.N.Y. Oct. 5, 2006)...................28

*Strauss v. Credit Lyonnais, S.A.*,
   175 F. Supp. 3d 3 (E.D.N.Y. 2016) ......................................................10

*Strauss v. Crédit Lyonnais, S.A.*,
   379 F. Supp. 3d 148 (E.D.N.Y. 2019) .................................................39, 40

*Stutts v. De Dietrich Group*,
   Case No. 03-CV-4058 (ILG), 2006 U.S. Dist. LEXIS 47638 (E.D.N.Y. June
   30, 2006) .......................................................................................31, 33

*Taamneh v. Twitter, Inc.*,
   343 F. Supp. 3d 904 (N.D. Cal. 2018) ...............................................38, 39

*Tannerite Sports, LLC v. NBCUniversal Media LLC*,
   135 F. Supp. 3d 219 (S.D.N.Y. 2015).................................................10

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 118 (2d Cir. 2013)................................................................35

*In re Terrorist Attacks on Sept. 11, 2001*,
   295 F. Supp. 3d 416 (S.D.N.Y. 2018) ..................................................................8, 9

*Timothy Coffey Nursery Landscape Inc. v. Soave*,
   760 F. App'x 58 (2d Cir. 2019) ........................................................................19, 22

*Trisvan v. Heyman*,
   305 F. Supp. 3d 381 (E.D.N.Y. 2018) ....................................................................9

*U.S. Bank N.A. v. Bank of Am. N.A.*,
   916 F.3d 143 (2d Cir. 2019) ...................................................................................17

*United States v. Awan*,
   459 F. Supp. 2d 167 (E.D.N.Y. 2006) ...................................................................24

*United States v. Ghayth*,
   709 F. App'x 718 (2d Cir. 2017) ...........................................................................26

*Walden v. Fiore*,
   134 S. Ct. 1115 (2014) .................................................................................. *passim*

*Waldman v. PLO*,
   835 F.3d 317 (2d Cir. 2016) ......................................................................... *passim*

*Weiss v. National Westminster Bank PLC*,
   05-cv-4622 (DLI) (RML) (E.D.N.Y.) ......................................................................1

*Weiss v. Nat'l Westminster Bank PLC*,
   453 F. Supp. 2d 609 (E.D.N.Y. 2006) ...................................................................28

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014) ...................................................................................30

*Weiss v. Nat'l Westminster Bank PLC*,
   278 F. Supp. 3d 636 (E.D.N.Y. 2017) ...................................................................38

*Weiss v. Nat'l Westminster Bank PLC*,
   381 F. Supp. 3d 223, 239 (E.D.N.Y. 2019), *appeal filed sub nom.*,
   *Applebaum v. Nat'l Westminster Bank, PLC*, No. 19-1159 (2d Cir. Apr. 16,
   2019) ................................................................................................................39, 40

## Statutes

18 U.S.C. § 2331(1) ....................................................................................29, 31, 32, 35

18 U.S.C. § 2333(a) ...............................................................................29, 30, 48, 49, 50

18 U.S.C. § 2333(d) ........................................................................................1, 2, 37, 38, 40

18 U.S.C. § 2334(a) ................................................................................................10

18 U.S.C. § 2339A ............................................................................................ *passim*

18 U.S.C. § 2339B ...................................................................................................24

Anti-Terrorism Act (ATA) ................................................................................ *passim*

Justice Against Sponsors of Terrorism Act (JASTA) ......................................... *passim*

N.Y. U.C.C. § 4-A-212 ............................................................................................20

**Other Authorities**

CPLR § 302 ...........................................................................................................10

Fed. R. Civ. P. 4(k) ...............................................................................................10

Fed. R. Civ. P. 12 ............................................................................................. *passim*

## PRELIMINARY STATEMENT

Plaintiffs allege they are the victims, or the relatives, survivors, or heirs of the victims, of 13 separate terrorist attacks in Israel between November 2001 and October 2002, during the Second Intifada.[1]  *See generally* Amended Complaint (Dkt. #36) ("Am. Compl.") ¶¶ 22-462. Plaintiffs claim these 13 attacks (collectively, the "Attacks") were carried out by individuals affiliated with the terrorist groups Hamas, PFLP, PIJ, and AAMB.  *Id.*, ¶¶ 22, 94, 111, 117, 122, 233, 303, 311, 333, 346, 366, 396, 436.  Plaintiffs further allege that various organizations—a Saudi charity called the "Saudi Committee" (*id.*, ¶¶ 477-485); a "Lebanon-based *Shahid* Foundation, which was funded by Iran and operated by Hezbollah" (*id.*, ¶¶ 486-490); and Saddam Hussein's government in Iraq (*id.*, ¶ 491-492)—provided millions of dollars to be paid to the family members of the attackers.

However, Plaintiffs have not sued the individual attackers or the organizations they claim committed the Attacks.  Nor have they sued the organizations they claim provided funds to the family members of the attackers.  Instead, they have brought multiple lawsuits against financial institutions that, they allege, have provided banking services to individuals or entities they claim funded or are otherwise related to the terrorist organizations whose members allegedly committed the Attacks.[2]  In this action, filed on the eve of the expiration of an extended statute of limitations, Plaintiffs claim that a Palestinian bank, Palestine Investment Bank ("PIB"), is liable for their

---

[1]  "Intifada" (alternatively transliterated "Intifadah") literally translates to "shaking off," and refers to "either of two popular uprisings of Palestinians in the West Bank and Gaza Strip aimed at ending Israel's occupation of those territories and creating an independent Palestinian state."  The Second Intifada "began in September 2000," and "most analysts agree that it had run its course by late 2005."  Encyclopaedia Britannica, "Intifadah," available at https://www.britannica.com/topic/intifadah (last visited Nov. 25, 2019).

[2]  In addition to this action, some or all of the Plaintiffs here are (or were) also asserting claims arising out of the same attacks in, among other cases, *Weiss v. National Westminster Bank PLC*, 05-cv-4622 (DLI) (RML) (E.D.N.Y.); *Applebaum v. National Westminster Bank PLC*, 07-cv-916 (DLI) (RML) (E.D.N.Y.); *Averbach, et al. v. Cairo Amman Bank*, 19-cv-00004 (GHW) (S.D.N.Y.); *Miller, et al. v. Arab Bank, PLC*, 18-cv-02192 (BMC) (E.D.N.Y.); and *Honickman, et al. v. Blom Bank*, 19-cv-00008 (KAM) E.D.N.Y.).

1

injuries under the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), for provision of material support for terrorism under 18 U.S.C. § 2339A; for conspiracy to provide material support for terrorism under 18 U.S.C. § 2339A; and for aiding and abetting foreign terrorist organizations ("FTOs") under 18 U.S.C. § 2333(d).  Those claims fail fundamentally because, as Plaintiffs acknowledge, PIB did nothing more than provide routine financial services to two customers:  an organization which was not, at the time, designated as a terrorist organization by the United States (whose banking system is the fulcrum for Plaintiffs' jurisdictional theory), and an individual who was not at the time (and today, is not) designated as a terrorist anywhere in the world.

Plaintiffs' claims should be dismissed in their entirety because Plaintiffs do not and could not make a *prima facie* showing of personal jurisdiction in this Court over PIB.  As Plaintiffs admit, PIB is a Palestinian bank, with its headquarters in Palestine and branches only in Palestine (with the exception of one branch in Bahrain established in 2016).  Plaintiffs do not allege that PIB has any branches, offices, operations, employees, or other physical presence in the United States, or that PIB did so during the time period relevant to this action.  Plaintiffs thus apparently acknowledge that PIB is not subject to general jurisdiction in U.S. courts.

Plaintiffs instead attempt to state a claim for specific jurisdiction by alleging that, during the relevant period of September 2001 to March 2003 (Am. Compl. ¶ 2), PIB "purposefully and knowingly directed its agents to use correspondent bank accounts in New York, particularly at Chase Manhattan Bank (via Arab Jordan Investment Bank) ("AJIB") and Bank of New York (via the Palestinian Monetary Authority ("PMA") . . . to facilitate . . .  U.S. dollar-denominated funds transfers on behalf of HLF; the Government of Iraq; the ALF [Arab Liberation Front] and its Palestinian leader, Rakad Salem; and the four FTO terrorist groups at issue." *Id.*, ¶ 20.

Plaintiffs' effort to establish specific jurisdiction over PIB fails, however, because the Amended Complaint does not identify a single banking transaction that allegedly was processed through the United States and relates in any manner to any of the Attacks.  In fact, as shown in the Declaration of Mohammad Sami Aghbar ("PIB Decl.") filed herewith, PIB did not make <u>any</u> transfers through U.S. banks during the relevant period.

PIB did not have a correspondent account with any bank in the United States until 2009.  PIB Decl. at ¶ 15.  During the relevant period, PIB settled all of its U.S. dollar transactions <u>entirely outside the United States</u>, including by way of credit and debit book entries in correspondent accounts with non-U.S. correspondent banks, primarily Arab Jordan Investment Bank ("AJIB") of Amman, Jordan.  PIB Decl. at ¶¶ 15-16, 23-26.  This common international banking arrangement, of offshore book-entry settlement of U.S. dollar transactions, does not involve any direct interaction by PIB with the U.S. banking system, and thus does not create the purposeful minimum contacts needed for specific jurisdiction in the United States over PIB.  Nor does the Amended Complaint identify a single banking transaction that allegedly was processed through the United States that relates in any way to any of the Attacks.

On a motion to dismiss for lack of personal jurisdiction, the Court is not bound by Plaintiffs' jurisdictional allegations when, as here, they are controverted by highly-specific, sworn factual evidence.  In assessing personal jurisdiction, the Court properly considers both the facts proffered in the PIB Declaration and the deficiencies in Plaintiffs' jurisdictional allegations, which taken together demonstrate that PIB is not subject to either general or specific personal jurisdiction in this action.

Even if Plaintiffs could make a *prima facie* case of jurisdiction over PIB (which they cannot), the Amended Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6).

Plaintiffs' claim that PIB knowingly provided material support for terrorism in violation of 18 U.S.C. § 2339A does not plausibly allege the required elements for primary liability under the ATA:

- Plaintiffs do not plausibly allege PIB knew or intended that its alleged banking services would be used to prepare for, or to carry out, the Attacks at issue—a demanding state-of-mind requirement unique to ATA civil actions predicated on Section 2339A (*see infra* at 24-29);

- Plaintiffs do not plausibly allege PIB's alleged banking services themselves constituted "an act of international terrorism"—that is, "violent acts or acts dangerous to human life"—as Second Circuit law mandates in ATA primary-liability claims against banks (*see infra* at 29-35);

- Plaintiffs do not plausibly allege PIB's alleged banking services proximately caused Plaintiffs' injuries, as Second Circuit law mandates in ATA primary-liability claims against banks.  For example, Plaintiffs do not make any effort to link any payment allegedly processed through PIB to 12 of the 13 Attacks, and do not plausibly allege that PIB's alleged banking services were a "substantial factor" in causing any of the Attacks, or that any of the Attacks was a foreseeable consequence of PIB's banking services (*see infra* at 35-37).

Plaintiffs' claim that PIB aided and abetted Foreign Terrorist Organizations ("FTOs") under the Justice Against Sponsors of Terrorism Act ("JASTA") also must be dismissed because the Amended Complaint fails to plausibly allege the required elements for a JASTA secondary-liability claim against a bank, as established by precedent in the Second Circuit:

- Plaintiffs do not plausibly allege that PIB provided any assistance—let alone the required "knowing" and "substantial assistance"—in the form of banking services or otherwise to the "person[s] who committed" any of the Attacks (*see infra* at 41-43);

- Plaintiffs do not plausibly allege that by providing routine banking services to Rakad Salem—who was not an alleged perpetrator or organizer of the Attacks, nor a designated terrorist—PIB was "aware" that it was playing a "role" in terrorist activities (*see infra* at 43-44).

Separately, the claims of a number of Plaintiffs also must be dismissed for the independent reason that they do not have standing to sue under the ATA, either because they are neither U.S. nationals nor are they the heirs of or bringing claims on behalf of the estate of a deceased U.S. national, or because their alleged injuries are not traceable to an Attack or PIB's alleged conduct. *See infra* at 48-51.

