UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEMIMA SPETNER, *et al.*, | : |
| | : |
| Plaintiffs, | : |
| | : |
| -against- | : |
| | : |
| PALESTINE INVESTMENT BANK, | : |
| | : |
| Defendant. | : |
| | : |

Case No. 19-cv-00005 (ENV)(RLM)

**ORAL ARGUMENT REQUESTED**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT PALESTINE INVESTMENT BANK'S MOTION
<u>TO DISMISS THE AMENDED COMPLAINT</u>**

**January 13, 2020**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL ALLEGATIONS ......................................................................................... 2

ARGUMENT ................................................................................................................... 5

I.      PIB IS SUBJECT TO SPECIFIC PERSONAL JURISDICTION. ............................ 5

    A.    This Court Has Personal Jurisdiction Over PIB Under N.Y. C.P.L.R.
§ 302(a)(1). ...................................................................................................... 5

    B.    PIB Processed the Relevant Transactions in New York Through Its Agent, Arab
Jordan Investment Bank. ............................................................................. 6

        1.    PIB's Agent Processed the Relevant Transactions in New York. ......................... 6

        2.    Plaintiffs Have Met Their Modest Burden of Alleging AJIB's Agency in the
Personal Jurisdiction Context. .................................................................. 8

    C.    Plaintiffs' Claims Arose From PIB's New York Transactions. ................................. 18

    D.    Exercising Personal Jurisdiction Over PIB Comports with Due Process. ............... 19

II.     DEFENDANT'S CONDUCT VIOLATED 18 U.S.C. § 2339A. .................................... 20

    A.    Defendant Knowingly Provided Material Support by Incentivizing Suicide
Bombings and Other Terrorist Attacks in Violation of § 2339A. .......................... 22

        1.    Saddam Hussein's Incentive Program for Palestinian Terrorists. ...................... 22

        2.    PIB's Account for the Holy Land Foundation. .................................................... 25

    B.    PIB's Conduct Was a Proximate Cause of Plaintiffs' Injuries. ............................. 26

        1.    Saddam Hussein's Incentive Program for Palestinian Terrorists Was a
Proximate Cause of Plaintiffs' Injuries. ..................................................... 26

        2.    PIB's Material Support to HAMAS through the Holy Land Foundation Was a
Proximate Cause of HAMAS Attacks that Injured Many of the Plaintiffs. ....... 28

    C.    PIB Committed "Acts of International Terrorism." .............................................. 29

        1.    The Complaint Plausibly Alleges that PIB's Conduct "Involve[s] Violent Acts or
Acts Dangerous to Human Life" As Required Under 18 U.S.C. § 2331(1). ........ 30

    **2.**    **The Complaint Plausibly Alleges that PIB Acted with the Terroristic Intent Required Under 18 U.S.C. § 2331(1)** ................................................................ 32

**III.**    **PIB JOINED THE HUSSEIN REGIME'S CONSPIRACY TO INCENTIVIZE TERRORIST ATTACKS IN ISRAEL.** .................................................................... 33

**IV.**    **PIB IS LIABLE UNDER 18 U.S.C. § 2333(d)(2).** ................................................. 36

    **A.**    **PIB Aided and Abetted the "Persons" who Committed the Attacks.** .................... 38

    **B.**    **PIB Was Generally Aware of Its Role in Saddam Hussein Regime's Overall Illegal and Tortious Activity.** .................................................................... 39

    **C.**    **PIB Knowingly Provided Substantial Assistance to FTOs.** ..................................... 40

**CONCLUSION** ............................................................................................................ 42

## TABLE OF AUTHORITIES

**Cases**

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n,*
   731 F.2d 112 (2d Cir. 1984)................................................................. 14

*Abecassis v. Wyatt,*
   7 F. Supp. 3d 668 (S.D. Tex. 2014) ................................................. 31, 32

*Abecassis v. Wyatt,*
   785 F. Supp. 2d 614 (S.D. Tex. 2011) ................................................. 28

*Al Rushaid v. Pictet & Cie,*
   28 N.Y.3d 316, 68 N.E.3d 1 (2016)...................................................... 13

*Amigo Foods Corp. v. Marine Midland Bank-N.Y.,*
   39 N.Y.2d 391, 348 N.E.2d 581 (1976)................................................ 14

*Arar v. Ashcroft,*
   585 F.3d 559 (2d Cir. 2009)................................................................. 24

*Banque Worms v. BankAmerica Int'l,*
   77 N.Y.2d 362 (1991) ........................................................................... 7

*Blumenthal v. United States,*
   332 U.S. 539 (1947).............................................................................. 34

*Boim v. Holy Land Found. for Relief and Dev.,*
   549 F.3d 685 (7th Cir. 2008) ................................................... 20, 21, 31

*Brill v. Chevron Corp.,*
   No. 15-cv-04916 (JD), 2017 WL 76894 (N.D. Cal. Jan. 9, 2017)........... 33

*Brill v. Chevron Corp.,*
   No. 15-cv-04916 (JD), 2018 WL 3861659 (N.D. Cal. Aug. 14, 2018) ....... 33

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985).............................................................................. 20

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.,*
   770 F.3d 993 (2d Cir. 2014)................................................................. 14

*Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.,*
   No. 14-cv-5216(DLC), 2015 WL 4164763 (S.D.N.Y. July 10, 2015) ..................... 17

iii

*CutCo Indus., Inc. v. Naughton*,
    806 F.2d 361 (2d Cir. 1986)..................................................................... 9, 10, 14

*Doe v. JPMorgan Chase Bank, N.A.*,
    899 F.3d 152 (2d Cir. 2018)........................................................................... 14

*Elman v. Belson*,
    32 A.D.2d 422, 302 N.Y.S.2d 961 (2d Dep't 1969).......................................... 9

*Emerald Asset Advisors, LLC v. Schaffer*,
    895 F. Supp. 2d 418 (E.D.N.Y. 2012) ............................................................. 9

*Export-Import Bank of the U.S. v. Asia Pulp & Paper Co.*,
    609 F.3d 111 (2d Cir. 2010).......................................................................... 14

*Freeman v. HSBC Holdings PLC*,
    No. 14-cv-6601(DLI)(CLP), 2018 WL 3616845 (E.D.N.Y. July 27, 2018) ........... 15

*Freeman v. HSBC Holdings PLC*,
    2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019) ............................................ 15, 19

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009)............................................................ 42

*Goodyear Dunlop Tires Operations S.A. v. Brown*,
    564 U.S. 915 (2011)..................................................................................... 20

*Grove Press, Inc. v. Angleton*,
    649 F.2d 121 (2d Cir. 1981).......................................................................... 10

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) .............................................................. *passim*

*In re Chiquita Brands Int'l, Inc.*,
    284 F. Supp. 3d 1284 (S.D. Fla. 2018) .......................................................... 23

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009).......................................................................... 39

*In re Terrorist Attacks on Sept. 11, 2001*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)............................................................ 22

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 659 (2d Cir. 2013).......................................................................... 12

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ........................................................................... 20

*Kaplan v. Lebanese Canadian Bank, SAL*,
    405 F. Supp. 3d 525 (S.D.N.Y. 2019) ............................................... 23

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ....................................................... 33, 35

*Lelchook v. Islamic Republic of Iran*,
    393 F. Supp. 3d 261 (E.D.N.Y. 2019) ............................................... 38

*Lerner v. Fleet Bank, N.A.,*
    318 F.3d 113 (2d Cir. 2003) .............................................................. 26

*Licci by Licci v. Lebanese Canadian Bank, SAL*,
    834 F.3d 201 (2d Cir. 2016) .............................................................. 24

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012) ............................................................ 5, 14

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ...................................................... *passim*

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327, 960 N.Y.S.2d 695 (2012) .................................. *passim*

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) ............................................... 22

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) ...................................................... *passim*

*MacDermid, Inc. v. Canciani*,
    525 F. App'x 8 (2d Cir. 2013) .......................................................... 17

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996) ............................................................... 20

*Miller v. Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ................................................. 38

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*,
    319 F. Supp. 2d 352 (S.D.N.Y. 2004) ..................................... 10, 11, 12

*Ocasio v. United States*,
 136 S. Ct. 1423 (2016) ................................................................. 35

*Rothstein v. UBS AG*,
 708 F.3d 82 (2d Cir. 2013) ........................................................... 26

*Shatsky v. PLO*,
 No. 02-cv-2280 (RJL), 2017 WL 2666111 (D.D.C. June 20, 2017) ....................................... 28

*Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*,
 234 A.D.2d 103 (1st Dep't 1996) ........................................................ 7

*Sokolow v. PLO*,
 60 F. Supp. 3d 509 (S.D.N.Y. 2014) ..................................................... 27

*Stansell v. BGP, Inc.*,
 2011 WL 1296881 (M.D. Fla. 2011) ...................................................... 32

*Strauss v. Crédit Lyonnais, S.A.*,
 175 F. Supp. 3d 3 (E.D.N.Y. 2016) .................................................. 5, 18

*Strauss v. Credit Lyonnais, S.A.*,
 No. 06-CV-702 (CPS), 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ....................................... 40

*Stutts v. De Dietrich Group*,
 No. 03-cv-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. Jun. 30, 2006) ............................. 32, 33

*Timothy Coffey Nursery Landscape Inc. v. Soave*,
 760 F. App'x 58 (2d Cir. 2019) ........................................................ 17

*Topps Co. v. Gerrit J. Verburg Co.*,
 961 F. Supp. 88 (S.D.N.Y. 1997) ........................................................ 9

*United States v. Amiel*,
 95 F.3d 135 (2d Cir. 1996) ............................................................ 34

*United States v. Capanelli*,
 479 F.3d 163 (2d Cir. 2007) ........................................................... 35

*United States v. Ferrarini*,
 219 F.3d 145 (2d Cir. 2000) ........................................................... 34

*United States v. Garcia*,
 509 F. App'x 40 (2d Cir. 2013) ........................................................ 34

*United States v. Ghayth*,
   709 F. App'x. 718 (2d Cir. 2017) .......................................................... 23

*United States v. Gurary*,
   860 F.2d 521 (2d Cir. 1988) ................................................................. 35

*United States v. Lanza*,
   790 F.2d 1015 (2d Cir. 1986) ............................................................... 33

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990) ................................................................. 35

*United States v. Stavroulakis*,
   952 F.2d 686 (2d Cir. 1992) ................................................................. 34

*Waldman v. Palestine Lib. Org.*,
   835 F.3d 317 (2d Cir. 2016) ........................................................... 12, 13

*Weiss v. Nat'l Westminster Bank PLC*,
   453 F. Supp. 2d 609 (E.D.N.Y. 2006) ............................................. 22, 40

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014) ........................................................... 20, 32

**Statutes**

1 U.S.C. § 1 ........................................................................................... 38

18 U.S.C. § 2331(1) ................................................................... 22, 29, 31

18 U.S.C. § 2331(3) ............................................................................... 38

18 U.S.C. § 2332 .................................................................................... 21

18 U.S.C. § 2333(a) ......................................................................... 20, 29

18 U.S.C. § 2333(d)(1) ........................................................................... 38

18 U.S.C. § 2333(d)(2) ..................................................................... 36, 38

18 U.S.C. § 2339A ........................................................................... 20, 21

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016) .................... 36

N.Y. C.P.L.R. § 302(a)(1) ............................................................. 5, 8, 17, 18

Nat'l Def. Auth. Act. FY 2013, Pub. L. No. 112-239, 126 Stat 1632 (Jan. 2, 2013) .................. 29

**Rules**

Fed. R. Civ. P. 4(k)(2)......................................................................................................... 5, 19

Fed. R. Civ. P. 8 ................................................................................................................... 29

### INTRODUCTION

The Amended Complaint ("Complaint" or "AC") alleges that Saddam Hussein's regime in Iraq conspired with its Palestinian proxy, the Arab Liberation Front ("ALF"); the ALF's Palestinian leader, Rakad Salem; Defendant Palestine Investment Bank ("PIB"); and others, to incentivize and reward suicide attacks on civilians (including U.S. nationals) in Israel between September 2001 and March 2003 (the "relevant period").

