UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

TEMIMA SPETNER, *et al.*,

        Plaintiffs,

-against-

PALESTINE INVESTMENT BANK,

        Defendant.

---

Case No. 19-cv-00005 (ENV)(RLM)

## DECLARATION OF RICHARD GEORGE

I, Richard George, declare pursuant to 28 U.S.C. § 1746 subject to penalties of perjury, as follows:

1. I have read the Sworn Declaration of Mohammad Sarni Aghbar in support of Defendant Palestine Investment Bank's ("PIB") Motion to Dismiss ("Aghbar Decl."), as well as the Amended Complaint and the Memorandum of Law in Support of the Motion to Dismiss, and offer the Court the following information based on my professional experience.

2. My professional experience spans 30 years serving in senior positions in Citigroup and other major banks, including serving as Citibank N.A.'s country corporate officer in Istanbul, Turkey and Manama, Bahrain.

3. A large part of my banking career involved U.S. Dollar transactions and remittances from and to foreign countries. During my time as Citibank's senior country officer in Istanbul, Turkey, in 1975-1979, I managed correspondent banking relationships for approximately 12 Turkish banks, including the Central Bank of Turkey. All such banks had direct or indirect accounts with a correspondent bank in New York.

1

4. I was the senior executive for Citibank's Middle Eastern regional treasury operations in Manama, Bahrain, during 1979-1982. At the time, Citibank's multi-currency and international treasury operation was the largest of all global banks in the area. These operations included daily trading and processing of hundreds of millions of dollar transactions through foreign exchange, swaps, placements, loans, all of which necessitated dollar clearing and settlement through the New York clearing system. Local banking services included retail checking accounts in both dollars and several regional currencies. Citibank's banking activities were regulated by the Bahrain Monetary Agency and the U.S. Federal Reserve Bank.

5. During my assignment in Tokyo, Japan, in 1982-1985, I was the executive in charge of sales and U.S. Dollar remittances of billions of dollars from the sale of Citicorp Travelers Checks throughout the Asia-Pacific countries. These remittances were made via dozens of local banks who accepted foreign currencies in exchange for Citi's dollar travelers checks. Both the sale and encashment of these checks was cleared and settled amongst the involved parties via the New York clearing system.

6. I was also a lecturer in finance at University of California, Berkeley and Georgetown University.

7. My C.V. is attached hereto as Exhibit 1. A list of cases in which I provided trial or deposition testimony is attached hereto as Exhibit 2.

**I.   Nearly all U.S. dollar-denominated payments are effectuated through U.S. banks**

8. Payments denominated in U.S. dollars using electronic funds transfer or checks, wherever they originate and wherever their ultimate destination, are generally processed with

settlement finality[1] in the United States, through a U.S. bank. *See Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370 (1991). In fact, nearly all transfers are processed in New York:

> Wholesale wire transfers are generally made over the two principal wire payment systems: the Federal Reserve Wire Transfer Network (Fedwire) and the [Clearing House Interbank Payment System ("CHIPS")]. The CHIPS network handles 95% of the international transfers made in dollars, transferring an average of $750 billion per day. These funds are transferred through participating banks located in New York because all of the banks belonging to the CHIPS network must maintain a regulated presence in New York. As a result, this State is considered the national and international center for wholesale wire transfers.

*Id.* (citation omitted).

9.  This remained true through the relevant period. *See* Fed. Reserve Bank of N.Y., "About the New York Fed: CHIPS" (April 2002), *available at* https://www.newyorkfed.org/aboutthefed/fedpoint/fed36.html (last accessed Jan. 13, 2020) ("CHIPS estimates that it handles 95 percent of all U.S. dollar payments moving between countries.").

10.  "Processing" of U.S. dollar-denominated electronic funds transfers ("EFTs") involves "clearing" and "settling" transactions. In an electronic funds transfer, the purpose of clearing and settling is to effect the transfer of credit from originator to beneficiary without having to physically move assets such as banknotes, securities or gold bullion. From the perspective of the banks, electronic funds transfers involve a series of steps where debts are extinguished and created by the mutually indebted banks involved in the respective payment chain.

