UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TEMIMA SPETNER, et al.,

                            Plaintiffs,

-against-

                                              19-cv-005 (ERK) (RLM)

PALESTINE INVESTMENT BANK,

                            Defendant.

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO
DISMISS OF PALESTINE INVESTMENT BANK**

**SQUIRE PATTON BOGGS (US) LLP**
Gassan A. Baloul
Mitchell R. Berger
2550 M Street, NW
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

Joseph S. Alonzo
30 Rockefeller Plaza, 23rd Floor
New York, New York 10112
Telephone: (212) 872-9800
Facsimile:  (212) 872-9815

*Counsel for Defendant Palestine Investment
Bank*

February 28, 2020

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................i

TABLE OF AUTHORITIES ........................................................................................................ii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................... 2

I.  THIS ACTION MUST BE DISMISSED FOR LACK OF PERSONAL
    JURISDICTION. ............................................................................................................. 2

    A.  AJIB Was Not PIB's Agent. ................................................................................ 2

    B.  PIB Is Not Subject to Personal Jurisdiction Based on Dollar-Denominated
        Banking Services Outside the United States........................................................ 6

    C.  PIB Is Not Subject to Personal Jurisdiction Based on Settlement Transfers
        Arising from the PMA's Mandatory Check-Clearing System.............................. 8

II.  PLAINTIFFS' PRIMARY LIABILITY CLAIM MUST BE DISMISSED.................... 10

    A.  Plaintiffs Have Not Plausibly Alleged That PIB Knew or Intended Its
        Support Would be Used in Preparation for or in Carrying Out the Attacks. ....... 11

    B.  Plaintiffs Have Not Plausibly Alleged That PIB Committed an Act of
        International Terrorism. ..................................................................................... 14

    C.  Plaintiffs Have Not Plausibly Alleged Proximate Cause.................................... 16

III.  PLAINTIFFS' AIDING-AND-ABETTING CLAIM MUST BE DISMISSED. ........... 17

    A.  Plaintiffs Have Not Plausibly Alleged that PIB Provided Knowing and
        Substantial Assistance to the "Person[s] Who Committed" the Attacks. ........... 17

    B.  Plaintiffs Have Not Plausibly Alleged that PIB was "Aware" it was
        Playing a "Role" in Violent or Life-Endangering Activity. ............................... 19

IV.  PLAINTIFFS' CONSPIRACY CLAIM MUST BE DISMISSED. .............................. 19

    A.  Plaintiffs Have Not Plausibly Alleged that PIB Conspired to Commit
        Terrorism............................................................................................................ 19

    B.  Plaintiffs Have Not Plausibly Alleged that PIB Conspired with the "Person
        Who Committed" the Attacks. ........................................................................... 20

CONCLUSION........................................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank*,
   731 F.2d 112 (2d Cir. 1984)................................................................................3, 6

*Amigo Foods Corp. v. Marine Midland Bank-N.Y.*,
   39 N.Y.2d 391 (1976) ...........................................................................................3

*Averbach v. Cairo Amman Bank*,
   19-cv-00004 (E.D.N.Y.) ......................................................................................13

*Averbach v. Cairo Amman Bank*,
   19-cv-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020)
   (Parker, M.J.) ................................................................................................. *passim*

*Bartlett v. Société Générale de Banque au Liban SAL*,
   19-cv-00007 (E.D.N.Y.) ........................................................................................8

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)..............................................................................................10

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.*,
   770 F.3d 993 (2d Cir. 2014)..................................................................................3

*CutCo Indus. v. Naughton*,
   806 F.2d 361 (2d Cir. 1986)..................................................................................5

*Emerald Asset Advisors v. Schaffer*,
   895 F. Supp. 2d 418 (E.D.N.Y. 2012) .................................................................4

*Export-Import Bank of the United States v. Asia Pulp & Paper Co.*,
   609 F.3d 111 (2d Cir. 2010)................................................................................3, 6

*Freeman v. HSBC Holdings PLC*,
   14-cv-6601 (PKC) (CLP) (E.D.N.Y.) ..................................................................4

*Freeman v. HSBC Holdings PLC*,
   413 F. Supp. 3d 67 (E.D.N.Y. 2019) ...............................................................4, 20

*Grove Press, Inc. v. Angleton*,
   649 F.2d 121 (2d Cir. 1981)..................................................................................4

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ...............................................................17, 18, 19

*Hau Yin To v. HSBC Holdings, PLC*,
    700 F. App'x 66 (2d Cir. 2017) ............................................................................5

*Honickman v. BLOM Bank SAL*,
    19-cv-00008, 2020 WL 224552 (E.D.N.Y. Jan. 14, 2020).....................12, 17, 18

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998).................................................................................5

*Kaplan v. Lebanese Canadian Bank, SAL*,
    405 F. Supp. 3d 525 (S.D.N.Y. 2019).......................................................... *passim*

*Licci v. Lebanese Canadian Bank*,
    732 F.3d 161 (2d Cir. 2013)......................................................................... *passim*

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018)...................................................................11, 14, 19

*Miller v. Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ..................................................................13

*Mumin v. Uber Techs., Inc.*,
    239 F. Supp. 3d 507 (E.D.N.Y. 2017) ..................................................................2

*Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.*,
    319 F. Supp. 2d 352 (S.D.N.Y. 2004)...................................................................4

*O'Sullivan v. Deutsche Bank AG*,
    No. 17 CV 8709, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019)..........14, 15, 19, 20

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)..................................................................................16

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019)..........................................................................17, 18

*Tamam v. Fransabank SAL*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010)................................................................7, 8

*United States v. Ghayth*,
    709 F. App'x 718 (2d Cir. 2017) ........................................................................11

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014)........................................................................................10

*Wallert v. Atlan*,
    141 F. Supp. 3d 258 (S.D.N.Y. 2015)......................................................................5

**Statutes**

18 U.S.C. § 2331...........................................................................................................14, 15

18 U.S.C. § 2332................................................................................................................11

18 U.S.C. § 2339A.............................................................................................................11

**Other Authorities**

C.P.L.R. § 302....................................................................................................................5

iv

## PRELIMINARY STATEMENT

Plaintiffs have not plausibly alleged facts that would provide for jurisdiction over Palestine Investment Bank ("PIB") or that would suffice to state a claim for any of their three causes of action under the ATA, as modified by JASTA, arising from any of the 13 separate terrorist attacks (the "Attacks") which they claim give rise to their injuries.   Plaintiffs' opposition brief ("Opposition" or "Opp.") fails to cure these deficiencies.  This action must now be dismissed.

