UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TEMIMA SPETNER, et al.,

                Plaintiffs,

-against-

PALESTINE INVESTMENT BANK,

                Defendant.

19-cv-005 (ENV)

## SUPPLEMENTAL DECLARATION OF MOHAMMAD SAMI AGHBAR

Mohammad Sami Aghbar declares the following pursuant to 28 U.S.C. § 1746:

1. My name is Mohammad Sami Aghbar. I live in Ramallah, Palestine, and I am employed as the Internal Audit Manager at Palestine Investment Bank ("PIB").

2. I submit this Declaration in further support of PIB's motion to dismiss the Amended Complaint filed in the above-captioned action and in reply to the Declaration of Richard George dated January 13, 2020 (the "George Declaration").

3. I am familiar with the facts set forth herein based on my work history and experience at PIB as well as my review of relevant PIB records and publicly available information, and on that basis believe them to be true and correct.

4. Because English is not my native language, I have received assistance from PIB's U.S. legal counsel in the correct English phrasing of some of the concepts discussed in this Declaration. However, all of the facts set forth in this Declaration are true and correct to the best of my knowledge.

5. As I stated in my original Declaration dated November 18, 2019, PIB has no physical presence in the United States, nor did it have any physical presence in the United States during the 2001-2003 period relevant to this litigation (the "relevant period").

6. As I also stated in my initial Declaration, PIB had no correspondent bank accounts in the United States during the relevant period. Rather, as explained in my initial Declaration, during the relevant period, PIB provided dollar-denominated banking services to its customers through means entirely outside the United States, including by clearing and settling checks through the system mandated by PIB's bank regulator, the Palestine Monetary Authority ("PMA"), and by processing and settling wire transfers via book-to-book entries with PIB's correspondent banks, primarily Arab Jordan Investment Bank ("AJIB").



7. As Mr. George notes in paragraph 14 of the George Declaration, PIB cannot participate in CHIPS or Fedwire, the primary clearinghouses for U.S. dollars through New York. Nor could PIB participate in CHIPS or Fedwire during the relevant period.

8. Paragraph 16 of the George Declaration states that "[n]on-U.S. banks access CHIPS or Fedwire through correspondent bank accounts, which are 'accounts in domestic [U.S.] banks held in the name of the foreign financial institutions.'" (citation omitted). It is correct that a non-U.S. bank <u>may</u> choose to access CHIPS or Fedwire through one or more correspondent bank accounts at U.S. banks, assuming that a U.S. bank is willing to open a correspondent bank account for the non-U.S. bank. However, non-U.S. banks may also choose to facilitate dollar-denominated transactions by other means entirely outside the United States, such as through a dollar-denominated correspondent bank account with a bank outside the United States, as PIB did during the relevant period through its correspondent account with AJIB.

9. Paragraph 17 of the George Declaration states: "When a person with an account at a non-U.S. bank wishes to transfer dollars to another person with an account at another non-U.S. bank, the former bank will instruct its U.S. correspondent bank to transfer money (*e.g.*, via Fedwire or CHIPS) to the U.S. bank where the beneficiary's non-U.S. bank has a correspondent account." This is <u>one possible</u> method by which funds may be transferred from a customer's account at one non-U.S. bank to a customer's account at a different non-U.S. bank. However, it is also possible for a non-U.S. bank that does not have a correspondent relationship with a U.S. bank—including, prior to 2009 and during the relevant period, PIB—to transfer dollars from the account of one of its customers to an account for a customer of another non-U.S. bank. PIB and other such banks do so by processing those transfers through their correspondent accounts with other <u>non-U.S.</u> banks, such as AJIB.

10. Paragraph 23 of the George Declaration states that "when PIB decided to offer some or all of its clients in the Palestinian Territories the option of maintaining accounts denominated in U.S. dollars, it fully understood that it would be availing itself of dollar clearing and settlement in New York". This is not true. PIB did not and could not "avail itself" of dollar clearing and settlement services in New York during the relevant period, as PIB had no correspondent banking accounts in the United States during the relevant period. Rather, as discussed in my initial Declaration, during the relevant period, PIB settled dollar-denominated checks entirely outside the United States, either on its own books or through the settlement and clearing system required by the PMA (as explained more fully in my initial Declaration and in paragraph 30 herein), and settled dollar-denominated funds transfers on a book-to-book basis with AJIB, its correspondent bank.

