UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------x

 TEMIMA SPETNER, et al.,

                   Plaintiffs,

                                              **MEMORANDUM AND ORDER**

             -against-
                                               19-CV-0005(EK)(RLM)

 PALESTINE INVESTMENT BANK,

                   Defendant.

-------------------------------------------x
ERIC KOMITEE, United States District Judge:

          Plaintiffs in this case are American victims of
terrorist attacks, their families and estates.  The Amended
Complaint (Complaint) alleges that the defendant bank violated
several provisions of the Anti-Terrorism Act (ATA), 18 U.S.C.
§ 2331 *et seq*., by facilitating the transfer of U.S. dollar-
denominated funds to terrorist groups that incentivized and
rewarded suicide bombings.  The Defendant has moved to dismiss
for lack of personal jurisdiction in New York and for failure to
state a claim on which relief can be granted.  For the reasons
below, I grant the motion to dismiss for lack of personal
jurisdiction.  Given that, I do not reach the question of
whether the Complaint states a valid claim for substantive
relief.

1

## I. Background

The terrorist attacks at issue occurred in Israel between September 2001 and March 2003 (the "relevant period"), and the facts recited over fifty pages of the Complaint are grotesque, describing bombs exploded in public squares, civilians killed and maimed, and families scarred for life. Plaintiffs allege that these attacks were incentivized and rewarded by Saddam Hussein, who diverted money sent to Iraq under the United Nations' humanitarian Oil-for-Food Program to pay the families of terrorists killed in suicide missions. *See* Amended Complaint ¶¶ 526-30, ECF. No. 36 (Compl.).

The defendant, Palestine Investment Bank (PIB), is said to have facilitated these so-called "martyr payments" in the Palestinian Territories through the account of one of its customers, Rakad Salem. Salem was the leader of a terrorist organization called the Arab Liberation Front (ALF), the Palestinian proxy of Saddam Hussein's regime. *Id*. ¶ 2. ALF was "well-known for its financial support for terrorist operatives." *Id*. ¶ 624. Attached to the Complaint are copies of two checks allegedly drawn on Salem's account at PIB, in the amount of $15,000 each. *See* Compl. Ex. A. These are made out to the families of two suicide bombers who carried out the Ben Yehuda Street attack in Jerusalem on December 1, 2001. Both checks are

marked with the notation "martyr" in Arabic.[1]  *See id.*
Plaintiffs allege that ALF handed out checks like these at well-
attended ceremonies that were reported on widely in the
Palestinian press and elsewhere, which had the effect of
incentivizing additional violence.  *See* Compl. ¶¶ 513-25.  The
amounts of the payments are said to have ranged from $10,000 to
$25,000.  *Id*. ¶ 21.

Plaintiffs also allege that PIB maintained a bank
account for the Holy Land Foundation (HLF), an organization that
raised funds for the terrorist group Hamas.  *Id*. ¶¶ 9-10.
Unlike the Saddam-ALF allegations, Plaintiffs do not identify
any specific payments made from the HLF bank account in support
of terrorist activity, but they allege that, in general, the HLF
supported Hamas activities by directing funds to its offices and
affiliated entities.  *Id*. ¶¶ 579-81.

Based on PIB's alleged role in facilitating martyr
payments and other funds transfers, Plaintiffs bring the
following causes of action against PIB: (1) conspiracy to
provide material support for international terrorism;
(2) providing material support for international terrorism; and

---

[1] Also attached to the Complaint are two checks drawn on the same
account at PIB, in the amount of $10,000 each, which are marked with the same
notation.  *See* Compl. Ex. A.  The Complaint does not connect these two
payments to any of the specific attacks that injured Plaintiffs, but they
appear to be additional examples of martyr payments drawn on Salem's PIB
account.

(3) aiding and abetting acts of international terrorism.[2]  These civil causes of actions are authorized by the ATA, as now amended by the Justice Against Sponsors of Terrorism Act. 18 U.S.C. § 2333(a) and (d).

There are a multitude of terrorism-financing cases in the Second Circuit concluding that jurisdiction lies over banks that executed funds transfers in New York *themselves*, either through their New York branch or a "correspondent account" they maintained in their own name.  This case is one step removed from those cases, however, because PIB is alleged to have processed the relevant transactions exclusively through its relationships with third parties outside of the United States. There appears to be no controlling case assessing whether a bank is subject to personal jurisdiction in these precise circumstances.

In support of their contention that PIB is subject to personal jurisdiction, Plaintiffs identify three different courses of action through which PIB is said to have transacted in New York, either directly or through an agent, despite having no branch or correspondent account here.

---

[2] In support of their first two claims, Plaintiffs allege that the Defendant itself committed acts of international terrorism by violating, and conspiring to violate, the material support statute, 18 U.S.C. § 2339A.  In support of their third claim, Plaintiffs allege that the Defendant provided substantial assistance to other entities that committed acts of international terrorism, without reference to the material support statute.

First, Plaintiffs allege that the funds transfers leading to the martyr payments required sustained, foreseeable action by PIB's "agent" in New York — the Arab Jordan Investment Bank, or AJIB — in order to reach Salem's account at PIB.  Even though PIB's correspondent account with AJIB was at AJIB's Amman, Jordan branch, Plaintiffs contend that the use of that Jordanian account necessitated follow-on actions by AJIB in New York that should satisfy the long-arm statute.

Second, Plaintiffs allege that the Palestinian Monetary Authority (PMA) also acted as PIB's agent in New York when it cleared and settled dollar-denominated checks drawn on a PIB account and deposited at another Palestinian bank (including, at times, Salem's "martyr payments").

Third, Plaintiffs allege that the HLF, a fundraising organization for the terrorist group Hamas, sent funds from its bank account in Richardson, Texas through intermediaries (including AJIB) in order to reach the HLF's account at PIB.  In connection with these transfers, Plaintiffs allege that PIB "directed" the flow of funds into a New York correspondent account that AJIB maintained.

Through these transactions, detailed below, Plaintiffs claim that PIB purposefully availed itself of the New York forum.

A.      ALF-AJIB Allegations

        Plaintiffs allege that funding for the martyr payments
came from the U.N.'s Oil-for-Food Program.  Because Iraq was a
designated "State Sponsor of Terrorism" during the relevant
period, the regime was subject to strict economic sanctions and
had access to that program only for humanitarian purposes.
Compl. ¶¶ 526-28.  Funds collected from Iraqi oil sales under
the program were processed exclusively from a U.N. account held
at BNP Paribas's branch in New York during the relevant period,
*id.* ¶ 529; but, as U.N. investigators would later learn,
significant oil revenues were "subsequently diverted" from the
BNP account "through elaborate kickback schemes" and sent to
accounts controlled by Saddam Hussein's regime.  *Id.* ¶ 530.  As
alleged, at least some of the diverted funds went to the head
office of Iraq's state-owned Al-Rafidain Bank in Baghdad.  *Id.*
¶ 532.