PIB identified these fundamental flaws in Plaintiffs' claims in its motion to dismiss the original complaint, which PIB served on Plaintiffs on August 5, 2019 (*see* ECF Doc. No. 33). Recognizing the weaknesses in their claims, Plaintiffs responded by filing an Amended Complaint, which remains as factually and legally deficient as its predecessor. In amending, Plaintiffs added a conclusory and fact-free assertion that PIB conspired with Saddam Hussein, the Arab Liberation Front, and PIB's alleged customer, Rakad Salem, "to incentivize and reward suicide attacks on civilians (including U.S. nationals) in Israel between September 2001 and March 2003 (the 'relevant period')." Am. Compl. ¶ 2. Plaintiffs' newly-minted conspiracy claim must be dismissed because Plaintiffs do not plausibly allege the key element of a JASTA-conspiracy claim: an agreement between PIB and Saddam Hussein, ALF, or Mr. Salem to incentivize and reward suicide

5

attacks.  Indeed, Plaintiffs do not even allege any communications or contact whatsoever between PIB and either Saddam Hussein or ALF, or any contact with Mr. Salem beyond routine banking services.  Plaintiffs thus were right to omit a JASTA-conspiracy claim from their original complaint, and have no basis for their on-second-thought decision to add one in response to PIB's original motion to dismiss.

Plaintiffs' amendments also fail to overcome the barrier to specific jurisdiction over PIB that emanates from the undisputed fact that PIB did not transact business in or through the United States because it did not have a U.S. correspondent bank account during the relevant period.  PIB Decl. at ¶¶ 15, 23, 27.  Plaintiffs' entirely conclusory allegation that PIB conducted banking business in the United States through "agents"—specifically, PIB's non-U.S. correspondent bank (AJIB) or its regulator (PMA), which in turn had their own U.S. correspondent banking relationships—fails as a matter of Second Circuit law.  Our Court of Appeals has held that intermediary banks like AJIB (PIB's Jordanian correspondent bank) or Arab Bank (the PMA's Palestinian correspondent bank) are not "the legal agent of []either the originator [bank] []or the intended beneficiary" bank or customer.  *Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 609 F.3d 111, 121 (2d Cir. 2010).  Therefore, PIB's "correspondent bank relationship [with AJIB], standing alone, does not create an agency relationship."  *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 122 (2d Cir. 1984).

Further, specific jurisdiction over PIB cannot be based on the decisions of third-parties— including PIB's customers, or its regulator, the PMA—to direct transfer of their own funds into or out of the United States.  Specific jurisdiction must be based on "contacts that the 'defendant himself' creates with the forum," and cannot be based on "the unilateral activity of another party

or a third person." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

As a factual matter, PIB did not control AJIB in how it chose to effect funds-transfers into or through the United States, and PIB did not control its customers or the PMA when they directed PIB to transfer funds to, or receive funds from, the United States.  PIB Decl. at ¶¶ 20-21, 27-29. PIB therefore is not subject to personal jurisdiction in the United States, regardless of whether AJIB transferred funds through the United States, or PIB customers or its regulators directed funds-transfers to or from U.S. accounts.

Plaintiffs' amendments also allege, for the first time, that PIB "aided and abetted" Hamas by providing routine financial services to an organization called the Holy Land Foundation ("HLF") while "knowing that HLF was, at the time, HAMAS's premier U.S.-based fundraising organization."  Am. Compl. ¶ 4; *see also id.* ¶ 9 (alleging that PIB maintained an account for HLF in Palestine and received and transferred funds for HLF).  However, the Amended Complaint identifies only <u>one</u> transaction allegedly sent to PIB for the benefit of HLF, dated August 23, 2001—<u>before</u> the "relevant period" as defined by Plaintiffs themselves.  *Id.*, ¶¶ 2, 574 and Exhibit C.  Further, Plaintiffs admit that HLF was not designated as a terrorist by the U.S. government until <u>December 2001</u>, months after the single transaction alleged in the Amended Complaint.  *Id.*, ¶ 11.  Plaintiffs do not plausibly allege that PIB processed any transactions—whether through New York or anywhere else—for HLF after it was designated by the U.S. government.  Nor do Plaintiffs plausibly allege any facts that would show PIB was aware of any connection between HLF and Hamas at the time that it allegedly processed the sole transaction involving HLF identified in the Amended Complaint.  Plaintiffs also do not even attempt to identify any causal connection between the one transaction they allege in August 2001 and any of the 13 Attacks in which they were

7

injured.  This one isolated transaction, which was not initiated by PIB, cannot support jurisdiction over PIB.

In sum, despite amending their complaint, Plaintiffs have failed to establish a *prima facie* case of jurisdiction over PIB and have failed to state a claim against PIB, even for those Plaintiffs who have standing to sue.  Plaintiffs' claims should now be dismissed.

## **ARGUMENT**

## I.   **PLAINTIFFS' ALLEGATIONS DO NOT STATE A *PRIMA FACIE* CASE FOR EITHER GENERAL OR SPECIFIC PERSONAL JURISDICTION OVER PIB.**

On a Rule 12(b)(2) motion to dismiss, the "plaintiff has the burden of making a prima facie showing that personal jurisdiction over the defendant exists."  *In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 3d 416, 424 (S.D.N.Y. 2018) (citation omitted); *see Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010); *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (citation omitted) ("*Licci IV*").  The Amended Complaint "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018); *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) ("*Licci I*"); *O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 659, 673 (2d Cir. 2013).  "A prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place."  *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015) (citing *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (rejecting jurisdictional allegations lacking "supporting facts" and "factual specificity")).  On a Rule 12(b)(2) motion, "the court is neither required to draw argumentative inferences in the plaintiff's favor, nor must it accept as true a legal conclusion couched as a factual

8

allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 3d at 424 (citations and quotations omitted).

In addition, in resolving a Rule 12(b)(2) motion, the Court "may consider materials outside the pleadings," including affidavits submitted by the defendant. *See Trisvan v. Heyman*, 305 F. Supp. 3d 381, 391 (E.D.N.Y. 2018); *Reliance First Capital, LLC v. Mid Am. Mortg., Inc.*, No. 18-cv-3528 (SFJ) (ARL), 2019 U.S. Dist. LEXIS 100901, at *2, 17 (E.D.N.Y. June 17, 2019); *Japan Press Serv., Inc. v. Japan Press Serv., Inc.*, No. 11 cv 5875, 2013 U.S. Dist. LEXIS 2163, at *4, *12 (E.D.N.Y. Jan. 2, 2013) (collecting cases).

"A motion to dismiss pursuant to Rule 12(b)(2) . . . is inherently a matter requiring the resolution of factual issues outside of the pleadings.  Therefore all pertinent documentation submitted by the parties may be considered in deciding the motion." *Reliance First Capital*, 2019 U.S. Dist. LEXIS 100901, at *2 (internal quotations and citations omitted) (granting motion to dismiss for lack of jurisdiction after considering "the affidavits and documentary exhibits submitted by Plaintiff and Defendant."); *Siegel v. HSBC Holdings PLC*, No. 17-cv-6593, 2018 U.S. Dist. LEXIS 8986, at *12 (S.D.N.Y. Jan. 19, 2018) (considering affidavits related to jurisdictional facts submitted by defendant banks and granting Rule 12(b)(2) motions to dismiss filed by HSBC Holdings and Al Rajhi Bank), *aff'd sub nom.*, *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019); *Cmty. Fin. Grp. Inc. v. Stanbic Bank Ltd.*, No. 14-cv-5216, 2015 U.S. Dist. LEXIS 89904, at *5, *11 (S.D.N.Y. July 10, 2015) (considering affidavit submitted by defendant in granting motion to dismiss for lack of jurisdiction).

"The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *Reliance First Capital*, 2019 U.S. Dist. LEXIS 100901, at *17 (quoting *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (emphasis

added)); *Levin v. Am. Document Servs., LLC*, No. CV 17-1285 (JFB)(AYS), 2018 U.S. Dist. LEXIS 10015, at *21 (E.D.N.Y. Jan. 19, 2018) (same); *ICO Servs., Ltd. v. Coinme, Inc.,* No. 18 Civ. 4276, 2018 U.S. Dist. LEXIS 212081, at *4 (S.D.N.Y. Dec. 17, 2018) (same). "[W]hen a defendant rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction—and plaintiffs do not counter that evidence— the allegation may be deemed refuted." *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 228 (S.D.N.Y. 2015) (internal quotation and citation omitted); *Reliance First Capital*, 2019 U.S. Dist. LEXIS 100901, at *17 (internal quotation and citation omitted); *Fallman v. Hotel Insider, Ltd.*, No. 14-cv-10140 (SAS), 2016 U.S. Dist. LEXIS 5895, at *5 (S.D.N.Y. Jan. 15, 2016) (internal quotation and citation omitted).[3]

Here, Plaintiffs allege PIB is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2). Am. Compl. ¶ 19. However, whether jurisdiction is asserted pursuant to federal or state law, the Court may only exercise jurisdiction over PIB consistent with due process and "'traditional notions of fair play and substantial justice' under the circumstances of the particular case." *Waldman v. PLO*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014)); *Johnson v. UBS AG*, No. 18-2906, 2019 U.S. App. LEXIS 33286 (2d Cir. Nov. 7, 2019) (summary order); *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007); *see Daimler*, 571 U.S. at 126-27.  Under these

---

[3] Further, even if the Court were to find that Plaintiffs had made a *prima facie* case of specific jurisdiction over claims arising from one of the 13 Attacks, that is insufficient to support the exercise of specific jurisdiction over claims arising from the remaining Attacks.  *See Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 23 (E.D.N.Y. 2016) (finding, in the ATA context, that "[a] plaintiff must establish personal jurisdiction with respect to each claim asserted."); *see generally Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1781-82 (2017).  "Because Plaintiffs allege injuries in connection with [multiple] different attacks, each associated with a distinct class of Plaintiffs, the Court disagrees that all of their claims can be aggregated into a single, unitary claim under the ATA for purposes of establishing specific jurisdiction."  *Strauss*, 175 F. Supp. 3d at 23.

standards, the Amended Complaint fails to make a *prima facie* case for either general or specific personal jurisdiction over PIB, requiring its dismissal.

### A.   PIB is a Palestinian Bank with No U.S. Operations, and had No U.S. Correspondent Accounts during the Relevant Period.

As Plaintiffs concede, PIB is "a Palestinian bank headquartered in Ramallah-al-Bireh, in the Palestinian Territories."  Am. Compl. ¶ 1.  It was established as a public shareholding company in Palestine in 1994, and began banking operations in March 1995.  *Id.* ¶ 463.  It is now listed on the Palestine Exchange.  *Id.*  Plaintiffs further allege that PIB "currently has 19 branches" in Palestine "and a branch in Bahrain".  *Id.* ¶ 466.[4]  As a commercial bank headquartered in Ramallah, Palestine, PIB is regulated by the PMA, the regulator for all banks in Palestine.  PIB Decl. ¶ 9.

PIB is not now, and has never been, incorporated, licensed, registered as a foreign corporation, or otherwise authorized to conduct business anywhere in the United States.  PIB Decl. ¶ 11.  It does not have a branch, office, subsidiary, agency, or other regular place of business anywhere in the United States, nor did it have any of these between September 2001 and March 2003, the "relevant period" in this action (as defined in ¶ 2 of the Amended Complaint).  *Id.* ¶ 12. It does not own, lease, or occupy any real property in the United States, nor did it do so during the relevant period.  *Id.* ¶ 13.  It has no employees, directors, or officers in the United States, nor did it have any during the relevant period.  *Id.* ¶ 14.

Plaintiffs allege that PIB "currently . . . offers dollar clearing services through its correspondent account at Bank of New York Mellon."  Am. Compl. ¶ 466 (emphasis added). However, during the relevant period, and at all relevant times before 2009, PIB did not have a correspondent account with any bank in the United States.  PIB Decl. ¶ 15.