In furtherance of the conspiracy, PIB knowingly provided as much as $35 million U.S. dollars between early October 2000 and the beginning of 2003 to the families and beneficiaries of terrorists who killed, maimed and injured civilians during the relevant period, including rewarding the families of Palestinian suicide bombers and suicide gunmen. AC ¶ 492. The payments were largely made in the form of U.S. dollar-denominated checks issued by PIB, *see, e.g.*, Exhibit A to the Complaint, and were often distributed in public ceremonies celebrating the "heroism" of the mass murderers who perpetrated terrorist attacks in Israel. *Id.* ¶¶ 513-15.

Initially, every family of a dead Palestinian terrorist received $10,000 U.S. dollars, regardless of the circumstances. *Id.* ¶ 497. In August 2001, Saddam Hussein decided to increase the sum of the financial grants transferred to the families of *suicide* terrorists (whether by bombing or mass shooting) from $10,000 to $15,000, whereas the payment for families of terrorists who died under less "heroic" circumstances remained at $10,000.[1] The increased incentive was widely covered by the Palestinian media. *Id.* ¶¶ 500-02. In March 2002, Saddam announced another increase in payments – families of suicide terrorists would receive $25,000 U.S. dollars, while the grants to the families of "ordinary" terrorists would remain at $10,000 U.S. dollars. *Id.* ¶ 509.

---

[1]   Less heroic circumstances might include, for instance, what Palestinian terrorist groups call "work accidents" – premature detonations of explosives – or in fire fights with Israeli forces operating in the Palestinian Territories. AC ¶ 499.

The Complaint also alleges that PIB knowingly maintained an account for the HAMAS fundraising organization known as the Holy Land Foundation ("HLF"), which was first designated on May 6, 1997, by the government of Israel as a HAMAS organization that "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks …." AC ¶ 570.

PIB's Memorandum of Law ("PIB Mem.") characterizes its role in incentivizing mass murder as "routine financial services to two customers," PIB Mem. at 2, downplays the significance of the reward program it facilitated as "after-the-fact payments," and distorts this Circuit's aiding and abetting analysis. But these rhetorical efforts cannot obscure the nature of PIB's conduct in this case or diminish its civil liability and moral culpability.

## FACTUAL ALLEGATIONS

The Complaint makes clear that Saddam Hussein used a terrorism rewards program to assert his leadership within the Arab world and that these payments were accompanied by great fanfare and were widely covered in the Palestinian media. AC ¶ 512. Because Iraq was a designated State Sponsor of Terrorism during the relevant period and was subject to strict economic sanctions, Saddam's regime could not easily transfer large sums of money denominated in U.S. dollars since that would require dollar-clearing and settlement activity in the United States. U.S. law prohibits most dollar clearing and settlement services performed on behalf of State Sponsors of Terrorism. *Id.* ¶¶ 526-27.

The Complaint describes the scheme Saddam Hussein's regime successfully used to bypass U.S. sanctions to deposit the rewards payments into the Amman branch of PIB so that the funds could ultimately be distributed through the regime's representatives in the Palestinian Territories

to terrorists and their families. *Id.* ¶¶ 529-541. For this purpose, the regime used Rakad Salem, the head of the moribund Arab Liberation Front and his account at PIB. *Id.* ¶ 539.

The Complaint describes one of many elaborate public events celebrating the rewards payments, a rally in Jenin (in the West Bank) that was covered in the May 7, 2002 edition of the Palestinian daily newspaper *Al-Ayam. Id.* ¶ 513. Numerous similar ceremonies focused on incentivizing and glorifying terrorism were held during the relevant period, and they frequently involved family members of suicide terrorists receiving both certificates on behalf of Saddam Hussein as well as U.S. dollar-denominated checks issued from PIB. *Id.* ¶¶ 513-15. In March 2002, Saddam Hussein publicly announced that he was increasing the reward payments to the families of suicide terrorists to $25,000, while the grants to the families of "ordinary" terrorists would remain at $10,000 U.S. dollars. *Id.* ¶ 509.

As the Complaint notes, Saddam's reward program was not only widely known in the Palestinian Territories but was infamous internationally. *Id.* ¶¶ 516-19. For example, on January 31, 2002, the *Los Angeles Times* reported that Saddam Hussein had ordered a memorial be erected in one of Baghdad's main squares in honor of the first Palestinian female suicide bomber, Wafa Idris, who, on January 27, 2002, blew herself up in Jerusalem, killing herself and an Israeli civilian and wounding dozens of people, including some of the Plaintiffs herein. Her family also received a U.S. dollar-denominated check from the ALF. *Id.* ¶¶ 507-08. In a March 13, 2003 article about what was likely the last payment ceremony before U.S. Forces invaded Iraq, the BBC reported: "'Iraq and Palestine are in one trench. Saddam is a hero,' read a banner over a picture of the Iraqi leader and Palestinian leader Yasser Arafat at the ceremony." *Id.* ¶ 518.

The payments were sufficiently well known that, according to an April 4, 2002 CBS article, ALF officer Mahmoud Safi said: "Some people stop me on the street, saying if you increase the

payment to $50,000, I'll do it immediately." *Id.* ¶ 519. While he said the comments were made "mostly . . . in jest," he "acknowledged that the support payments for relatives make it easier for some potential bombers to make up their minds." *Id.* Importantly, the Hussein regime's payments processed by PIB were made to the family members of terrorists belonging to *all* Palestinian terror factions. *Id.* ¶¶ 520-25.

As the Complaint makes clear, PIB's role in supporting Palestinian terrorism was not limited to facilitating Saddam Hussein's rewards payments. PIB also maintained account number 41914 for HLF, an infamous HAMAS fundraising front organization. *Id.* ¶ 571. That account remained open, upon information and belief, *at least* until December 2001 when the U.S. designated HLF as a HAMAS fundraiser and froze its accounts in the United States. *Id.* ¶¶ 578-80. Since 1996, published reports in *The New York Times* and elsewhere have identified HLF as a HAMAS fundraiser. *Id.* ¶¶ 568-69. On May 6, 1997, the government of Israel designated HLF a HAMAS organization and declared that HLF "deals in the practice of transferring monies to families of Hamas activists, who carried out deadly attacks…." *Id.* ¶ 570. When the U.S. government designated HLF a Specially Designated Global Terrorist ("SDGT") in December 2001, it confirmed that HLF "supports HAMAS activities through direct fund transfers to its offices in the West Bank and Gaza that are affiliated with HAMAS and transfers of funds to Islamic charity committees ('zakat committees') and other charitable organizations that are part of HAMAS or controlled by HAMAS members." *Id.* ¶ 579. *After* the Israeli designation of HLF, but before the U.S. designation, PIB knowingly provided material support to HAMAS by maintaining an account for, and providing financial services to, HLF. *Id.* ¶¶ 9-12, 574-76, 580-83.

## ARGUMENT

### I.   PIB IS SUBJECT TO SPECIFIC PERSONAL JURISDICTION.

This Court has personal jurisdiction over PIB because PIB purposefully availed itself of New York's banking system and predictable legal system, as well as the stability and fungibility of the U.S. dollar, and Plaintiffs' claims arise from that availment. PIB's purposeful availment on behalf of ALF and HLF financed and incentivized terrorist attacks, including the terror attacks at issue here. All of the relevant transfers were processed through New York, and PIB's use of an agent in doing so does not immunize it from suit in New York or the United States generally.

This Court in *Strauss* set out the relevant personal jurisdiction standard:

> To make a *prima facie* showing that personal jurisdiction exists, a plaintiff must demonstrate: (1) proper service of process upon the defendant; (2) a statutory basis for personal jurisdiction over the defendant; and (3) that [the court's] exercise of jurisdiction over the defendant is in accordance with constitutional due process principles.

*Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 16 (E.D.N.Y. 2016) (internal quotation marks and citation omitted). PIB does not contest proper service of process, requiring this Court to analyze only the latter two elements. As shown below, this Court has jurisdiction over PIB under N.Y. C.P.L.R. § 302(a)(1) and Fed. R. Civ. P. 4(k)(2), and jurisdiction comports with due process principles.

### A.   This Court Has Personal Jurisdiction Over PIB Under N.Y. C.P.L.R. § 302(a)(1).

Section 302(a)(1) has two prongs: (1) "purposeful availment," directly or through an agent, of the privilege of conducting activities within New York, thereby invoking the benefits and protections of its laws, and (2) an "articulable nexus" or "substantial relationship" between the plaintiff's claims and the defendant's transaction in New York. *Id.* at 18-19 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 61 (2d Cir. 2012) ("*Licci II*")).

In *Licci v. Lebanese Canadian Bank, SAL ("Licci III")*, 20 N.Y.3d 327, 960 N.Y.S.2d 695

(2012), the New York Court of Appeals found purposeful availment on facts similar to those here:

> [A] foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a course of dealing—show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States.

*Id.* at 339 (internal quotation marks and citation omitted). This is precisely what Plaintiffs have

alleged here – that PIB repeatedly "use[d] correspondent account[s] in New York" to transfer funds

on behalf of two clients, ALF and HLF, which constituted material support and aid for terrorist

attacks. As shown below, that PIB's use of New York correspondent accounts went through an

intermediate bank does not rob this Court of jurisdiction over it.

**B. PIB Processed the Relevant Transactions in New York Through Its Agent, Arab Jordan Investment Bank.**

**1. PIB's Agent Processed the Relevant Transactions in New York.**

In attempting to escape *Licci*, PIB claims that it "settled all of its U.S. dollar transactions

entirely outside the United States," through Arab Jordan Investment Bank ("AJIB"), and thus did

not purposefully avail itself of New York as a forum. PIB Mem. at 3. *See also id.* at 6 ("PIB did

not transact business in or through the United States because it did not have a U.S. correspondent

bank account during the relevant period."). In so doing, PIB mischaracterizes the correspondent

banking system. In reality, *all* of its U.S. dollar transactions were settled in the United States—

specifically, New York. As international banking expert Richard George explained in his expert

declaration in opposition to PIB's motion to dismiss ("George Decl."), payments denominated in

U.S. dollars using electronic funds transfers or checks, wherever they originate and wherever their

ultimate destination, are almost entirely processed with finality in the United States (*see* George

Decl. ¶ 8 & n.1), through a U.S. bank located in New York:

> Wholesale wire transfers are generally made over the two principal wire payment systems: the Federal Reserve Wire Transfer Network (Fedwire) and the [Clearing House Interbank Payment System ("CHIPS")]. The CHIPS network handles 95% of the international transfers made in dollars, transferring an average of $750 billion per day. These funds are transferred through participating banks located in New York because all of the banks belonging to the CHIPS network must maintain a regulated presence in New York. As a result, this State is considered the national and international center for wholesale wire transfers.