11.  During the clearing step of processing a dollar-denominated EFT in New York (that is, when clearing by either book entry or an offshore system is not chosen by a foreign commercial

---

[1] According to the Bank for International Settlements ("BIS"), settlement finality is defined as "the irrevocable and unconditional transfer of an asset or financial instrument, or the discharge of an obligation by the [payment system] or its participants in accordance with the terms of the underlying contract." BIS, "Principles for Financial Market Infrastructures" (2012), at 64, *available at* https://www.bis.org/cpmi/publ/d101a.pdf. "[P]ayment finality is critical to the process of decentralized exchange." Federal Reserve Bank of Atlanta, "The Economics of Payment Finality" (2002), at 11, *available at* https://www.frbatlanta.org/-/media/documents/research/publications/economic-review/2002/vol87no2_kahn-roberds.pdf.

bank like PIB), participating banks primarily send and receive payments through CHIPS, which matches and sets off these transfers to reduce the number of ultimate transfers of debt that must be processed between the banks. *See* CHIPS, "About Chips," *available at* https://www.theclearinghouse.org/payment-systems/chips (select "How It Works") (last accessed on Jan. 13, 2020).

12. Until January 2001, according to the Federal Reserve Bank of New York, CHIPS conducted all of its settling at the end of the business day. *See* Fed. Reserve Bank of N.Y., "About the New York Fed: CHIPS," cited *supra*, ¶ 9. Since then, CHIPS provides its correspondent banking customers with intraday payment finality through a real-time settlement system. *First*, CHIPS settles small payments individually using the banks' available balances; *second*, CHIPS settles larger payments through either bilateral or multilateral netting between the banks; *third*, payments not matched for netting during the business day are settled by CHIPS at the end of the day using the banks' pre-funding deposits; and, *finally*, banks that have positive closing positions at the end of the day receive the amounts that they are due from other banks in the form of Fedwire payments. *Id.*

13. Because the ultimate CHIPS settlements are provided using Fedwire, these balances are paid across the balance sheet of the Federal Reserve Bank of New York (acting in its Central Bank role as the lender of last resort for all cross-border electronic funds transfers denominated in U.S. dollars).

14. However, a foreign bank with no physical U.S. presence like PIB, cannot directly participate in CHIPS or Fedwire. Only a few dozen banks currently have met the requirements to directly participate in CHIPS, all of which must, by CHIPS's rules, have a U.S. presence. *See* U.S. Dep't of the Treasury, Financial Crimes Enforcement Network, *Feasibility of a Cross-Border*

*Electronic Funds Transfer Reporting System Under the Bank Secrecy Act* (Oct. 2006), App. D, at 62, *available at* https://www.fincen.gov/sites/default/files/shared/CBFTFS_Complete.pdf ("Access to the CHIPS payment system is conditional upon a financial institution's U.S. presence. In other words, the financial institutions using CHIPS must operate a U.S. branch or office for the use of the system.").

15. These banks are among the "relatively small number of major money center banks"—largely based in New York for U.S. dollar transfers—that "specialize in facilitating international funds transfers through their network of correspondent relationships, and thus form a key link in the vast majority of all international funds transfers." *Id.* at 57. *See also Sigmoil*, 234 A.D.2d at 104 ("New York banks play an important role" in the "entire system of correspondent banking").

16. Non-U.S. banks access CHIPS or Fedwire through correspondent bank accounts, which are "accounts in domestic [U.S.] banks held in the name of the foreign financial institutions." *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104 (1st Dep't 1996).

17. When a person with an account at a non-U.S. bank account wishes to transfer dollars to another person with an account at another non-U.S. bank, the former bank will instruct its U.S. correspondent bank to transfer money (*e.g.*, via Fedwire or CHIPS) to the U.S. bank where the beneficiary's non-U.S. bank has a correspondent account.

18. For example, if a customer of a German bank wishes to process a dollar-denominated transfer to the customer of another German bank, even one located on the same street corner in Frankfurt, the transfer ordinarily must clear through the United States and ultimately settle across the balance sheet of the Federal Reserve Bank of New York.

5

19. A few alternative systems based outside of the United States offer limited U.S. dollar processing for participating banks, but none are applicable here. For instance, in 2015, Tokyo, Hong Kong, Singapore and Manila housed "the only official offshore US dollar clearing centres" permitted by the Federal Reserve to process transactions. *See* Duncan Kerr, "Clearing: European banks weigh up US dollar clearing options" (Jan. 5, 2014), *available at* https://www.euromoney.com/article/b12kjyygbzp9v4/clearing-european-banks-weigh-up-us-dollar-clearing-options. Other locations, such as London and Dubai, may have had clearing centers at various times, backed by U.S. banks.