Plaintiffs concede, as they must, that PIB is not subject to general jurisdiction in U.S. courts.  Plaintiffs also concede that PIB did not maintain correspondent bank accounts in the United States during the relevant period, September 2001 to March 2003 (Am. Compl. ¶ 2).  Nonetheless, Plaintiffs argue that PIB is subject to specific personal jurisdiction based on its offshore correspondent banking relationship with a non-U.S. bank, Arab Jordan Investment Bank ("AJIB"), because AJIB maintained correspondent accounts in New York during the relevant period and allegedly processed transactions through those accounts for PIB.  Plaintiffs argue that based on these allegations, AJIB was acting as PIB's "agent," rendering PIB subject to jurisdiction in New York based on AJIB's correspondent accounts.

Plaintiffs are wrong.  As a matter of law, and as set forth in PIB's Moving Brief, a correspondent banking relationship does not create an agency relationship.  Plaintiffs' cited cases do not hold that a foreign correspondent bank is a U.S. agent for jurisdictional purposes.  And those cases hold that for any person to be a U.S. "agent" for jurisdictional purposes, the out-of-forum defendant must exercise "control" over the person similar to the control exercised by members of a joint venture or partnership.  The facts, which this Court properly considers on a challenge to jurisdiction, negate any such relationship between PIB and AJIB here.

What Plaintiffs are really arguing is that any bank, operating anywhere in the world, is subject to specific personal jurisdiction in New York if it offers banking services denominated in

1

dollars because essentially all dollar transactions are settled with "finality" in New York.  That

theory is foreclosed by the Second Circuit's *Licci* decision.

Even if Plaintiffs had sufficiently plead jurisdiction, they have failed to state a cause of

action as to any of their three claims:

- Plaintiffs' material support claim (Count II) fails because Plaintiffs have not plausibly alleged that PIB ***knew or intended*** that its alleged banking services would be used to prepare for, or to carry out, the Attacks at issue; that PIB committed an act of ***international terrorism***; or that PIB's alleged banking services ***proximately caused*** Plaintiffs' injuries.

- Plaintiffs' claim for aiding-and-abetting liability (Count III) must be dismissed because Plaintiffs have not plausibly alleged that PIB provided **"*knowing*" and "*substantial assistance*"** to the "person[s] who committed" the Attacks, or that PIB was ***"aware"*** that it was ***playing a "role" in violent or life-threatening activities***;

- Plaintiffs' conspiracy claim (Count I) must be dismissed because Plaintiffs do not plausibly allege that PIB ***agreed with anyone to commit a terrorist act***, or that PIB conspired with the individuals or organizations who committed the Attacks.

- Several Plaintiffs must be dismissed for lack of standing, *see* Moving Brief at 48-51. Plaintiffs did not address this argument in their Opposition, and have thus waived it. *See Mumin v. Uber Techs., Inc.,* 239 F. Supp. 3d 507, 536 n.19 (E.D.N.Y. 2017).

Plaintiffs have failed to establish a *prima facie* case of jurisdiction over PIB and have failed

to state a claim against PIB.  Plaintiffs' claims must now be dismissed.

## **ARGUMENT**

## I.   **THIS ACTION MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION.**

### A.   **AJIB Was Not PIB's Agent.**

PIB, a Palestinian bank with no U.S. presence, is not subject to general jurisdiction here,

and Plaintiffs do not contend otherwise.  Nor is PIB subject to specific personal jurisdiction

because, unlike in *Licci v. Lebanese Canadian Bank*, 732 F.3d 161 (2d Cir. 2013), PIB did not

conduct suit-related transactions through a correspondent account at a U.S. bank.  Instead, PIB fits

into the exception recognized in *Licci*—it opted to conduct its dollar-denominated business

entirely outside the United States through a correspondent account at a non-U.S. bank.  These undisputed facts preclude jurisdiction over PIB and require dismissal of this action.

Attempting to skirt the *Licci* exception, Plaintiffs posit that PIB is subject to specific jurisdiction because it maintained a correspondent bank account <u>outside</u> the United States during the relevant period, with AJIB, in Amman, Jordan, and AJIB in turn maintained correspondent bank accounts in the United States.  Plaintiffs contend that this arrangement made AJIB an "agent" of PIB with respect to any transactions PIB sent to AJIB that AJIB then routed to or through a bank in the United States.

Plaintiffs' argument fails as a matter of law because, as the cases cited on page 20 of PIB's Moving Brief establish, correspondent banks are <u>not</u> "the legal agent of []either the originator [bank] []or the intended beneficiary" bank or customer, *Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 609 F.3d 111, 121 (2d Cir. 2010), and therefore "[a] correspondent bank relationship, standing alone, <u>does not create an agency relationship</u>," *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 122 (2d Cir. 1984) (emphasis added); *see also Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 770 F.3d 993, 1002 (2d Cir. 2014).

Plaintiffs do not seriously attempt to distinguish these cases in their Opposition.  Instead, Plaintiffs argue that because both *Aaron Ferer* and *Licci* cite to *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391 (1976), the *Licci* court's finding that "the defendant's use of" an in-forum correspondent account can support jurisdiction is somehow controlling.  Plaintiffs' argument fails because, in *Licci*, the court found LCB subject to jurisdiction based on its use of its <u>own</u> correspondent account <u>in New York</u>.  PIB, on the other hand, had no correspondent accounts in the United States during the relevant period, or prior to 2009.