11. Paragraph 28 of the George Declaration purports to describe my initial Declaration as stating that PIB "relied upon AJIB to undertake dollar clearing and settlement on its behalf using AJIB's correspondent bank accounts in the United States." That is not true. While PIB maintained a U.S. dollar-denominated correspondent account with AJIB, and at times instructed AJIB to process U.S. dollar-denominated funds transfers on behalf of a PIB customer, PIB did not direct or control AJIB's use of AJIB's own correspondent relationships. Indeed, Mr. George concedes in paragraph 32 of his Declaration that "it is certainly plausible, as Mr. Aghbar's Declaration states, that Defendant Palestine Investment Bank 'never controlled how AJIB processed funds to or through the United States' and that 'AJIB made its own decisions

about whether it would use its own U.S. correspondent banks, and who those correspondents would be".

12. Paragraph 29 of the George Declaration refers to "a banking practice called 'nesting.'" "Nested," or "downstream," correspondent banking is a common practice in international banking whereby "a respondent bank provides downstream correspondent services to other financial institutions and processes these transactions through its own correspondent account." See "Nesting," AML Glossary of Terms, Association of Certified Anti-Money Laundering Specialists ("ACAMS"), available at https://www.acams.org/aml-glossary/. Nesting is "a normal part of correspondent banking." Id.

13. As the Basel Committee on Banking Supervision has noted, "[d]ownstream correspondent banking relationships are an integral and generally legitimate part of correspondent banking." See Basel Committee Guidelines on Sound Management of Risks Related to Money Laundering and Financing of Terrorism, June 2017, attached hereto as Exhibit A, at 26. As the Basel Committee has recognized, these relationships are a legitimate "way for regional banks to help small local banks within the respondent's region obtain access to the international financial system or to facilitate transactions where no direct relationship exists between banks." Id. A foreign bank's use of a nested correspondent account, however, does not make the correspondent bank an agent of the foreign bank, nor did PIB otherwise designate AJIB as its agent.

14. Paragraph 30 of the George Declaration states that "PIB used AJIB as its agent to access the U.S. financial system. That is, when PIB Bank would 'request that AJIB process the outbound transfer to the beneficiary on behalf of PIB's customer,' Aghbar Decl. ¶ 24, it was instructing AJIB to process the transaction through AJIB's New York correspondent accounts." That is not true. As set forth in my initial Declaration, PIB did not participate in, direct, or control AJIB's relationships with any other banks (whether in or outside of the United States) that may have been correspondents of AJIB for dollar-denominated business. Moreover, PIB did not control how AJIB processed funds to or through the United States. Rather, AJIB made its own decisions about whether it would use its own U.S. correspondent banks to process funds transfers for PIB, and AJIB was free to direct those funds transfers to banks other than its own U.S. correspondents.

15. As an illustration of the above, Exhibit 3 to the George Declaration is AJIB's profile in the January 2003 edition of the Bankers' Almanac. (George Declaration ¶ 34.) According to that document, in addition to correspondent banks in the United States, AJIB maintained correspondent banking relationships with a number of large global banks outside the United States, including among others HSBC in London, Crédit Agricole in Paris, Deutsche Bank in Frankfurt, Credit Suisse in Zurich, and ABN AMRO in Amsterdam. Given that PIB did not control how AJIB processed funds to or through the United States, to the extent PIB instructed AJIB to send a transfer to or through a U.S. bank, AJIB was free to route the transfer through those non-U.S. banks, rather than sending the transfer to AJIB's U.S. correspondent banks.

16. Similarly, during the relevant period, PIB did not control how foreign banks chose to send dollar-denominated transfers to PIB account-holders. While a foreign bank could have



done so by "sending the transfer through its New York correspondent account to AJIB's New York correspondent account for the benefit of PIB and ultimately the PIB account-holder," as stated in paragraph 31 of the George Declaration, it was entirely the choice of the foreign bank how to send the transfer to AJIB, including through one of AJIB's non-U.S. correspondents.

17. Paragraph 35 of the George Declaration states that PIB and AJIB are "related." This is not true. PIB and AJIB are entirely separate corporate entities. As stated in Exhibit 3 to the George Declaration, AJIB is a Jordanian Joint Stock Bank established in 1978. On the other hand, as set forth in my initial Declaration, Palestine Investment Bank P.L.C. was established in Palestine as an independent public shareholding company on August 10, 1994, and is publicly traded and listed on the Palestine Securities Exchange.

18. I have reviewed Exhibit 3 to the George Declaration, and I note that it purports to identify a number of AJIB's "Affiliated Companies," "Offshore Banking Units," and "Other Offices," and that PIB is not identified in any of these categories. While it purports to identify PIB as "Related" to AJIB, it does not provide any details or factual basis for that categorization or what it means by "Related."

19. PIB and AJIB are not now, and have never been, part of a parent-subsidiary or affiliate relationship, nor have they ever been "related" entities as part of a larger corporate structure (or otherwise).

20. PIB and AJIB are today, and were during the relevant period, financially independent of one another and do not share or intermingle assets.