        According to the Complaint, these funds were then
covertly transferred to Al-Rafidain Bank's branch in Amman,
Jordan.  *Id.*  Although the funds were destined for Rakad Salem,
the ALF leader in the Palestinian Territories, Al-Rafidain could
not send the money directly to Salem's account at PIB.  *Id.*
¶¶ 533-34.  The reason had to do with PIB's lack of direct
access to the New York banking system:  while the martyr
payments were transmitted by Saddam Hussein in U.S. dollars, and

ultimately paid to the recipients in U.S. dollars, PIB could not receive wire transfers denominated in dollars. *See id*. at ¶¶ 21, 534-35. This was because PIB did not participate directly in New York-based wire payment systems like CHIPS[3] or Fedwire,[4] nor did it hold a correspondent account with a bank in the United States that did participate.[5]

PIB therefore had to insert an intermediary between Al-Rafidain's Amman branch and itself. That intermediary was AJIB in Amman. AJIB could receive (and settle) the dollar-denominated wires because it held correspondent accounts with at

---

[3] The Clearing House Interbank Payment System (CHIPS) is the primary provider of clearing and settlement services in U.S. dollar-denominated funds for Eurodollar transactions. Compl. ¶ 551 n.13. Eurodollar transactions refer, somewhat counterintuitively, to any U.S. dollar-denominated deposits at banks outside the United States. *Id.* ¶ 534 n.10. Banks must have a CHIPS account to settle a transaction in New York through the CHIPS system. Declaration of Richard George in Support of Plaintiffs' Opposition ¶¶ 8-9, ECF No. 42-1 (George Decl.). PIB did not, as indicated above. During the relevant time period, CHIPS estimated that it handled 95% of all U.S. dollar payments moving between countries. *See id.* ¶ 9.

[4] The Federal Reserve Wire Transfer Network (Fedwire) is a provider of clearing and settlement services in U.S. dollar-denominated funds operated by the United States Federal Reserve Banks that allows financial institutions to electronically transfer funds. A foreign bank with no physical U.S. presence cannot directly participate in the CHIPS or Fedwire systems. George Decl. ¶ 14. As with CHIPS, non-U.S. banks may access Fedwire through correspondent bank accounts. *Id.* ¶ 16.

[5] A correspondent account is "a domestic bank account held by a foreign bank . . . used for deposits, payments and transfers of funds." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*, 732 F.3d 161, 165 n.3 (2d Cir. 2013) (cleaned up). A foreign bank may use a correspondent account in New York to "facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States." *Id.* (quoting *Licci v. Lebanese Canadian Bank ("Licci III")*, 20 N.Y.3d 327, 338 (2012)). Non-U.S. banks with correspondent accounts in New York can send and receive dollar-denominated funds transfers through their correspondent accounts, which are held at U.S. banks with access to the CHIPS or Fedwire system and thus have the ability to clear and settle funds transfers in New York.

least two United States banks (Chase Manhattan Bank and the Bank of New York).  *See* Compl. ¶¶ 534, 536.  PIB's correspondent banking relationship with AJIB thereby enabled PIB to offer customers the option of maintaining dollar-denominated accounts through which they could pay and deposit dollar-denominated checks.  *See id.* ¶ 535.

Thus, the Oil-for-Food funds allegedly went from the Al-Rafidain Bank branch in Amman to PIB's correspondent account at AJIB, also in Amman.  *Id.* ¶¶ 532-33.  (AJIB and PIB each maintained accounts with the other.)  As alleged, the U.S. dollar transfer from Al-Rafidain to PIB's correspondent account at AJIB would have needed to be cleared in New York.  George Decl. ¶ 22.  Indeed, Plaintiffs allege that these funds did clear through one of AJIB's New York correspondent accounts.[6]  Compl. ¶¶ 532-36; George Decl. ¶¶ 30-31. (Plaintiffs' expert avers that, in general, when sending a U.S. dollar-denominated transfer from one non-U.S. bank account to another, the first bank — here, Al-Rafidain — would instruct its U.S. correspondent bank to transfer money to the U.S. bank where

---

[6] Plaintiffs identify a few alternative systems outside of the United States that offer limited U.S. dollar processing for participating banks, but rule them out because AJIB "did not advertise use of those systems and presumably chose not to access them."  George Decl. ¶ 21.

the beneficiary — here, AJIB — had a correspondent account.[7]  *See*
George Decl. ¶¶ 17-18.)

     After the funds landed at AJIB, AJIB would (based on
the undisputed description in the parties' declarations) notify
PIB of a deposit into its correspondent account for the benefit
of PIB's account holder.  PIB would then debit AJIB's
correspondent account at PIB in the same amount and credit the
account holder — here, Rakad Salem — by way of book entries.[8]

_____

     [7] Plaintiffs do not explain how Al-Rafidain could have instructed a U.S.
correspondent bank to send a dollar-denominated funds transfer to AJIB's
correspondent bank, given the "severe restrictions imposed on Iraq's economy
by U.N. and U.S. sanctions."  *See* Compl. ¶ 531.

     [8] The parties' declarations provide extensive additional detail about
the funds transfer process:

     Defendant explains that U.S. dollar transfers were settled between PIB
and AJIB by way of book entries, rather than by wiring funds.  *See*
Declaration of Mohammad Sami Aghbar in Support of Defendant's Motion to
Dismiss ¶ 26, ECF No. 41-2 ("Aghbar Decl.").  This meant that when a bank
outside of Palestine, on behalf of a customer, wanted to send a dollar-
denominated transfer to a PIB account holder, the originator bank would send
the transfer to AJIB for the benefit of the PIB account holder.  *See id.*
¶ 25.  AJIB would credit PIB's correspondent account in the amount of the
transfer, notify PIB, and request that PIB credit its account holder.  *Id.*
PIB would then debit AJIB's correspondent account in the amount of the
transfer and credit the funds to its account holder.  *Id.*  The banks followed
a similar process in reverse to process a transfer from a PIB account holder
to an individual or entity outside of Palestine.  *See id.* ¶ 24.  Because PIB
had no direct access to the U.S. banking system, AJIB handled the clearing
and settling of U.S. dollar-denominated transactions to or from PIB account
holders.  *See id.* ¶¶ 27-28.

     Plaintiffs characterize PIB's use of AJIB for handling U.S. dollar-
denominated transactions as "nesting", which "occur[s] when a foreign
financial institution gains access to the U.S. financial system by operating
through a U.S. correspondent account belonging to another foreign financial
institution."  George Decl. ¶ 29.  Accordingly, when PIB requested that AJIB
process an outbound dollar-denominated transfer on behalf of a PIB account
holder, PIB was instructing AJIB to process the transaction through AJIB's
New York correspondent accounts, *id.* ¶ 30; and when a bank outside of the
Palestinian Territories wanted to send a transfer to a PIB account holder, it

Salem later drew funds from his PIB account to make martyr payments to the families of suicide bombers.  *See, e.g.*, Compl. ¶¶ 515, 623.