---

[4]  In fact, PIB has 20 branches and offices in the West Bank, including a head office in Ramallah, and one branch in Gaza.  (PIB Decl. ¶ 6.)  At the end of 2016, PIB established a branch in Manama, Bahrain.  (*Id.* ¶ 7.)

Prior to 2009, PIB processed dollar-denominated transactions for its customers in different ways based on the nature of the transaction—none of which involved PIB transferring or clearing dollars through the United States. *Id.* ¶ 16. Dollar-denominated transfers from one PIB account-holder to another, such as checks drawn on one PIB account for payment into another PIB account, were cleared and settled on PIB's own books. *Id.* ¶ 17. Dollar-denominated transfers between an account-holder at PIB and an account-holder at another Palestinian bank (or a Palestinian branch of a foreign bank) were settled through the PMA's clearing and settlement system. *Id.* ¶¶ 18-19.

During the relevant period, and at all relevant times prior to 2009, for dollar-denominated transactions involving counter-parties outside Palestine, PIB maintained correspondent banking relationships with non-U.S. correspondent banks, primarily Arab Jordan Investment Bank ("AJIB"), which is based in Amman, Jordan, and also with Bank Hapoalim, which is based in Tel Aviv, Israel. *Id.* ¶ 15. During the relevant period, dollar-denominated transfers between account-holders at PIB and third parties outside Palestine were cleared through PIB's correspondent banking relationships with those non-U.S. correspondent banks, primarily AJIB. *Id.* ¶ 23. Because the Amended Complaint specifically (and incorrectly) alleges that PIB "purposefully and knowingly" processed funds transfers through the United States via AJIB (*see* Am. Compl. ¶ 20), the process with respect to AJIB is described below.

To process a dollar-denominated transfer from a PIB account-holder to an individual or entity outside of Palestine (an "outbound transfer") through AJIB during the relevant period, PIB would debit its account-holder's account in the amount of the transfer and credit AJIB's correspondent account in the same amount. PIB Decl. ¶ 24. PIB would then send AJIB a credit entry notification and request that AJIB process the outbound transfer to the beneficiary on behalf of PIB's customer. *Id.* When a bank outside Palestine, on behalf of its customer (the "originator")

12

wanted to send a dollar-denominated transfer to a PIB account-holder (an "inbound transfer") during the relevant period, the originator's bank would send the transfer to AJIB for the benefit of the PIB account-holder.  *Id.* ¶ 25.  AJIB would then credit PIB's correspondent account in the amount of the transfer, and send a notification to PIB informing PIB of the transfer, and asking PIB to credit its customer's account.  *Id.*  PIB would then debit AJIB's correspondent account in the amount of the transfer, and credit the funds to its account-holder's account.  *Id.*  In other words, and as is common in international correspondent banking, U.S. dollar transfers between PIB and AJIB were settled entirely by way of book entries—that is, credits and debits to the correspondent (or "nostro-vostro") accounts PIB and AJIB each held on the books of the other—rather than by wiring funds between the two banks. *Id.* ¶ 26.  With respect to both outbound transfers and inbound transfers, PIB did not participate in, direct, or control whatever relationships AJIB may have had with any other banks (whether in or outside of the United States) that may have been correspondents of AJIB for dollar-denominated business. *Id.* ¶ 28.  All outbound transfers for, and inbound transfers to, PIB account-holders were accomplished entirely outside the United States by way of book-entry transactions between PIB and AJIB.  *Id.*  PIB never controlled how AJIB processed any dollar-denominated or other transactions through a U.S. bank.  *Id.* ¶ 29.  Rather, AJIB made its own decisions about whether it would use its own U.S. correspondent banks, and who those correspondents would be.  *Id.*  To the extent PIB's payment messages to AJIB relating to a wire transfer identified a U.S. bank or bank account in the path of the funds transfer, such instructions simply implemented decisions and express directions made independently by the PMA, PIB's customer, or the counterparty to the transaction, not as a result of any arrangement made by PIB with any U.S. bank.  *Id.*  Those independent third-party decisions thus do not reflect

13

PIB's purposeful availment of the U.S. banking system, and do not support personal jurisdiction over PIB under *Walden* and the Second Circuit decisions implementing *Walden* in ATA lawsuits.

The Amended Complaint does not identify any correspondent bank account maintained by PIB anywhere in the United States before 2009, nor could it.  It also does not identify a single transaction or a single dollar that PIB directed to be processed through a bank in the United States during the relevant period, let alone any funds that PIB allegedly processed (or directed to be processed) through New York that were <u>then</u> transferred to a terrorist organization, an individual terrorist, or even to family members of a terrorist, whether related in some way to the Attacks or otherwise.

### B.   Plaintiffs Allege Only that PIB Engaged in Routine Banking Activity.

Plaintiffs do not allege that PIB maintained accounts or provided banking services to any of the individuals or organizations that carried out the Attacks.  Rather, they allege (at most) that PIB provided routine banking services to an individual, Rakad Salem, the alleged leader of the Arab Liberation Front ("ALF"), and an organization called the Holy Land Foundation ("HLF"). Am. Compl. ¶¶ 4, 20-21.

As the Court may take judicial notice, neither the ALF nor Salem was designated as a terrorist in the United States, Israel, or anywhere else in the world during the relevant period, nor are they so designated today.  *See* Office of Foreign Assets Control Specially Designated Nationals List, available at https://www.treasury.gov/ofac/downloads/sdnlist.pdf (last visited Nov. 25, 2019); *see also Freeman v. HSBC Holdings PLC*, No. 14 CV 6601 (DLI) (CLP), 2018 U.S. Dist. LEXIS 127289, at *22 n.11 (E.D.N.Y. July 27, 2018) (court taking judicial notice of dates Iranian oil company was designated by OFAC and then designation was removed).  In fact, in August 2004—even <u>after</u> all 13 of the Attacks at issue in this action—an Israeli military court <u>acquitted</u> Mr. Salem of the charge of membership in a terror group because the court held that ALF was <u>not</u>

14

a terror group, and had not been one since at least 1996, well underline(before) all 13 of the Attacks at issue here.[5]

Importantly, Plaintiffs do not allege that either ALF or Salem was involved in planning or carrying out any of the Attacks.  Instead, they allege that ALF and/or Salem made certain payments to family members of those who died, were wounded, or whose houses were destroyed during the Second Intifada.  Am. Compl. ¶ 493.  However, the only payments alleged to have been paid through a PIB account to family members of a person who committed one of the Attacks are two checks referenced in Exhibit A to the Amended Complaint.  Those checks allegedly, and on their face, were drawn on the account of a PIB customer in favor of family members of the perpetrators of the Ben Yehuda Street bombings (*id.* ¶¶ 22, 522; Exhibit A).  The Amended Complaint does not allege that anyone involved with any of the other 12 Attacks, or any of their families, received a payment drawn on a PIB account or otherwise made through PIB, or identify any other transactions through PIB related in any way to the other 12 Attacks.  Nor does the Amended Complaint allege that the perpetrators of the Ben Yehuda Street bombings were aware that their families would receive a payment, much less that the perpetrators were motivated by the payment to participate in that Attack.

Plaintiffs also allege that PIB provided routine banking services to HLF, including maintaining an account for HLF in Palestine and processing one transaction, in August 2001, for approximately $5,000, to an account at PIB.  As Plaintiffs admit, HLF was not designated by OFAC until December 2001, and Plaintiffs do not allege that PIB processed any transactions for HLF subsequent to its OFAC designation.  Nor do Plaintiffs allege, other than in conclusory

---

[5] Arnon Regular, "Arab Liberation Front Chief Is Acquitted of Terror Charges in Military Court," Haaretz, Aug. 25, 2004, *available at* https://www.haaretz.com/1.4832552 (last visited Nov. 25, 2019).

15

fashion, that PIB was aware of any alleged connection between HLF and Hamas at the time of the August 2001 transaction.

### C.    There is No General Jurisdiction over PIB Because PIB Is Not "Essentially at Home" in the United States.

As Plaintiffs appear to acknowledge, this Court does not have general jurisdiction over PIB.  General jurisdiction is limited to circumstances where a defendant's contacts with the forum are so "constant and pervasive" that it is "essentially at home in the forum State." *Daimler*, 571 U.S. at 122; *Waldman*, 835 F.3d at 331.  As the Second Circuit recently reaffirmed, "[b]ecause general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts." *SPV OSUS, Ltd.*, 882 F.3d at 343 (quotations omitted).

PIB is a Palestinian bank headquartered in Ramallah.  Am. Compl. at ¶¶ 1, 463, 465.  It is not "essentially at home" in New York (or elsewhere in the United States).  It has never maintained a branch, office, subsidiary, or agency in the United States; has no physical presence in the United States; is not registered or licensed to conduct business in the United States; and has no employees or directors in the United States.  PIB Decl. ¶¶ 11-14.  Accordingly, PIB is not "present" in the United States for "all purposes" and is not subject to general personal jurisdiction. *Waldman*, 835 F.3d at 332-33.  Plaintiffs do not plausibly allege facts that would show otherwise.

### D.    There is No Plausible Basis for Specific Jurisdiction over PIB.

When determining whether specific jurisdiction exists over a defendant consistent with constitutional due process, courts consider "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (citations omitted); *In re del Valle Ruiz*, No. 18-3226 (L), 2019 WL 4924395 (2d Cir. Oct. 7, 2019) (same) (quoting *SPV Osus*, 882 F.3d at 344).  "For a State to exercise jurisdiction consistent with due process, the <u>defendant's suit-</u>

16

related conduct must create a substantial connection with the forum State." *Id.* (emphasis added). The focus of the specific jurisdiction inquiry is on the "contacts that the 'defendant himself' creates with the forum State," as opposed to the contacts of third parties. *Id.* at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (emphasis added)).

As the Supreme Court has emphasized, "we have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum state." *Walden*, 134 S. Ct. at 1122. Contacts with the U.S. that are "random, fortuitous, or attenuated," or represent "the unilateral activity of another party or a third person" do not permit the exercise of personal jurisdiction. *Burger King Corp.*, 471 U.S. at 475 (internal quotation and citation omitted). Rather, "the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State." *U.S. Bank N.A. v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1785 (2017)).

In the ATA context, the Second Circuit has confirmed that to establish specific jurisdiction, a plaintiff must plausibly allege facts showing that "the defendants' suit-related conduct—their role in the . . . terror attacks at issue—creates a substantial connection with the forum State pursuant to the ATA." *Waldman*, 835 F.3d at 335 (emphasis added). In an ATA case, "[t]he relevant 'suit-related conduct'" is "the conduct that could have subjected [the defendant] to liability under the ATA." *Id.* When the defendant is a bank, and jurisdiction is predicated on alleged financial transfers through the United States, a plaintiff must show not only the defendant's "selection and repeated use of New York's banking system" during the relevant period, but also that the defendant made financial transfers through U.S. banks that served "as an instrument for accomplishing the

alleged wrongs for which the plaintiffs seek redress." *Licci IV*, 732 F.3d at 171; *see id.* at 168 (explaining that "both the frequency and deliberate nature" of the use of correspondent accounts were "determinative" in satisfying New York's long-arm statute); *see also Waldman*, 835 F.3d at 342 (deeming irrelevant to personal jurisdiction activities in the United States "that are not proscribed by the ATA and are not connected to the wrongs").

The *Licci* test does not allow for specific jurisdiction over PIB because PIB did not make any use of the New York (or other U.S.) banking system during the relevant period, and Plaintiffs do not identify any PIB bank transfer through the United States that was "an instrument" for the Attacks that harmed them.  Plaintiffs cannot bridge these gaps by way of allegations concerning AJIB (*see* Am. Compl. ¶¶ 20, 535, 575), because any U.S. banking transaction by AJIB is the act of a third party, not an act of PIB.

As the Second Circuit has underscored, the "relationship between the defendant and the forum . . . must arise out of contacts that the defendant himself creates with this forum." *Waldman*, 835 F.3d at 335 (internal quotations and citations omitted).  Accordingly, any banking relationship or transaction that AJIB or any other third party may have conducted by or through correspondent banks in New York, without the control of PIB, is "insufficient to demonstrate that the use of the [New York] account was [a] purposeful" act by PIB—and therefore is insufficient to support specific jurisdiction.  *Stanbic Bank Ltd.*, 2015 U.S. Dist. LEXIS 89904, at *5, *11.