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370 (1991) (footnote and citation omitted).This remained true through the relevant period. *See* George Decl. ¶ 9.

The few alternative systems based outside of the United States are usually limited to low-volume transfers and to particular participating banks—but even those systems ultimately clear and settle in New York. These systems, to the extent they would be available to PIB, lack the "cost savings or other conveniences associated with" a New York correspondent account. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) ("*Licci IV*") (summarizing *Licci III*, 20 N.Y.3d at 339). In any event, AJIB only advertised dollar-clearing capabilities in correspondent accounts in New York. George Decl. ¶ 28.

Non-U.S. banks access CHIPS or Fedwire through correspondent bank accounts, which are "accounts in domestic [U.S.] banks held in the name of the foreign financial institutions." *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726 (1st Dep't 1996). PIB contends that during the relevant period it did not hold a correspondent account in New York. Instead, PIB held a "nested" bank account with AJIB: "Nested accounts occur when a foreign financial institution gains access to the U.S. financial system by operating through a U.S. correspondent account belonging to another foreign financial institution." George Decl. ¶ 29 (quoting Fed. Fin. Insts. Examination Council,[2] "BSA/AML Examination Manual" (Feb. 27,

---

[2]      "The Council is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the Federal Reserve System …." FFIEC Homepage, *available at* https://www.ffiec.gov/ (last accessed Jan. 13, 2020).

2015), at 178, *available at* https://bsaaml.ffiec.gov/docs/manual/05_ProductsAndServices/02.pdf). *See also* PIB Mem. at 3 (accurately describing their nested account as a "common international banking arrangement").

### 2. Plaintiffs Have Met Their Modest Burden of Alleging AJIB's Agency in the Personal Jurisdiction Context.

Instead of opening a correspondent account in the United States, PIB used AJIB as its agent to access the U.S. financial system—when PIB Bank would "request that AJIB process the outbound transfer to the beneficiary on behalf of PIB's customer," Declaration of Mohammad Sami Aghbar in Support of PIB's Motion to Dismiss ("Aghbar Decl.") ¶ 24, it was instructing AJIB to process the transaction through AJIB's New York correspondent accounts. Likewise, when a foreign bank "wanted to send a dollar-denominated transfer to a PIB account-holder" and "the originator's bank [sent] the transfer to AJIB for the benefit of the PIB account-holder," Aghbar Decl. ¶ 25, the originator bank was in fact sending the transfer through its own New York correspondent account to AJIB's New York correspondent account for the benefit of PIB and ultimately the PIB account-holder. That AJIB transferred those dollars to PIB across its books is irrelevant—the availment of New York occurred a stage earlier.

Interposing AJIB as an agent for those transactions does not change the fact that PIB knowingly directed all of its U.S. dollar transactions through New York. New York's long-arm statute reaches "any non-domiciliary . . . who in person *or through an agent*[] transacts any business within the state or contracts anywhere to supply goods or services in the state . . . ." § 302(a)(1) (emphasis added). Because the operation of nested and correspondent accounts constituted, as Mr. George explained, facts fundamental to banking in U.S. dollars, when PIB decided to offer its clients—including ALF and HLF—the option of maintaining U.S. dollar-

denominated accounts, it fully understood that it would be availing itself of dollar clearing and settlement in New York.

That is, PIB knew that all of the alleged transfers at issue in this case were processed through banks in New York. As shown in Exhibit B to the Complaint, when an incoming payment was stopped by the PMA's correspondent bank in New York, PIB reached out to that bank directly to demand payment, rather than leave those "decisions" to AJIB (that the letter post-dated the relevant period only affected *which* correspondent bank stopped payment, not whether PIB chose to contact it). *See* George Decl. ¶ 25. As a result, PIB's principal defense that its use of a nested account "does not involve any *direct* interaction by PIB with the U.S. banking system," PIB Mem. at 3 (emphasis added), does not preclude personal jurisdiction.

Establishing agency for personal jurisdiction purposes at the pleading stage presents Plaintiffs with a "modest burden." *See Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 431 (E.D.N.Y. 2012) ("With regard to an agency theory, it appears that Emerald has met its modest burden."). And despite PIB's protests that AJIB was not *formally* its agent, agency in the personal jurisdiction context asks less: "In determining whether an agency exists under § 302, courts have focused on the realities of the relationship in question rather than the formalities of agency law." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986). *See also Topps Co. v. Gerrit J. Verburg Co.,* 961 F. Supp. 88, 91 (S.D.N.Y. 1997) ("In interpreting Section 302(a)(2), New York courts have customarily interpreted the term 'agent' rather broadly.") (citations omitted); *Elman v. Belson*, 32 A.D.2d 422, 425, 302 N.Y.S.2d 961 (2d Dep't 1969) (holding that an independent contractor's activities were sufficient for agency personal jurisdiction where "all of these activities were conducted for [defendant's] benefit, even though [defendant] now chooses not to recognize them").

"To be considered an agent for jurisdictional purposes, the alleged agent must have acted in the state 'for the benefit of, and with the knowledge and consent of' the non-resident principal." *CutCo*, 806 F.2d at 366 (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)). Further, "some control is necessary to establish agency for jurisdictional purposes." *Id.* at 366. As then-district judge Gerard Lynch explained, that "control" can be established where a defendant "chose to delegate the matter" of selecting a forum in which to transact the relevant business, and therefore "had absolute control over whether" it would agree to that selection and risk that forum's jurisdiction applying to it. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 362 (S.D.N.Y. 2004). Where a defendant accepts a delegee's choice rather than seek out another forum, "it was [its] choice not to exercise that control." *Id.*[3]

In *Nat'l Union Fire*, some of the defendants entered into various projects with their indirect parent,[4] and in each case agreed to the insurance coverage offered by the parent for those projects. That insurance plan was negotiated and executed in New York by an insurance broker retained by the parent. In contesting personal jurisdiction on an agency theory, those defendants argued that they did not negotiate or agree to the insurance plan (which was executed *before* they joined the projects) and thus none of them "knew about or consented" to the insurance broker's activities in New York, "still less exercised 'some control' over" the insurance broker. *Id.* at 360. The court rejected the argument. *First*, the court noted that each defendant "knew and voluntarily authorized" the parent to acquire insurance for their projects: "A company cannot deputize another to take certain actions on its behalf and then disclaim knowledge or interest when those actions give rise

---

[3]    Although the control in *CutCo* was shown through allegations of an "arrangement" "similar to" or "sufficiently analogous to a joint venture or partnership," that decision did not require such allegations to show control, or require allegations of "the formal legal requirements of a partnership or joint-venture relationship." *Nat'l Union Fire*, 319 F. Supp. 2d at 361. In any event, *Nat'l Union Fire* relies on, and applies, the *CutCo* standard for agency.

[4]    *Nat'l Union Fire* does not rely on the indirect ownership relationship as grounds for finding agency.

to a legal dispute." *Id.* Although the insurance plan was executed before the defendants' involvement, they "effectively 'bought in' to the [insurance plan,] including its contacts to New York and a New York insurer, thereby purposefully availing themselves of the benefits of" the broker's and their parent's "prior dealings in New York to acquire insurance for their projects." *Id.* at 361.

*Second*, the "control" test was satisfied by, as explained above, their delegation of the selection of insurance forums to others, which delegation they could have withdrawn. As the court explained, "[t]he purpose of requiring 'some control' is to ensure that a party will not be subjected to suit in a jurisdiction against its will, by virtue of the actions of a purported 'agent' to which that party did not consent and as to which it had no choice." *Id.* That purpose is "clearly met" where defendants "could have avoided amenability to suit on such matters in New York by the simple expedient of asking about the insurance arrangements, and if they objected to them, seeking to negotiate the right to obtain other, more suitable coverage on their own, or if necessary, rejecting the business." *Id.* at 361-62. Ultimately, "[t]hat they chose not to cannot immunize them from personal jurisdiction on a cause of action arising out of the very activities they delegated to" their parent, and through the parent to the insurance broker, to perform. *Id.* at 360.

The same is true here. PIB knew that AJIB processed its transactions in New York, as did nearly all banks in the world. PIB does not deny knowing that AJIB processed its dollar transactions in New York, *see* PIB Mem. at 21, but, much like the *Nat'l Union Fire* defendants, argues that "AJIB made its own decisions about whether it would use its own U.S. correspondent banks, and who those correspondents would be," *id.* But in retaining AJIB for its dollar-clearing services, PIB "effectively 'bought in'" to AJIB's choice of New York correspondent banks. *Nat'l Union Fire*, 319 F. Supp. 2d at 361. PIB had "the right to obtain other" dollar-clearing services,

*see* George Decl. ¶¶ 19-21, "or if necessary, reject[] the business" from ALF and HLF. *Id.* at 361-62. That those other means for dollar clearing services may have been less convenient or harder to obtain does not immunize PIB from choosing New York—as the Court of Appeals in *Licci III* explained: "Presumably, using the AmEx account was cheaper and easier for LCB than other options, and whatever financial and other benefits LCB enjoyed as a result allowed the bank to retain Shahid as a customer and to support its allegedly terrorist activities and programs." *Licci III*, 20 N.Y.3d at 340. Indeed, PIB could have diminished its risk of "amenability to suit on such matters in New York" by simply refusing to offer dollar-denominated accounts to high risk institutions, such as ALF and HLF.

PIB argues that its knowledge of AJIB's (or the Palestinian Monetary Authority's ("PMA")) dollar processing in New York is "jurisdictionally irrelevant" because, "[f]oreseeability of a third-party's contacts with the United States is not, under *Waldman*, evidence that PIB itself engaged in purposeful contacts with the United States." PIB Mem. at 21 (citing *Waldman v. Palestine Lib. Org.*, 835 F.3d 317 (2d Cir. 2016)). PIB's repeated reliance on *Waldman* is misleading and directly rejected by the case itself. *Waldman* was principally an "effects test" case, not a purposeful availment case. *Waldman*, 835 F.3d at 337. The *Waldman* court held that "the mere 'fact that *harm* in the forum is foreseeable'" is insufficient to show that defendants intended for that harm to be felt in the forum, as required under the effects test. *Id.* at 339 (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013)).

The *Waldman* court pointed out that "[i]n *Licci*, this Court also distinguished the 'effects test' theory of personal jurisdiction which is 'typically invoked where (*unlike here*) the conduct that forms the basis for the controversy occurs entirely out-of-forum . . . .'" *Id.* at 342 (quoting *Licci IV*, 732 F.3d at 173) (emphasis added in *Waldman*). In *Waldman*, the only in-forum contacts

12

were the defendants' diplomatic missions, which were "not connected to the wrongs for which the plaintiffs here seek redress." *Id.* As the Second Circuit explained in *Licci IV*, under the correct standard, foreseeability is *precisely* the governing standard: "*It should hardly be unforseeable* [sic] to a bank that selects and makes use of a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use." 732 F.3d at 171-72 (emphasis added).