20. These systems may only accept lower-volume transactions or involve other inconveniences, and each will present greater credit and liquidity risks to foreign banks than choosing to process U.S. dollar transactions in New York, as PIB did, although that risk may be mitigated to some extent by backing from central banks that, for instance, enjoy access to liquidity swaps with the Federal Reserve. *See, e.g.*, Federal Reserve System, "Credit and Liquidity Programs and the Balance Sheet" (last updated Oct. 17, 2018) *available at* https://www.federalreserve.gov/monetarypolicy/bst_liquidityswaps.htm.[2]

21. However, as shown below, PIB's correspondent bank, Arab Jordan Investment Bank ("AJIB") did not advertise use of those systems and presumably chose not to access them. The relevant transfers did not go through these systems. The Holy Land Foundation ("HLF") transfer shown in Exhibit C to the Amended Complaint, for instance, went through New York. And, as discussed herein, the relevant check settlements went through New York.

---

[2] During times of market stress, the U.S. Central Bank's swap lines "are designed to improve liquidity conditions in dollar funding markets in the United States and abroad by providing foreign central banks with the capacity to deliver U.S. dollar funding to institutions in their jurisdictions." *Id.*

22. PIB may have been able to conduct book transfers with other AJIB customers. However, a transfer from another bank, such as Bank Rafidain, or an originator's third party bank, such as BankOne for HLF in Texas, to PIB's correspondent account at AJIB must be made through New York or other clearing center, had Rafidain and AJIB held accounts there (which they did not).

23. These facts are fundamental to banking in U.S. dollars. Thus, when PIB decided to offer some or all of its clients in the Palestinian Territories the option of maintaining accounts denominated in U.S. dollars, it fully understood that it would be availing itself of dollar clearing and settlement in New York (backed by the full faith and credit of the United States).

24. In my opinion, PIB also must have known that all of the alleged transfers at issue in this case were processed through banks in New York.

25. In fact, this is evidenced by Exhibit B to the Amended Complaint, which consists of a July 20, 2005 letter from PIB to the PMA's bank in New York, Bank of New York Mellon ("BNY"). Despite having AJIB as its correspondent bank for U.S. dollar banking, PIB still wrote directly to its counterparty's New York bank and demanded payment from BNY to AJIB for PIB's benefit.

26. Exhibit C to the Amended Complaint likewise shows a transaction from HLF in Texas through PIB's account at AJIB. Because PIB's correspondent account at AJIB was not advertised at the time in the Bankers' Almanac, PIB likely directed HLF to send the transfer through New York and its account at AJIB.

II. **Palestine Investment Bank Effectuated Its Correspondent Banking in New York Through Arab Jordan Investment Bank, Its Agent for this Purpose.**

27. Mr. Aghbar's Declaration does not dispute any of the foregoing facts.

7

28. Instead, Mr. Aghbar states that during the relevant period, PIB did not *directly* maintain correspondent bank accounts in the United States, but instead relied upon AJIB to undertake dollar clearing and settlement on its behalf using AJIB's correspondent bank accounts in the United States.[3]

29. Paragraphs 27-28 of Mr. Aghbar's Declaration simply describe a banking practice called "nesting." "Nested accounts occur when a foreign financial institution gains access to the U.S. financial system by operating through a U.S. correspondent account belonging to another foreign financial institution." Federal Financial Institutions Examination Council, "BSA/AML Examination Manual" (Feb. 27, 2015), *available at* https://bsaaml.ffiec.gov/docs/manual/05_ProductsAndServices/02.pdf.

30. In simple terms, PIB used AJIB as its agent to access the U.S. financial system. That is, when PIB Bank would "request that AJIB process the outbound transfer to the beneficiary on behalf of PIB's customer," Aghbar Decl. ¶ 24, it was instructing AJIB to process the transaction through AJIB's New York correspondent accounts.