3

In support of their novel "offshore correspondent bank as U.S. agent" theory, Plaintiffs cite to only one case that even involved a defendant with an out-of-forum correspondent banking account, *Freeman v. HSBC Holdings PLC*, 14-cv-6601 (PKC) (CLP) (E.D.N.Y.).  In that case, the plaintiffs' ATA claims were <u>dismissed</u> by Judge Pamela Chen of this Court, 413 F. Supp. 3d 67 (E.D.N.Y. 2019), despite a report and recommendation from Magistrate Judge Pollak to the contrary.  In finding jurisdiction over a non-U.S. defendant, Bank Saderat, the Court based its holding on the fact that Bank Saderat allegedly was engaged in a conspiracy with other non-U.S. banks to route transactions to the U.S.  *Id.* at 73-74, 78-80.  By contrast here, Plaintiffs do not allege that AJIB and PIB engaged in any such conspiracy, and indeed AJIB is not a defendant. Accordingly, the *Freeman* theory of conspiracy-jurisdiction does not apply.

None of the other cases Plaintiffs cite on agency even involves correspondent banking, and thus cannot undermine the rule that correspondent banking does not establish an agency relationship. Rather, plaintiffs' other agency cases stand only for the proposition that an agency relationship requires proof that "the alleged agent acted in New York for the benefit of, with the knowledge and consent of, <u>and under some control by</u>, the nonresident principal."  *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981) (emphasis added); *see also Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 360 (S.D.N.Y. 2004) (same); *Emerald Asset Advisors v. Schaffer*, 895 F. Supp. 2d 418, 429-32 (E.D.N.Y. 2012) (finding in-forum acts of principal's "agent and co-conspirator" established jurisdiction where the principal "exercised some control over" agent).

Plaintiffs' imaginative pleading in support of their agency theory cannot survive the factual showing made in PIB's affidavits, which negate any agency relationship between PIB and (i) AJIB or (ii) AJIB's correspondents.  As the Second Circuit recently confirmed, "[i]t is not enough to allege that defendants had the legal ability to control the alleged agent; plaintiffs seeking to

4

establish jurisdiction under C.P.L.R. § 302(a)(2) "must allege the actual exercise of control, based on 'the realities of the relationship.'"  *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (emphasis added) (citing *CutCo Indus. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)); *Wallert v. Atlan*, 141 F. Supp. 3d 258, 275 (S.D.N.Y. 2015) ("some control" is "necessary to establish that [out-of-forum principal] is subject to personal jurisdiction.")

*CutCo Indus.*, which Plaintiffs cite, holds that the required control must rise to the level of "that existing in a partnership or joint venture."  806 F.2d at 366 (emphasis added).  Put another way, the level of control must satisfy New York's "mere department" test for jurisdiction, which applies only when two legally separate entities in fact operate as one.  *See, e.g., Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184-85 (2d Cir. 1998) (listing factors as "'common ownership'"; "financial dependency of the subsidiary on the parent corporation"; "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities"; and "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent.") (citation omitted).

Plaintiffs fail to meet these standards because the almost entirely speculative assertions in the Declaration of Richard George ("George Decl.") cannot withstand factual scrutiny.  Through Mr. George, Plaintiffs argue that PIB and AJIB are "related," because they "share senior management, including Hani al-Qadi and Abdulkadir al-Qadi," George Decl. at ¶ 35, and that, "[a]ccording to PIB's credit report," PIB "has close connections with the Amman-based Arab Jordan Investment Bank," *id.* ¶ 36.

But these assertions are not true, and the Court is obliged to consider the real facts on a challenge to personal jurisdiction.  Moving Brief at 9-10.  As set forth in the Supplemental Declaration of Mohammad Sami Aghbar ("Suppl. Decl."), PIB and AJIB are not now, and have

never been, part of a parent-subsidiary or affiliate relationship, nor have they ever been "related" entities as part of any larger corporate structure. Suppl. Decl. ¶ 19. Neither AJIB nor PIB has any ownership stake in the other. *Id.* ¶ 26. Rather, PIB and AJIB are today, and were during the relevant period, operationally and financially independent of one another. *Id.* ¶¶ 20-24. In particular, during the relevant period, the individuals comprising PIB's senior management team were entirely independent of AJIB and were not employed by AJIB. *Id.* ¶ 25.

With respect to particular correspondent-banking transactions, PIB did not direct or control AJIB's decisions about how AJIB selected or used its own correspondent banks (whether in or outside the United States) or how AJIB cleared dollar-denominated transactions. *Id.* ¶¶ 11, 14. Nor did PIB control how AJIB processed funds to or through the United States. *Id.* Rather, AJIB made its own decisions about how it would process dollar-denominated transfers for PIB, and AJIB itself decided whether to use its own U.S. correspondents or another banking channel. *Id.* ¶¶ 14-15.

As a matter of law, Plaintiffs cannot establish jurisdiction over PIB based on AJIB's use of U.S.-based correspondent accounts because correspondent banking, without more, does not create an agency relationship. *Aaron Ferer & Sons*, 731 F.2d at 122; *Export-Import Bank*, 609 F.3d at 121. And on these facts, where AJIB is not alleged to be PIB's co-conspirator and PIB and AJIB are independent entities that do not control one another, there is no "more" to be added.

> **B.     PIB Is Not Subject to Personal Jurisdiction Based on Dollar-Denominated Banking Services Outside the United States.**

Plaintiffs argue that because PIB chose to offer its customers dollar-denominated accounts and banking services outside the U.S., it is subject to jurisdiction in the U.S., because dollars clear with "finality" across the books of CHIPS and Fedwire in the U.S. Opp. at 6; *see id.* at 8

6

("Interposing AJIB . . . does not change the fact that PIB knowingly directed all of its U.S. dollar transactions through New York.").  Plaintiffs are wrong as a matter of law.