21. Today, and during the relevant period, PIB and AJIB maintain separate balance sheets, prepare and file separate annual financial reports, and are operated and treated as independent profit centers.

22. Neither PIB nor AJIB pays or guarantees the debts or obligations of the other, nor did either do so during the relevant period.

23. PIB and AJIB do not share offices, branches, or other real estate, nor did they do so during the relevant period.

24. PIB and AJIB market and operate themselves independently. Neither PIB nor AJIB exercises any degree of control over the marketing or operational policies of the other, nor did they do so during the relevant period.

25. Paragraph 35 of the George Declaration states that PIB and AJIB "share senior management." This is not true. While it is the case that, during the relevant period, a minority of the members of the boards of PIB and AJIB were common, including Abdulkadir Al Qadi as chairman, the two banks had entirely separate senior management teams. In particular, during the relevant period, PIB's senior management team included Yousef Abbas Nasrallah al-Qadi as general manager, Zakaria Ahmed Salamah Ghawanmeh as deputy general manager, and Fawzi Tawfiq Ibrahim Al Jawhari as assistant deputy general manager. None of these individuals was employed by AJIB during the relevant period. See Exhibit B attached hereto (with informal translation).

26. AJIB does not have any ownership stake in PIB, nor does PIB have any ownership stake in AJIB. While Abdulkadir al-Qadi and Hani al-Qadi had individual ownership stakes in both banks during the relevant period, those ownership stakes represented a minority position in both banks.

27. Paragraph 38 of the George Declaration states that "PIB would have therefore known that transfers the government of Iraq made from the Jordan branch of its state-owned Bank Rafidain to PIB's account at AJIB were processed in New York using CHIPS and Fedwire." That is not true. PIB did not participate in whatever transfers may have occurred between Bank Rafidain and AJIB, nor was PIB aware of how, if at all, those transfers involved New York. PIB has never had a correspondent relationship or any other relationship with Bank Rafidain. Further, during the relevant period, PIB's knowledge of the inward transfers it received through AJIB was limited to information provided to PIB by AJIB, and in no instance did the information AJIB provided to PIB about such a transfer involving any of the alleged accounts at issue in this litigation identify Bank Rafidain as the source of funds.

28. Paragraph 43 of the George Declaration states that "each Palestinian bank must access a correspondent bank in New York to settle its daily debit or credit position with each other Palestinian bank" and that "each respective Palestinian bank does so between its New York correspondent account and the PMA's New York correspondent account". This was not true as to PIB during the relevant period. As previously explained, PIB did not have a New York correspondent account during the relevant period.

29. As explained more fully in my initial Declaration, if PIB owed a net debt to the other Palestinian banks as a result of activity through the PMA's clearing and settlement system, it was required to settle that debt by transferring dollars (a "Settlement Transfer") to the account the PMA had designated for this purpose, which was an account at Arab Bank-Ramallah, through a correspondent account at Arab Bank-New York. PIB was required to participate in the PMA's clearing and settlement system, and PIB had no involvement in the PMA's determination to have Settlement Transfers processed through Arab Bank-New York.

30. To the extent PIB had to send a Settlement Transfer, it did so through AJIB, and PIB's involvement in the transaction ended with AJIB. While, as required by the PMA, PIB instructed AJIB to send Settlement Transfers to the PMA's account at Arab Bank-Ramallah through a correspondent account at Arab Bank-New York, PIB did not direct AJIB to use any of AJIB's U.S. correspondent banks to send those Settlement Transfers to Arab Bank-New York, and, as noted above, AJIB maintained correspondent accounts with a number of non-U.S. banks during the relevant period.

31. Paragraph 48 of the George Declaration refers to Exhibit B to the Amended Complaint, which Mr. George suggests "relates to a 2005 communication by BIP to [Bank of New York]." As I noted in paragraph 31 of my initial Declaration, Exhibit B post-dates the relevant period by more than two years, and, furthermore, the PMA did not begin routing transfers related to its clearing and settlement activity through Bank of New York until after the relevant period.

32.     Paragraph 48 also states that, based on Exhibit B to the Amended Complaint, a document from July 2005, PIB "presumably" also "would have" communicated directly with PMA's New York correspondent bank during the relevant period. This presumption is not accurate. As I stated in paragraph 30 of my initial Declaration, during the relevant period, PIB did not communicate directly with New York banks in relation to the settlement of its U.S. dollar-denominated checks.

33.     I understand that this Declaration is not intended to waive any of PIB's privileges, immunities, objections, or defenses in this action, including but not limited to jurisdictional objections and defenses, all of which are reserved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Ramallah, Palestine, on the 23rd day of February, 2020.

_____
Mohammad Sami Aghbar