Plaintiffs do not allege that PIB itself had direct contact with the New York banking system at any point along this chain; instead, they allege only that PIB had contact with AJIB in Amman, by way of book-to-book transfers between the two banks.  Plaintiffs do, however, argue that PIB knew and intended that AJIB would necessarily transact in the New York banking system as a consequence of PIB's decision to offer dollar-denominated bank accounts to its customers, *see* Compl. ¶ 555; George Decl. ¶ 37; and they claim that in doing so, AJIB acted as PIB's agent.

In sum, Plaintiffs allege that PIB knew Salem was distributing these funds from his account to reward and incentivize terrorism.  Compl. ¶¶ 540, 623.  In leveling this allegation, Plaintiffs identify a conspiracy comprised of Saddam Hussein's regime in Iraq; its Palestinian proxy, the ALF; the ALF's Palestinian leader, Salem; PIB; and others.  The object of this conspiracy, they allege, was to incentivize and reward

---

was in fact sending the transfer to AJIB's correspondent account in New York for the benefit of PIB, *id.* ¶ 31.  Plaintiffs attach AJIB's profile in the January 2003 Bankers' Almanac, which advertised that AJIB processed U.S. dollars through New York correspondent accounts and, separately, listed PIB as a "related company."  *See id.* ¶¶ 34, 36, Ex. 3.

suicide attacks in Israel between September 2001 and March 2003.
*See id.* ¶¶ 2, 526-41.  Importantly (for the jurisdictional
analysis to follow), the Complaint does not allege that AJIB was
a member of this conspiracy.

B.    PMA Allegations

Plaintiffs also allege a second mechanism through
which, they say, PIB availed itself of the New York forum in a
manner giving rise to jurisdiction.  This is PIB's relationship
with the Palestinian Monetary Authority (PMA), which functioned
as the central bank for the Palestinian Territories.  Plaintiffs
point to what they describe as sustained, purposeful contacts
with New York that are inherent in that course of dealing.

The Complaint avers that U.S.-dollar checks drawn on
PIB accounts and deposited at other Palestinian banks —
including, "in most cases," checks Salem paid to the "martyrs'"
families, Compl. ¶ 21 — were cleared and settled in the United
States via the PMA.  *Id.* ¶ 551.  In order to reduce transaction
costs, the PMA first "set[] off countervailing debts among
Palestinian banks" to determine their net credit or debt.  *Id.*
¶ 552.  The PMA held a correspondent bank account with at least
one U.S. bank during the relevant period (the New York branch of
Arab Bank, Plc[9]), which it used to coordinate the settlement of

_____

[9] Plaintiffs allege that PMA used Arab Bank, Plc until March 29, 2003,
and then moved this function to Bank of New York.  Compl. ¶ 554 n.16.

11

balances due to or owed by Palestinian banks, including PIB.
*Id.* ¶ 553.  Plaintiffs allege that PIB knew that its customers'
U.S. dollar-denominated checks, in most cases, were processed
through the PMA's clearinghouse in the Palestinian Territories
and ultimately settled in New York.  *Id.* ¶¶ 552-55.

In support of the allegation that PIB knew about the
involvement of New York banks in clearing and settling its
transactions, Plaintiffs point to a letter from PIB to the Bank
of New York (BoNY) dated July 20, 2005 — over two years *after*
the relevant period.  The letter concerns a payment order from
the PMA to BoNY regarding a credit due to PIB.  *See* Compl.
¶ 561; Ex. B.[10]  After BoNY blocked the transfer, PIB reached out
to BoNY directly to request the release of the funds (about
$650,000).  As discussed in greater detail below, Plaintiffs
argue that the communication demonstrates PIB's knowledge of —
and direct interaction with — a correspondent bank in New York
as part of U.S. dollar-denominated check clearing and settlement
on behalf of PIB customers, albeit after the period giving rise
to Plaintiffs' claims.  *Id.* ¶ 561.

---

[10] To coordinate the payment of the credit due to PIB, the PMA issued a
payment order to its correspondent account at BoNY designated for the benefit
of AJIB's correspondent account at JPMorgan Chase in New York (formerly Chase
Manhattan Bank), for further credit to PIB's correspondent account at AJIB in
Jordan.  *Id.* ¶¶ 558-59.

C.      <u>HLF Allegations</u>

In Plaintiffs' third example of PIB's alleged ties to New York, they allege that PIB maintained a bank account for the Holy Land Foundation (HLF), a U.S.-based fundraising organization for Hamas, during the relevant period.[11]  Compl. ¶ 9.  The HLF is not alleged to have played any role in the martyr-payment program perpetrated by Saddam Hussein and the ALF, but Plaintiffs point out that the HLF had its own history of support for terrorist activity.  They cite to the HLF's May 1997 designation by the Government of Israel as an organization that "deals in the practice of transferring monies to families of Hamas activists, who carried out deadly attacks," *id.* ¶ 570, and its December 2001 designation by the United States as an organization that "masquerades as a charity, while its primary purpose is to fund Hamas."  *Id.* ¶¶ 578-80.  The U.S. designation in 2001 was accompanied by an order blocking all HLF assets in the United States.  *Id.* ¶ 578.  Plaintiffs attribute five of the

---

[11] On December 5, 2001, the HLF was designated a Specially Designated Global Terrorist by the United States government because of its support for Hamas.  *Id.* ¶¶ 578-79; *see also infra* note 16 (describing terrorism designations used by the U.S. Departments of State and Treasury).

thirteen terrorist attacks identified in the Complaint to Hamas terrorists, dating from December 2001 to October 2002.[12]

Plaintiffs allege that HLF transferred money from the United States to its PIB account in the Palestinian Territories using AJIB's correspondent bank account at Chase Manhattan Bank (again, because PIB did not have its own U.S. correspondent account). *Id.* ¶¶ 572-74. Plaintiffs identify a funds transfer in August 2001 — before the HLF's assets were blocked by the United States government — in the amount of $5,646. This transfer originated from an HLF account at BankOne in Richardson, Texas and was routed through AJIB's correspondent account at Chase Manhattan Bank, for the ultimate benefit of the HLF's PIB account in Ramallah. Although Plaintiffs supply only this one example of an HLF funds transfer (pre-dating the relevant period), they allege that the HLF "repeatedly transferred money from the United States to its offices in the Palestinian Territories," *id.* ¶ 572, and that all funds transfers reached the HLF's PIB account "in the exact same manner each time." *Id.* ¶ 576.

---

[12] These are the Ben Yehuda Street Bombings on Dec. 1, 2001, *id.* ¶ 22; the Sheffield Club Bombing on May 7, 2002, *id.* ¶ 94; the Passover Massacre at the Park Hotel in Netenaya on Mar. 27, 2002, *id.* ¶ 111; the Patt Junction Bus #32A Bombing on June 18, 2002, *id.* ¶ 117; and the Ariel Bombing on Oct. 27, 2002, *id.* ¶ 333.