When, as here, a third-party (AJIB) allegedly conducted banking transactions through a New York account without control by a foreign defendant (PIB), courts conclude that the third-party's New York connection has only an "essentially adventitious" or "coincidental," rather than a "purposeful," relationship to the foreign defendant and cannot support personal jurisdiction over

18

it.  *Licci v. Lebanese Canadian Bank SAL*, 20 N.Y.3d 327, 338, 984 N.E.2d 893, 960 N.Y.S.2d

695 (2012); *MacDermid, Inc. v. Canciani*, 525 F. App'x 8, 10-11 (2d Cir. 2013) (same).

A recent Second Circuit case, *Timothy Coffey Nursery Landscape Inc. v. Soave*, 760 F.

App'x 58 (2d Cir. 2019), confirms this point.  There, plaintiffs alleged that defendants were subject

to personal jurisdiction in New York based on "the use of funds flowing between *plaintiffs'* New

York bank account and defendants' Canadian bank account and some communications associated

with these wire transfers."  *Id.* at 60.  The Second Circuit held that, unlike in *Licci*, "[t]his

'essentially adventitious' use of a New York bank account does not establish personal jurisdiction"

because the defendant did not direct the transfer of funds through New York.  *Id.*  As in *Timothy*

*Coffey*, PIB cannot be subject to personal jurisdiction in New York based on the "adventitious"

and "coincidental" alleged processing of dollar-denominated transactions by AJIB—not by PIB—

through AJIB's U.S. correspondent bank accounts without any control by PIB.

Similarly, in *MacDermid*, the Second Circuit held that a defendant's maintenance and use

of a brokerage account in Connecticut was insufficient to subject him to personal jurisdiction.  The

court found that the defendant did not know the account had been set up in Connecticut, and "there

is no indication that [defendant's] use of a Connecticut account was anything other than

coincidental or random or that [defendant] purposefully availed himself of Connecticut's banking

system."  *MacDermid, Inc.*, 525 F. App'x at 11.

Here, the Amended Complaint does not plausibly and with sufficient factual detail allege

that PIB <u>itself</u> engaged in "repeated use of New York's banking system," let alone that such use

constituted "conduct that could have subjected [PIB] to liability under the ATA[.]"  *Waldman*, 835

F.3d at 335, 342.  Plaintiffs do not and could not plausibly allege that PIB <u>itself</u> had <u>any</u>

19

correspondent banking accounts or transactions in the United States during the relevant period—and the PIB Declaration confirms that PIB did not.

Plaintiffs seek to jump this gap by alleging that PIB conducted banking business in the United States through "agents", namely intermediary banks like AJIB (PIB's Jordanian correspondent bank) or Arab Bank (the PMA's Palestinian correspondent bank during the relevant period). This argument fails as a matter of law, because the Second Circuit has held that intermediary banks are not "the legal agent of []either the originator [bank] []or the intended beneficiary" bank or customer. *Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 609 F.3d 111, 121 (2d Cir. 2010). Therefore, "[a] correspondent bank relationship, standing alone, does not create an agency relationship." *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 122 (2d Cir. 1984) (emphasis added).

Article 4 of the Uniform Commercial Code governs electronic funds transfers ("EFTs") in New York. *See, e.g., Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152, 156 (2d Cir. 2018). The UCC specifically provides that "[a] receiving bank is not the agent of the sender or beneficiary of the payment order it accepts, or of any other party to the funds transfer, and the bank owes no duty to any party to the funds transfer except as provided in this Article or by express agreement." N.Y. U.C.C. § 4-A-212 (emphasis added). Applying UCC Article 4 in terrorism cases involving banks, the Second Circuit has held that intermediary banks in New York that process EFTs for overseas banks (like PIB or, indeed, AJIB) are independent actors, not agents of the overseas banks that initiate or receive funds processed through U.S. banks. *Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 770 F.3d 993, 1002 (2d Cir. 2014) (holding that, "under New York law, 'EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank.'").

20

Alongside that doctrine, third-party activity in the United States cannot create specific jurisdiction over PIB based on its overseas actions, including PIB's interaction with AJIB. In the ATA context, "the <u>defendant's</u> suit-related conduct—<u>their</u> role in the . . . terror attacks at issue"— *i.e.*, "the conduct that could have subjected" the <u>defendant</u> "to liability under the ATA" is the <u>only</u> conduct relevant to establishing jurisdiction. *Waldman*, 835 F.3d at 335 (emphasis added); *see Walden*, 134 S. Ct. at 1122 (relevant contacts with the forum are "contacts that <u>the 'defendant himself' creates</u> with the forum State") (emphasis added) (quotations omitted).

It is jurisdictionally irrelevant that PIB allegedly knew that AJIB or the PMA would use their own U.S. correspondent banks to process dollar-denominated transfer involving PIB. Foreseeability of a third-party's contacts with the United States is not, under *Waldman*, evidence that PIB itself engaged in purposeful contacts with the United States. As a factual matter, all of PIB's dollar-denominated transfers outside Palestine were accomplished offshore, by way of book-to-book transfers primarily with its Jordanian correspondent bank, AJIB. PIB Decl., ¶¶ 15-16, 23-26.

Further, PIB never controlled how AJIB processed funds to or through the United States. AJIB made its own decisions about whether it would use its own U.S. correspondent banks, and who those correspondents would be. PIB Decl., ¶ 29. To the extent PIB instructed AJIB to process a payment to a U.S. bank or bank account, such instruction simply implemented antecedent decisions made independently by, and at the express direction of, the PMA, PIB's customer, or the counterparty to the transaction, not by PIB and not as a result of any arrangement or relationship PIB had with any U.S. bank. *Id.*

On these facts, any alleged processing of dollars through a U.S. bank by AJIB, even if foreseeable by PIB, is purely "adventitious" and "coincidental" as to PIB, and cannot support jurisdiction over PIB. *Timothy Coffey*, 760 F. App'x at 60-61; *MacDermid*, 525 F. App'x at 11.

Nor can the sole transaction Plaintiffs allege regarding the HLF subject PIB to specific jurisdiction. Even accepting, for Rule 12 purposes, Plaintiffs' allegations regarding that transaction, that one transaction was initiated in the United States by a party other than PIB, and sent through a non-PIB correspondent account in the United States, and then ultimately to PIB. This single transaction, on its face, does not constitute PIB's "selection and repeated use of New York's banking system," as required under *Licci*, 732 F.3d at 171, but rather represents the "random, fortuitous, or attenuated" "unilateral activity of another party or a third person," *Burger King Corp.*, 471 U.S. at 475. Further, the alleged HLF transaction cannot constitute "suit-related conduct" on the part of PIB because it occurred outside the time period relevant to this action as Plaintiffs themselves define it, and Plaintiffs do not even attempt to draw any causal connection between the transaction and any of the Attacks.

In sum, Plaintiffs have not plausibly alleged that PIB (rather than a third party) maintained any correspondent banking relationship or processed any transactions through the United States during the relevant period, let alone that those same transactions gave rise to the Attacks. As the Amended Complaint does not allege any other factual basis which could establish jurisdiction over PIB, the Amended Complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(2).

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR ATA PRIMARY LIABILITY.

Independent of the insurmountable lack of personal jurisdiction, Plaintiffs' claims are legally insufficient to establish a claim for either primary or secondary liability under the ATA, even crediting their allegations for Rule 12(b)(6) purposes. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).  Under Rule 12(b)(6), the court may consider only well-pled factual allegations, *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014), and must ignore "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678 (citation omitted); *see Bank v. Vivint Solar*, No. 18-CV-2555, 2019 U.S. Dist. LEXIS 48033, at *7 (E.D.N.Y Mar. 22, 2019) (opining that though "allegations contained in the complaint are assumed true," that "principle is inapplicable to legal conclusions" (citation and internal quotations omitted)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is insufficient to survive a motion to dismiss.  *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678) (other citations omitted).

Plaintiffs' second claim for relief alleges material support for terrorism in violation of 18 U.S.C. § 2339A.  The Amended Complaint fails to state this type of primary-liability claim against PIB because it does not plausibly allege facts that, if true, would show that PIB provided banking services with the heightened state of mind required for a civil claim based on Section 2339A—*i.e.*, that PIB knew or intended that its banking services would be used to prepare for or to carry out the Attacks.  Further, Plaintiffs do not plausibly allege, as required, that PIB's banking services were themselves "an act of international terrorism" or that PIB's banking services proximately caused the Attacks that give rise to their injuries.

    **A.**    **The Amended Complaint Does Not Plausibly Allege that PIB Knew or Intended that its Banking Services Would Be Used to Prepare for or Carry Out the Attacks.**

Plaintiffs predicate their primary-liability claim on an alleged violation of 18 U.S.C. § 2339A, but they fail to plausibly allege that PIB acted with the heightened state of mind demanded by that provision.  To state a violation of Section 2339A, a plaintiff must allege that "the defendant must have known or intended that [its] support [here, banking services] would be used in preparation for, or in carrying out," the alleged underlying terrorist act (here, the Attacks). *Ayda Husam Ahmad v. Christian Friends of Israeli Cmtys.*, 13 Civ. 3376 (JMF), 2014 U.S. Dist. LEXIS 62053, at \*7 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x. 800 (2d Cir. Apr. 22, 2015). "In contrast to § 2339B, which broadly criminalizes the provision of any 'material support' to any group known to be a foreign terrorist organization, § 2339A(a) raises the scienter requirement and criminalizes only the provision of material support knowing or intending that they be used in preparation for, or in carrying out, certain specific crimes." *United States v. Awan*, 459 F. Supp. 2d 167, 179 (E.D.N.Y. 2006) (citations and quotations omitted); *see also Linde v. Arab Bank, PLC*, 882 F.3d 314, 330 n.11 (2d Cir. 2018) (recognizing that unlike claims brought under § 2339B, a § 2339A claim requires "proof of knowledge or intent that material support be used in preparation for or in carrying out specified crimes").

In other words, Section 2339A is a specific-intent crime that "requires proof of heightened mens rea." *In re Chiquita Brands Int'l, Inc.,* 284 F. Supp. 3d 1284, 1309 (S.D. Fla. 2018).  "[T]he mental state required under § 2339A extends both to the support itself, <u>and</u> to the underlying purposes for which the support is given, and an ATA plaintiff proceeding on a § 2339A predicate must show evidence of the defendant's specific knowledge of, or intent to further, the specified underlying crime." *Id.* (internal citations omitted) (emphasis in original).

Here, the Amended Complaint does not plausibly allege that PIB knew or intended that any of its alleged banking services would be used in preparation for, or in carrying out the Attacks or any other violent act.  For example, the Amended Complaint does not plausibly allege that PIB knew that its purported customer, Mr. Salem, was involved in terrorism in any way, or that PIB knew of Mr. Salem's alleged role in any payment scheme.  The Amended Complaint also does not allege that PIB helped to administer or facilitate, or was even aware of, a broader "reward" program for the families of terrorists.

Instead, the Amended Complaint alleges that the ALF, with funding from Saddam Hussein, made payments to surviving family members of attackers using checks drawn on Rakad Salem's account at PIB.  *See* Am. Compl. ¶¶ 515, 522, 525.  Even if credited for Rule 12 purposes, these allegations do not plausibly demonstrate that these ALF payments would be used in preparation for, or in carrying out, the Attacks or any other terrorist act—let alone that PIB knew or intended that its financial services to Rakad Salem would be so used.  If those ALF payments were so obviously linked to terrorist attacks, and if those payments were widely publicized, as Plaintiffs posit, then the Government of Israel certainly would not have maintained its position, from 1996 forward, that the ALF was not a terrorist organization, nor would an Israeli court have so held. *See supra* at 14-15.