Further, PIB acknowledges, as it must, that it allegedly "instructed AJIB to process a payment to a U.S. bank or bank account," PIB Mem. at 21—indeed, it did so for every settling payment it made to the PMA for the U.S. dollar-denominated checks at issue. *See* George Decl. ¶¶ 39-49 (explaining that the PMA only added another layer of superficial "clearing" and "settling" services to the standard processing of U.S. dollar-check-related transactions in New York). It also presumably instructed originators like HLF in Texas on how to transfer payments to PIB customers through New York, as shown in Exhibit C. However, PIB argues "such instruction simply implemented antecedent decisions made independently by, and at the express direction of, the PMA, PIB's customer, or the counterparty to the transaction, not by PIB and not as a result of any arrangement or relationship PIB had with any U.S. bank." *Id.* The distinction is legally irrelevant:

> The Appellate Division erroneously concluded that plaintiffs failed to establish purposeful availment because defendants 'merely carried out their clients' instructions'. Our cases do not require that the foreign bank itself direct the deposits, only that the bank affirmatively act on them. Contrary to the dissent's assertion, in *Licci*, it was Hizballah that directed the wire transfers through LCB's correspondent bank and not defendant, LCB. A foreign bank with a correspondent account, therefore, that repeatedly approves deposits and the movement of funds through that account for the benefit of its customer is no less 'transacting business in New York' because the customer, or a third party at the customer's direction, actually deposits or transfers the funds to New York.

*Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 328, 68 N.E.3d 1, 9 (2016). Again, PIB itself sought to dislodge a settling payment from the PMA *in* New York. *See* George Decl. ¶ 48.

Rather than contend with this controlling case law, PIB argues instead that a correspondent bank is not its customers' "*legal* agent," PIB Mem. at 6 (quoting *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 121 (2d Cir. 2010)) (emphasis added). Again, the test is as to "the realities of the relationship in question rather than the formalities of agency law." *CutCo*, 806 F.2d at 366. None of PIB's cases relate to personal jurisdiction. As PIB concedes, PIB Mem. at 20, *Export-Import Bank*, *Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152, 156 (2d Cir. 2018), and *Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 770 F.3d 993, 1002 (2d Cir. 2014) hold only that a correspondent bank is not its customer's agent under N.Y. U.C.C. § 4-A-212 for attachment purposes. The U.C.C. is not determinative of agency in the personal jurisdiction context.

PIB's remaining case, *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, holds that "[a] correspondent bank relationship, *standing alone*, does not create an agency relationship" in the context of determining the sufficiency of a breach of fiduciary duty claim. 731 F.2d 112, 122 (2d Cir. 1984) (emphasis added). Notably, while *Aaron Ferer* is not a personal jurisdiction case, its holding relies on the very case that underlies *Licci*: *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391, 348 N.E.2d 581 (1976). In *Amigo Foods*, the New York Court of Appeals held that "a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under CPLR 302," *id.* at 396, but as the Court of Appeals later clarified, "if the defendant's *use* of that account was purposeful," it *would* form that basis, *Licci III*, 20 N.Y.3d at 338 (emphasis added) (quoting *Licci II*, 673 F.3d at 63, 66)). In short, a correspondent bank is not a general agent so as to locate its customers in the forum, but when a correspondent bank executes a transfer on behalf, and with the

knowledge and consent, of its customer in New York, that customer is amenable to suit in New York for claims arising from that transfer.

Magistrate Judge Cheryl L. Pollak rejected arguments substantially similar to PIB's in another ATA case, *Freeman v. HSBC Holdings PLC*. Relying on C.P.L.R. § 302 and *Licci*, Judge Pollak found that this Court had personal jurisdiction over the Iranian Bank Saderat where that bank "transferred U.S. dollars through New York based correspondent accounts" (which transfers "were related to the provision of support to terrorist groups") even though the bank itself had "*no correspondent accounts in the United States*." No. 14-cv-6601(DLI)(CLP), 2018 WL 3616845, at *61 (E.D.N.Y. July 27, 2018) (emphasis added), *rep. and rec. rejected on other grounds*, 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019). Barred from holding a correspondent bank in New York, Bank Saderat held a correspondent account with Lloyds in London; Lloyds processed Bank Saderat's transfers in New York. Judge Pollak agreed with plaintiffs that where Bank Saderat was "funneling funds through the correspondent branch of another bank, such as Lloyds, that branch was operating as an 'agent' of Bank Saderat." *Id.*

The *Freeman* District Court affirmed the report and recommendation on personal jurisdiction over Bank Saderat, rejecting Bank Saderat's Fed. R. Civ. P. 72(b) objections to Judge Pollak's decision. Although the District Court focused on the conspiracy basis for jurisdiction,[5] it concluded that "Bank Saderat's conduct was not simply directed at international banks with their headquarters in foreign countries; it was purposefully targeted at obtaining benefits available to it only by using agents in New York. It is no defense that Bank Saderat was not *itself* transacting business in New York." *Freeman*, 2019 WL 4452364, at *7.

---

[5]      Notably, however, Plaintiffs have alleged that PIB conspired with Saddam Hussein's regime in providing funding for ALF, which involved the essentially same deceptive steps taken to "illegally clear and settle dollar-denominated transactions through correspondent accounts in New York." *Freeman*, 2019 WL 4452364, at *7.

The conclusions in the *Freeman* decisions are applicable here. The U.S. dollar-denominated checks PIB issued to families of suicide bombers and other terrorists were also processed through New York. As Mr. George explained, like any other USD transfer between foreign banks, the net debt or credit positions created by the clearing of checks issued or deposited by PIB to or from other banks, including other banks in the Palestinian Territories, had to generally be settled in New York between U.S. correspondent banks utilizing CHIPS and Fedwire. Thus, while the PMA in Ramallah may have offered an *additional* stage of clearing and settlement services among Palestinian banks, Aghbar Decl. ¶¶ 18-20, either as a convenience or to promote reliability in a still-developing banking system, all electronic funds transfers relating to the daily credit and debt positions between Palestinian banks arising from their respective U.S. dollar-denominated check processing activities were ultimately cleared and settled in the United States. George Decl. ¶ 43. The PMA was (and is) incapable of settling dollar electronic funds transfers (beyond, perhaps, utilizing the extremely limited amounts of USD bank notes in its possession). *Id.* ¶ 44.

Thus, as Mr. Aghbar explains, after the PMA sets off checks among the Palestinian banks, those banks settled their final obligations to each other through New York, Aghbar Decl. ¶¶ 10, 19, 20, ultimately across the balance sheet of the Federal Reserve Bank of New York, *see* George Decl. ¶ 45. Specifically, "[i]f a bank owed a net debt to other banks, then it was required to settle that debt by transferring funds in dollars (a 'Settlement Transfer') to the account the PMA had designated for this purpose," Aghbar Decl. ¶ 19, which was evidently an account at Arab Bank's former New York branch, *id.* ¶¶ 20-21. The PMA would then transfer those funds through New York to the creditor banks. *Id.* ¶ 19. Therefore, where the Complaint alleges that PIB issued dollar-denominated checks to beneficiaries who deposited them at other banks in the Palestinian

Territories, PIB purposefully directed them *through* AJIB's correspondent accounts in New York to and from the Arab Bank-New York account for the PMA. George Decl. ¶ 49.

In PIB's remaining cases, PIB Mem. at 18-19, courts did not find jurisdiction based on transactions that travelled through New York under circumstances less relevant than those in *Licci*. *Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, No. 14-cv-5216(DLC), 2015 WL 4164763 (S.D.N.Y. July 10, 2015); *Timothy Coffey Nursery Landscape Inc. v. Soave*, 760 F. App'x 58 (2d Cir. 2019); *MacDermid, Inc. v. Canciani*, 525 F. App'x 8 (2d Cir. 2013). None reached agency. *See, e.g.*, *id.* at 11 (noting that the plaintiff "failed to argue before the district court that [the defendant] transacted business in Connecticut by means of an agent"). Thus, while these cases are readily distinguishable (*Stanbic* involved only one transaction, sent by plaintiff, and relating to a negligence/breach of fiduciary duty claim;[6] in *Timothy Coffey*, plaintiff sent the transactions and the receiving bank was not a defendant; in *MacDermid*, the defendant "did not know" the relevant account, opened by plaintiff, was located in the forum state), *Licci* is not. PIB made the choice to offer dollar accounts to ALF (publicly associated with Saddam Hussein's sanctioned regime) and HLF (already designated by Israel) and chose to use AJIB's account in New York for its dollar-clearing. PIB's cases, however, "present[] the inverse of the type of business relationship that might establish personal jurisdiction in New York: rather than an out-of-state defendant seeking out business in New York, in-state plaintiffs sought out business outside of New York." *Timothy Coffey*, 760 F. App'x at 61.

---

[6]       Section 302 is a "single act statute," meaning "one transaction in New York is sufficient to invoke jurisdiction [under § 302(a)(1)] … so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Strauss*, 175 F. Supp. 3d at 21 (quoting *Deutsche Bank Secs., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71, 818 N.Y.S.2d 164, 850 N.E.2d 1140 (2006)). The court in *Strauss* found personal jurisdiction over ATA claims against the defendant foreign bank where the plaintiffs (*after jurisdictional discovery*) had identified 1.8% of the alleged transactions for HAMAS as denominated in dollars and processed in New York, because they constituted "an integral facet of the conduct that is the basis for all of Plaintiffs' claims." *Id.* Here, Plaintiffs allege that PIB used New York correspondent accounts for *all* of the relevant transfers.

### C. **Plaintiffs' Claims Arose From PIB's New York Transactions.**

As for the "nexus" prong of § 302(a)(1), showing a nexus is a "relatively permissive" standard that "does not demand a causal connection between the defendant's New York transaction [and] the plaintiff's claim." *Strauss*, 175 F. Supp. 3d at 9. Instead, it "requires only a 'relatedness ... such that the latter is not completely unmoored from the former'" and that "at least one element [of the plaintiff's claim] arises from the [defendant's] New York contacts." *Id.* (quoting *Licci III*, 20 N.Y.3d at 339). Thus, "a lawsuit seeking redress for the allegedly unlawful provision of banking services of which the wire transfers are a part"—which in *Licci* were "allegations of LCB's repeated, intentional execution of U.S.-dollar-denominated wire transfers on behalf of" a Hezbollah-affiliated charity—"are sufficient." *Licci IV*, 732 F.3d at 171. As stated above, the Second Circuit concluded that "[i]t should hardly be unforeseeable [sic] to a bank that selects and makes use of a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use." *Id.* at 171-72. As shown more thoroughly in the following sections, Plaintiffs have met that low burden here by showing that PIB's transfers through New York supported and incentivized the terrorist attacks at issue.

PIB misdirects in arguing that Plaintiffs do not "identify a single banking transaction that allegedly was processed through the United States that relates in any way to any of the Attacks." PIB Mem. at 3. All of the transactions at issue—every transfer from HLF, including the one specifically identified in Exhibit C and every final settlement resulting from PIB's dollar-denominated checks to families of terrorists—were processed through New York, and PIB has not provided any evidence to the contrary.