31. Likewise, when a foreign bank "wanted to send a dollar-denominated transfer to a PIB account-holder" and "the originator's bank [sent] the transfer to AJIB for the benefit of the PIB account-holder," the originator bank was in fact sending the transfer through its New York

---

[3] Mr. Aghar declared that "[f]or dollar-denominated transactions prior to 2009, and during the relevant period, PIB maintained a correspondent banking relationship with . . . Bank Hapoalim, which is located in Tel Aviv, Israel." Aghar Decl. ¶ 15. That account is presumably for dollar transactions involving Israel or for exchange for shekels (which will happen across the Bank of Israel through U.S. dollars). *See* Bank of Israel, "Israel's Payment and Settlement Systems" (2013), at 48-39 & n.37 (explaining that "[t]he banks operating in the Palestinian Authority are represented" for "settlement of electronic" and "paper" transactions by, *inter alia*, "Bank Hapoalim") and 39 (Bank of Israel provides … settlement services for shekel-dollar transactions"), *available at* https://www.boi.org.il/en/PaymentSystem/Documents/redb2013e.pdf. In any event, none of the relevant transactions are alleged by either party to involve Bank Hapoalim.

8

correspondent account to AJIB's New York correspondent account for the benefit of PIB and ultimately the PIB account-holder.

32. While it is certainly plausible, as Mr. Aghbar's Declaration states, that Defendant Palestine Investment Bank "never controlled how AJIB processed funds to or through the United States" and that "AJIB made its own decisions about whether it would use its own U.S. correspondent banks, and who those correspondents would be," Aghbar Decl. ¶ 29, it is nonetheless also true that by (1) maintaining accounts dollar-denominated accounts and directing that funds transfers be initiated and received in U.S. dollars and (2) operating nesting accounts at AJIB for the purpose of accessing its U.S. correspondent accounts and the clearing and settling functions provided by the U.S. banks holding those accounts, PIB was deliberately directing banking activities to occur in the United States and New York, specifically.

33. Although PIB may not have chosen AJIB's specific correspondent bank in New York, it did choose AJIB as its correspondent banking agent because of AJIB's capacity to clear and settle EFTs through New York (as stated above, the limited alternatives lack the convenience, liquidity and legal protections of dollar-clearing in New York and are generally restricted to smaller-volume transfers).

34. In fact, foreign banks can choose nesting banks based on where the nesting banks hold correspondent accounts in the U.S., which is advertised in publications like the Bankers' Almanac. For instance, in January 2003, AJIB advertised that it processed U.S. dollars through Bank of New York, Citibank NA, and JPMorgan Chase Bank. AJIB's profile in that edition of the Bankers' Almanac is attached hereto as Exhibit 3.

35. However, here PIB likely had additional knowledge of AJIB's correspondent banking practices: the two banks are related. The banks share senior management, including Hadi

al-Qadi and Abdulkadir al-Qadi; the former of whom "led AJIB's team in the initial public offering of . . . the Palestine Investment Bank (US$ 20,000,000)." *See* Hani al-Qadi's profile page, Arab Advisors Group, http://www.arabadvisors.com/hani-al-qadi# (last accessed Jan. 13, 2020).

36. According to PIB's credit report, attached hereto as Exhibit 4, PIB "has close connections with the Amman-based Arab Jordan Investment Bank, sharing the same chairman Abdulkadir Al Qadi." The January 2003 Bankers' Almanac lists one "Related Company" for AJIB: PIB. *See* Exhibit 3.

37. Thus, while PIB may not have had any formal say in which specific U.S. correspondent banks AJIB used to facilitate its dollar-denominated transactions, as stated above, it certainly knew and intended that its dollar-denominated transactions would "clear" and "settle" with finality in the United States.

38. As particularly relevant here, PIB would have therefore known that transfers the government of Iraq made from the Jordan branch of its state-owned Bank Rafidain to PIB's account at AJIB were processed in New York using CHIPS and Fedwire. Amended Complaint ¶¶ 532-34. *See also id.* ¶¶ 528-31 (explaining Iraq's use of New York accounts in collecting proceeds from oil sales and diverting them for other purposes, including those at issue here).

### III. Palestine Investment Bank Effectuated the Settlement of Its U.S. Dollar-Denominated Check Processing Obligations in New York Through Arab Bank.

39. By offering U.S. dollar-denominated checking accounts, PIB again purposefully availed itself of New York-based dollar clearing and settlement processes that were backed by the Federal Reserve Bank of New York.