In *Licci*, the Second Circuit held that the defendant, Lebanese Canadian Bank, was subject to specific personal jurisdiction in New York based on its use of its <u>own</u> correspondent account at a New York bank to process transfers that were causally related to the attacks at issue in that case. Plaintiffs cannot use the *Licci* theory of jurisdiction, because PIB did not have any correspondent-bank accounts in the United States.  Declaration of Mohammad Sami Aghbar ("PIB Decl."), ECF No. 41-2, ¶¶ 15, 23, 27; Suppl. Decl. ¶ 6.

Additionally, *Licci* was based on the finding that, "[i]n light of the widespread acceptance and availability of U.S. currency, LCB <u>could have</u> . . . processed U.S.-dollar-denominated wire transfers . . . through correspondent accounts <u>anywhere in the world</u>," but that instead, "LCB deliberately <u>chose</u> to process the . . . wire transfers through <u>AmEx in New York</u>."  732 F.3d at 171 (emphasis added).  For that reason, LCB's "in-forum activity sufficiently reflect[ed] [its] 'purposeful availment' of the privilege of carrying on its activities" in New York.  *Id.* at 173.  In other words, LCB was subject to personal jurisdiction in New York because it chose to process the transfers at issue through its own correspondent account with a New York bank.  ***On the other hand, if LCB had chosen instead to route the transfers through "correspondent accounts anywhere in the world" <u>outside</u> the U.S., it would <u>not</u> have been subject to jurisdiction in New York.***[1]

PIB made precisely the choice allowed in *Licci*, to conduct its U.S. dollar business outside the United States.  PIB did not even <u>have</u> a correspondent account in the U.S. during the relevant period.  PIB thus falls squarely within the exemption from jurisdiction recognized by *Licci*.

---

[1] *See also Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010) ("Underlying Plaintiffs' argument is the faulty assumption that U.S. dollars can only be obtained in the United States. . . .  [G]iven the worldwide availability of U.S. currency, it does not follow that New York (or even the United States) is essential to the provision of said currency.").

Entirely contradicting *Licci*, Plaintiffs take the stunning position that any foreign bank, operating anywhere in the world, with no relationship with any U.S. bank and without sending a single dollar or a single transfer to a U.S. bank, can nonetheless be subject to personal jurisdiction in New York because dollars must ultimately be settled on an aggregate basis across CHIPS and Fedwire.  Opp. at 8-9.  According to Plaintiffs, PIB's only option if it wanted to avoid being forced to litigate in a U.S. court was "refusing to offer dollar-denominated accounts," *id.* at 12.

That is not the law, and Plaintiffs have not cited a <u>single case</u> that stands for the proposition that a non-U.S. bank (like PIB) can be subject to U.S. jurisdiction based on sending dollar-denominated transfers to a correspondent bank outside the U.S. (like AJIB).  *Licci* and *Tamam* properly focused their jurisdictional holdings only on whether the defendant banks purposely chose to route their dollar transfers through the United States even though they had the option to bypass the United States.  A theory that, instead, predicates jurisdiction on transfers anywhere in the world, <u>so long as they are denominated in dollars</u>, not only would violate the due process principles expounded in *Licci* but also would disrupt worldwide banking practices.  *See generally* Brief of *Amici Curiae* the European Banking Federation and the Institute of International Bankers, ECF No. 141 in *Bartlett v. Société Générale de Banque au Liban SAL*, 19-cv-00007 (E.D.N.Y.) (filed Feb. 3, 2020), at 6 ("Providing banking services to customers engaging in legitimate transactions . . . is especially vital to the functioning of the global financial system and international finance and trade.").

###### C.    PIB Is Not Subject to Personal Jurisdiction Based on Settlement Transfers Arising from the PMA's Mandatory Check-Clearing System.

Plaintiffs also argue that PIB is subject to specific personal jurisdiction here because "[t]he U.S. dollar-denominated checks" allegedly written by PIB customers within Palestine "were also processed through New York."  Opp. at 16; *see id.* at 6.  Plaintiffs are wrong for at least three reasons.

First, the checks allegedly at issue were cleared in Palestine, not in the U.S.  Those checks were not processed through the United States.  PIB Decl. ¶¶ 18-20.  The only transactions related to the clearing and settlement of checks through the PMA's system that were ultimately sent through a U.S. bank—at the PMA's instruction—were Settlement Transfers.  *Id.*, ¶ 19-20.  Those Settlement Transfers did not reflect the amounts deposited or withdrawn in connection with any checks allegedly at issue in this case.  Rather, they reflected the net debts or credits owed by the Palestinian banks to one another based on all checks processed through all the accounts at all banks in Palestine.  *Id.*, ¶ 19.  Sending or receiving bulk Settlement Transfers at the direction of the PMA that results from the PMA's calculation of net balances owed among Palestinian banks does not reflect purposeful availment of the U.S. banking system by PIB.

Second, purposeful availment by PIB is further negated by the fact that, during the relevant period, the PMA—PIB's bank regulator—required all banks operating in Palestine, including PIB, to participate in its system for clearing and settling checks.  *Id.* ¶¶ 9-10.  The PMA further required banks to settle the results of those operations, including any net credits or debts among them, by sending funds transfers to the PMA's account at Arab Bank Ramallah, through a correspondent account at Arab Bank-New York.  *Id.* ¶ 20.