Plaintiffs surmise that the HLF must have received payment instructions *from PIB* in advance to effectuate these transfers.  There is no other way HLF would have known to approach AJIB as intermediary, Plaintiffs contend, because PIB was not advertising its correspondent relationship with AJIB in any of the usual venues — places like the SWIFT system[13] or the Bankers' Almanac[14] — at the time of the transfer.[15]  *See id.* ¶ 576 (Because PIB "was neither on the SWIFT system nor advertising its correspondent accounts in the Bankers' Almanac at that time, . . . HLF's offices in Texas likely provided its local bank with specific instructions identifying each bank in the chain to its account at Defendant Palestine Investment Bank"); *id.* ¶ 577 ("HLF's Ramallah office must have provided HLF in Texas with payment instructions they received from Defendant Palestine Investment Bank.").  Plaintiffs allege that by providing its account holder with instructions to send a funds

---

[13] SWIFT is a global private network that enables financial institutions to send and receive information about financial transactions in a standardized message format.  *See* Compl. ¶ 542 n.14.  Banks that are on the SWIFT network can communicate with each other about how to send or receive a transaction.

[14] The Bankers' Almanac is a reference book used by banks to obtain information about other banks, including to identify their correspondent accounts.  *Id.* ¶ 537.

[15] Plaintiffs do not make a similar allegation about the ALF-AJIB transfers described in Section I.A, above.  The Complaint does not explain how Al-Rafidain knew to send the funds transfers to PIB's correspondent account at AJIB in order to reach Salem's account at PIB, but it does not allege that PIB must have provided instructions to do so.

transfer to AJIB's correspondent account at Chase Manhattan Bank, PIB "affirmatively directed HLF transfers through New York." *Id.* ¶ 575.  Notwithstanding PIB's alleged role in the HLF transactions, Plaintiffs make no specific allegations about the August 2001 funds transfer being connected to any of the terrorist attacks at issue, nor do they identify any other funds transfers from HLF's account to support terrorist activity. Given the HLF's connection to Hamas, Plaintiffs allege that by providing financial services to HLF, PIB was aiding and abetting the Hamas terrorist organization.  *Id.* ¶¶ 4, 538.

D.    Alleged Material Support for Terrorism

As a result of dollar-denominated funds transfers to the ALF (via Salem) and the HLF, Plaintiffs allege the following terrorist groups received support from PIB during the relevant period:  Hamas, the Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine, each of which was designated a Specially Designated Terrorist (SDT) in 1995, a Foreign Terrorist Organization (FTO) in 1997, and a Specially Designated Global Terrorist (SDGT) in 2001; and the Al Aqsa Martyrs Brigade, which was designated an SDT, FTO, and SDGT in 2002.[16]  *Id.* ¶¶ 584-616.  These terrorist organizations, in turn,

_____

[16] Organizations and individuals can be designated as an SDT by the U.S. Department of the Treasury under Executive Order 12947, which was enacted in 1995; and an SDGT by either the U.S. Department of State or the U.S.

are alleged to have perpetrated one or more of the attacks that
killed and injured Plaintiffs or their family members.  *Id.*
¶¶ 22-462.  Plaintiffs allege that PIB played a "significant and
integral role" in facilitating these terrorist attacks "by
making large U.S. dollar-denominated rewards available to the
families of these operatives."  *Id.* ¶ 15.

## II. Legal Standards

To overcome PIB's motion to dismiss, Plaintiffs bear
the burden of establishing a *prima facie* case that *in personam*
jurisdiction is proper under both the Federal Rules of Civil
Procedure and the U.S. Constitution.  *Licci ex rel. Licci v.
Lebanese Canadian Bank, SAL ("Licci IV")*, 732 F.3d 161, 167-68
(2d Cir. 2013).  Fed. R. Civ. P. 4(k) allows a federal district
court to exercise personal jurisdiction to the extent allowed by
the law of the state in which it sits.  The New York "long-arm"

---

Department of the Treasury under Executive Order 13224, which was enacted in
2001.  The SDT and SDGT designations are used to freeze the assets of
individuals and entities known to provide material support to terrorist
activity as a way to block terrorist financing.  *See* Audrey Kurth Cronin, *The
"FTO List" and Congress: Sanctioning Foreign Terrorist Organizations*, CRS
Report for Congress (Oct. 21, 2003) at CRS-4 (discussing the SDT and SDGT
designations).  Organizations can also be designated as an FTO by the U.S.
Department of State, pursuant to Section 219 of the Immigration and
Nationality Act, as amended by the Antiterrorism and Effective Death Penalty
Act.  The FTO designation applies to foreign organizations that are known to
engage in terrorist activity and threaten the security of U.S. citizens or
the national security of the United States.  *Id.* at CRS-2.  This designation
triggers an asset freeze, imposes immigration restrictions on members of the
organization by virtue of their membership, and triggers a criminal
prohibition on knowingly providing material support or resources to the
designated organization.  *See Foreign Terrorist Organizations*, Bureau of
Counterterrorism, U.S. Dep't of State, state.gov/foreign-terrorist-
organizations/.

statute provides, in turn, that courts have jurisdiction over non-domiciliaries that "transact[] any business within the state," "in person or through an agent," in a "cause of action arising from" such transaction.  N.Y. C.P.L.R. § 302(a)(1).  The New York statute is less expansive in its reach than the Constitution would permit, which has led the Second Circuit to observe that "it would be a rare case in which the exercise of jurisdiction that is permissible under the statute would nonetheless be found unconstitutional."  *Licci IV*, 732 F.3d at 168.

      To satisfy the New York long-arm statute, a plaintiff must plead some act by which the defendant "purposely avail[ed] itself of the privilege of conducting activities in New York[,] thereby invoking the benefits and protections of its laws." *Amigo Foods Corp. v. Marine Midland Bank-New York*, 348 N.E.2d 581, 584 (1976); *accord Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*, 673 F.3d 50, 61 (2d Cir. 2012). Personal jurisdiction under CPLR Section 302(a) may be proper "even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Fischberg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (quoting *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.,* 7 N.Y.3d 65, 71 (2006)).  Jurisdiction under Section 302(a) may

also be based on the acts of an agent where "the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)).  Although the New York long-arm statute and the Due Process Clause of the U.S. Constitution are not technically coextensive, the Second Circuit has observed that the New York requirements for agency (benefit, knowledge, some control) are "consonant with the due process principle that a defendant must have 'purposefully availed itself of the privilege of doing business in the forum.'"  *Id.* (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)).  Whether a defendant has purposefully availed itself of the New York forum is a fact-intensive inquiry that requires the trial court to "closely examine the defendant's contacts for their quality." *Licci IV*, 732 F.3d at 168.