In any event, the Amended Complaint does not plausibly allege that PIB was aware of any ostensible publicity concerning these ALF payments.  *See* Am. Compl. ¶¶ 512-519, 635, 651; *see also Kaplan v. Lebanese Canadian Bank*, *SAL*, 08 Civ. 7253 (GBD), 2019 U.S. Dist. LEXIS 162505, *22 (S.D.N.Y. Sept. 20, 2019) (dismissing ATA claims against bank because reports in, *inter alia*, "Hizbollah websites," "television and radio stations" and "various English-language publications" were insufficient to put bank on notice of its customers' affiliation with terrorist

organization where "Plaintiffs nowhere allege[d] . . . that Defendant read or was aware of such sources."). Nor do Plaintiffs even attempt to connect any of the alleged payments (publicized or otherwise) to the Attacks. And for good reason.

As a matter of law, "[a] showing of support—even post-attack financial support to the families of terrorists—is not sufficient to demonstrate that [the remitter was] somehow responsible for the attacks." *Sokolow v. PLO*, 60 F. Supp. 3d 509, 517 n.11 (S.D.N.Y. 2014); *accord Shatsky v. PLO*, No. 02-2280 (RJL), 2017 U.S. Dist. LEXIS 94946, at *31 (D.D.C. June 20, 2017) ("without more, . . . after-the-fact [martyr] payments [to surviving families] are not sufficient for a reasonable jury to conclude that defendants proximately cause the . . . bombing.") (appeal pending, *Shatsky v. PLO*, No. 17-7168 (D.C. Cir. filed Dec. 11, 2017)) (quoting *Sokolow*). The Amended Complaint does not plausibly allege that any of the perpetrators of the Attacks was motivated by the possibility that their families might receive a post-Attack payment, let alone that PIB knew or intended that those individuals would be so motivated. *See Shatsky v. PLO*, 2017 U.S. Dist. LEXIS 94946, at *31.

Ultimately, the Amended Complaint alleges only that PIB processed facially routine banking transactions for Mr. Salem—who was not himself, and whose organization (ALF) was not, designated as a terrorist, and who was acquitted by an Israeli court of membership in a terrorist group after the Attacks and after the payments alleged in the Amended Complaint occurred. The Amended Complaint thus does not show that PIB knew or intended its provision of routine banking services after an Attack would "be used in preparation for, or in carrying out" the Attacks. 18 U.S.C. § 2339A; *see United States v. Ghayth*, 709 F. App'x. 718, 722-23 (2d Cir. 2017) (summary order) (quoting § 2339A).

The documents attached as Exhibit A to the Amended Complaint do not change the analysis.  Plaintiffs allege that these documents include checks drawn on a third party's PIB account to family members of perpetrators of the Ben Yehuda attack.  *See* Am. Compl. ¶ 522 and Ex. A.  However, the Amended Complaint alleges no facts plausibly suggesting that PIB knew or intended that its redemption and processing of these checks would be used in the preparation for, or in carrying out, the Attacks.  For example, nothing about these checks plausibly suggests that PIB knew—either when its account-holder drew those checks, or when PIB subsequently processed those checks—that Mr. Salem wrote those checks as part of any scheme to promote terrorism or to underwrite the Attacks or any other terrorist act.  And the Amended Complaint does not allege (plausibly or otherwise) that the handwritten reference to "martyr[s]" on those checks was made contemporaneously by Mr. Salem (rather than subsequently by someone else), or that in processing the checks PIB would have read or understood any such reference that was contemporaneously written on the check.

Further, the Amended Complaint does not allege (plausibly or otherwise) that PIB prepared or was otherwise aware of the "receipts" included in Exhibit A.  The Amended Complaint's non-conclusory alleged facts, if true, would suggest only that PIB conducted routine commercial banking business for its customer, including the processing of its customer's checks.  Nor does the Amended Complaint plausibly allege that PIB knew the identity of the individuals who perpetrated the Ben Yehuda bombing or of a familial relationship between those individuals and their family members who allegedly received a check drawn on an account maintained at PIB, such that PIB could have known that the payments were being made as a "reward" for the Attack.

As to HLF, Plaintiffs allege, without factual support, that HLF "repeatedly transferred money from the United States . . . using HLF's account at" PIB, and that such transfers "were

27

routed from Texas to the Palestinian Territories via Chase Manhattan Bank, using the correspondent account of [PIB]'s agent, AJIB."  Am. Compl. ¶¶ 572-573.  However, Plaintiffs in fact allege only <u>one</u> transaction for HLF into an account at PIB.  That alleged transaction, allegedly reflected in Exhibit C to the Amended Complaint, is dated August 23, 2001, which is prior to the "relevant period" as defined by Plaintiffs, and also several months prior to HLF's designation by OFAC in December 2001.  Plaintiffs have not plausibly alleged that PIB was aware of any connection between HLF and any terrorist organization at the time it allegedly processed the transfer identified in Exhibit C.

The alleged facts here stand in sharp contrast to other ATA cases where courts have found allegations sufficient to plead a bank's knowing support for terrorism.  Indeed, the sharply different facts in those cases illustrate why Plaintiffs have not plausibly alleged PIB's knowing or intentional support for the Attacks or any other act of terrorism.  For example, in ATA cases against National Westminster Bank and Credit Lyonnais, the complaints contained non-conclusory allegations that the banks were on notice, at the time of the alleged transfers at issue, that specific customers had connections to terrorism.  *See Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 626–27 (E.D.N.Y. 2006) (customers were designated as Hamas fronts by Israeli government); *Strauss v. Credit Lyonnais, S.A.*, No. 06-CV-702 (CPS), 2006 U.S. Dist. LEXIS 72649, at *14–15, *47 (E.D.N.Y. Oct. 5, 2006) (bank was aware of "unusual activity" in accounts belonging to customers designated by Israel as connected to Hamas).  Similarly, in ATA cases against Arab Bank, plaintiffs plausibly alleged that the bank maintained accounts in the names of well-known Hamas operatives, some of whom were listed by the United States as Specially Designated Global Terrorists based on their affiliations with Hamas.  *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 486 (E.D.N.Y. 2012).

By contrast here, Plaintiffs have not plausibly alleged that PIB knowingly maintained a single account or processed a single transaction for a customer who was a designated terrorist or terrorist organization.  Plaintiffs have not met and could not meet the "knowing or intending" standard required by 18 U.S.C. § 2339A.  Plaintiffs' material support claim should be dismissed.

### B.      The Amended Complaint Does Not Plausibly Allege that PIB Committed an "Act of International Terrorism."

ATA civil actions, like RICO actions, require multi-level allegations and proof, not only (i) that the defendant has violated a predicate criminal statute (here, Section 2339A), but also (ii) that the defendant has violated the additional elements for the ATA civil cause of action established in 18 U.S.C. § 2333(a).  *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012) ("Like a civil RICO claim, a suit for damages under the ATA is akin to a Russian matryoshka doll, with statutes nested inside of statutes.") (internal quotation and citation omitted).  Those additional civil-action requirements include plausible allegations that a U.S. national was injured "by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  Plaintiffs fail to plausibly allege that PIB committed "an act of international terrorism"—and, as will be shown later, they fail to allege that PIB's banking services were the proximate cause of Plaintiffs' injuries, as required by the "by reason of" language in Section 2333(a).

The ATA defines "international terrorism" as activities that:

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State,

(B) appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States.

18 U.S.C. § 2331(1).

To state a viable claim for primary liability under § 2333(a), Plaintiffs must plausibly allege that PIB <u>itself</u> committed an act of "international terrorism" that satisfies each of the elements of Section 2331 above. *See, e.g., Linde v. Arab Bank, PLC*, 882 F.3d 314, 320, 331 (2d Cir. 2018); *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013). The Amended Complaint fails this requirement.

Plaintiffs do not allege that PIB committed the Attacks that injured them. Nor do Plaintiffs allege that PIB maintained accounts for, or processed transactions for, the organizations that Plaintiffs claim committed the Attacks, namely Hamas, PFLP, PIJ, and AAMB. Nor do Plaintiffs claim that PIB ever provided funds or banking services to any of the individuals who committed the Attacks. Rather, Plaintiffs allege that PIB provided routine banking services to one person, Rakad Salem, and that Mr. Salem made payments through his PIB account to family members of perpetrators of <u>one</u> of the <u>13</u> Attacks, the Ben Yehuda Street bombing (*id.* ¶ 522 and Exhibit A); and one organization, HLF, and that HLF received <u>one</u> transfer, unconnected to any of the Attacks (*id.* ¶ 574 and Exhibit C). Plaintiffs have not alleged, and could not plausibly allege, facts showing that PIB's conduct meets the definition of "international terrorism," and Plaintiffs' first claim must be dismissed for that reason as well.

        1.     The Amended Complaint Does Not Plausibly Allege that PIB Acted with the Terroristic Intent Required Under 18 U.S.C. § 2333(a).

Plaintiffs fail to plausibly allege that PIB's alleged banking services "appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government," *Linde*, 882 F.3d at 326. This is an objective test that "does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014).

Courts have regularly dismissed ATA claims where plaintiffs have failed to plausibly allege that a defendant acted with terroristic intent, as required by Section 2331(1). *See Brill v. Chevron Corp.*, Case No. 15-cv-04916, 2017 U.S. Dist. LEXIS 4132, at *19-20 (N.D. Cal. Jan. 9, 2017) (finding it "impossible" to say that plaintiffs had sufficiently alleged Chevron's terrorist intent in conducting oil business with Iraq); *Stansell v. BGP, Inc.*, Case No. 8:09-cv-2501-T-30AEP, 2011 U.S. Dist. LEXIS 39808, *26 (M.D. Fla. Mar. 31, 2011) (dismissing complaint where allegation that defendants made payments to terrorist group in exchange for agreement that defendants could conduct oil exploration activities without being targeted by terrorist acts "would not lead an objective observer to conclude Defendants intended to achieve any one of the results listed in § 2331(1)(B)."). "The plain language of the ATA compels the conclusion that, by engaging in commercial banking activity, the Bank Defendants were not involved in violent acts or acts dangerous to human life.  Nor were their actions designed to coerce civilians or government entities as required under § 2331." *Stutts v. De Dietrich Group*, Case No. 03-CV-4058 (ILG), 2006 U.S. Dist. LEXIS 47638, at *11-12 (E.D.N.Y. June 30, 2006).

Here, as in *Stutts*, the only acts in which PIB is alleged to have engaged are routine commercial banking activities, specifically banking services for an individual, Rakad Salem, who is not alleged to be either a terrorist or a member of a terrorist organization, and an organization, HLF, which Plaintiffs admit was not designated as a terror organization by the U.S. at the time of the sole transaction alleged in the Amended Complaint.  Courts have repeatedly found that such transactions are insufficient to show terroristic intent. *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018) ("While giving fungible dollars to a <u>terrorist organization</u> may be dangerous to human life, doing business with companies and countries that have significant legitimate operations is not necessarily so.") (internal quotation marks omitted) (emphasis added);

*O'Sullivan v. Deutsche Bank AG*, No. 17 CV 8709-LTS-GWG, 2019 U.S. Dist. LEXIS 53134, at *32-33 (S.D.N.Y. Mar. 28, 2019) (finding allegations that defendants provided financial services to Iranian banks and businesses "with connections to terrorist organizations," as opposed to services directly to terrorists, did not satisfy the terroristic intent requirement).

Mr. Salem and the organization of which he is allegedly a leader, ALF, were not designated terrorists anywhere in the world during the relevant period, nor are they so designated today.  HLF was not designated as a terrorist organization in the United States at the time of the transaction; indeed, it is telling that the U.S. bank ostensibly involved in that transaction did not block it. Plaintiffs have not alleged, and could not allege, that it was illegal to maintain an account or to process banking transactions for Mr. Salem in the United States, Israel, or Palestine during the relevant period.  In fact, even <u>after</u> all of the Attacks, Mr. Salem was tried and <u>acquitted</u> of membership in a terrorist organization by an Israeli military tribunal, because (the Israeli military tribunal found) ALF had not been a terrorist organization since at least 1996—well before the relevant period in this action.  *See supra* at 14-15.  Plaintiffs also have not alleged, and could not allege, that it was illegal to maintain an account or to process banking transactions for HLF in the United States or Palestine as of the date of the transaction identified in Exhibit C.  In sum, Plaintiffs have not plausibly alleged that PIB's purported banking activities had the objective intent of coercing or intimidating a civilian population or affecting government conduct, and Plaintiffs' primary liability claim must be dismissed.