Because PIB's remaining challenges are to their liability, they are addressed more fully in the sections below. In short, PIB argues that because Plaintiffs have only identified payments made to a family of one of the attackers at issue, and none directly to any of the attackers themselves,

personal jurisdiction should be limited to its liability as to that attack. *Id.* at 15. The point is irrelevant—the ALF checks incentivize future attacks, they do not cause attacks that already happened when they are sent, *post hoc*, to the attacker's family. As for HLF, PIB concedes that Plaintiffs identified an HLF transaction, but argues it was made "*before* the 'relevant period,'" PIB Mem. at 7; as shown below, PIB seems to posit that relevant assistance must come *on* the day of the first attack. Finally, its characterization of its services for ALF and HLF as "routine" is, as explained below, (1) inaccurate; (2) a jury question; and (3) not relevant to personal jurisdiction.

## D. Exercising Personal Jurisdiction Over PIB Comports with Due Process.

As the Second Circuit found in *Licci*, the exercise of jurisdiction over a foreign bank that avails itself of New York's dependable financial system comports with constitutional due process principles. *Licci IV*, 732 F.3d at 171.[7] This is unsurprising – *Licci IV* also noted that although "personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare." Indeed, the Court could find "no such decisions in this Circuit." *Id.* at 170. This case is not the first; the fact that PIB interposed an additional agent between itself and the New York financial system does not change the analysis. *See, e.g.*, *Freeman*, 2019 WL 4452364, at *7 (finding personal jurisdiction over Bank Saderat despite its use of agents outside of the U.S. to reach New York). The alternative finding would permit foreign banks to immunize themselves from U.S. jurisdiction simply by adding another agent.

"Due process considerations require that the defendant 'have certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Licci IV*, 732 F.3d at 169 (quoting *Int'l Shoe Co. v. Washington*,

---

[7]     For the same reason, this Court would have personal jurisdiction over PIB under Fed. R. Civ. P. 4(k)(2), should this Court find that the requirements of § 302 are not met.

326 U.S. 310, 316 (1945)). For specific jurisdiction "the jurisdictional inquiry focuses on the "affiliation between the forum and the underlying controversy." *Id.* at 169-70 (quoting *Goodyear Dunlop Tires Operations S.A. v. Brown*, 564 U.S. 915, 919 (2011)). In *Licci*, "LCB's repeated use of the correspondent account—and hence New York's banking system—as an instrument to achieve the wrong complained of in this suit satisfies the minimum contacts component of the due process inquiry." *Id.* at 173. The same is true here.

Having found the first element, PIB "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 173-74 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). The *Licci* court recognized that the plaintiffs resided in Israel, and "many of the documents and witnesses relevant to this litigation are located abroad," but "'the conveniences of modern communication and transportation ease' any burden the defense of this case in New York might impose on LCB." *Id.* at 174 (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996)). Finally, the Second Circuit noted "the United States' and New York's interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends." *Id.* All of these factors are equally applicable here.

## II.   DEFENDANT'S CONDUCT VIOLATED 18 U.S.C. § 2339A.

In *Weiss v. Nat'l Westminster Bank PLC*, the Second Circuit expressly held that "through [a] complex series of statutory incorporation … a defendant may be liable for civil remedies under § 2333(a) for providing material support to an organization that solicits funds for an FTO." 768 F.3d 202, 209 (2d Cir. 2014). *See also Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (*en banc*) ("*Boim III*"). To properly plead liability under § 2333(a) for criminal violations of 18 U.S.C. § 2339A, plaintiffs must plausibly allege that a defendant (1)

provided material support (2) knowing that it was to be used in preparation for, or in carrying out, terrorist attacks[8] (3) which proximately caused Plaintiffs' injuries and that (4) defendant's § 2339A violation(s) satisfy the definitional requirements of 18 U.S.C. § 2331(1). *Id.*

As the Seventh Circuit noted in *Boim III,* "Primary liability in the form of material support to terrorism has the character of secondary liability. Through a chain of incorporations by reference, Congress has expressly imposed liability on a class of aiders and abettors." *Id.* at 691-92. The *Boim III* court went on to explain the elements necessary to find a defendant liable for primary liability under § 2333(a) predicated on a violation of § 2339A:

> A knowing donor to Hamas—that is, a donor who knew the aims and activities of the organization—would know that Hamas was gunning for Israelis (unlike some other terrorist groups, Hamas's terrorism is limited to the territory of Palestine, including Israel); that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel … and that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel. And given such foreseeable consequences, such donations would "appear to be intended ... to intimidate or coerce a civilian population" or to "affect the conduct of a government by ... assassination," as required by section 2331(1) in order to distinguish terrorist acts from other violent crimes, though it is not a state-of-mind requirement; it is a matter of external appearance rather than subjective intent, which is internal to the intender.

*Id.* at 693-94 (citations omitted).

Here, PIB was a knowing and willing conduit for Saddam Hussein's highly-publicized rewards program to the families of Palestinian suicide bombers and other terrorists. It knew that it was facilitating these payments during a period of extreme, daily violence during which Israelis and a considerable number of American civilians were targeted by suicide bombers and other terrorists, and that rewards payments to the families of suicide bombers and others increased the fame and prestige of these mass murderers, enabling Palestinian terrorist groups to recruit more

---

[8]      Section 2339A references multiple criminal laws including 18 U.S.C. § 2332, which criminalizes killing (whether classified as homicide, voluntary manslaughter, or involuntary manslaughter), conspiring to kill, or inflicting bodily injury on, any American citizen outside the United States.

volunteers to kill or wound more people in Israel. And given such foreseeable consequences, the provision of rewards payments to the families of suicide bombers and others would "appear to be intended ... to intimidate or coerce a civilian population" or to "affect the conduct of a government by ... assassination," as required by section 2331(1).

### A. Defendant Knowingly Provided Material Support by Incentivizing Suicide Bombings and Other Terrorist Attacks in Violation of § 2339A.

Although various courts have acknowledged that routine banking activities do not create liability when defendants act *without knowledge* that they are supporting terrorism (*see, e.g., In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 832-33 (S.D.N.Y. 2005)), "[w]here 'the Bank knows that the groups to which it provides services are engaged in terrorist activities' even the 'provision of basic banking services may qualify as material support.'" *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 625 (E.D.N.Y. 2006) (quoting *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 588 (E.D.N.Y. 2005)).

### 1. Saddam Hussein's Incentive Program for Palestinian Terrorists.

PIB argues that "the Amended Complaint does not plausibly allege that PIB knew that its purported customer, Mr. Salem, was involved in terrorism in any way, or that PIB knew of Mr. Salem's alleged role in any payment scheme. The Amended Complaint also does not allege that PIB helped to administer or facilitate, or was even aware of, a broader 'reward' program for the families of terrorists." PIB Mem. at 25. Given the detailed allegations in the Complaint, this assertion is ridiculous on its face.

PIB also argues that § 2339A requires a "heightened state of mind" because the statute requires a defendant to know that its material support would be used in preparation for, or in carrying out," terrorist acts. *Id.* at 24. But one of the very cases PIB cites notes (in language it omits from its quotation) that "it is not necessary for an ATA plaintiff to show the defendant's 'specific

intent to aid or encourage the *particular attacks* that injured plaintiffs.'" *In re Chiquita Brands Int'l, Inc.,* 284 F. Supp. 3d 1284, 1309 (S.D. Fla. 2018) (emphasis in the original).

*United States v. Ghayth,* also cited by PIB, PIB Mem. at 26, confirms that "[t]he government had no need to show that [defendant] possessed knowledge of any particular plot to kill Americans or that he had the specific intent to carry out such a plot. Its burden was to prove that he had 'knowing participation or membership in the scheme' and 'some knowledge of [its] unlawful aims and objectives.' In other words, the jury only had to find that Abu Ghayth knew of Al Qaeda's objective to kill Americans and intended to participate." 709 F. App'x. 718, 721 (2d Cir. 2017) (summary order) (internal citations omitted).

Here, the Complaint alleges that PIB facilitated a highly-publicized, massive, multi-million-dollar incentive program to reward terrorist attacks. This creates a triable issue of fact as to whether the payment of those incentives assisted Palestinian terrorist groups in preparing for or carrying out attacks, and assisting in recruiting suicide bombers and other volunteers by (1) assuaging their concerns that their families would suffer financially as a result of their deaths or imprisonments and (2) encouraging them to believe that their sacrifice will gain them fame, confirmed by the payments made to their families as "heroes" worthy of acknowledgement.

In the face of these detailed and well-pleaded allegations, PIB cites *Kaplan v. Lebanese Canadian Bank*, *SAL*, 405 F. Supp. 3d 525, 535 (S.D.N.Y. 2019) for the proposition that allegations that entities identified with Hezbollah on its "websites, press releases, television and radio stations, press conferences, and interviews" were insufficient to plausibly plead that "Defendant read or was aware of such sources." PIB Mem. at 25-26. But setting aside the fact that Plaintiffs consider *Kaplan* wrongly decided,[9] the allegations here are not that PIB read a terrorist

---

[9]      In the parallel case brought by foreign nationals under the Alien Tort Statute, the Second Circuit, applying a higher legal standard, noted that "LCB … argues only that the District Court correctly held that Plaintiffs have failed

group's website or press releases. Instead, the Complaint describes a widely publicized campaign undertaken on behalf of Saddam Hussein during an ongoing onslaught of daily terrorist attacks – a grotesquery so infamous it received media coverage not only in the Palestinian Territories, AC ¶¶ 513-15, but in the international media as well, *id.* ¶¶ 516-19.

As PIB's brief helpfully points out, even the checks it issued and deposited contain handwritten references to "martyrs." PIB argues that the Complaint fails to allege that the writing on those checks was made "contemporaneously" or that its employees would have noticed that information even if was. PIB Mem. at 27. These arguments, read in the light most favorable to PIB, are a challenge to the *evidence* at trial; they are hardly appropriate to a motion to dismiss where a court must "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009) (*en banc*).

Instead, PIB improperly introduces its own counter-allegations, asserting that Rakad Salem was acquitted of certain charges by an Israeli military court, to argue that the government of Israel "maintained [a] position" that "from 1996 forward, [] the ALF was not a terrorist organization…." PIB Mem. at 25. But setting aside the fact that PIB's assertions are outside the Complaint, they also grossly misrepresent the facts they improperly allege. First, the government of Israel prosecuted Salem and "maintained [the] position" that he was a member of an unlawful organization. However, an Israeli military court ultimately ruled that the prosecution failed to prove beyond a reasonable doubt that the ALF was an unlawful organization during the years 1996-2002. But the legal standard applied by an Israeli military court for determining whether an

---

to meet the required *mens rea* for accessorial liability. We disagree. Plaintiffs' complaint, considered in conjunction with the Shaya declaration and the government's actions against LCB, satisfies our preliminary review of the *mens rea* requirement for aiding and abetting violations of the law of nations." *Licci by Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 218 (2d Cir. 2016) ("*Licci V*").

24

organization is unlawful under military government law bears no relationship to the question of whether PIB knew it was facilitating payments to the families of suicide bombers.