40. With the exception of U.S. dollar-denominated checks issued by PIB and deposited back into PIB accounts, Aghbar Decl. ¶ 17, when PIB allegedly agreed to permit certain

individuals or entities to issue U.S. dollar-denominated checks on behalf of ALF, it knew that the transactions it was facilitating would require processing in New York.[4]

41. A U.S. dollar-denominated check issued by one foreign bank and deposited at another is simply a potential stage in a U.S. dollar transfer.

42. Like any other U.S. dollar transfer between foreign banks, the net debit or credit positions created by the clearing of checks issued or deposited by PIB to or from other banks, including other banks in the Palestinian Territories, generally had to be settled in New York between U.S. correspondent banks utilizing CHIPS and Fedwire.

43. Thus, while the Palestinian Monetary Authority ("PMA") in Ramallah may have offered a *limited, additional* stage of clearing and "settlement" services among Palestinian banks, Aghbar Decl. ¶¶ 18-20, either as a convenience or to promote reliability in a still-developing banking system, all EFTs relating to the daily credit and debit positions between Palestinian banks and arising from their respective U.S. dollar-denominated check processing activities were ultimately cleared and settled in the United States. Thus, as explained below, each Palestinian bank must access a correspondent bank in New York to settle its daily debit or credit position with each other Palestinian bank—but instead of doing so on a bilateral basis directly with each other Palestinian bank, each respective Palestinian bank does so between its New York correspondent account and the PMA's New York correspondent account, for final distribution to the other Palestinian banks.

44. The PMA cannot offer a meaningful U.S. dollar settlement capability in the Palestinian Territories because it is not a central bank, *see Palestine Monetary Authority v.*

---

[4] As Mr. Aghbar explained, a check both issued by *and* deposited in PIB accounts is cleared across PIB's books, without transferring through New York. Aghbar Decl. ¶ 17. However, with limited exceptions, the dollars in the issuing account must have ultimately been transferred to PIB from another bank through New York.

11

*Strachman*, 62 A.D.3d 213, 217 (N.Y. App. Div. 2009), or located in a jurisdiction with a functioning U.S. dollar funding market (and the PMA did not have access to liquidity swap lines from the U.S. Federal Reserve System). It was (and is) incapable of settling U.S. dollar electronic funds transfers with finality by itself.

45. Thus, as Mr. Aghbar explains, after the PMA sets off checks among the Palestinian banks, those banks settled their final obligations to each other through New York, ultimately across the balance sheet of the Federal Reserve Bank of New York. Aghbar Decl. ¶¶ 10, 19, 20.

46. Specifically, "[i]f a bank owed a net debt to other banks, then it was required to settle that debt by transferring funds in dollars (a 'Settlement Transfer') to the account the PMA had designated for this purpose," *id.* ¶ 20, which was, according to Mr. Aghbar, an account at Arab Bank's former New York branch, *id.* ¶ 21. The PMA would then transfer those funds through New York to the creditor banks. *Id.* ¶ 19.

47. Only in March 2003 did PMA establish another local bank, Palestine International Bank, to replace Arab Bank as the "intermediary between Palestinian commercial banks," although, again, those commercial banks still made settlement transfers through their correspondent accounts in New York to "Palestine International Bank's account at Bank of New York." *Id.* ¶ 22. *See Strachman*, 62 A.D.3d at 217–18 ("the PMA's bank, the Palestine International Bank … acts as a clearinghouse for those banks whose interbank transactions in U.S. dollars are cleared through the BNY.").

48. Thus, although Exhibit B to the Amended Complaint relates to a 2005 communication by PIB to BNY, PIB at that time allegedly still banked in New York through AJIB. Thus, notwithstanding its use of AJIB as a banking agent, PIB communicated directly with PMA's New York correspondent bank in reference to a transaction, relating to U.S. dollar-denominated

12

checks and processed in New York, just as it presumably would have during the relevant period (when the PMA used Arab Bank–N.Y.).

49. Therefore, where the complaint alleges that PIB issued dollar-denominated checks to beneficiaries who deposited them at banks other than PIB in the Palestinian Territories, PIB purposefully directed funds to and from the PMA's correspondent account at Arab Bank–New York through AJIB's correspondent accounts in New York.

Executed:    San Francisco, California
             January 13, 2020


                                            /s/ Richard George