PIB had no choice whether to participate in the PMA's mandatory check-clearing system.  Nor did PIB have any role in determining the process by which the results of those operations were settled, in the PMA's selection of Arab Bank-Ramallah as the bank to which Palestinian banks would send Settlement Transfers, or in the designation of Arab Bank-New York as the correspondent bank through which those Settlement Transfers must be sent.  *Id.* ¶ 21.  Rather, those directives were issued by the PMA, and that process, including the routing of Settlement Transfers through the correspondent account at Arab Bank-New York, was required of all Palestinian banks.  *Id.* ¶¶ 19-22.

9

Specific jurisdiction must be based on the affirmative acts of the party itself, and cannot be based on the unilateral acts of a third party, such as the PMA. *See Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Accordingly, by definition, the clearing of checks through the PMA's system and the sending and receiving of Settlement Transfers cannot constitute "purposeful availment" by PIB of the U.S. banking system, as required for specific jurisdiction.

<u>Third</u>, to the extent PIB was required to issue a Settlement Transfer to settle a net debt it owed to the other Palestinian banks as a result of check-clearing activity in the PMA's system during the relevant period, PIB sent those Settlement Transfers not to a U.S. bank, but to AJIB.  PIB Decl. ¶¶ 27, 30.  As explained above, PIB did not direct or control the path by which AJIB further directed the funds, and AJIB was free to choose to route the funds through a non-U.S. bank rather than use one of AJIB's U.S. correspondent banks.  *See supra* p. 6; *see* Suppl. Decl. ¶¶ 14-15, 30.

Plaintiffs have failed to make a *prima facie* case for personal jurisdiction over PIB, and this action must be dismissed.

## II.   PLAINTIFFS' PRIMARY LIABILITY CLAIM MUST BE DISMISSED.

Plaintiffs have not plausibly alleged a claim for primary liability for the same reasons already recognized in other ATA cases that have recently been dismissed, including *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525 (S.D.N.Y. 2019), and in *Averbach v. Cairo Amman Bank*, 19-cv-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) (Parker, M.J.), and other cases.  In particular, Plaintiffs' effort to predicate liability on PIB's alleged banking services to third-parties who, in turn, allegedly ran an "incentive program to reward terrorist attacks" (Opp. at 23) has been squarely rejected in *Averbach*.  Plaintiffs have not stated a cause of action for primary liability because Plaintiffs have not plausibly alleged that PIB knew or intended that its provision of banking services would be used in preparation for or in carrying out the Attacks,

10

as required under 18 U.S.C. § 2339A; or that PIB itself engaged in an act of international terrorism

and that PIB proximately caused Plaintiffs' injuries, as required for a primary liability claim.

> **A.    Plaintiffs Have Not Plausibly Alleged That PIB Knew or Intended Its Support Would be Used in Preparation for or in Carrying Out the Attacks.**

Plaintiffs' primary liability claim, predicated on an alleged violation of 18 U.S.C. § 2339A,

requires "proof of knowledge or intent that material support be used in preparation for or in

carrying out specified crimes" of terrorism, *Linde v. Arab Bank, PLC*, 882 F.3d 314, 330 n.11 (2d

Cir. 2018); see Moving Brief at 24-29.  Plaintiffs do not even attempt to meet this standard.  Opp.

at 23, citing *United States v. Ghayth*, 709 F. App'x 718, 721 (2d Cir. 2017) (summary order).

Plaintiffs' cited portion of non-precedential *Ghayth* deals with a different statute (§ 2332(b))

addressing "conspiracy to murder Americans," 709 F. App'x at 721, which requires a lower

standard.  The portion of *Ghayth* that <u>did</u> discuss § 2339A makes clear that it requires a showing

that the defendant "(1) knowingly (2) provid[ed] material support or resources (3) knowing or

intending that such resources are to be used in preparation for or in carrying out (4) an offense

identified as a federal crime of terrorism."  *Id.* at 722-23.

Plaintiffs have not met, and could not meet, this standard.  They have not plausibly alleged

that PIB knew (from news reports or otherwise) or intended that its banking services supported the

alleged incentive-payment program that is the fulcrum of Plaintiffs' § 2339A claim, let alone that PIB

knew or intended that such banking services supported terror attacks.  *See* Moving Brief at 25-26.

*Kaplan* and *Averbach* drive home this point.  In *Kaplan*, similar to Plaintiffs here, the

plaintiffs alleged that the bank's customers' affiliation with Hizbollah "was openly, publicly and

repeatedly acknowledged and publicized by Hizbollah during the several year period prior" to the

attacks "on Hizbollah's websites, press releases, television and radio stations, press conferences, and

interviews" and "'repeatedly publicized' 'in various English-language publications,'" 405 F. Supp.

3d at 535.  However, the court dismissed the plaintiffs' ATA claim because the plaintiffs did not allege that the defendant "read or was aware of such sources." *Id; see also Honickman v. BLOM Bank SAL*, 19-cv-00008, 2020 WL 224552, *5 (E.D.N.Y. Jan. 14, 2020) (dismissing ATA aiding-and-abetting claim where plaintiffs alleged "public statements" connected bank customer to Hamas, but not that bank "was aware of these facts.").  The same is true here.  Plaintiffs allege similar sources of information existed that could have made PIB aware of a connection between its customers and terrorism.  But Plaintiffs have not plausibly alleged that PIB was aware of those sources.