To conclude that jurisdiction lies, a court must also satisfy itself that the given cause(s) of action "arise from" the transaction(s) that touched New York — that is, that there is "an articulable nexus, or substantial relationship, between the claim asserted and the [defendant's] actions that occurred in New York." *Licci II*, 673 F.3d at 66.  Establishing this

19

nexus or substantial relationship is not a heavy burden; a
plaintiff need only plead facts showing the defendant's (or its
agent's) transaction of business "is not completely unmoored
from the [legal claim], regardless of the ultimate merits of the
claim." *Licci v. Lebanese Canadian Bank ("Licci III")*, 20
N.Y.3d 327, 339 (2012) (explaining that the nexus inquiry under
New York's long-arm statute is relatively permissive).  Where
"at least one element [of the plaintiff's claims] arises from
the New York contacts, the relationship between the business
transaction and the claim asserted supports specific
jurisdiction under the statute."  *Id.* at 341.

        The plaintiff's *prima facie* showing "must include an
averment of facts that, if credited by the ultimate trier of
fact, would suffice to establish jurisdiction over the
defendant."  *In re Terrorist Attacks on September 11, 2001*, 714
F.3d 659, 673 (2d Cir. 2013) (citing *Chloe v. Queen Bee of
Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).  In
addition to the pleadings, courts may rely on outside materials
in considering a motion to dismiss for lack of personal
jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d
81, 84 (2d Cir. 2001).  "The allegations in the complaint must
be taken as true to the extent they are uncontroverted by the
defendant's affidavits." *In re Platinum & Palladium Antitrust*

*Litig.*, 449 F. Supp. 3d 290, 318 (S.D.N.Y. 2020) (quoting

*MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)).

**III. Discussion**

A.      Transaction of Business "Through an Agent"

         As noted above, Plaintiffs do not allege that PIB

transacted business in New York itself in the course of the ALF-

Iraq conspiracy or the HLF transactions.  Instead, they allege

that AJIB acted as PIB's New York agent in clearing and settling

wire transfers from Iraq, and that the terrorism-related claims

in this case "arise from" those New York transactions.  Compl.

¶¶ 20, 535.  They also allege that the PMA acted as an agent for

Palestinian banks, including PIB, by settling their U.S. dollar-

denominated transactions in New York.  *Id.* ¶¶ 20, 550-52.

Plaintiffs contend that PIB's engagement with AJIB and the PMA

enabled it to offer checking accounts denominated in U.S.

dollars, *id.* ¶¶ 546-48, and therefore constitutes purposeful

availment of the New York forum.

         The parties do not appear to dispute that if PIB

maintained and used its own correspondent bank account in New

York for the relevant transactions, jurisdiction would lie.

Decisions of the Second Circuit and New York Court of Appeals

support this proposition.  "[T]he use of a New York

correspondent bank account, standing alone, may be considered a

'transaction of business' under the long-arm statute if the

21

defendant's use of the correspondent account was purposeful." *Licci IV,* 732 F.3d at 168; *see also Licci III*, 20 N.Y.3d at 340 (repeated use of a correspondent bank in New York on behalf of a client represented a "course of dealing" that showed "purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States"). A defendant bank's repeated use of its own correspondent account in New York to facilitate dollar-denominated transactions that allegedly funded terrorist attacks has been the basis for personal jurisdiction in other ATA cases. *See, e.g.*, *Licci III*, 20 N.Y. 3d at 340 (finding personal jurisdiction where Lebanese Canadian Bank used its correspondent account in New York to transfer U.S. dollars to the Shahid Foundation, which allegedly provided the transferred funds to Hezbollah to carry out terrorist attacks that injured plaintiffs).

But PIB maintained no such account in New York, and so Plaintiffs are relegated to arguing that (1) AJIB acted as PIB's agent in transacting through AJIB's own correspondent accounts at Chase Manhattan Bank and the Bank of New York, Compl. ¶ 536; and (2) the PMA acted as PIB's agent in settling U.S. dollar-denominated checks in New York using a combination of correspondent banks, CHIPS, and the Federal Reserve Bank of New

York, Compl. ¶ 21.  These contentions, however, are foreclosed by Second Circuit precedent: the Court of Appeals has held that "[a] correspondent bank relationship, standing alone, does not create an agency relationship." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 122 (2d Cir. 1984).  It is on this point that Plaintiffs' jurisdictional claims founder.

The Second Circuit has directed that courts focus on the "realities of the relationship in question rather than the formalities of agency law" when determining whether an agency relationship exists for the purpose of establishing personal jurisdiction under Section 302.  *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986).  But even this practical analysis turns on the elements of the classic agency relationship: that the in-forum intermediary acted (1) for the benefit of, (2) with the knowledge and consent of, and (3) under some degree of control of the non-resident principal.  *See id.*

Courts have found these elements satisfied in circumstances where, for example, the nonresident defendant shared decision-making authority or joined in a business enterprise with the in-forum intermediary.  *See Chloe*, 616 F.3d at 169  (imputing company's New York contacts to nonresident defendant where that defendant profited from company's in-forum handbag sales, had joint access to company bank account, and

"shared in the decision-making and execution of the purchase and sale of handbags"); *CutCo*, 806 F.2d at 366 (finding that intermediary's visit to New York for business meetings was a "significant jurisdictional contact" attributable to nonresident defendant where the in-forum meetings related to a proposed joint business venture under consideration by defendant and intermediary).  Courts have also found these elements satisfied where the nonresident defendant played an active role in directing the intermediary's activities relating to the specific in-forum transactions at issue.  *See Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988) (imputing corporation's purposeful sales activities in New York to nonresident corporate officers "who both benefitted from those activities and exercised extensive control over . . . the transaction underlying this suit"); *Shpak v. Curtis*, No. 10-CV-1818, 2011 WL 4460605, at *9 (E.D.N.Y. Sept. 26, 2011) (finding that plaintiffs adequately alleged an agency relationship where nonresident defendants were alleged to have directed in-forum intermediaries to take specific actions and make specific misrepresentations in New York in furtherance of alleged fraud scheme).

That critical element of control is not present in the garden-variety correspondent banking relationship alleged here. Plaintiffs argue that AJIB acted as PIB's agent by maintaining a

correspondent account for PIB in Amman, Jordan, and that, through this correspondent banking relationship, AJIB provided services that enabled PIB customers to send and receive U.S. dollar-denominated funds transfers. Plaintiffs do not allege, however, that PIB chose the providers of AJIB's two correspondent accounts in New York or exercised any say over which of the two accounts were used for specific transactions. *See, e.g.*, George Decl. ¶¶ 33, 37. In connection with the ALF and PMA allegations, at least, Plaintiffs do not allege that PIB chose to receive money in New York through a correspondent banking partner there, unlike the facts that led to a finding of purposeful availment in *Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56 (S.D.N.Y. 2016). And while Plaintiffs come closer to making such an allegation in connection with the HLF transactions (as discussed further below), they still do not allege that PIB exercised sufficient control over the transactions at issue to render AJIB its agent in New York.