2.      The Amended Complaint Fails to Plausibly Allege that PIB Engaged in "Violent Acts or Acts Dangerous to Human Life."

Independent of that flaw, the Amended Complaint also fails to allege facts to support a reasonable inference that PIB engaged in activities that "involve violent acts or acts dangerous to human life[,]" sufficient to constitute an act of "international terrorism" under Section 2331(1).  In

ATA litigation against banks, the Second Circuit has made clear that "the provision of material support to a terrorist organization does not invariably equate to an act of international terrorism." *Linde*, 882 F.3d at 326.  Indeed, even providing routine financial services to a terrorist organization itself—not alleged here—is "not so akin to providing a loaded gun to a child" as to compel a finding that those services were violent or life-endangering.  *Linde*, 882 F.3d at 327; *see Stutts*, 2006 U.S. Dist. LEXIS 47638, at *11-12 (finding the ATA "compels the conclusion that, by engaging in commercial banking activity, the Bank Defendants were not involved in violent acts or acts dangerous to human life.") (citations and quotations omitted).

Plaintiffs' Amended Complaint spends more than 440 of its 652 paragraphs describing the 13 Attacks and their tragic results, including the injuries Plaintiffs allegedly have suffered.  Am. Compl. ¶¶ 22-462.  But neither PIB nor any PIB customer is mentioned <u>anywhere</u> in those paragraphs, and with good reason—neither PIB, nor any PIB customer, is alleged to have had any role in planning or committing any of the Attacks.

The only operative allegations about PIB are that it accepted transfers into Mr. Salem's account from Iraq (Am. Compl. ¶¶ 532-533, 622); processed payments from Mr. Salem's account to families of perpetrators who killed themselves or who were killed during terrorist attacks (*id.* ¶¶ 21, 522), and allowed certain of these families to deposit those payments back into their own accounts at PIB (*id.* ¶ 514 n.9); and that PIB accepted <u>one</u> transfer into HLF's account in 2001, prior to HLF's designation by OFAC <u>and outside the relevant period for the Attacks (as defined by Plaintiffs themselves)</u> (*id.* ¶ 2, 574).  But the processing of transfers between bank accounts, or payment of checks, constitutes routine commercial banking activity.  As *Linde* instructs, without more, such routine banking services cannot be violent or dangerous to human life—and Plaintiffs have not alleged that PIB did anything more.

33

The Amended Complaint's allegations regarding the "Saudi Committee," a "private charity registered with the Kingdom of Saudi Arabia," highlight the deficiency of Plaintiffs' claims against PIB.  Am. Compl. ¶ 477.  The Saudi Committee is not alleged to have been a customer of PIB or to have processed any transactions to or through PIB.  Instead, the Amended Complaint alleges that—<u>without PIB's involvement</u>—the Saudi Committee "provided a comprehensive 'insurance' benefit or 'martyr' payment of approximately $5,316 USD to the families of Palestinian terrorists who died in the course of the Second Intifada."  *Id.* ¶ 482.  By contrast to what is alleged here, some of the Plaintiffs have brought other lawsuits alleging that <u>another</u> financial institution, Arab Bank, <u>did</u> provide supporting banking services to the Saudi Committee's payment program.  *See Miller v. Arab Bank*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019).  The contrast between what is alleged here and what some of these Plaintiffs have separately alleged against Arab Bank makes clear that there is no plausible allegation that PIB provided material support for terrorism.

In *Miller*, another ATA case pending in the Eastern District of New York, the complaint alleges that Arab Bank contributed its <u>own funds</u> in support of the Second Intifada; <u>changed</u> its routine banking procedures to facilitate the Saudi Committee's payment program; took extraordinary steps to facilitate the payments, such as contacting the program's beneficiaries to notify them of payments; and received instructions directly from the Saudi Committee and Hamas-affiliated charities explicitly connecting the payments to violent acts.  *See id.* at 39-40 (noting that Arab Bank received detailed lists containing the names of the "martyrs," their personal information, and the date and manner of their deaths, such as "'Martyr Operation'").

Here, by contrast to *Miller*, Plaintiffs do not plausibly allege facts showing that PIB facilitated any "program" of payments or did anything but provide routine financial and banking services to an individual, Mr. Salem, and an organization, the HLF, prior to the HLF's designation.

34

There is no allegation that PIB itself supported or raised funds to be provided to the family members of terrorists; that PIB took any extraordinary steps or changed any of its routine procedures to facilitate any payments at issue; or that PIB received any instructions from Mr. Salem or the HLF, or communications from others, linking Mr. Salem's or the HLF's transactions to the Attacks or to any other terrorist act.  The Amended Complaint therefore fails to allege that PIB's commercial banking activities were dangerous or violent acts, as necessary to constitute an "act of international terrorism" under § 2331(1).  This failure requires the dismissal of Plaintiffs' claim.

### C.     The Amended Complaint Fails to Plausibly Allege that PIB Proximately Caused the Attacks.

As noted, to state a civil claim for ATA primary civil liability, Plaintiffs must also plausibly allege facts showing that their injuries occurred "by reason of" an act of international terrorism committed by PIB.  The Second Circuit has interpreted the "by reason of" language to require a showing that the defendant's acts proximately caused plaintiff's injury.  *See Rothstein*, 708 F.3d at 95; *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123-24 (2d Cir. 2013); *D'Addario v. D'Addario*, 901 F.3d 80, 96 (2d Cir. 2018) (to state a civil RICO claim, plaintiff must show "that her injury was caused 'by reason of' the RICO violation—a standard that we have equated to the familiar 'proximate cause' standard.") (citing *Sergeants Benevolent Ass'n Health and Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 86 (2d Cir. 2015)).

"The proximate cause requirement is designed to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity."  *Ashton v. Al Qaeda Islamic Army (In re Terrorist Attacks on September 11, 2001)*, 298 F. Supp. 3d 631, 645-46 (S.D.N.Y. 2018).  "The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."

*Shatsky*, 2017 U.S. Dist. LEXIS 94946, at *19.  To adequately plead proximate cause, Plaintiffs must plausibly allege that the Bank's purported conduct was "a substantial factor in the sequence of responsible causation," and that Plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence."  *Rothstein*, 708 F.3d at 91.

Putting aside that Plaintiffs have not plausibly alleged that PIB committed an "act of international terrorism," Plaintiffs also have not plausibly alleged a proximate-cause relationship between PIB's conduct and the Attacks, requiring dismissal of their claims.  First, the Amended Complaint fails to plausibly allege that PIB's purported conduct was a "substantial factor" in carrying out the Attacks at issue.  Plaintiffs do not allege that PIB participated in the Attacks or provided banking services to the perpetrators or organizations allegedly responsible for them.  In fact, the Amended Complaint does not contain a single allegation that PIB processed any payments—not even a post-Attack payment to a family member—in connection with 12 of the 13 Attacks.  For this reason alone, PIB "could not have proximately caused the bombing[s]," and claims arising from those 12 attacks must be dismissed.  *See Shatsky*, 2017 U.S. Dist. LEXIS 94946, at *31.  But even Plaintiffs' allegations that PIB processed "after-the-fact payments" to families of Hamas operatives who allegedly carried out the Ben Yehuda Street Bombing are insufficient to plausibly allege that PIB proximately caused the Ben Yehuda Attack.  *Id.*

"[P]ost-attack financial support to the families of terrorists—is not sufficient to demonstrate that [the remitter was] somehow responsible for the attacks."  *Sokolow*, 60 F. Supp. 3d at 517 n.11.  The Amended Complaint lacks a single non-conclusory allegation that the two individuals who allegedly perpetrated the Ben Yehuda Street bombings knew that their families would receive payments after the attack, or that they were motivated by the prospect of such payments.  *Shatsky*, 2017 U.S. Dist. LEXIS 94946, at *31.

Plaintiffs also fail to plausibly allege that the Attacks were "reasonably foreseeable or anticipated as a natural consequence" of PIB's alleged provision of banking services to Mr. Salem or HLF. *Rothstein*, 708 F.3d at 91. The Second Circuit has made clear that "the mere provision of routine banking services to . . . individuals said to be affiliated with terrorists does not necessarily establish causation[.]" *Linde*, 882 F.3d at 32 (internal citations and quotations omitted). Here, the Amended Complaint does not allege, other than in the most conclusory way, that PIB provided banking services to terrorists or terrorist organizations. Rather, Plaintiffs factually allege only that PIB processed checks—related to only one of the 13 Attacks—to family members of two alleged attackers, <u>after</u> that Attack had already occurred, and processed one transfer—unrelated to any of the 13 Attacks—<u>before</u> the "relevant period" as Plaintiffs themselves define it. It defies logic that an attack could be "foreseeable" or "anticipated" as a result of a payment that takes place <u>after</u> the attack or <u>before</u> the relevant time period.

In sum, Plaintiffs' allegations are simply "too speculative [and] attenuated to raise a plausible inference of proximate causation," and Plaintiffs' direct liability claim must be dismissed. *Fields v. Twitter*, 200 F. Supp. 3d 964, 974 n.4 (N.D. Cal. 2016), *aff'd* 881 F.3d 739 (9th Cir. 2018).

## III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING LIABILITY UNDER 18 U.S.C. § 2333(d).

Plaintiffs' aiding and abetting claim[6] fails under the framework recently established by the Second Circuit in the *Linde* decision. Under the same Rule 12(b)(6) standards governing Plaintiffs' primary-liability claims (*supra* at 22-23), that claim must be dismissed for failure to

---

[6] Plaintiffs' third claim for relief alleges that PIB is liable for aiding and abetting FTOs in committing Attacks 1 through 9, in violation of 18 U.S.C. § 2333(d). Am. Compl. ¶ 638. In particular, Plaintiffs allege that PIB "provided substantial assistance to HAMAS, PIJ, PFLP and AAMB by transferring significant sums of money to the families of their operatives." *Id.*, ¶ 639. Plaintiffs do not and could not allege that Attacks 10-13 give rise to a claim for secondary liability, because those Attacks were allegedly perpetrated by AAMB before AAMB was designated as an FTO. *See id.*, ¶¶ 346, 366, 396, 436; *see also id.*, ¶ 614 (AAMB designated an FTO on March 27, 2002).

plausibly allege the essential elements identified in *Linde* for an ATA secondary-liability claim. First, Plaintiffs do not plausibly allege either that PIB "knowingly" provided "substantial assistance" to the "person who committed" the Attacks. Second, Plaintiffs do not plausibly allege that PIB was "aware" that it was assuming a "role" in those Attacks, or in any other violent or life-endangering activity, by providing banking services to Mr. Salem or HLF.

The ATA did not originally include a cause of action for secondary liability. *See Linde*, 882 F.3d at 319-20 ("Initially, the ATA afforded civil relief only against the principals perpetrating acts of international terrorism.") (citing *Rothstein*, 708 F.3d at 97). In 2016, Congress amended the ATA by enacting JASTA, which created aiding-and-abetting (and conspiracy) liability under the ATA in certain <u>limited</u> circumstances. 18 U.S.C. § 2333(d); *see Linde*, 882 F.3d at 320. JASTA provides that, in order to state a claim for secondary liability, a plaintiff must plausibly allege (and later show) that his or her injury arises from "an act of international terrorism committed, planned, or authorized" by an FTO, and that the defendant "knowingly provid[ed] substantial assistance" to the "person who committed" the terrorist act. 18 U.S.C. § 2333(d)(2); *see Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 650 (E.D.N.Y. 2017) ("By the plain language of the statute, § 2333(d) does not create liability against a person who aids and abets . . . the person who merely authorized (rather than committed) the terrorist act"). "Congress, in enacting JASTA, instructed that the 'proper legal framework for how [aiding and abetting] liability should function' under the ATA is that identified in" *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *Linde*, 882 F.3d at 329 (quoting 18 U.S.C. § 2333 Statutory Note) (alterations in original). In *Halberstam*, "the D.C. Circuit indicated that . . . the assistance given by the defendant should play a 'major part in prompting the tort' or be 'integral' to the tort in order to be considered substantial

assistance." *Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 918 (N.D. Cal. 2018) (internal citations and quotations omitted).