At the same time, Saddam Hussein's regime in Iraq was a U.S.-designated State Sponsor of Terrorism and was therefore limited in its ability to transfer U.S. dollars. Without the active cooperation of PIB and other co-conspirators, Saddam Hussein's regime had no mechanism to transfer millions of dollars from Iraq to the Palestinian Territories. AC ¶¶ 526-34. It is both morally repugnant and a sign of desperation for PIB to describe the transfer of those millions of dollars from a rogue regime and the distribution of those funds in the form of reward payments to families of suicide bombers as "routine commercial banking business for its customer." PIB Mem. at 27.

### 2. PIB's Account for the Holy Land Foundation.

The Complaint alleges that PIB "maintained a U.S. dollar-denominated account for HLF in Ramallah and both received funds from HLF's offices in the United States and transferred funds on behalf of HLF's Palestinian offices." AC ¶ 9. HLF was "a HAMAS fundraising institution established in Richardson, Texas, to funnel donations from the United States to HAMAS, particularly in the Palestinian Territories" that was designated an SDGT by the U.S. government in December 2001. *Id.* ¶¶ 9-12. The Complaint specifically identifies HLF's bank account number at PIB, *id.* ¶ 571, and attaches a *sample* of an actual wire transfer from HLF in Texas to its account at PIB as Exhibit C.

PIB contends that the Complaint's allegations "stand in sharp contrast to other ATA cases where courts have found allegations sufficient to plead a bank's knowing support for terrorism." PIB Mem. at 28. It then cites ATA cases against National Westminster Bank and Crédit Lyonnais where "the complaints contained non-conclusory allegations that the banks were on notice, at the time of the alleged transfers at issue, that specific customers had connections to terrorism." PIB's

brief then specifically cites these two cases as examples where the defendant bank held accounts

for an entity designated as a HAMAS front by the Israeli government:

> See *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 626–27 (E.D.N.Y. 2006) (customers were **designated as Hamas fronts by Israeli government**); *Strauss v. Credit Lyonnais, S.A.*, No. 06-CV-702 (CPS), 2006 U.S. Dist. LEXIS 72649, at *14–15, *47 (E.D.N.Y. Oct. 5, 2006) (bank was aware of "unusual activity" in accounts belonging to customers **designated by Israel as connected to Hamas**).

*Id*. (Emphasis added). Of course, that is *precisely* what the Complaint here also alleges.

Specifically, "[o]n May 6, 1997, the Government of Israel designated HLF a HAMAS organization

and declared that HLF "deals in the practice of transferring monies to families of HAMAS

activists, who carried out deadly attacks …." AC ¶ 570.

## B. PIB's Conduct Was a Proximate Cause of Plaintiffs' Injuries.

In *Rothstein v. UBS AG*, plaintiffs argued that defendant's provision of currency to Iran

violated U.S. criminal law, and thus they should be entitled to a finding of *per se* liability, and

proximate cause "should be presumed." 708 F.3d 82, 96 (2d Cir. 2013). The Second Circuit

disagreed, instead affirming that a primary liability claim requires plausible allegations supporting

the inference that a defendant's conduct proximately caused a plaintiff's injury. The Court noted:

> Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his *acts were a substantial factor in the sequence of responsible causation* and whose injury was reasonably foreseeable or anticipated as a natural consequence.

*Id.* at 91-92 (*citing Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 123 (2d Cir. 2003)).

### 1. Saddam Hussein's Incentive Program for Palestinian Terrorists Was a Proximate Cause of Plaintiffs' Injuries.

PIB argues that its conduct was not a substantial factor in the sequence of responsible

causation and that Plaintiffs' injuries were not a reasonably foreseeable consequence of its conduct

because (1) PIB did not participate in the relevant terrorist attacks or (2) provide banking services

to the perpetrators or organizations allegedly responsible for them. PIB Mem. at 36. Of course, Saddam Hussein's reward payments were paid to operatives of the organizations responsible for the attacks as well as the immediate family members of suicide terrorists. Whether these highly publicized payments assisted terrorist organizations in recruiting suicide bombers and other terrorists is a factual question for a jury, but it is obviously plausible that such payments (which constituted vast sums by the living standards of the Palestinian Territories at that time) would encourage recruitment, particularly of suicide bombers.

Since the very purpose of Saddam Hussein's campaign was to encourage terrorism, PIB relies on two cases brought against the Palestine Liberation Organization ("PLO") whose facts are easily distinguishable – a footnote in *Sokolow v. PLO* and a citation to that footnote in the out-of-circuit case of *Shatsky v. PLO.* In both cases, the principal allegations were that the PLO itself played a role in terror attacks (as well as providing material support to other terrorist organizations that carried out some of the attacks). In both cases there was evidence that the PLO or Palestinian Authority provided stipends or other payments to individuals involved in the relevant attacks or their relatives, but in neither case were these payments central to the plaintiffs' claims, nor did the plaintiffs argue that these payments alone were a substantial factor in causing the attacks at issue. In *Sokolow*, plaintiffs sought to argue that a defendant's payments to the families of its employees who perpetrated one of the seven attacks at issue served as "ratification" of its employees' actions and was is itself a violation of the ATA. The *Sokolow* court held the payments alone did not demonstrate that Defendants were responsible for the attacks but could be presented to the jury in support of plaintiffs' argument that the defendant's employees were acting within the scope of their employment. *Sokolow v. PLO*, 60 F. Supp. 3d 509, 517 n.11 (S.D.N.Y. 2014). *Shatsky v. PLO* is equally unhelpful to PIB's argument. There, the district court

considered the relevance of small monthly payments made to the family of the suicide bomber, describing the evidence as "to say the least, disturbing." No. 02-cv-2280 (RJL), 2017 WL 2666111 at *10 (D.D.C. June 20, 2017). The court concluded, however, that "*without more*, these after-the-fact payments are not sufficient for a reasonable jury to conclude that defendants proximately caused the Karnei Shomron bombing." *Id.* (emphasis added).

Here, by contrast, the Complaint describes a highly-publicized, enormously well-funded and infamous reward payment scheme systematically implemented and paid to the family of every successful suicide bomber (among other categories). *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 649 (S.D. Tex. 2011) (finding allegations of knowing kickbacks to the Hussein regime plausibly pleaded proximate causation for terrorist attacks in Israel) ("Given the … allegations about Hussein's publicly stated dedication to, and involvement in, attacks on Israel, it was foreseeable that if given off-book money, Hussein would use at least some of it to support terrorist attacks in that country…."). Plaintiffs do not contend that any single after-the-fact payment to the family of a specific suicide bomber proximately caused that attack. Rather, as the Complaint alleges, Saddam Hussein's rewards program – facilitated by PIB – "glorified, encouraged and incentivized Palestinian terrorists to commit terrorist attacks of the kind that injured Plaintiffs and rewarded them by paying their families even greater sums if they forfeited their lives in the commission of these acts of terrorism." AC ¶ 633.

### 2. PIB's Material Support to HAMAS through the Holy Land Foundation Was a Proximate Cause of HAMAS Attacks that Injured Many of the Plaintiffs.

Oddly, PIB's brief contends that the Complaint's allegations that HLF repeatedly transferred money from the United States using HLF's account at PIB is "without factual support," when the Complaint specifies the account number HLF held at PIB. *Id.* ¶ 576. The Complaint also provides a copy of a sample transaction from HLF in Texas to its PIB account in Ramallah, *id*, and

it sets forth in detail HLF's role in HAMAS, the organization's designation by Israel in 1997 and the factual findings of the U.S. government concerning HLF's role in HAMAS. *Id.* ¶¶ 562-83. Unable to grapple with these detailed and damning allegations, PIB's brief attempts instead to discuss the *sample* wire transfer attached to the Complaint as if it constituted the entirety of its alleged conduct, even suggesting that because the exhibit "is dated August 23, 2001, which is prior to the 'relevant period' as defined by Plaintiffs, and also several months prior to HLF's designation by OFAC in December 2001[,] Plaintiffs have not plausibly alleged that PIB was aware of any connection between HLF and any terrorist organization at the time it allegedly processed the transfer identified in Exhibit C." PIB Mem. at 28.

But the Complaint's "relevant period" refers to the statutory period for attacks whose limitations period is tolled by the 2013 amendment to the ATA.[10] That period extends from September 11, 2001 to the time when Saddam Hussein's regime was toppled in 2003. Neither the Complaint nor any court has suggested that material support provided a few months prior to a terrorist attack is outside the "relevant period" for purposes of proximate cause as a matter of law. Nor are Plaintiffs obligated under Fed. R. Civ. P. 8 to furnish *evidence* establishing the scope of a defendant's wrongdoing. Rather, Plaintiffs attached Exhibit C to the Complaint merely to confirm the plausibility of their allegations which the HLF wire transfer attached as Exhibit C certainly does.

## C.  PIB Committed "Acts of International Terrorism."

In order to state a claim predicated on primary liability under 18 U.S.C. § 2333(a), Plaintiffs must also plausibly plead that a defendant's conduct satisfies the definitional requirements of an "act of international terrorism" under 18 U.S.C. § 2331(1), which require conduct that:

---

[10]      *See*, Nat'l Def. Auth. Act. FY 2013, Pub. L. No. 112-239, § 1251(c), 126 Stat 1632 (Jan. 2, 2013) (extending the limitations period for attacks that occurred on or after September 11, 2001).

(1) involve violent acts or acts dangerous to human life;

(2) that are a violation of the criminal laws of the United States or of any state;

(3) appear to be intended to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion or affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(4) occur primarily outside the territorial jurisdiction of the United States or transcend national boundaries in terms of the means by which they are accomplished.

PIB does not challenge the second and fourth elements but does argue that its conduct did not involve violent acts or acts dangerous to human life or objectively appear to have a terroristic intent. In *Linde,* the Second Circuit stated that knowing donations to a terrorist organization do not *always* satisfy § 2331's definitional requirements. Instead, reviewing a full trial record, the Court held: "We conclude only that providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to excuse the charging error here and compel a finding that *as a matter of law*, the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018) (emphasis added). On a motion to dismiss, the question before the Court therefore is not whether the Complaint's allegations compel a finding *as a matter of law*, that the services PIB provided were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments. To the contrary, the Court need only decide whether the Complaint plausibly alleges that PIB's conduct *could* plausibly satisfy § 2331(1)'s definitional elements.

1. **The Complaint Plausibly Alleges that PIB's Conduct "Involve[s] Violent Acts or Acts Dangerous to Human Life" As Required Under 18 U.S.C. § 2331(1).**

PIB asserts that the Complaint fails to allege facts to support a reasonable inference that PIB engaged in activities that "involve violent acts or acts dangerous to human life," but it relies almost entirely on a misreading of the legal standard set forth in *Linde*, in which the Second Circuit

held only that "the provision of material support to a terrorist organization does not *invariably* equate to an act of international terrorism." 882 F.3d at 326 (emphasis added).[11] The Complaint, however, plausibly alleges activities that are far from *routine* under any reasonable banking standard. Even with respect to PIB's material support to HAMAS's Holy Land Foundation, *Linde* held that whether that conduct qualifies as an act of international terrorism "raises questions of fact for a jury to decide." *Id*. at 327.