In *Averbach*, the defendant bank, Cairo Amman Bank ("CAB"), was alleged to have provided financial services to "seventeen charities alleged to be members of Hamas's civilian infrastructure," one of which was the Holy Land Foundation, as well as "four prominent members of Hamas," 2020 WL 486860, *2.  One of the customers, the *al-Ansar* Charitable Society, allegedly "made 'martyr payments' to the families of terrorist operatives who were killed, injured, or imprisoned as a result of their terrorist activities," just as Plaintiffs allege here regarding PIB's purported account for Rakad Salem.  *Id.*  In *Averbach*, the plaintiffs contended "that CAB knew or should have known that the charity Account Holders were affiliated with Hamas based on Western media reports, terrorism designations from the Israeli government, and in some cases, the identity of charity's leadership, who were alleged to be prominent members of Hamas," as well as the fact that the PA had temporarily closed some of the charities prior to the attacks, and that "CAB knew or should have known that the individual Account Holders were 'well-known Hamas leaders,' based on Western media reports, Israel's designations, and their public facing roles on behalf of Hamas." *Id.*  Nonetheless, the magistrate judge found that "none of the allegations in this case support a conclusion that CAB knew the funds transferred to the Account Holders would be used for terrorist activities, let alone the Attacks that injured Plaintiffs or their relatives." *Id.* at *13; *see id.* at *12

12

("Allegations that a defendant bank was generally aware it was playing a role in terrorist activities by virtue of media and non-U.S. governmental designations . . . are insufficient absent allegations that the defendant actually read or was aware of the designations and media reports.").

*Averbach* is particularly notable for its rejection of a primary-liability claim based, as here, on allegations that banking services facilitated "martyr payments." There, plaintiffs alleged that "martyr payment" checks were drawn on an account at CAB; that the website of a CAB customer, *al-Ansar*, stated that "Al-Ansar opens its doors to the families of martyrs," and also listed two accounts it held at CAB; and that "[a]nnouncements in Palestinian papers called on families of martyrs seeking payments from the *al-Ansar* society to produce documentation proving their claims." Complaint, ECF No. 1, *Averbach v. Cairo Amman Bank*, 19-cv-00004 (E.D.N.Y.) (filed Jan. 1, 2019), ¶¶ 796, 800-04. Nonetheless, the magistrate judge found that "there was no indication that CAB knew that its services were being used for martyr payments." 2020 WL 486860, *15. There is no material difference between the allegations made here against PIB and the allegations made in *Averbach* as to each bank's ostensible involvement in a "martyr payment" program.

The magistrate judge also distinguished the *Averbach* allegations from those in *Miller v. Arab Bank PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019). In *Miller*, the court found, the bank "actively administered a 'martyr payment' scheme," and there were "several 'red flags'" that should have caused the bank to take action, including that the bank "received lists identifying violent causes of death as part of its administration of the 'martyr payment' scheme, that there were advertisements describing the bank as the administrator of 'martyr payments,' and that a bank employee affirmatively contacted a terrorist to inform him of his eligibility for payment." 2020 WL 486860, *14. No similar allegations are, or could be, plausibly made against PIB. Here, as in *Averbach* (and unlike in *Miller*), there is no plausible allegation "that [PIB] knew that its services

13

were being used for martyr payments."  None of the "red flags" present in *Miller* are present here.

While Plaintiffs claim (as plaintiffs did in *Averbach*) that the program was "highly publicized,"

they have not plausibly alleged that PIB was aware of any such publicity.  Plaintiffs have not

alleged that PIB knew or intended that its support would be used to carry out the Attacks or any

other violent or life-threatening acts.

**B.      Plaintiffs Have Not Plausibly Alleged That PIB Committed an Act of International Terrorism.**

Plaintiffs' primary liability claim also fails because Plaintiffs have not plausibly alleged

that PIB <u>itself</u> committed an act of "international terrorism," namely a "violent act" or an act that

was "dangerous to human life" and that was done with the terroristic intent required by 18 U.S.C.

§ 2331.  *See, e.g., Linde*, 882 F.3d at 319.

Plaintiffs rely on the out-of-circuit *Boim* and *Abecassis* decisions to argue that "[o]ne can

reasonably infer from [PIB's] knowledge of Saddam Hussein's infamous incentive payment

program that it was <u>encouraging</u> terrorism intended to coerce and intimidate a civilian population

or affect the conduct of a government."  Opp. at 31 (emphasis added).

Plaintiffs are wrong for multiple reasons.  <u>First</u>, Plaintiffs' cases involved provision of the

defendants' <u>own funds</u> to a Hamas charity (*Boim*) or illegal kickbacks to the Saddam Hussein

regime (*Abecassis*).  Here, there is no allegation that PIB provided its own funds for any purpose,

let alone to finance terrorism.  *Boim* was also distinguished by *Linde*, which held that even

providing routine financial services to a terrorist organization <u>itself</u>—not alleged here—is "not so

akin to providing a loaded gun to a child" as to compel a finding that those services were violent

or life-endangering.  882 F.3d at 327.  <u>Second</u>, *Linde* and other cases in <u>this</u> circuit have made

clear that "the provision of financial services does not, in itself, equate to international terrorism."

*Kaplan*, 405 F. Supp. 3d at 532; *see O'Sullivan v. Deutsche Bank AG*, No. 17 CV 8709, 2019 WL

14

1409446, *8 (S.D.N.Y. Mar. 28, 2019) ("The Complaint does not allege plausibly that the provision of banking services, which are not inherently violent or dangerous, can be considered as acts dangerous to human life"). <u>Third</u>, Plaintiffs must plausibly allege that PIB <u>itself</u> committed an act of international terrorism, and even in their Opposition, Plaintiffs only claim that PIB "encouraged" such an act, which is insufficient to state an ATA primary liability claim. <u>Fourth</u>, Plaintiffs have not plausibly alleged PIB had knowledge of "Saddam Hussein's infamous incentive payment program" or that any of its customers were involved in such a program.