Instead, Plaintiffs contend simply that PIB elected to work with AJIB because of its ability to clear and settle dollar-denominated transactions, *id.* ¶ 37, and that PIB thereby "bought in" to AJIB's decisions to use correspondent banks in New York to accomplish this. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss at 11-12, ECF No.

25

42 (Pl. Br.).  The Court accepts that much as true; but all that means is that AJIB would receive moneys destined for PIB and transmit monies destined from PIB to elsewhere.  These functions strike the Court as analogous to the functions performed by banks in a chain of electronic-funds transfers (*i.e.*, wire transfers, or EFTs) — functions that the Second Circuit has held do not give rise to an agency relationship.  *See Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 121 (2d Cir. 2010) (an intermediary bank that processes EFTs is not the "legal agent" of either the originator or the intended beneficiary of the funds transfer under Article 4 of the New York Uniform Commercial Code).  AJIB used its New York presence to clear and settle the dollar transfers, but Plaintiffs make no non-conclusory allegation that in doing so AJIB acted under the control, or at the direction, of PIB.  PIB may have expected, or even known for a fact, that AJIB would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling.[17]

---

[17] The New York Court of Appeals has observed that the long-arm statute "do[es] not require that the foreign bank itself *direct* the deposits, only that the bank affirmatively act on them."  *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 328 (2016) (emphasis added).  Accordingly, when the Lebanese Canadian Bank in *Licci* executed transactions on behalf of their account holders, it was enough that they repeatedly accepted transactions *in New York themselves* through their New York correspondent accounts — they were not required to have "directed" those transactions through New York.  *See Licci IV*, 732 F.3d at 171.  Their acceptance was jurisdictionally relevant because they could have rejected the transactions, as the nonresident defendant had

As a result, Plaintiffs' key contentions are styled as factual allegations but mostly amount to legal conclusions — for example, that PIB "purposefully and knowingly directed its agents to use correspondent bank accounts in New York," Compl. ¶ 20; that PIB "used AJIB as its agent to process U.S. dollar-denominated transfers (through New York) for its customers," *id.* ¶ 535; and that PIB "and its agent AJIB" supported the PMA's clearing and settlement of all Jordanian dinar-denominated checks circulating in the Palestinian Territories, *id.* ¶ 547. None of these general allegations of "agency" demonstrate PIB's direction or control over AJIB.  *See Pincione v. D'Alfonso*, 506 F. App'x 22, 24 (2d Cir. 2012) (holding that "allegations concerning [non-party's] agency were entirely conclusory and thus inadequate" to establish personal jurisdiction).  These conclusory allegations do not suffice.

This result may seem, at first blush, inconsistent with the principle expressed in cases like *Nat'l Union Fire Ins Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352 (S.D.N.Y. 2004), that a party cannot avoid jurisdiction by doing indirectly — through an intermediary — that which would plainly

---

done in *Amigo Foods*.  *See Amigo Foods Corp. v. Marine Midland Bank-New York,* 402 N.Y.S.2d 406, 407-08 (1978), *aff'd*, 46 N.Y.2d 855 (1979) (no jurisdiction where foreign bank was merely a passive recipient of funds because it rejected the one and only transfer that tied it to New York).  Here, however, PIB did not have its own New York correspondent account at all.  Its acceptance of a funds transfer from its correspondent account *in Jordan* does not have the jurisdictional significance that it might if the funds transfer came directly from a correspondent account that it maintained in New York.

give rise to jurisdiction if the party did so directly.  In
*National Union*, the Court wrote that:

> If *X* transacts business in New York, then *X* will be
> subject to personal jurisdiction on a cause of
> action arising out of that transaction.  If *X*
> instead hires *Y* to transact the same business in
> New York, and *Y*'s contacts with New York relative
> to that transaction would suffice to confer on a
> New York court personal jurisdiction over *Y,* then
> *X* will also be subject to personal jurisdiction on
> a cause of action arising out of that transaction.

*Id.* at 363 (internal citation omitted).

But the intermediary in *National Union* was a classic
agent — an insurance broker engaged to obtain insurance policies
and negotiate coverage terms on behalf of its principal and
various subsidiaries.  That important distinction between
*National Union* and this case is memorialized in the above-quoted
passage itself, in the phrase "*X hires.*"  The use of "hires"
implies the existence of a principal-agent relationship, perhaps
in the nature of employer-employee.  As alleged, no such
relationship existed between PIB and AJIB or between PIB and the
PMA.

At oral argument, Plaintiffs' counsel suggested that a
"limited agency relationship" may arise when a bank needs to
retain the services of a third party to facilitate a currency
conversion as part of a funds transfer.  *See* Transcript of
Proceedings held of June 17, 2020 at 33:15-34:11, ECF No. 48
(Tr.") ("[W]hen a bank like PIB decides to have U.S. dollar, or

any other currency account, other than the local currency, and
it then proceeds to hire and retain the services of another bank
to provide that service for them, they are their agent for the
purposes of that service."). The Court invited Plaintiffs to
supplement their briefing with case law demonstrating that this
set of facts gives rise to an agency relationship. *Id.* at
35:17-24. In response, Plaintiffs cited *Arcapita*, 549 B.R. 56.
As discussed further below, the district court in *Arcapita* found
the exercise of personal jurisdiction over defendant Tadhamon
proper because it had specifically designated a New York bank
account to receive and transfer funds for the investment
transaction that was the subject of the complaint. *Id.* at 70.
Even if that set of facts did establish a limited agency
relationship between Tadhamon and the third party in New York,
the case does not support Plaintiffs' proposition that a third
party may be deemed an agent any time a bank uses it to
facilitate funds transfers in another currency. The facts of
*Arcapita* are distinguishable because, as described in Section
III.B., below, they involved much more than a standard
correspondent banking relationship between Tadhamon and a third
party. Indeed, *Arcapita* focused on a contact with New York that
the defendant set up and directed itself. *Id.* at 68-69
(explaining that the defendant set the terms of the investment
transactions, selected the correspondent account in New York it

would use, and actively directed the funds at issue into that
account, among other things).

Plaintiffs also claimed at oral argument that the
Court could find an agency relationship between PIB and AJIB
based on the allegations of conspiracy in the Complaint.  *See*
Tr. at 22:18-22.  A co-conspirator relationship is one sub-
species of the principal-agency relation, such that acts of
conspirators bind their co-conspirators.  *See, e.g.*, *Emerald
Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 431
(E.D.N.Y. 2012) (the New York activities of a co-conspirator may
be imputed to an out-of-state defendant for purposes of personal
jurisdiction "under an agency rationale") (quoting *Shpak*, 2011
WL 4460605, at *8); *see also Charles Schwab Corp. v. Bank of Am.
Corp.*, 883 F.3d 68, 87 (2d Cir. 2018).