The Second Circuit in *Linde* recently synthesized these requirements and applied them in the context of a JASTA claim against a bank. In doing so, it emphasized that "the mere provision of routine banking services to organizations and individuals said to be affiliated with terrorists does not necessarily establish causation" as required under the ATA. *Linde*, 882 F.3d at 327 (quotations and citations omitted). Emphatically, JASTA liability for "aiding and abetting an <u>act</u> of international terrorism requires more than the provision of material support to a designated terrorist <u>organization</u>." *Id.* at 329 (emphasis in original). "JASTA requires Plaintiffs to show that, in providing [financial] services, [Defendant] was generally aware that it was thereby playing a role in [the terrorist organization's] violent or life-endangering activities, which requires more than the provision of material support to a designated terrorist organization." *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 239 (E.D.N.Y. 2019) (alterations in original; internal quotations and citations omitted), *appeal filed sub nom.*, *Applebaum v. Nat'l Westminster Bank, PLC*, No. 19-1159 (2d Cir. Apr. 16, 2019); *Strauss v. Crédit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 156 (E.D.N.Y. 2019) ("For a defendant that is a financial institution, this requires a showing that 'in providing [financial] services, the bank was generally aware that it was thereby playing a role in [the terrorist organization's] violent or life-endangering activities'") (quoting *Linde*, 882 F.3d at 319) (alterations in original), *appeal filed,* No. 19-1285 (2d Cir. Apr. 26, 2019).

"Evidence that Defendant knowingly provided banking services to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement." *Weiss*, 381 F. Supp. 3d at 238-39 (concluding, using "a Rule 12(b)(6) motion [as] the benchmark," that plaintiffs' proposed motion to amend would be futile as a matter of law because plaintiffs could not demonstrate that

defendant bank "had the requisite knowledge required by JASTA."); *Strauss*, 379 F. Supp. 3d at 163-164 (same); *Siegel v. HSBC Bank USA, N.A.*, No. 17-cv-6593, 2018 U.S. Dist. LEXIS 126152, at *12-13 (S.D.N.Y. July 27, 2018) (dismissing aiding and abetting claim because plaintiffs "failed to cite to any allegations in their complaint that show in a plausible, non-conclusory fashion that the defendants knowingly aided or abetted any terrorist organization's violent or life-endangering activities."), *aff'd sub nom. Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019).

Under *Linde*, "[a]iding and abetting requires the secondary actor"—here, PIB—"to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 477); *see id.* (plaintiff must show that "the bank was 'generally aware' that it was . . . playing a 'role' in Hamas's violent or life-endangering activities"). "Thus, although a defendant need not know of or intend to bring about the specific attacks at issue, the Complaint must allege plausibly that, in providing financial services, Defendants were 'generally aware' that they were thereby playing a 'role' in an FTO's violent or life-endangering activities." *O'Sullivan v. Deutsche Bank AG*, 2019 U.S. Dist. LEXIS 53134, at *39 (quoting *Linde*, 882 F.3d at 329). Consistent with those requirements, mere incidental assistance in the form of financial services is insufficient for JASTA liability; instead, JASTA expressly states that liability arises only when the secondary actor provides "substantial assistance" to the primary wrongdoer. 18 U.S.C. § 2333(d)(2).

As JASTA itself makes clear, and as has been further clarified by courts interpreting JASTA in the context of banks, the "substantial assistance" requirement of § 2333(d) mandates that, in order to state a valid aiding and abetting claim, a plaintiff must plausibly allege a substantial link between the defendant's banking services and the principal wrongdoer's violent acts (that is, the Attacks). Plaintiffs do not plausibly allege any such link here.

That missing link requires dismissal of Plaintiffs' secondary-liability claim against PIB. Courts have recognized that "it is particularly important to focus with care . . . on each of the necessary elements to a finding that [JASTA] has been violated," and that "[t]hose elements present a substantial hurdle when one financial institution is accused of having violated the ATA by providing assistance to terrorist organizations through engaging in common commercial banking practices . . . ." *Siegel*, 2018 U.S. Dist. LEXIS 126152, at *12 (dismissing JASTA claim against global bank).

### A. Plaintiffs Have Not Alleged, and Could Not Plausibly Allege, that PIB Knowingly Provided Substantial Assistance to FTOs in Committing the Attacks.

Plaintiffs' JASTA claim fails because the Amended Complaint does not plausibly allege that PIB "knowingly provid[ed] substantial assistance" to the "person who committed" the Attacks, as required under § 2333(d)(2).  In *Halberstam*, the D.C. Circuit court identified six factors relevant to determining "how much encouragement or assistance is substantial enough" to satisfy the requirement that the defendant "must knowingly and substantially assist the principal violation." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 487).  Those six factors are: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. *Id.* (citing *Halberstam*, 705 F.2d at 483-84).

The *Halberstam* factors make clear that Plaintiffs have not alleged, and cannot plausibly allege, that PIB provided substantial assistance to the Attacks or to their perpetrators.  Plaintiffs allege that Attacks 1-9 were committed by FTOs and individuals affiliated with those FTOs. However, the Amended Complaint contains no allegations that PIB ever provided any banking services to, or ever had any contact or "relation" <u>whatsoever</u> with, the individuals or organizations

who committed the Attacks.  PIB was not present during the Attacks.  There is no allegation that PIB provided any funds, banking services, or any other assistance, for any period of time, to the FTOs or to individuals who allegedly committed the Attacks.  As explained *supra*, the Amended Complaint does not plausibly allege that PIB harbored terroristic intent.   In sum, under the standards established in *Halberstam*, incorporated into JASTA by Congress, and adopted by the Second Circuit in *Linde*, the Amended Complaint does not plausibly allege that PIB substantially assisted the persons who committed the Attacks.

Plaintiffs have not identified a single transaction processed through PIB that provided funds—directly or ultimately—to a terrorist or a terrorist organization, or that were used to commit any of the Attacks.  At most, the Amended Complaint alleges that PIB held an account for Raked Salem, and that Salem used funds from this account to make payments to family members of perpetrators of one of the 13 Attacks—and there, only after the Attack had already occurred; and that PIB held an account for HLF, and that HLF received one transfer into that account not only prior to HLF's OFAC designation, but prior to the "relevant period" for this action as defined in the Amended Complaint, with no connection to any of the Attacks.  *Cf. Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 425-26 (E.D.N.Y. 2009) ("It has long been recognized that 'substantial assistance' means more than just a little aid'") (finding that a bank's processing of three wire transfers for an OFAC-designated entity affiliated with Hamas "fail[ed] to establish 'substantial assistance' of the sort required to support an aiding and abetting claim.") (citations omitted).

PIB cannot have "knowingly provid[ed] substantial assistance" in the perpetration of an Attack when the Amended Complaint does not allege that PIB ever processed a single payment, or provided any financial services (or anything whatsoever), in connection with that Attack.  Even with respect to the Ben Yehuda bombing, Plaintiffs do not plausibly allege facts that would establish that

42

the perpetrators were even aware of a potential payment to their family, or that any such knowledge motivated or incentivized them to commit the attack.  A payment that allegedly occurred <u>after</u> the attack had already taken place cannot logically be said to have "substantially assisted" in the attack. *See supra* at 26, 36 (citing *Sokolow v. PLO*, 60 F. Supp. 3d at 517 n.11).  Put another way, PIB is too far "down the causal chain" for Plaintiffs to establish aiding and abetting liability under JASTA for any of the Attacks.  *See Kemper*, 911 F.3d at 389.

### B.    Plaintiffs Have Not Alleged, and Could Not Plausibly Allege, that PIB was "Aware" it was "Assuming a Role" in Violent Terrorist Activity.

In addition to failing to plausibly allege that PIB substantially assisted the Attacks, Plaintiffs' JASTA claim must be dismissed because Plaintiffs have not alleged (other than in entirely conclusory fashion which cannot be credited) that PIB was "aware" that it was playing a "role" in the terrorist activities of the FTOs who allegedly committed the Attacks.  Under JASTA, secondary liability "requires the secondary actor"—here, PIB—"to be 'aware' that, by assisting the principal, it [was] itself assuming a 'role' in terrorist activities" and to have been "aware that . . . it was playing a role in violent or life-endangering acts whose apparent intent was to intimidate or coerce civilians or to affect a government." *Linde*, 882 F.3d at 329-30.  Further, the "principal" must be "the person who committed [the] act of international terrorism." *Id.* at 320.

Plaintiffs do not allege that PIB provided any banking services to, or had any contact whatsoever with, "the person who committed" the Attacks.  Rather, they allege only that PIB provided financial services to an individual, Raked Salem, and an organization, HLF.  But there is no allegation that Mr. Salem (or his organization, the ALF) or the HLF played any role in committing any of the Attacks, or provided any funds to any FTOs.  Neither Mr. Salem nor ALF was designated as a terrorist anywhere in the world during the relevant period—and Mr. Salem was <u>acquitted</u> of terrorism <u>after</u> the Attacks and all the payments alleged in the Amended

43

Complaint were made.  Nor was HLF designated as a terrorist in the United States at the time of the single alleged transfer processed for HLF, in August 2001.  There is no plausible allegation that, by purportedly providing routine banking services to Mr. Salem and HLF, PIB was "aware" it was playing a "role" in the Attacks, or any other violent or life-endangering activities of any FTO.

Plaintiffs thus have not satisfied, and could not satisfy, the requirements for aiding and abetting liability under JASTA, and Plaintiffs' second claim for relief should be dismissed.

## IV.  PLAINTIFFS' NEW CONSPIRACY CLAIM DOES NOT PLAUSIBLY ALLEGE THAT PIB AGREED WITH ANYONE TO COMMIT OR TO SUPPORT TERRORIST ATTACKS.

### A.  The Amended Complaint Fails to Plausibly Allege that PIB Conspired to Commit a Terrorist Act.

"The crux of any conspiracy is an agreement between the co-conspirators."  *Kemper*, 911 F.3d at 395 (quoting *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016)).  "Although 'a conspirator [need] not agree to commit or facilitate each and every part of the offense,' she must 'reach an agreement with the <u>specific intent</u> that' the conspiratorial goal be completed."  *Id.* (emphasis and alteration in original).

Plaintiffs' conspiracy claim against PIB fails under these standards.  The Amended Complaint does not plausibly allege that PIB agreed with Saddam Hussein, ALF, or Mr. Salem to commit <u>any</u> act of "international terrorism" as defined in the ATA, let alone the Attacks at issue here.  Indeed, Plaintiffs do not even allege any communications or contact whatsoever between PIB and either Saddam Hussein or ALF, or any contact with Mr. Salem beyond routine banking services.

The *Kemper* decision is instructive.  There, a plaintiff alleged that Deutsche Bank had conspired to provide Iran with banking services in violation of U.S. sanctions on Iran, and was

thus liable for the terrorist attack that killed her son. The Seventh Circuit affirmed the dismissal of the plaintiff's complaint, finding that Deutsche Bank "may have engaged in business dealings that <u>incidentally assisted</u> a separate terrorism-related conspiracy involving Iran", but that the facts did not plausibly suggest the bank "<u>ever agreed to join</u> that conspiracy":

> None of the allegations suggest that Deutsche Bank cared how its Iranian customers obtained or spent the funds that it processed for them. <u>A person who is indifferent to the goals of an ongoing conspiracy does not become a party to this conspiracy merely because that person knows that his or her actions might somehow be furthering that conspiracy.</u> This principle—that <u>one cannot join a conspiracy through apathy</u>—is especially important in business dealings. Because by definition market transactions—whether in legal or illegal markets—benefit both parties, we do not assume, *ab initio*, that they carry with them the excess baggage of conspiracy.

*Id.* at 395 (internal citations and quotations omitted) (emphasis added).