*Boim III* also makes clear that where a defendant provides material support to a terrorist organization, knowing its "aims and activities" and knowing that the support would "enable" it "to kill or wound, or try to kill, or conspire to kill more people," that support "would 'appear to be intended'" to have the objectives listed in § 2331(1)(B). 549 F.3d at 693-94. Moreover, *Boim III* recognized that deliberate indifference, in which "one knows there is a substantial probability that the [supported] organization engages in terrorism but one does not care," qualifies as knowledge under § 2333(a). *Id.* at 693. One can reasonably infer from the Bank's knowledge of Saddam Hussein's infamous incentive payment program that it was encouraging terrorism intended to coerce and intimidate a civilian population or affect the conduct of a government. *See Abecassis v. Wyatt*, 7 F. Supp. 3d 668, 676 (S.D. Tex. 2014) (holding that kickback payments to Saddam Hussein's regime that allegedly financed payments to the families of suicide bombers and others killed in carrying out the terrorist attacks satisfied § 2331(1)'s requirements).

---

[11]     Section 2331(1)(A) defines international terrorism as "activities that [] involve violent acts or acts dangerous to human life . . ." not as activities that *are* themselves violent or dangerous to human life. Congress's addition of this degree of separation is consistent with the availability of predicate crimes under § 2331(1)(A) (activities that violate criminal laws of the United States or of any State) that are not themselves violent or life-endangering, such as material support, 18 U.S.C. §§ 2339A-2339C, financial transactions with state sponsors of terrorism, 18 U.S.C. § 2332d, and harboring or concealing terrorists, 18 U.S.C. § 2339, as well as a large number of state crimes, such as identity fraud.

## 2. The Complaint Plausibly Alleges that PIB Acted with the Terroristic Intent Required Under 18 U.S.C. § 2331(1).

Both parties agree that whether PIB's conduct "appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government" is an objective test that "does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions." *Weiss*, 768 F.3d at 207 n.6. Nonetheless, PIB relies on *Stansell v. BGP, Inc.*, 2011 WL 1296881 (M.D. Fla. 2011), where the court relied on the defendant's motive as alleged in the complaint to find that plaintiffs had not adequately pleaded the § 2331(1)(B) element. In so doing, the court "relied on the *subjective* intent of the defendants as pled by the plaintiffs," as a later decision noted in distinguishing *Stansell*. *Abecassis*, 7 F. Supp. 3d at 676 (emphasis added). But "[t]he subjective intent of the defendant is not relevant." *Id.*

Because Plaintiffs' claims here describe an infamous scheme to incentivize suicide bombings, PIB is compelled to rely upon cases whose allegations are wholly factually dissimilar from the allegations here. For example, PIB relies upon *Stutts v. De Dietrich Group*, No. 03-cv-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. Jun. 30, 2006), where plaintiffs brought a class action against, *inter alia*, a group of banks for injuries U.S. servicemen allegedly sustained by exposure to chemicals that were released into the environment when U.S. and coalition forces bombed Iraqi depots during the Gulf War in 1991. *Id.* at *1.

Judge Glasser summarized the *Stutts* plaintiffs' theory of causation and foreseeability as follows:

> What the plaintiffs essentially ask the Court to accept is that by providing letters of credit to the manufacturers of chemicals, the Bank Defendants should have perceived the risk that those chemicals would be sold to Iraq; that Saddam Hussein would use those chemicals to manufacture lethal weapons; that those weapons would be stockpiled in a location that would one day be bombed by coalition forces; that the bombs would hit and detonate those weapons; that the detonation would cause the toxic emissions to be released; that those emissions would permeate the

atmosphere; that the plaintiffs would be present in that atmosphere, inhale those emissions and sustain the injuries alleged.

*Id.* at *17.

Here, PIB provided payments of up to $25,000 directly to the families of suicide bombers and other terrorists as part of an infamous incentive program funded by one of the world's most brutal dictators. An objective observer could reasonably conclude that facilitating such conduct encouraged and enabled further acts of terrorism. PIB also relies on *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018), a case involving a defendant's alleged participation in a conspiracy with Iran that helped Iranian entities launder funds through the United States. The case involved no allegations of payments to the families of suicide bombers or anything remotely analogous to the allegations at issue here.

Finally, PIB cites *Brill v. Chevron Corp.*, No. 15-cv-04916 (JD), 2017 WL 76894, at *19-20 (N.D. Cal. Jan. 9, 2017), where the plaintiffs sued Chevron for allegedly paying bribes to Saddam Hussein's regime (in return for oil contracts) that they claimed were ultimately used by the regime to fund the very incentive program at issue here. As the subsequent decision in the same case made clear, "there is no plausible allegation that money from Chevron ever reached the terrorists in Israel." *Brill v. Chevron Corp.*, No. 15-cv-04916 (JD), 2018 WL 3861659 at *2 (N.D. Cal. Aug. 14, 2018). Here, the Complaint provides detailed and plausible allegations that money flowed from PIB directly to the families of suicide bombers and directly to terrorist operatives (wounded or imprisoned by Israel).

## III. PIB JOINED THE HUSSEIN REGIME'S CONSPIRACY TO INCENTIVIZE TERRORIST ATTACKS IN ISRAEL.

Knowledge of a conspiracy has two elements: "1) knowing participation or membership in the scheme charged and 2) some knowledge of the unlawful aims and objectives of the scheme." *United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir. 1986). Further, "some knowledge" of the

unlawful aims and objectives of the scheme can be satisfied by allegations showing that Defendant actually knew or was "aware of a *high probability* of *some* of the conspiracy's unlawful aims." *United States v. Garcia*, 509 F. App'x 40, 42 (2d Cir. 2013) (first emphasis added) ("A conscious avoidance charge is appropriate where a defendant 'assert[s] what amounts to ignorance of the specific objectives alleged in the indictment.'").[12]

"Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) (quoting W. Prosser, Law of Torts § 46, at 292 (4th ed. 1971); 16 Am. Jur. 2d *Conspiracy* § 68 (1979)). *See also United States v. Amiel*, 95 F.3d 135, 144 (2d Cir. 1996) ("There need not be any written statement or even a speaking of words which expressly communicates agreement."). Here, the first element of conspiracy is satisfied by Plaintiffs' allegations that PIB worked with Saddam Hussein, the Arab Liberation Front and others to transfer millions of dollars through the United States to PIB's branches in the Palestinian Territories at a time when Iraq was a designated State Sponsor of Terrorism cut off from the U.S. financial system. AC ¶¶ 526-27. The Complaint makes clear that PIB agreed to receive covert U.S. dollar-denominated funds from Iraq's state-owned Al-Rafidain Bank's branch in Amman, Jordan. *Id.* ¶¶ 532-33. It also agreed to serve as the distribution portal for those funds, which were administered through Rakad Salem's account at the Al-Bireh branch of PIB. *Id.* ¶ 533.

PIB therefore focuses on the second prong of conspiracy – the unlawful aims and objectives of the scheme – to urge this court to adopt the Seventh Circuit's holding that a plaintiff must plead that a defendant "cared how its … customers obtained or spent the funds that it processed for

---

[12]     *See also United States v. Ferrarini*, 219 F.3d 145, 154-55 (2d Cir. 2000) (same); *United States v. Stavroulakis*, 952 F.2d 686, 690 (2d Cir. 1992) ("The policies underlying conspiratorial liability could easily be thwarted by the *careful compartmentalization of information*, and 'conspirators would go free by their very ingenuity,' if it were required that they agree on *all* details of the scheme.") (emphasis added) (quoting *Blumenthal v. United States*, 332 U.S. 539, 557 (1947)).

them." *Kemper*, 911 F.3d at 395. But *Kemper*'s dicta[13] is not the law in this Circuit nor is it consistent with Supreme Court precedent. *See United States v. Capanelli*, 479 F.3d 163, 166-67 (2d Cir. 2007) ("The individual conspirators can have incongruent intentions as to particular details or specific goals of the conspiracy, so long as the coconspirators share a 'common purpose' and agree on the 'essential nature' of the enterprise."); *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) ("The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes." *See also Ocasio v. United States*, 136 S. Ct. 1423, 1429-30 (2016) (holding that plaintiffs need only allege that a defendant agreed to "pursue the same criminal objective" of the conspiracy, even if it did not "agree to commit or facilitate each and every part of the substantive offense").

In fact, Second Circuit rejected a nearly identical argument made here by PIB in *United States v. Gurary*, 860 F.2d 521 (2d Cir. 1988). In *Gurary*, defendants sold false invoices for a fraction of their face value. Many of their customers used the invoices to report fictitious business expenses on their corporate taxes. The defendants were charged with, among other things, conspiring to impede the IRS. The defendants argued that they could not know that their customers would use the invoices for tax fraud as opposed to, *e.g.*, embezzlement. The court disagreed. First, "intent to defraud the United States may be incidental to another primary motivation or purpose.... Impeding the IRS, though not defendants' primary purpose, was part and parcel of the scheme." *Id.* at 525. Second, the defendants *must have known* that the invoices would lead to inaccurate tax returns, as they would be recorded on corporate books (even if only to facilitate embezzlement) used in preparation of those tax returns. *Id.* Like the defendant in *Gurary*, PIB knew that it was joining a conspiracy through which Saddam Hussein's regime was able to transfer tens of millions

---

[13]     *Kemper* held that the defendant's alleged conduct in that case did not satisfy § 2331(1)'s definitional requirements for primary liability under § 2333(a). 911 F.3d at 390.

of dollars in circumvention of sanctions specifically intended to prevent its support of terrorism and made it possible for Hussein's local representatives to distribute reward payments to terrorists and their families. Finally, as in *Gurary*, PIB's own "motivations" and "primary purpose" in participating in the conspiracy are *irrelevant* to their liability as long as they possessed "some knowledge" of the Hussein's regime's unlawful aims and objectives.

## IV.   PIB IS LIABLE UNDER 18 U.S.C. § 2333(d)(2).

The parties agree that when Congress enacted the Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016) ("JASTA") it instructed that the 'proper legal framework for how [aiding and abetting] liability should function' under the ATA is that identified in" *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *Linde*, 882 F.3d at 329 (quoting 18 U.S.C. § 2333 Statutory Note) (alterations in original).

JASTA established that plaintiffs may assert statutory secondary liability for acts of international terrorism committed, planned, or authorized by a foreign terrorist organization ("FTO") against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). JASTA was explicitly added to expand the relief already available to civil litigants under § 2333(a):

> The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA, § 2(b). *Accord Linde*, 882 F.3d at 328 (describing JASTA as an "expansion" of the ATA).

JASTA directs courts to interpret aiding and abetting liability pursuant to *Halberstam* (an appellate case reviewing a full trial record, not a motion to dismiss). *See also id.* at 329 (same). In *Halberstam*, the defendant, Linda Hamilton, was found civilly liable for aiding and abetting the

murder of Michael Halberstam by her boyfriend, Bernard Welch, during a botched burglary. *See* 705 F.2d at 474 ("[Ms. Hamilton is] civilly liable, as a joint venturer ... for the killing of Michael Halberstam"). However, Hamilton, who assisted what she claimed was her boyfriend's antiques business, did not know about the murder—or even the burglary:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises.