Plaintiffs also have not plausibly alleged that PIB acted with the terroristic intent required by Section 2331. Plaintiffs argue that because they allege that PIB "provided payments of up to $25,000 directly to the families of suicide bombers and other terrorists," "[a]n objective observer could reasonably conclude that facilitating such conduct <u>encouraged and enabled</u> further acts of terrorism." Opp. at 33 (emphasis added). Again, Section 2331 requires that PIB <u>itself</u> commit an act of international terrorism, not that PIB <u>encourage</u> such an act. Further negating terroristic intent, PIB's alleged customer Rakad Salem was and is not a designated terrorist anywhere in the world. Finally, Plaintiffs allege only one inbound receipt to a PIB account, for the Holy Land Foundation ("HLF"), and that occurred <u>before</u> the relevant period and <u>before</u> HLF was designated by OFAC. *See O'Sullivan*, 2019 WL 1409446, *8 (allegations that defendants provided financial services to Iranian banks and businesses "with connections to terrorist organizations," as opposed to services directly to terrorists, did not satisfy terroristic intent requirement); *Kaplan*, 405 F. Supp. 3d at 532 ("[E]ven assuming, *arguendo*, that Defendant was aware that it was providing [financial] services to Hizbollah affiliates and that doing so violated economic sanctions imposed by the U.S. government, the provision of financial services does not, in itself, equate to international terrorism.").

15

### C.     Plaintiffs Have Not Plausibly Alleged Proximate Cause.

Plaintiffs have not plausibly alleged that an act of international terrorism committed by PIB proximately caused their injuries. *See Rothstein v. UBS AG*, 708 F.3d 82, 91, 95 (2d Cir. 2013); *see* Moving Brief at 35-37. As in *Kaplan*, 405 F. Supp. 3d at 533, the Court here cannot credit Plaintiffs' conclusory proximate-cause allegations when Plaintiffs have not plausibly alleged that the bank provided funds to a terrorist organization, or even that bank customers sent funds to a terrorist organization which used them to perpetrate the Attacks, or that any terrorist organization would not have been able to carry out the Attacks absent any such funds.

Because of those missing links, Plaintiffs posit proximate cause on the theory that "martyr payments" "would encourage recruitment, particularly of suicide bombers." Opp. at 27. But that theory collapses in the face of Plaintiffs' concession that they "do not contend that any single after-the-fact payment to the family of a specific suicide bomber proximately caused that attack." *Id.* at 28.

Additionally, just as in *Kaplan*, Plaintiffs do not allege that PIB provided funds directly to an FTO; that any funds processed through PIB were ultimately sent to any of the terrorist organizations or perpetrators of the Attacks and then used to commit the Attacks; or that the terrorist organizations would not have been able to carry out the Attacks absent those funds. 405 F. Supp. 3d at 533. Further, Plaintiffs do not allege that any person who planned or committed any of the Attacks even <u>knew</u> about the possible availability of such payments by PIB customers at the time of the Attacks, let alone that any person involved in any of the Attacks was motivated to commit an Attack by the possibility that they or their family would receive a payment. Plaintiffs' effort to pin proximate cause on alleged PIB banking services to the Holy Land Foundation (Opp. at 28) is equally unavailing. The <u>one</u> transfer for HLF's benefit that Plaintiffs allege pre-dates HLF's OFAC designation. Further, as in *Kaplan*, Plaintiffs do not allege that HLF itself was involved in any Attack; that those funds were ultimately provided to Hamas or any of

16

the perpetrators of the Attacks and used to commit an Attack; or that Hamas could not have committed the Attacks absent those funds.  Plaintiffs' primary liability claim must be dismissed.

## III.    PLAINTIFFS' AIDING-AND-ABETTING CLAIM MUST BE DISMISSED.

### A.    Plaintiffs Have Not Plausibly Alleged that PIB Provided Knowing and Substantial Assistance to the "Person[s] Who Committed" the Attacks.

The six factors identified in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), for determining "how much encouragement or assistance is substantial enough" to show that a defendant "knowingly and substantially assist[ed] the principal violation"—that is, the Attacks at issue—as required for a JASTA aiding-and-abetting claim, favor dismissal here, as other courts have recently found with respect to ATA aiding-and-abetting claims.  *See Averbach*, 2020 WL 486860, *16-17; *Kaplan*, 405 F. Supp. 3d at 536; *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019); *Honickman*, 2020 WL 224552, *10-12.

With respect to the first factor, "the nature of the act encouraged," Plaintiffs point to "the horrific nature of the primary torts," namely the Attacks.  Opp. at 41.  However, this factor favors dismissal because Plaintiffs "have not plausibly alleged that [defendant] encouraged the heinous [attacks] or provided any funds to [the FTOs or perpetrators of the attacks]."  *Siegel*, 933 F.3d at 225; *see Honickman*, 2020 WL 224552, *11; *Averbach*, 2020 WL 486860, *16.  Here, as in *Averbach*, "there are no facts in the Complaint to suggest that [PIB] took on any active role in encouraging or administering 'martyr payments'", and in any event, "Plaintiffs [have] not pleaded that [PIB] was aware that any Account Holder was involved in making 'martyr payments.'"

For the second *Halberstam* factor, the amount of assistance, Plaintiffs cite to paragraphs of the Amended Complaint alleging that Iraq sent funds to PIB, with no allegation that those funds were used in connection with any Attack, and that Iraq sent funds to unnamed family members of Palestinians killed or wounded during the Intifada, with no connection to PIB.  Am. Compl. ¶¶ 6,

492.  Plaintiffs fail to link those allegations to any Attack, or otherwise allege that any funds processed by PIB were sent to any terrorist or terrorist organization.  *Honickman*, 2020 WL 224552, *11 (even assuming the bank's customers "did work to drum up political support for Hamas," no allegations that bank's assistance "went towards Hamas' violent activities."); *Siegel*, 933 F.3d at 225; *Kaplan*, 405 F. Supp. 3d at 536.  The second *Halberstam* factor favors dismissal.

For the third factor, PIB's presence or absence at the time of the Attacks, Plaintiffs do not allege PIB was present at the time of the Attacks.  Rather, Plaintiffs refer to PIB's "presence in the middle of the communities," Opp. at 41.  This is plainly insufficient and favors dismissal.