The Complaint alleges that PIB conspired with others
to facilitate the martyr payments, but — importantly — does not
allege that AJIB was a member of that conspiracy.  Instead,
Plaintiffs allege a conspiracy among PIB, Iraq, Salem, the ALF,
and "others" to "incentivize and reward suicide attacks on
civilians . . . in Israel."  Compl. ¶¶ 2, 617-28.  At oral
argument, Plaintiffs' counsel contended that the Court could
make a "reasonable inference" from the Complaint that AJIB was a
co-conspirator, despite the absence of any written allegation to

that effect.  Tr. at 22:18-22.  But the Court sees no basis for such an inference in the Complaint.[18]

        Plaintiffs also attempt to invoke PIB's connection with the PMA, which had its own contacts in New York during the relevant period (including a correspondent account), to show that PIB used a New York "agent".  But this attempt founders because the PMA is again alleged to have engaged only in routine check clearing and settlement transactions on behalf of Palestinian banks.  *See, e.g.*, *id.* ¶ 21 n.5 (the PMA was involved in the "settlement of credit and debt balances resulting from its check clearing operations between Palestinian banks").  Because the PMA could not "offer a meaningful U.S.-dollar settlement capability in the Palestinian Territories" during the relevant time period, it had to transfer funds through New York to complete such transactions.  *See* George Decl. ¶¶ 43-46.  In doing so, Plaintiffs allege, the PMA "act[ed] as the Palestinian banks' agent."  *Id.* ¶ 551; *see also*

_____

[18] Plaintiffs' failure to name AJIB as a co-conspirator distinguishes the instant case from *Freeman v. HSBC Holdings*, which Plaintiffs cite in their opposition.  Pl. Br. at 15-16.  The *Freeman* plaintiffs alleged that Bank Saderat — which was headquartered in Iran and had no U.S. correspondent accounts of its own — "engaged in affirmative acts aimed at New York, directing *its co-conspirators* to illegally clear and settle dollar-denominated transactions through correspondent accounts in New York" on its behalf.  *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 80 (E.D.N.Y. 2019) (emphasis added).  The *Freeman* complaint was "replete with allegations" that Bank Saderat entered into a conspiracy with other non-U.S. banks "intending that they operate as Bank Saderat's agents in transferring U.S. dollars through correspondent accounts in New York, and that Bank Saderat took steps to ensure that such transfers were accomplished."  *Id.*

George Decl. ¶ 49.  But these allegations of an agency relationship between PIB and the PMA fall short for the same reasons that the allegations of PIB's relationship with AJIB do — PIB is not alleged to have exercised direction or control over the PMA's contacts with New York.

Plaintiffs make a final attempt to connect PIB to the New York forum in relation to the PMA's check clearing and settlement services by identifying one communication from PIB to BoNY (where the PMA held a correspondent account) in 2005 regarding a blocked funds transfer.  As alleged, the PMA had sent a payment order to BoNY in the amount of $649,990, representing the net credit due to PIB based on U.S.-dollar checks drawn on other banks in the Palestinian Territories and deposited by PIB customers.  *Id.* ¶ 557.  After BoNY blocked the payment order, PIB wrote to BoNY directly, claiming the payment order "concern[ed] funds belonging exclusively and entirely to our bank and the transfer was being effected to facilitate normal banking transactions of our own clients."  *Id.* Ex. B.  Plaintiffs contend that PIB's direct communication with a bank in New York demonstrates a transaction of business in New York.  This effort comes up short, however, because the communication occurred more than two years after the relevant time period and Plaintiffs cannot establish a nexus between it and the claims at issue.  Plaintiffs make no allegation that the blocked funds

transfer related in any way to the terrorist organizations or
attacks at issue — nor do they allege that the transfer was even
completed.  Although establishing an articulable nexus is not a
heavy burden and does not require causation, *see Licci III*, 20
N.Y.3d at 339, it nevertheless limits the "transaction-of-
business" prong of CPLR Section 302 to confer jurisdiction "only
over those claims in some way arguably connected to the
transaction."  *Id.* at 340.  Plaintiffs have not adequately pled
the nexus required for personal jurisdiction in connection with
this contact.

B.     Alleged "Direction" of Transfers through New York

        There is only one instance alleged in the Complaint
where PIB might be said to have directed a transfer of funds
through New York.  This is the HLF transaction in August 2001.
With respect to this transaction, the Complaint alleges at least
a bit more than a mere correspondent banking relationship.
Specifically, the Complaint alleges that moneys originating with
the HLF in Texas made their way to PIB in the Palestinian
Territories, and that this sequence of transfers likely began
with PIB *directing* the HLF to have its local bank send the funds
to one of AJIB's correspondent accounts in New York.  *See* Compl.
¶ 576.  Plaintiffs ask how, in endeavoring to send money to PIB,
HLF's local bank in Texas could have known to seek out Chase
Manhattan Bank (the correspondent bank for AJIB in New York)

without PIB's explicit instructions.  They eliminate other
possibilities, alleging that PIB was not on the SWIFT network or
advertising its correspondent banking relationships in the
Bankers' Almanac at the relevant time.  Accordingly, goes
Plaintiffs' logic, PIB must have directed the HLF to send the
funds this way.[19]

Plaintiffs' allegations about this HLF transfer are
the closest Plaintiffs come to pleading agency.  Plaintiffs' HLF
logic makes sense on its face, and PIB does not offer evidence
to refute it.  *See* Aghbar Decl.; Defendant's Memorandum of Law
in Support of Motion to Dismiss at 22, ECF No. 41.  The Court is
thus left to assess whether personal jurisdiction lies in light
of the allegation that PIB instructed, either directly or
indirectly, its account holder — a putative terrorist
organization — to transfer funds to its PIB account by sending
money through the New York forum to a bank *of PIB's choosing*,
namely AJIB.

These factual allegations are similar — but by no
means identical — to those that Judge Daniels found sufficient
to confer jurisdiction over an out-of-forum bank in

---

[19] This may (or may not) also have been the case with the Saddam-to-Salem
transfers - *i.e.*, that PIB "must have" directed Al-Rafidain to AJIB at the
front end of that chain.  But Plaintiffs do not make such an allegation in
that context, and the Court declines to assume, on its own initiative, that
such a directive must have been issued.

*Arcapita*.  One defendant there, Tadhamon Bank, was based in Bahrain and had no U.S. correspondent accounts of its own, but it designated a third party's correspondent bank account in New York to receive and transfer investment funds for Arcapita.  The Bankruptcy Court had concluded that Tadhamon's use of a third-party's account was insufficient to establish jurisdiction because "Tadhamon made a conscious decision to forgo maintenance of a correspondent account in the United States."  *In re Arcapita Bank B.S.C.(c)*, 529 B.R. 57, 66 (Bankr. S.D.N.Y. 2015).  But the district court reversed, finding that this purposeful use of a correspondent account in New York to facilitate the investment transactions at issue was enough for personal jurisdiction, even though the bank did not maintain its own correspondent account in New York and had no other relevant New York contacts.  549 B.R. at 70 & n.19 (finding that Tadhamon "actively selected" the correspondent bank account in New York and directed the funds to these accounts).  The district court also observed, without explanation, that Khaleeji Commercial Bank, the third-party bank that maintained the correspondent account in New York, "acted as Tadhamon's agent when it received the funds, and thus, [its] receipt of funds in New York can be imputed to Tadhamon."  *Id.* at 70 n.18.