Similarly here, Plaintiffs allege only that PIB provided routine banking services, the very type of "market transactions" that the *Kemper* court identified. Plaintiffs do <u>not</u> plausibly allege that PIB involved itself in how any of its alleged customers obtained or spent any funds processed through PIB. To the contrary, there is an "obvious alternative explanation," *Iqbal*, 556 U.S. at 682, for PIB's alleged provision of banking services—specifically, that PIB's business model centers on the provision of banking services to create revenue and profit. *See Kemper*, 911 F.3d at 390 ("[t]o the objective observer, [Deutsche Bank's] interactions with Iranian entities were motivated by economics, not by a desire to 'intimidate or coerce.'"). The allegation in the Amended Complaint that PIB "knew and agreed to serve as the mechanism by which Saddam Hussein's regime in Iraq made U.S. dollar-denominated payments to reward and incentivize suicide terrorist attacks," Am. Compl. ¶ 625, is purely conclusory, without any factual support, and cannot be credited even on a Rule 12 motion. Plaintiffs do not allege a single communication between Saddam Hussein or his "regime in Iraq" and PIB, let alone any agreement. For the same reasons that Plaintiffs have not plausibly alleged (for their § 2339A primary-liability claim) that

45

PIB "knew or intended" that its banking services to Mr. Salem would be used to prepare for or to conduct the Attacks at issue, or any other violent act (*supra* at 24-29), the Amended Complaint does not plausibly allege that PIB <u>agreed</u> with the ALF, Saddam Hussein, or anyone else to perpetrate or to facilitate the Attacks at issue or any other violent act.  Put simply, Plaintiffs do not plausibly allege that PIB agreed to commit an underlying act of international terrorism as defined by the ATA.  Plaintiffs' conspiracy claim must be dismissed.

### B.   Plaintiffs' Conspiracy Claim Must be Dismissed Because Plaintiffs Do Not Plausibly Allege the Required Causal Connection.

In the ATA context, courts are particularly wary of permitting plaintiffs to use conspiracy allegations to circumvent the causation requirements of the ATA.  The *Kemper* decision focused attention on this concern, which is particularly germane here given that, as discussed *supra* at 35-37, the Amended Complaint does not plausibly allege that any conduct by PIB was the proximate cause of Plaintiffs' injuries.

In *Kemper*, the plaintiff sought to hold Deutsche Bank responsible for a terror attack by alleging it conspired with Iran, Iranian financial institutions, and the terrorist organizations that committed the attack.  911 F.3d at 394-95.  The Seventh Circuit referred to these allegations as "factually implausible," and the "legal theory underlying those allegations" as "problematic."  *Id.* With respect to causation, the court found:

> If Kemper's conspiracy liability theory could succeed on these facts, it would undermine the causation analysis required by the ATA's use of the phrase "by reason of."  . . . [T]he further down the causal chain a defendant sits, the more diligent a plaintiff must be to plead facts that plausibly suggest that the defendant entered into an agreement to support terrorism.

*Id.* at 395-96.

These concerns are equally present here.  Plaintiffs have not alleged that PIB agreed to commit an act of international terrorism.  Nor have they alleged that Plaintiffs had <u>any</u>

communications with Saddam Hussein, the ALF, or the terrorist organizations that allegedly committed the Attacks.  Plaintiffs have not identified a single dollar or a single transaction processed through PIB that was ultimately provided to a terror organization or used to carry out any of the Attacks.  As in *Kemper*, this absence of a causal-connection between PIB's alleged acts and the Attacks that injured Plaintiffs requires dismissal of Plaintiffs' § 2339A conspiracy claim.

> ### C.   Plaintiffs Cannot Escape Their Failure to Allege Personal Jurisdiction by Asserting a Theory of "Conspiracy Jurisdiction."

Plaintiffs have not plausibly alleged facts sufficient to state <u>either</u> (a) a claim against PIB for conspiracy to violate 18 U.S.C. § 2339A <u>or</u> (b) a *prima facie* case for specific jurisdiction over PIB.  *See supra* at 16-22.  In addition, as discussed previously, Plaintiffs fail plausibly to allege that PIB's routine banking services caused Plaintiffs' injuries or that PIB was "aware" it was "assuming a role" in terrorist activity.  Plaintiffs have not alleged that PIB processed any transactions or provided any services to any individual or group that committed any of the Attacks. Further, the *Halberstam* factors all militate against a finding that Plaintiffs have plausibly alleged that PIB's actions played a substantial role in events leading to the Attacks.

Given Plaintiffs' insufficient allegations against PIB, they cannot use the theory of "conspiracy jurisdiction" as a last resort to hale PIB into this Court.  To use that theory, Plaintiffs would have to establish that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (citation omitted); *Contant v. Bank of Am. Corp.*, No. 17 Civ. 3139 (LGS), 2019 U.S. Dist. LEXIS 84251, at *11 (S.D.N.Y. May 17, 2019).

Plaintiffs cannot meet this test.  The Amended Complaint does not plausibly allege that PIB participated in a conspiracy to provide material support to the Attacks, for all the reasons noted above.  Plaintiffs do not allege that PIB itself processed any transaction through New York "in furtherance of" any purported conspiracy, let alone a conspiracy to support terrorism, nor do Plaintiffs allege that PIB's correspondent banks were its agents for any purpose, let alone its agents for supporting a terrorist conspiracy.  Nor are there any other non-conclusory allegations in the Amended Complaint tying PIB to any conspiracy to support terrorism or any actions by PIB involving New York (or elsewhere) that give rise to Plaintiffs' injuries.

Put simply, Plaintiffs have not plausibly alleged <u>either</u> a conspiracy involving PIB <u>or</u> jurisdiction over PIB.  They cannot plausibly claim to have alleged facts sufficient to establish <u>both</u>.

## V.   SEVEN PLAINTIFFS LACK STANDING BECAUSE THEY ARE NOT U.S. NATIONALS, REQUIRING DISMISSAL OF THEIR CLAIMS.

As alleged in the Amended Complaint, Plaintiffs Chaviva Braun, Yehuda Braun, Yoni Braun, Eliana Braun Peretz, Oriella Braun, Matanya Braun, and Revital Bauer are foreign nationals, not U.S. nationals. Am. Compl. ¶¶ 189, 191-195, 379.  Nor are they the estates, heirs, or survivors of a U.S national killed in one of the Attacks.  Rather, as alleged in the Amended Complaint, these seven Plaintiffs are relatives of U.S. nationals who are alleged to have been injured in, but survived, one of the Attacks at issue.  *Id.* at ¶¶ 181, 188, 367-368, 377-378.  These Plaintiffs lack standing under the ATA and their claims must be dismissed.

The ATA's plain language provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue . . . ." 18 U.S.C. § 2333(a) (emphasis added).  The right to bring claims under the ATA is thus limited to U.S. nationals and their estates, survivors, or heirs.  *Id.*

48

Put another way, the ATA "excludes foreign nationals (with the possible exception of foreign survivors or heirs)" from its provisions creating a cause of action.  *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1404 (2018); *see also Miller v. Arab Bank, PLC*, 372 F. Supp. 3d at 41 (same).

The Second Circuit has recognized that "[n]on-nationals can recover under the ATA <u>only</u> if they are <u>survivors or heirs</u> of a U.S. national injured by international terrorism."  *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 147 n.7 (2d Cir. 2015) (emphasis added); *see Jesner*, 138 S. Ct. at 1405 (cautioning against permitting "foreign plaintiffs" to "bypass Congress' express limitations on liability under the Anti-Terrorism Act").  In *Miller*, the court dismissed on standing grounds the claims of several of the same Plaintiffs here:  "<u>Chaviva Braun, Yehuda Braun, Yoni Braun, Matanya Braun, Eliana Braun Peretz, and Oriella Braun</u> . . . are relatives of a United States national injured in a suicide bombing but they are not United States citizens.  Because this United States national survived the attack, he has no survivors or heirs.  Therefore, the ATA does not provide a cause of action for these six plaintiffs, and their claims are dismissed."  *Miller*, 372 F. Supp. 3d at 41-42 (emphasis added); *Saperstein v. Palestinian Auth.*, No. 04-cv-20225, 2006 U.S. Dist. LEXIS 92778, at *5 n.3 (S.D. Fla. Dec. 22, 2006) (dismissing for lack of standing claims brought by foreign relatives of a U.S. national injured in a terrorist attack); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1337 (D. Utah 2006) (same).

Based on the plain language of the ATA, these seven Plaintiffs cannot plausibly allege standing because they are not the "estate[s], survivors, or heirs" of U.S. nationals injured by an act of international terrorism.  18 U.S.C. § 2333(a).  These Plaintiffs should voluntarily withdraw their claims, as Arie Miller has now done; if they fail to do so, this Court should dismiss their claims with prejudice.

49

VI.     **THE STEINHERZ FAMILY LACKS STANDING BECAUSE THEIR INJURY IS NOT FAIRLY TRACEABLE TO THE ATTACKS OR PIB'S CONDUCT.**

Plaintiffs Altea Steinherz, Jonathan Steinherz, Temima Steinherz, Joseph Ginzberg, Peter Steinherz, and Laurel Steinherz (collectively, the "Steinherz Family") claim injury arising out of the following facts:  On December 1, 2001, Altea Steinherz—who was nine months pregnant at the time—and Jonathan Steinherz were at a restaurant in Jerusalem when they heard first one, then another bomb explode. Am. Compl. ¶¶ 75-76.  "Believing the bombing was now over, they began to walk home," because "Altea wanted to get home to her daughter who was with a babysitter at the time[.]"  *Id.* ¶¶ 76-77.  While walking, "they saw a crazed-looking man run past them" and they "began to run" in the other direction.  *Id.* ¶¶ 78-79.  "As they began to run, Altea fell twice, and she broke her left arm as a result of one of the falls."  *Id.* ¶ 79.  Altea and Jonathan were afraid, until their son was born 11 days later, that her pregnancy might have been terminated "as a result of her falls."  *Id.* ¶¶ 81-82.  The Steinherz Family members each claim to have suffered mental anguish and emotional distress as a result.  *Id.* ¶¶ 83-93.

Based on the allegations in the Amended Complaint, Altea Steinherz's injuries were not proximately caused by any of the Attacks, or by any act of PIB.  Rather, Altea Steinherz was injured because, at nine months pregnant, she was walking home, after a bombing at which she was not present was "over," and she was then startled by seeing an unidentified "crazed-looking man" in the street, decided to turn and <u>start</u> to run, and then fell.  *Id.* ¶¶ 77-79.  Plaintiffs do not allege that this unidentified man is a customer of PIB or has any relationship to any PIB customer; that he has any relationship to any FTO; that he played any role in any Attack; or even that the man was running or "looked" "crazed" as a result of any Attack.  Accordingly, none of the Steinherz Family was injured "by reason of an act of international terrorism," 18 U.S.C. § 2333(a).  The Steinherz Family all lack standing because their injuries are not "fairly traceable" to PIB's

actions.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (to meet the "irreducible constitutional minimum" of Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.") (citations omitted); *Miller*, 372 F. Supp. 3d at 41.  These Plaintiffs' claims must be dismissed.

## CONCLUSION

For the reasons set forth above, the Amended Complaint should be dismissed in its entirety as against PIB with prejudice.

Dated: November 25, 2019             Respectfully submitted,
                                     **SQUIRE PATTON BOGGS (US) LLP**


                                     /s/ *Gassan A. Baloul*
                                     Gassan A. Baloul
                                     gassan.baloul@squirepb.com
                                     Mitchell R. Berger
                                     mitchell.berger@squirepb.com
                                     2550 M Street, N.W.
                                     Washington, D.C. 20037
                                     Telephone: (202) 457-6000
                                     Facsimile:  (202) 457-6315

                                     Joseph S. Alonzo
                                     joseph.alonzo@squirepb.com
                                     30 Rockefeller Plaza, 23rd Floor
                                     New York, New York 10112
                                     Telephone: (212) 872-9800
                                     Facsimile:  (212) 872-9815

                                     *Counsel for Defendant Palestine Investment Bank*