*Id.* at 488.

In *Halberstam,* Hamilton acted as her boyfriend's "banker, bookkeeper, recordkeeper, and secretary," and denied knowing of the criminal nature of his "evening forays." *Id.* at 486-87. Notwithstanding that her actions were "neutral standing alone," the court found that "it defies credulity that Hamilton did not know that something illegal was afoot." *Id.* at 486, 488. Thus, the court concluded that because she "knew about and acted to support Welch's illicit enterprise," she "had a general awareness of her role in a continuing criminal enterprise." *Id.* at 488. Because the killing was "a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake," and because her services substantially assisted the burglary resulting in murder, she was liable as an aider and abettor of the murder. *Id.*

*Linde*, following *Halberstam*, held that in the terrorism context, a bank can be found liable for aiding and abetting a terrorist organization if it was generally aware of "a 'role' in terrorist activities" performed by that organization. 882 F.3d at 329. Plaintiffs need *not* show "specific intent," "intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed,'" or that the bank "knew of the specific attacks at issue when it provided financial services for Hamas." *Id.* Two recent JASTA decisions relating to terror

financing apply *Linde*'s holdings. *See Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 267-68 (E.D.N.Y. 2019) (finding Iranian Bank Saderat liable for aiding and abetting Iranian terror attacks); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 47 (E.D.N.Y. 2019) (denying motion to dismiss claims that Arab Bank aided and abetted HAMAS terror attacks).

### A.  PIB Aided and Abetted the "Persons" who Committed the Attacks.

PIB does not challenge the sufficiency of the Complaint's allegations that nine of the attacks were "committed, planned or authorized" by FTOs, but it does argue that the reward payments to the terrorists belonging to these (and other) FTOs and the families of suicide bombers and other terrorists do not satisfy § 2333(d)(2)'s requirement that PIB aid and abet "the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2).

But § 2333(d)(1) expressly defines "person" more broadly than even the ATA's own broad definition of person set forth in § 2331(3) ("any individual or entity capable of holding a legal or beneficial interest in property") by incorporating, instead, the more expansive definition in 1 U.S.C. § 1 ("'person' . . . include[s] corporations, companies, *associations*, firms, partnerships, *societies*, and joint stock companies, *as well as individuals*") (emphasis added).

The "person who committed" the attack is therefore not limited to the individual triggerman or suicide bomber, but clearly also includes any FTO or *other* individual or entity that committed the attack. Congress's definitional choice recognizes that acts of international terrorism are often committed with the assistance and participation of a variety of actors, including FTOs, other designated terrorist groups (e.g., SDGTs), criminal organizations, and other entities and individuals. Thus, while § 2333(d) limits a JASTA cause of action to individuals injured in terrorist attacks "committed, planned, or authorized" by an FTO, liability attaches to a defendant that aids and abets (or conspires with) any "person" – broadly defined under 1 U.S.C. § 1 – who commits

the attack. That "person" can be an organization, association or person and need not be a member or operative of the FTO that "committed, planned, or authorized" the attack.

Contrary to PIB's assertion, PIB Mem. at 42, Plaintiffs *do* allege that PIB provided banking services to, and had contact with, "the persons who committed" the attacks. The bank issued hundreds (if not thousands) of checks to terrorist operatives belonging to the FTOs that perpetrated the attacks and facilitated incentive payments to the families of deceased FTO operatives. The Complaint alleges that this campaign played a role – in fact, the precise role stated and intended by Saddam Hussein and his minions – to encourage, subsidize and reward all of the attacks at issue. Nor can PIB evade liability by arguing that its payments to FTO terrorist operatives do not equate to payments to FTOs themselves. The only thing that matters for purposes of § 2333(d)(2) is whether PIB knowingly provided substantial assistance to associations, societies, or individuals that committed the attacks.

Finally, PIB argues that § 2333(d)(2)'s requirements are not satisfied as to HLF because it wasn't designated as a terrorist in the United States at the time the attacks were committed. The question, however, is not whether *HLF* was designated an SDGT at that time, but whether HLF was a HAMAS-controlled institution and whether *HAMAS* was designated an FTO at the time the attacks were committed. The Complaint alleges both. AC ¶¶ 10-12, 588.

**B. PIB Was Generally Aware of Its Role in Saddam Hussein Regime's Overall Illegal and Tortious Activity.**

Although courts are expected to be "lenient in allowing scienter issues …. [t]o survive motions to dismiss," *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (internal quotation marks and citation omitted), the Complaint sets forth many specific allegations providing a strong inference of PIB's awareness of its role in the Saddam Hussein regime's rewards program for Palestinian suicide bombers, including the central fact that it held

accounts for Raked Salem, Saddam Hussein's principal representative in the Palestinian Territories who presided over the public ceremonies where the rewards payments were distributed, AC ¶¶ 21, 499-502, 618, 623-24, and that it processed transfers on behalf of a well-known HAMAS institution. *Id.* ¶¶ 568-77.

PIB tacitly concedes that its conduct satisfies the scienter prong for § 2333(d)(2) aiding and abetting. Instead, it mislabels its challenge to § 2333(d)(1)'s definition of "person" in its section on "general awareness" but otherwise provides no analysis or argument on this issue.

Even PIB's assertion that HLF was not "designated as a terrorist in the United States at the time of the single alleged transfer processed for HLF, in August 2001," PIB Mem. at 44, elides HLF's 1997 designation by Israel as a "HAMAS organization." *Id.* ¶ 570. Elsewhere in its brief, PIB acknowledges that courts have repeatedly found *Israeli* designations of bank customers as a "Hamas front" sufficient to plausibly plead a defendant's knowledge. *See* PIB Mem. at 28, citing *Weiss*, 453 F. Supp. 2d at 626–27 (customers were designated as HAMAS fronts by Israeli government); *Strauss v. Credit Lyonnais, S.A.*, No. 06-CV-702 (CPS), 2006 WL 2862704, at *14–15 (E.D.N.Y. Oct. 5, 2006) (bank was aware of "unusual activity" in accounts belonging to customers designated by Israel as connected to HAMAS).

### C. PIB Knowingly Provided Substantial Assistance to FTOs.

In *Halberstam*, the D.C. Circuit court identified six factors relevant to determining "how much encouragement or assistance is substantial enough" to satisfy the requirement that the defendant "must knowingly and substantially assist the principal violation." 705 F.2d at 477-78, 483-84. Those six factors are: (1) the nature of the act encouraged, (2) the amount and kind of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. *Id.* at 483-84. These factors strongly support Plaintiffs' claims:

40

- the horrific nature of the primary torts, *id.* at 484 n.13 ("a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences"), AC ¶¶ 22-462 (describing attacks);

- the amount of the support, *id* ¶¶ 6, 492;

- the Bank's presence in the middle of the communities in which, and at the time when, Saddam Hussein's agents were holding rallies and widely publicizing the campaign to incentivize further mass murder, *id.* ¶¶ 513-16, 635, 651;

- the Bank's direct role as the banker linking Saddam Hussein's regime to the FTO beneficiaries of the incentive program, *id.* ¶¶ 2, 5-8, 492-509;

- the duration of the Bank's material support for HAMAS and for families of terrorists, which extended from at least 2001 to 2003, *id.* ¶¶ 496-518; and

- the Bank's knowledge that it was interacting with and supporting Saddam Hussein's agents, as well as families of terrorists, responsible for the wave of terrorist attacks, *id.* ¶¶ 501-02, 507, 513, 515-18.

Here, as in *Linde*, the "[d]isputed facts pertinent to these factors and the weight to assign such facts are not matters that can be determined as a matter of law from the record in this case." 882 F.3d at 330.

Nonetheless, PIB argues that, as a matter of law, the Complaint fails to allege that it processed any funds "to a terrorist or a terrorist organization." PIB Mem. at 42. But of course, the Complaint *does* allege that PIB processed funds for an FTO by maintaining an account and processing funds for HLF, an organization controlled by HAMAS. AC ¶¶ 9-12, 570. It also processed payments to terrorist operatives who were wounded during the conflict. *Id.* ¶ 493. Finally, PIB facilitated payments to the families of deceased terrorists belonging to various FTOs. The Complaint provides concrete examples of payments made via PIB to families of HAMAS suicide bombers, *id.* ¶¶ 498, 522-24; PIJ suicide

bombers, ¶¶ 504, 521; PFLP operatives, ¶ 506; and AAMB suicide bombers, ¶¶ 504, 506-08, 525.[14]

Essentially, PIB argues that it did not substantially assist terrorists or FTOs in their illicit enterprise because the payments the bank facilitated did not fund specific attacks and the reward payments were made after the terrorists blew themselves up or otherwise perished. But aiding and abetting liability under *Halberstam* does not require that PIB know of, let alone provide substantial assistance to, any specific terrorist attacks.[15] In *Halberstam,* the defendant was found liable as "a joint venturer ... for the killing of Michael Halberstam …." 705 F.2d at 474. The defendant acted as "banker, bookkeeper, recordkeeper, and secretary" to her boyfriend, neither knowing about nor contributing directly to the *unplanned* murder he committed while burglarizing the victim's house. *Id*. at 487.

Here, PIB possessed far greater knowledge of the purposes for which its assistance was being provided. And the atrocities committed were neither unplanned nor unforeseeable; they were *expressly* intended to reward mass murder and encourage further violence. Facilitating millions of dollars in incentives to the families of suicide bombers provided far more direct, substantial and foreseeable assistance to the 13 attacks at issue than the defendant's banking, bookkeeping, recordkeeping, and secretarial services in *Halberstam* did to an *unplanned* murder.

## **CONCLUSION**

For the reasons set forth herein, Defendant's motion to dismiss should be denied.

---

[14]     PIB incorrectly states that the Complaint specifies a payment to family members of perpetrators of *one* of the 13 attacks, PIB Mem. at 42, overlooking the payment made to the family of Wafa Ali Khalil Idris, the female suicide bomber responsible for the January 27, 2002 attack. AC ¶¶ 507-08.

[15]     PIB's brief cites *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 425-26 (E.D.N.Y. 2009) for the proposition that "a bank's processing of three wire transfers for an OFAC-designated entity affiliated with Hamas 'fail[ed] to establish 'substantial assistance' of the sort required to support an aiding and abetting claim.'" PIB Mem. at 42. But *Goldberg* was not applying *Halberstam* or addressing a claim brought under § 2333(d)(2), nor does the Complaint here allege that PIB processed only three funds transfers.

Dated: January 13, 2020
      Hackensack, NJ

OSEN LLC

By: /s/ Gary M. Osen
Michael Radine, Esq.
Gary M. Osen, Esq.
Ari Ungar, Esq.
Aaron Schlanger, Esq.
2 University Plaza, Suite 402
Hackensack, New Jersey 07601
(201) 265-6400

ZUCKERMAN SPAEDER LLP
Shawn P. Naunton, Esq.
485 Madison Avenue, 10th Floor
New York, NY 10022
(646) 746-8655

TURNER & ASSOCIATES, P.A.
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard, Esq.
Stephen H. Schwartz, Esq.
Neil L. Glazer, Esq.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700