As to the fourth factor, PIB's relation to the principal, Plaintiffs refer to PIB's alleged "direct role as the banker linking Saddam Hussein's regime to the FTO beneficiaries of the incentive program," Opp. at 41.  But Plaintiffs have not plausibly alleged that PIB provided a single dollar to any "FTO beneficiaries."  As in *Averbach*, 2020 WL 486860, *16, "Plaintiffs have not pleaded that [PIB] had any type of relationship other than an arms-length business relationship with [its alleged customers] and have pleaded no relationship at all to [the FTOs] except through the [alleged customers]. . . . Thus, Plaintiffs have failed to plead facts indicating a close relationship of the kind in *Halberstam*."  The fourth factor favors dismissal.

For the fifth factor, PIB's state of mind, Plaintiffs allege PIB knew that it was "interacting with and supporting Saddam Hussein's agents, as well as families of terrorists," Opp. at 41. However, as set forth herein, Plaintiffs have not plausibly alleged that PIB knew or intended its banking services would be used to facilitate any Attack or other violent or life-threatening act, nor that PIB was "aware" that it was playing a "role" in violent or life-threatening activities.

For the sixth factor, the period of PIB's assistance, Plaintiffs allege that PIB's assistance "extended from at least 2001 to 2003," Opp. at 41.  But Plaintiffs have not plausibly alleged that

18

PIB provided <u>any</u> assistance, for any length of time, to the FTOs or individuals who perpetrated the Attacks.  And the only transactions Plaintiffs have identified are Exhibits A and C to the Amended Complaint, which occurred in August 2001 and January 2002, a period of five months.

All of the *Halberstam* factors mandate dismissal of Plaintiffs' aiding-and-abetting claim.

> **B.**    **Plaintiffs Have Not Plausibly Alleged that PIB was "Aware" it was Playing a "Role" in Violent or Life-Endangering Activity.**

Plaintiffs' aiding-and-abetting claim must also be dismissed because Plaintiffs have failed to plausibly allege that PIB was "aware that . . . it was playing a role in violent or life-endangering acts" of an FTO, *Linde*, 882 F.3d at 329-30.  <u>First</u>, nothing about PIB's alleged account services for Rakad Salem (Opp. at 39-40) can satisfy this standard, because neither Salem nor his organization (ALF) is designated as a terrorist anywhere in the world today, nor were they during the relevant period.  <u>Second</u>, PIB's one alleged receipt of funds from the Holy Land Foundation is likewise insufficient, because that transfer pre-dates both HLF's OFAC designation and the "relevant period" as defined in the Amended Complaint.  <u>Third</u>, Plaintiffs have not plausibly alleged that PIB was aware of the Israeli government's designation of HLF, or of any alleged "public ceremonies" related to rewards payments, Opp. at 40.  *See Averbach*, 2020 WL 486860, *12 ("media and non-U.S. governmental designations . . . are insufficient absent allegations that the defendant actually read or was aware of the designations and media reports.").  <u>Finally</u>, there is nothing about the provision of banking services that would suggest awareness of involvement in violent or life-endangering activity, as the Second Circuit recognized in *Linde*.

## IV.    PLAINTIFFS' CONSPIRACY CLAIM MUST BE DISMISSED.

> **A.**    **Plaintiffs Have Not Plausibly Alleged that PIB Conspired to Commit Terrorism.**

Plaintiffs fail to meet the foundational requirement of a JASTA conspiracy claim—that "a defendant must have conspired to <u>commit an act of international terrorism</u>."  *O'Sullivan*, 2019 WL

1409446, *9 (emphasis added); *Kaplan*, 405 F. Supp. 3d at 534 ("Plaintiffs must allege that Defendant and Hizbollah entered into an agreement to commit an act of international terrorism"). Plaintiffs' allegations do not come close to supporting an inference that PIB agreed with anyone to commit an act of international terrorism.

Plaintiffs argue only that PIB "worked with Saddam Hussein, the Arab Liberation Front and others" to transfer funds to PIB, while having "'some knowledge' of the Hussein's regime's unlawful aims and objectives." Opp. at 34, 36. These conclusory assertions do not show that PIB took the extraordinary step of joining with Saddam or the ALF to commit terrorist acts, particularly when the ordinary objective observer would not infer an agreement to commit terrorist acts from a decision by a bank to open an account for a customer that is nowhere designated as a terrorist.

### B.      Plaintiffs Have Not Plausibly Alleged that PIB Conspired with the "Person Who Committed" the Attacks.

Plaintiffs fail to plausibly allege that PIB "conspire[d] directly with the person or entity that committed the act of international terrorism that injured the plaintiff." *Freeman*, 413 F. Supp. 3d at 98 n.41; *Kaplan*, 405 F. Supp. 3d at 534 ("Plaintiffs must allege that Defendant and Hizbollah entered into an agreement to commit an act of international terrorism"); *O'Sullivan*, 2019 WL 1409446, * 9 ("Plaintiffs' allegations do not demonstrate that Defendants entered into any agreements with the FTOs that committed the attacks at issue."). As in *Freeman*, *Kaplan*, and *O'Sullivan*, the conspiracy claim must be dismissed because Plaintiffs do not allege that PIB conspired with, or had any contact at all with, the FTOs or the individuals who committed the Attacks.

### CONCLUSION

For the reasons set forth herein and in PIB's Moving Brief, the Amended Complaint should be dismissed in its entirety as against PIB with prejudice.

Dated: February 28, 2020

Respectfully submitted,

**SQUIRE PATTON BOGGS (US) LLP**

/s/ *Gassan A. Baloul*
Gassan A. Baloul
gassan.baloul@squirepb.com
Mitchell R. Berger
mitchell.berger@squirepb.com
2550 M Street, NW
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

Joseph S. Alonzo
joseph.alonzo@squirepb.com
30 Rockefeller Plaza, 23rd Floor
New York, New York 10112
Telephone: (212) 872-9800
Facsimile:  (212) 872-9815

*Counsel for Defendant Palestine Investment Bank*