Although *Arcapita* shares certain factual similarities with the instant case, it also bears meaningful distinctions.

The *Arcapita* plaintiffs made a series of additional allegations about Tadhamon's control over the in-forum transactions, in addition to pointing to its direction of funds into New York. Arcapita hired Tadhamon to make two investments on its behalf, pursuant to an agreement under which Tadhamon would set the terms of the potential investment transaction and make an offer to Arcapita. *Id.* at 61. Under the agreement, Tadhamon would determine, among other things, the amount and currency of funds that Arcapita would transfer for the investment, the specific bank account into which funds would be transferred, the commodity or securities that Arcapita would invest in, and the rate of return that Arcapita would earn. *Id.* Tadhamon had the authority and obligation to control nearly all aspects of the investment transactions under these contractual terms, and the district court found it jurisdictionally relevant that Tadhamon selected U.S. dollars as the currency in which to execute the investment transactions and designated a third party's correspondent bank account in New York to receive and transfer the funds from Arcapita. *Id.* at 68-69. This is all classic agency behavior.[20]

---

[20] Even where a foreign bank executed relevant funds transfers through its *own* correspondent account in New York, the level of control the bank exercised over the transactions is considered relevant to the analysis of whether jurisdiction lies. In *Vasquez v. Hong Kong & Shanghai Banking Corp.*, for example, defendant HSBC Hong Kong was alleged to have facilitated

As discussed above, PIB did not exercise control over AJIB's selection and use of its correspondent accounts in New York, or AJIB's decision to use correspondent accounts as opposed to another means of clearing and settling U.S. dollar transactions.  Nor did PIB exercise control over the decisions of its customers seeking to transfer dollar-denominated funds into their accounts.  With respect to the HLF transaction in August 2001, PIB is alleged at most to have provided payment instructions to an account holder making dollar-denominated wire transfers.  Had AJIB decided to close the account or avail itself of another means of clearing U.S. dollar transactions, PIB would have needed to change its wiring instructions.

Courts have held, analogously, that a wire transfer through New York is insufficient to establish jurisdiction under the long-arm statute where other New York contacts are lacking. *See, e.g.*, *Daewoo Int'l (Am.) Corp. v. Orion Eng'g & Serv., Inc.*, No. 02-CV-8809, 2003 WL 22400198, at *2 (S.D.N.Y. Oct. 20, 2003) (where the underlying transaction was a $20 million loan

---

international bank transfers required to perpetrate a Ponzi scheme, and to have chosen — "for its own convenience as well as that of its customer" — to use its correspondent account at HSBC in New York rather than send the plaintiffs' funds through other channels.  No. 18-CV-1876, 2019 WL 2327810, at *12 (S.D.N.Y. May 30, 2019), *reconsideration denied*, No. 18-CV-1876, 2019 WL 3252907 (S.D.N.Y. July 19, 2019).  The *Vasquez* court called for jurisdictional discovery, in part to address the extent to which HSBC Hong Kong actively directed plaintiffs to use its correspondent accounts in New York.  *Id.; see also Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, No. 18-CV-1876, 2020 WL 4586729, at *12 n.9 (S.D.N.Y. Aug. 10, 2020).  In the end, the court dismissed claims against HSBC Hong Kong for lack of personal jurisdiction.

that was negotiated out of forum, there was no jurisdictionally significant transaction regarding the loan in New York even though, "[a]dmittedly, the loan was dispersed through (and interest payments made to) a New York bank"); *Symenow v. State St. Bank & Tr. Co.*, 244 A.D.2d 880, 881 (1997) (no transaction of business under the long-arm statute where defendant provided banking services to plaintiff in Massachusetts, and "defendant's only contact with New York was in wiring money from the allegedly fraudulent or forged checks to designated parties in New York"). Applying this principle to facts analogous to those here, one district court found that the defendant's use of a third-party bank to process U.S. dollar transactions, and its instructions to plaintiff to wire redemption funds through the third party's correspondent account in New York, was not a transaction of business in New York for purposes of the long-arm statute. *See Steinberg v. A Analyst Ltd.*, No. 04-CV-60898, 2009 WL 806780, at *6 (S.D. Fla. Mar. 26, 2009) (discussing No. 04-CV-60898, ECF No. 161 at 11-16 (S.D. Fla. Sept. 25, 2006)).

Plaintiffs' allegations regarding the August 2001 HLF transaction thus are not enough to tip the balance with respect to PIB's amenability to suit in New York. PIB did not exercise the requisite direction or control over the transactions at issue to support a finding that PIB transacted business in the New York forum through an agent.

                    *      *      *      *      *

          In sum, PIB's alleged contacts with New York are

insufficient to support personal jurisdiction, both individually

and in the aggregate.  This case is about a foreign bank with no

New York presence or contacts during the relevant period.  It

had no branches, offices, accounts, employees, or customers in

New York.  It is not alleged to have solicited business,

marketed its services, or had any communications in New York

during the relevant period.  And, the third parties PIB worked

with did not serve as its agents in New York.  Courts must look

at the "totality of circumstances concerning the party's

interactions with, and activities within, the state" when

determining whether the party has "transacted business" in New

York, *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171

F.3d 779, 787 (2d Cir. 1999), and based on the facts and

allegations presented here, the Court finds that PIB did not

purposefully avail itself of the privilege of conducting

activities in New York directly or through an agent during the

relevant period.

     C.      Jurisdictional Discovery

          Finally, the Court notes that Plaintiffs have not

sought jurisdictional discovery in this case.  Although a court

may order discovery when it concludes that a plaintiff may be

able establish jurisdiction if given the opportunity to develop

a full factual record, *see Leon v. Shmukler*, 992 F. Supp. 2d
179, 194 (E.D.N.Y. 2014), the Court sees no basis for doing so
here.  Jurisdictional discovery is appropriate where there are
contested allegations sufficient to articulate a colorable basis
for personal jurisdiction, which could be established with
further development of the factual record.  *Id.* at 195.  The
parties have acknowledged that the jurisdictional analysis here
is a legal question, not a dispute of fact.  The Court does not
find a colorable basis to find a principal-agent relationship
between PIB and AJIB, the PMA, or any other third party, or to
find that conspiracy-based personal jurisdiction in New York is
proper in this case.

## IV.  Conclusion

For the reasons set forth above, the Court finds that
personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1) is lacking
because PIB is not alleged to have transacted business in New
York in person or through an agent as required for the exercise

of long-arm jurisdiction.  Accordingly, Defendant's motion to
dismiss for personal jurisdiction is GRANTED.


        SO ORDERED.

                        /s/ Eric Komitee
                        ERIC KOMITEE
                        United States District Judge


Dated:      October 16, 2020
            Brooklyn, New York