UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
TEMIMA SPETNER,                : 19-cv-00005-EK-JAM
                               :
              Plaintiff,       :
                               :
    - versus -                 : U.S. Courthouse
                               : Brooklyn, New York
PALESTINE INVESTMENT BANK,     :
                               : May 13, 2024
              Defendant        : 12:26 p.m.
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**

<u>**For the Plaintiff**</u>:        **Michael J. Radine, Esq.**
                           **Dina Gielchinski, Esq.**
                           **Ari Ungar, Esq.**
                           Osen LLC
                           2 University Plaza Drive
                           Hackensack, NJ 07601


<u>**For the Defendant**</u>:        **Mitchell Rand Berger, Esq.**
                           **Joseph S. Alonzo, Esq.**
                           **Alex M. Hyman, Esq.**
                           Squire Patton Boggs (US) LLP
                           1211 Avenue of the Americas
                           New York, NY 10036


<u>**Transcription Service**</u>:    **Transcriptions Plus II, Inc.**
                           61 Beatrice Avenue
                           West Islip, New York 11795
                           RL.Transcriptions2@gmail.com




Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE COURT:  Please be seated.

2          THE CLERK:  Civil Cause for Oral Argument,

3     docket number 19-cv-00005, *Spetner, et al. v. Palestine*

4     *Investment Bank*.

5          Will the parties please state their appearances

6     for the record starting with the plaintiff?

7          MR. RADINE:  Good afternoon, your Honor.

8     Michael Radine of Osen LLC for the plaintiffs.  I'm

9     joined today by Dina Gielchinski and Ari Ungar.

10         THE COURT:  Good afternoon.

11         MR. BERGER:  Good afternoon, your Honor.

12    Mitchell Berger from Squire Patton Boggs for Palestine

13    Investment Bank and with me are my colleagues Joseph

14    Alonzo and Alex Hyman.

15         THE COURT:  Good afternoon to you all as well.

16    All right.  I thought I logged in here successfully but

17    apparently not.

18         We're here for oral argument on the 12(b)(6)

19    side of defendant's motion to dismiss, now the second

20    amended complaint.  Both sides should think of themselves

21    as having precisely 30 minutes for their arguments.

22    We're going to wrap at 1:30.  And if the defense wants to

23    reserve ten minutes or so for rebuttal, you should feel

24    free to do that.  But let's begin with the defense,

25    please.

3

Proceedings

1      MR. BERGER:  Great.  Thank you, your Honor.
2  And I will please then reserve ten minutes for rebuttal.
3  And I would say this.   I'm mindful of the southern
4  district's observation in *King v. Habib Bank* that
5  liability for banking services allegedly provided to
6  support a terrorist group is more generally properly
7  analyzed under JASTA aiding and abetting than under ATA
8  primarily liability.  But of course here we've got two
9  primary liability counts before we even get to the JASTA
10  count.  But if the Court doesn't have a preference, I'll
11  just take it in the order in which they appear in the
12  complaint.
13      THE COURT:  That's fine.
14      MR. BERGER:  All right.  Thank you, your Honor.
15      Well, the second amended complaint fails legal
16  standards for all three counts; conspiracy, 2339A
17  material support, and JASTA aiding and abetting.
18      First up, the conspiracy count fails because
19  the second amended complaint does not allege that
20  Palestine Investment Bank acted with the required
21  specific intent that the conspiratorial goal be
22  completed.
23      As I know your Honor appreciates, specific
24  intent is the test for the essential conspiracy element
25  of agreement.  You can find that in the *Kemper* case we

4

Proceedings

1   cite at 911 F.3d 395, but it's in accord with the Second

2   Circuit's decision in *Freeman*, 57 F.4th 80, and with

3   Second Circuit conspiracy law, a case including *The*

4   *United States v. Aleskerova*, 300 F.3d 286, 292.

5          For a 2339A conspiracy, which is what we have

6   year, the conspiratorial goal must be to provide material

7   support for terrorists.  The second amended complaint

8   makes no factual allegations in which the Court could

9   infer specific intent by PIB to commit or support

10  terrorist acts.  And in fact, the second amended

11  complaint doesn't use the phrase intent or specific

12  intent in alleging what PIB did.  He relies merely on

13  knowledge.  But knowledge is not enough for a 2339A

14  conspiracy.

15         The *Kemper* case, which involved a 2339A

16  conspiracy, nailed this point saying, this is again at

17  page 395 of 911 F.3d, "A person who is indifferent to the

18  goals of the conspiracy does not become a party to the

19  conspiracy merely because that person knows that his or

20  her actions might somehow be furthering that conspiracy."

21  So --

22         THE COURT:  What is the state of your client's

23  obligations with respect to international AML/KYC

24  requirements.

25         MR. BERGER:  Right.  So your Honor, I think

5

Proceedings

1  that's an excellent question because it has two aspects.

2  One is now as opposed to then.

3          THE COURT:  Then.

4          MR. BERGER:  And then the answer is there is

5  limited, if any, requirements within the Palestinian

6  territories for Know Your Customers.  That became a later

7  aspect of --

8          THE COURT:  I am not limiting my question to

9  regulations emanating from within the Palestinian

10  territories.  This bank had correspondent accounts in

11  Jordan, was obviously connected to the international

12  financial system.  My question is what obligations did it

13  have from any source?

14          MR. BERGER:  So the short answer is for

15  checking which is what we're dealing with here.  So --

16          THE COURT:  I'm not talking about checking

17  either.  You keep changing the hypo.  There are -- KYC

18  requirements apply at the account opening stage and every

19  day thereafter.  What were the KYC requirements, if any,

20  that applied to your customer during the period?

21          MR. BERGER:  Sorry.  In 2001 and 2002 the

22  answer is none.

23          THE COURT:  None.

24          MR. BERGER:  None.

25          THE COURT:  You could open an account for

6

Proceedings

1  anybody?

2         MR. BERGER:  It was up to the banks.  First of

3  all, there's nothing in the second amended complaint that

4  even offers an allegation on this subject.

5         THE COURT:  I think there -- well, we can

6  debate the sufficiency of the allegation, but I think

7  that's factually incorrect, right?  The complaint says in

8  paragraph 648, "As a financial institution that offered

9  U.S. dollar denominated accounts to its customers and

10  utilized U.S. correspondent banking relationships,

11  defendant Palestine Investment Bank was aware of

12  international banking standards including the above

13  referenced Know Your Customer and enhanced due diligence

14  guidelines."  That follows a long discussion about what

15  the Basel Committee has said.

16         So what is the state of -- were the Basel

17  standards -- you're saying they were completely optional

18  as to PIB?

19         MR. BERGER:  Yes, they were.  And indeed, your

20  Honor, I know you don't want to hear me quibble with you,

21  but I don't think I'm quibbling.  The language you read

22  didn't say PIB was bound by international --

23         THE COURT:  No, I understand that.

24         MR. BERGER:  It says aware of international

25  banking standards.  And indeed, they know, if you look at

7

Proceedings

1   footnote 2 on page 11 of the opposition brief, they know

2   they've got a problem.  They include information that

3   footnote 2, page 11, is talking about what PIB must have

4   done when processing checks.

5          But the short answer is nothing in the amended

6   complaint says that in 2001 and 2002, which is the

7   relevant time period for this case, that PIB had or is

8   bound by any international banking standards.  To the

9   extent that PIB's correspondent banks were engaged in

10  U.S. transactions, wire transfer transactions, then those

11  banks would certainly have had to comply with whatever

12  they were required to.  But as you know from the

13  jurisdictional phase in this case, PIB wasn't even doing

14  that.

15         So the short answer is nothing as we read it in

16  the complaint alleges that PIB was bound to do this and

17  there are --

18         THE COURT:  I don't think you should -- so it's

19  possible that this question could be answered by

20  reference not only to specific allegations in the

21  complaint, but also by reference to anything of which the

22  Court might take judicial notice.  And you know, U.S.

23  treaties, for example, I would think would be something

24  that the Court could take judicial notice of.  I don't

25  know how that applies to international banking standards

8

Proceedings

1  at the moment, but the Basel Committee was headquartered

2  at the bank for international settlements and the BIS was

3  a consortium of central banks.  Do you know if the PMA

4  was a member of that consortium?

5           MR. BERGER:  I do not believe they were at the

6  time but I'm happy to provide a post argument argument

7  submission that answers that question if it's

8  consequential for your Honor as it appears to be.

9           I would say only while we're talking about the

10  conspiracy count at best what it shows is knowledge and

11  it's not even plausibly pled.  And it says they were

12  aware of that knowledge of international banking

13  statements.  Knowledge is simply not enough for a

14  conspiracy count.

15           THE COURT:  Well, I mean we started this whole

16  conversation because you said there's nothing in the

17  second amended complaint from which one could infer a

18  desire on PIB's part to see this endeavor succeed, this

19  endeavor to blow up civilians on buses succeed.  And it

20  seems potentially relevant in that regard that if the PIB

21  was willing to put its status instead, and its standing,

22  in the international banking community at risk to do this

23  kind of thing, that that might be some indication of its

24  desire.  You don't expect the bank to put out a press

25  release that says we would like to see the second

9

Proceedings

1   intifada succeed and in that vein we're happy to put out,

2   to facilitate martyr payments and do anything else that

3   we possibly can.  Right?  We're going to have to infer

4   such a desire, if we see one, from the circumstances.

5   And so in that vein it is relevant to me what legal or

6   even prudential incentives they had as described in the

7   complaint and anything else of which I might take

8   judicial notice.

9           And we see that in the *Kaplan* case, right, that

10  Judge Pierce is saying these people had Know Your

11  Customer obligations in a way that seemed important to

12  the Circuit as well.

13          MR. BERGER:  So there's two or three aspects of

14  what your Honor asked that I'd like to address and take

15  them in turn.

16          First of all, the Court can draw inferences and

17  no one would expect any bank to put out a statement that

18  says here's our intent.  On the other hand, there is a

19  reason why the law says there must be a difference

20  between knowledge and intent, and intent is what is

21  required for conspiracy.  And they don't even bother to

22  allege intent.  Your Honor, they don't even ask you to

23  draw specific intent.  What they argued is that they had

24  knowledge.  Knowledge is simply as a matter of law not

25  enough for a conspiracy.

10

Proceedings

1  So even with a 12(b)(6) obligation to read

2  things favorably to plaintiffs it would take a heroic act

3  of gymnastics to bend over backwards to infer intent when

4  only knowledge is pled.

5  Further, your Honor mentioned *Kaplan*.  What was

6  dispositive in *Kaplan*, and the Court mentioned this, and

7  *Honickman* picked up in this in discussing what was going

8  on in Kaplan is what was the difference maker in Kaplan?

9  It was not so much that they knew about international

10  banking standards, but there was a plausibly pled

11  allegation that, and I'm quoting here from *Honickman* in

12  terms of how it's analyzing *Kaplan* --

13  THE COURT:  That the bank expanded its limits?

14  MR. BERGER:  It says that -- it noted that the

15  martyr payment theory in *Kaplan* was found sufficient

16  because the bank, and here I'm quoting, "permitted the

17  laundering of money in violation of regulatory

18  restrictions meant to hinder the ability of FTOs to carry

19  out terrorist attacks and also made exceptions to pay to

20  the customers."  Neither of those is present in this

21  case.  And in fact, here's the key point.  And I guess

22  because --

23  THE COURT:  But there are distinctions -- so

24  what I read *Twitter* to say, and I realize *Twitter* is

25  about aiding and abetting liability, not material

11

Proceedings

1   support.  But the word aid and the word support are close

2   cousins let's say at least.  You're looking at a sliding

3   scale where the closer the bank is to the conduct, the

4   less specificity we require by way of knowledge and

5   intent.  And the more passive and incidental the bank or

6   other actor is to the conduct, the more we require by way

7   of knowledge and intent.  And I think there might be a

8   distinction, I'm not as crystal clear on the facts of

9   *Kaplan* as I will be, but I think the clients there were

10  not as clearly alleged to be participating as Mr. Salem

11  is here.

12          MR. BERGER:  So two points there, your Honor.

13  Number one, they were alleged to have been Hezbollah

14  fronts in *Kaplan* and that they were well known

15  Hezbollah --

16          THE COURT:  But Hezbollah funds for what

17  purpose?

18          MR. BERGER:  For the purpose of waging the 2006

19  rocket attacks that occurred that were the subject of all

20  of the LCD litigations.

21          THE COURT:  What were the five clients in

22  *Kaplan* specifically alleged to have done?  So here you've

23  got Mr. Salem, who is PIB's client, is alleged to be the

24  guy who makes the martyr payments, at least the final leg

25  of the martyr payments.  And that's pretty direct

Proceedings

1  participation.  What was the equivalent, if there was

2  one, in *Kaplan?*

3          MR. BERGER:  Well, so that's what's so

4  important, your Honor, which is the difference is your

5  Honor is focusing on what the bank did in *Kaplan*, right?

6  And here, the equivalent is what did PIB do?  The

7  remitters here, Mr. --

8          THE COURT:  No, I'm focusing on what the bank's

9  client did.  I just asked you a question about -- I just

10  framed the statement about Mr. Salem's personal

11  involvement --

12          MR. BERGER:  Right.

13          THE COURT:  -- in the suicide bombing process

14  and I'm asking you what were the clients, the five

15  clients', involvement in Kaplan.

16          MR. BERGER:  Yeah, I don't -- your Honor, I

17  apologize.  I don't have a specific answer to that.  My

18  recollection is that the five clients were alleged to be

19  Hezbollah fronts that moved money to Hezbollah with the

20  benefit of exceptions granted to favor them by LCD so

21  that money went into Hezbollah's pocket to wage rocket

22  attacks.

23          THE COURT:  Right.  But there's a difference

24  perhaps, and I think *Twitter* counsels that when we think

25  about okay, what is somebody's knowledge and intent,

13

Proceedings

1    we're on that sliding scale that I described, you know,

2    helping to funnel money to Hezbollah generally so that

3    Hezbollah can buy computers or even weapons seems to me

4    at least a half step removed from what Mr. Salem is

5    alleged to be doing which is specifically rewarding the

6    families of the people actually carrying out attacks.

7              MR. BERGER:  If I may address the various

8    aspects of the question, your Honor, and I've got a lot

9    to say on it but I don't want to -- I want to be

10   responsive to the Court's question.

11             THE COURT:  Yes.

12             MR. BERGER:  But here's the deal which is I

13   frankly think you could put conspiracy aside.  It would

14   take a heroic effort to say there's specific intent

15   plausibly pled.  Knowledge is what I think we are dealing

16   with.  And your Honor has fair questions about what do I

17   do about the alleged knowledge.  And I'd like to give you

18   an answer that parses the actual second amended complaint

19   because I think the, for lack of a better word, the sort

20   of gestalt in your Honor's offering about how you're

21   reading the second amended complaint is undermined by the

22   specific allegations in the second amended complaint

23   itself and would not give the type of knowledge required

24   to PIB.

25             Let me give you some for instances if I may.

14

Proceedings

1   The second amended complaint does not allege any public

2   statement by Salem supporting terrorist attacks or

3   revolts.  When you look, as I know the Court has, at

4   paragraphs 504, 506, and 535 to 536 of the second amended

5   complaint, those are the only paragraphs that attribute

6   views or statements through Rakad Salem.  Not one of

7   those statements is supporting terrorism.  What they

8   merely do is express a --

9           THE COURT:  But why does it have to be his own

10   statements?  I mean there are all these, and I think

11   *Kaplan* rejects the approach that you just took, there are

12   all these press reports all over the world that say that

13   Salem is handing out millions of dollars in martyr

14   payments.

15           MR. BERGER:  That's not correct as I read the

16   second amended complaint, your Honor.  And I therefore

17   would try to point out a couple of --

18           THE COURT:  What's not correct?

19           MR. BERGER:  That the press all around the

20   world is attributing statements to Rakad Salem supporting

21   terrorism.

22           THE COURT:  You keep changing the hypo.  I said

23   the press all around the world is reporting that Mr.

24   Salem is facilitating or making millions of dollars in

25   martyr payments.  I didn't say anything about what the

15

Proceedings

1   press is reporting Mr. Salem to have said.  I'm talking

2   about what the press is reporting Mr. Salem to have done.

3   Right?

4               MR. BERGER:  So your Honor, both for JASTA --

5               THE COURT:  Both what?

6               MR. BERGER:  Both for JASTA and for 2339A which

7   turn to some extent on knowledge, both require actual

8   knowledge.  Your Honor has said, and I hear and I'm

9   trying to be responsive to this, that the Court would

10  infer actual knowledge.  But of course the Court has to

11  infer it from something.  So let me start with the

12  various points.  Most of the second amended complaint's

13  public reports are alleged from, as your Honor said,

14  worldwide media.  There has to be a reason to infer, even

15  under *Kaplan*, that the bank would have read media outside

16  of Palestine.

17              Second, the Palestinian media reports, the ones

18  you'll see in paragraphs 510 --

19              THE COURT:  Well, if the Daily Telegraph knows

20  this, it seems you've got the San Francisco Chronicle,

21  the French Press agency that I won't try to pronounce the

22  name of, the Daily Telegraph, the AP, and on and on.

23  Al-Hayat al-Jadida, a leading Palestinian newspaper, is

24  reporting on Saddam Hussein's inquiries in suicide terror

25  payments.

Proceedings

1          MR. BERGER:  Your Honor, I couldn't tell you

2    the last time I looked at the Daily Telegraph or the San

3    Francisco Chronicle.  There has to be a real world basis

4    from the Court to infer --

5          THE COURT:  Yes.  I mean this really does go

6    back to a little bit the question of what obligations,

7    legal or prudential, your client has or had.  It seems to

8    me in 2001 it would have been the small minority of

9    participants in the international banking system who were

10   truly at liberty to just remain blissfully ignorant of

11   who they were banking with.  But I think we may need to

12   bear down on that via some supplemental briefing.

13         MR. BERGER:  Your Honor, I mean I think one of

14   the things that your Honor recognized in the

15   jurisdictional decision is that this bank was in fact

16   uniquely set up.  It was not participating in the

17   international banking system.  I understand the Court of

18   Appeals said --

19         THE COURT:  Yes, I got overruled.

20         MR. BERGER:  -- by way of agency that they are

21   deemed to have, but that doesn't mean that in the real

22   world they're participating in the international banking

23   system.  They didn't have a correspondent account.  And

24   respectfully --

25         THE COURT:  They did have an international

17

Proceedings

1  correspondent account.

2          MR. BERGER:  They did not have an international

3  correspondent account.

4          THE COURT:  They did have an international

5  correspondent account.

6          MR. BERGER:  Oh, with Jordan.

7          THE COURT:  Yes.

8          MR. BERGER:  With the bank in Jordan.  But they

9  did not process through the United States and were not

10 subject therefore to what would normally have been in

11 place at that time for international wire transfer.

12          Your Honor, I do think it's important, and

13 again --

14          THE COURT:  International dollar denominated

15 wire transfers.

16          MR. BERGER:  Right.  None of which --

17          THE COURT:  What about euros?

18          MR. BERGER:  None is alleged here in the

19 complaint.  Your Honor, I understand --

20          THE COURT:  I understand the law -- we're

21 having a question about, a conversation about what the

22 law was.

23          MR. BERGER:  Right.

24          THE COURT:  And you don't really need to allege

25 law in the complaint.

18

Proceedings

1       MR. BERGER:  You don't need to allege law in

2  the complaint but you do need to allege both for the

3  2339A material support count and for the JASTA count

4  actual knowledge.  I understand the Court can draw an

5  inference of actual knowledge.  There has to be something

6  more than Basel standards out in the ether from which the

7  Court could infer actual knowledge on the part of PIB as

8  to Mr. Salem.

9       It is important because I do think there's a

10  lot of blurring in the argument here by the plaintiffs.

11  The Palestinian media reports alleged in the complaint,

12  paragraphs 510 and 511, 531, 533 through 34, they don't

13  allege any support for terrorism by Rakad Salem.  The --

14       THE COURT:  Yes, they do.

15       MR. BERGER:  The question both for the --

16       THE COURT:  Are you disputing that making

17  martyr payments is support for terrorism?

18       MR. BERGER:  Yes, your Honor, I am.  I have

19  both a factual answer to that and a legal answer, if I

20  may.

21       THE COURT:  Yes.

22       MR. BERGER:  Okay.  So factually, the complaint

23  alleges, and I'll give you the paragraph cites, multiple

24  reasons why martyr checks were written that have nothing

25  to do with terrorism.  You can find this in paragraph

19

Proceedings

1  531, 535, 495, 503, 419 -- I'm sorry, 514, 545, 493, 475.

2          THE COURT:  You can stop with the number.  Tell

3  me what the --

4          MR. BERGER:  They allege three non-terror

5  reasons.

6          Number one, advancing Saddam's political

7  standing with the Palestinians.

8          THE COURT:  That's not a non-terror reason.

9  That reason only works if the terrorist attacks bring

10 some advancement to Saddam.  You're making arguments now

11 that seem to me to be, just so that I can be totally

12 transparent with you, arguments that seem factually

13 preposterous.  You're free to do that if you want to --

14         MR. BERGER:  I don't believe I'm doing that.

15         THE COURT:  -- but the notion that the martyr

16 payments would not advance the cause of terrorism --

17         MR. BERGER:  Yes.

18         THE COURT:  -- you're talking about mental

19 gymnastics.  We seem to be off to the gymnastics meet in

20 that respect.

21         MR. BERGER:  Well, your Honor, I apologize if

22 you think I'm not being straight with the Court.   I'm

23 trying to give you allegations in the second amended

24 complaint that are directly responsive to the Court's

25 questions about the martyr payments.  And now I'll give

Proceedings

1   you a legal answer since you said this depends on the

2   law.

3           In the *Sokolow* case, Judge Daniels held, and I

4   will quote here, that --

5           THE COURT:  In the what case?

6           MR. BERGER:  *Sokolow*, S-O-K-O --

7           THE COURT:  Who's the judge?

8           MR. BERGER:  Judge George Daniels, Southern

9   District of New York.

10          THE COURT:  Okay.  Who gets overruled on the

11  subject in *Kaplan*.  I think you're fighting the settled

12  law as articulated by the Second Circuit in Kaplan.  They

13  say -- I mean it's alleged there perhaps more expressly

14  than it is alleged here, and we'll get to that when we

15  get to the plaintiffs, but the Second Circuit opinion in

16  *Kaplan* makes clear what is probably you don't even need

17  to say it because it's so obvious that knowing that

18  somebody blows themselves up on a bus that their families

19  are going to get what is a small or maybe even medium-

20  sized fortune by Palestinian standards serves to

21  incentivize future attacks.

22          MR. BERGER:  I don't believe that is what the

23  *Kaplan* case dealt with.  Judge Daniels was not --

24          THE COURT:  The *Kaplan* case said it explicitly.

25          MR. BERGER:  I think what I was quoting from

Proceedings

1   the *Sokolow* case, and I respectfully suggest it's germane

2   here, we put it in our brief, but your Honor was looking

3   for some legal doctrine and I'm trying to provide legal

4   doctrine.  Here's the quote having to do with a martyr

5   payment in the *Sokolow* case.  "Post attack financial

6   support to the families of terrorists is not sufficient

7   to demonstrate the defendants were somehow responsible

8   for the attacks."  That's dealing with remitters --

9           THE COURT:  If that was a single attack, then I

10  don't know what the facts were there, if we're talking

11  about a single attack, then of course it might be true.

12  But when you're talking about the intifada where a bomb

13  is going off every X number of days, again, I find it

14  hard to believe that you even believe in the non-

15  frivolous nature of the argument you're making here.

16          MR. BERGER:  Well, your Honor, that's --

17          THE COURT:  I'm not bound by whatever statement

18  of law comes out of a district court case in the southern

19  district and I am very much bound by what the Second

20  Circuit said in *Kaplan* which I think says the opposite of

21  what you're asking me to conclude here.

22          MR. BERGER:  I don't and I'm sorry that your

23  Honor thinks I'm making frivolous arguments because we

24  have addressed martyr payment programs in a number of

25  cases including in *Sokolow*.  These cases involve

22

Proceedings

1   institutionalized Palestine Liberation Organization

2   programs to make martyr payments to families of

3   terrorists during the second intifada, precisely the

4   question your Honor asked.  And it is in that context

5   that not only the *Sokolow* case held that martyr checks

6   are not an evidence of responsibility, but the D.C.

7   district court in the *Shatsky* case, which we cite in our

8   brief, the district court reached the same conclusion.

9   Your Honor said --

10          THE COURT:  The Second Circuit says, it refers

11  to the SAC's allegation in that case that the purpose of

12  that funding and support, i.e. financial support to

13  wounded Hezbollah terrorists and the families of

14  Hezbollah terrorists killed in action, the purpose of

15  that funding in support is to, "provide peace of mind to

16  current," and then the Second Circuit switches to

17  italics, emphasis theirs, "current and prospective

18  Hezbollah terrorists by knowing that they and their

19  families will be cared for in the event of death or

20  injury."  Citing paragraph 22 of the complaint, emphasis

21  ours.  Emphasis on and prospective terrorists is the

22  Second Circuit's.  So --

23          MR. BERGER:  So your Honor, that would take me

24  back to my point earlier about *Honickman's* explanation of

25  the *Kaplan* holding to which you adverted.  And *Honickman*

23

Proceedings

1  at 6 F.4 --

2          THE COURT:  I got your argument about

3  *Honickman*.

4          MR. BERGER:  Right.  There has to be something

5  more.  We're not talking about the remitter.  You're

6  talking about a bank that processed a remitter's checks

7  for martyr payment liability.  There must be something

8  more than merely processing a martyr check.  And that is

9  what *Kamna*, for example, tells us.  *Kamna* says there's

10 two aspects to bank liability for aiding and abetting.

11 One is actual knowledge of customer wrongdoing.  And your

12 Honor, if I'm running over time, I'll wrap it up --

13          THE COURT:  Yes.

14          MR. BERGER:  -- because I would like to save

15 time for rebuttal.  There has to be actual knowledge of

16 customer wrongdoing.  Your Honor says you can draw an

17 inference about actual knowledge and you've already drawn

18 an inference that a martyr check is customer wrongdoing.

19 So let's move to the second thing *Kamna* requires for

20 aiding and abetting liability which is quite clear.

21 There has to be affirmative misconduct, not passive

22 nonfeasance, by a bank in order to impose liability on a

23 bank for aiding and abetting.  All that is alleged here

24 is passive nonfeasance by processing checks.

25          I understand your Honor's point about knowledge

24

Proceedings

1   and international wire transfers, but that's not what's

2   at issue here.  Checks are at issue.  And I would ask

3   your Honor to take --

4          THE COURT:  That's a misconception of how the

5   international banking system works.  If indeed it is the

6   case that, and we're going to be a down on this now, but

7   if indeed it is the case that the Palestine Investment

8   Bank has either legal obligations or strong prudential

9   incentives to know who his customers are and to keep

10  narcotics proceeds, terrorism financing, and all the

11  other horribles out of the banking system, then you

12  can't, I don't think you can hide behind the notion that

13  all they're doing here is processing checks.  The point

14  is they have an incentive to know who their customers are

15  and they know that their customer is somebody engaged in

16  the facilitation of regular acts of terrorism, and yet

17  they continue to bank with him even though it puts their

18  standing perhaps, I don't know, in the international

19  banking community at risk.

20          Let's hear from the plaintiffs now.

21          MR. RADINE:  Thank you, your Honor.  So

22  briefly, and I'll turn to these subjects.  As the Court

23  noted, we've alleged plausibly that PIB conspired the

24  Saddam Hussein regime to illegally funnel millions of

25  dollars into the accounts --

25

Proceedings

1    THE COURT:  What do you say about, and what is

2  the state of the law in 2001 and 2, about PIB's

3  obligation to know its customers and to keep terrorism

4  financing from going through its pipeline?

5    MR. RADINE:  So a few allegations were made.

6  First is that Israel publicized its own legal

7  pronouncements in the Palestinian territories in that

8  period for this purpose.  That's shown in the Politist

9  (phonetic) declaration.

10    THE COURT:  Sorry, where is that?

11    MR. RADINE:  The Politist declaration is

12  Exhibit C.

13    THE COURT:  Hold on just one second.

14    MR. RADINE:  Sure.

15    THE COURT:  Exhibit C.  I have your exhibits --

16  oh to the complaint you're talking about?

17    MR. RADINE:  Yes, your Honor.

18    THE COURT:  Okay.  Exhibit C looks like a

19  control report of some kind.  Oh, that's the amended

20  complaint.  Sorry.  Exhibit C is the Politist

21  declaration.  I got it.

22    MR. RADINE:  And the Politist declaration

23  explains --

24    THE COURT:  What paragraph?

25    MR. RADINE:  This is 17 through 18 and I

26

Proceedings

1  believe also 24.  The Politist declaration sets out

2  Israeli law in terms of publicizing Israeli legal

3  proclamations such as the designation of ALF in the

4  Palestinian territories.

5          THE COURT:  But I'm not asking about

6  proclamations to the effect that ALF is a terrorist

7  organization.  I'm asking about legal authority or

8  prudential authority that would have required PIB to know

9  its customers.  I'm saying I'm not asking whether they

10  knew Mr. Salem was or not.  I'm asking whether they had a

11  legal or prudential obligation to care who their

12  customers were.  What does the complaint say on that?

13          MR. RADINE:  Yeah, well at paragraph 650 --

14  your Honor already noted the paragraphs relating to the

15  Basel Committee.

16          THE COURT:  Yes, but those are -- all that says

17  is that PIB was aware of what the Basel Committee -- it

18  was aware of international banking standards but it

19  doesn't say whether those standards apply.

20          MR. RADINE:  Well, in paragraph 650, your

21  Honor, we also allege that Palestine Investment Bank --

22          THE COURT:  That was subject to FATF

23  regulations.

24          MR. RADINE:  Yes, your Honor, which included

25  Know Your Customer and due diligence needs as well as not

Proceedings

1    providing banking services to terrorist organizations.

2              THE COURT:  Tell me again what FATF -- that's

3    an international body?

4              MR. RADINE:  Yes.

5              THE COURT:  And just humor me.  Let's say I

6    wanted to dispute, which I know I'm not at liberty to do

7    it at the motion to dismiss stage, although I could maybe

8    if I'm taking judicial notice of something, how do I know

9    that paragraph 650 is true that PIB was not only aware of

10   but was also subject to FATF regulations?

11             MR. RADINE:  Well, it's our allegation, your

12   Honor.  I haven't seen anything that the Court could

13   judicially notice that -- I mean submitted by defendant,

14   that PIB was not subject to any due diligence rules or

15   FATF specifically.

16             But your Honor, if I may, the Court pointed out

17   that *Kaplan* notes the defendant LCB's due diligence

18   program.  But that's not a necessity on the knowledge

19   count.  In *Honickman*, where there is no due diligence

20   allegation at all, makes clear by saying, and I quote,

21   "As we explain in *Kaplan*, plaintiffs do not need to

22   allege that the defendant bank knew or should have known

23   the public sources at the pleading stage.  Such a

24   requirement at this juncture would be too exacting."  And

25   that rule is not dependent on a due diligence allegation.

Proceedings

1    Again, there was not one in *Honickman*.  Instead, the

2    point that the court makes in *Honickman*, this is in a

3    footnote that I'm not seeing immediately, is that the

4    issue is whether it's plausible that a bank would know

5    something if it wasn't known in the media.  The question

6    is, and I think your Honor alluded this as well --

7              THE COURT:  No, but can I -- let me just lay

8    out my focus here for you so that you can respond to it.

9    Knowledge and intent are two different things.  Right?

10             MR. RADINE:  Yes, your Honor.

11             THE COURT:  And it was plausibly alleged in the

12   *Twitter* case that Twitter knew exactly what was going on

13   on its platform.  The Supreme Court maybe tends to fight

14   that allegation a little bit by saying there are, you

15   know, billions of tweets a day or whatever.

16             But the Supreme Court also says very clearly

17   that knowledge is different from intent.  You can know

18   something and be completely indifferent to it.  Aiding

19   and abetting liability requires some expressed or implied

20   desire to see the venture succeed.  And what I've said to

21   defense counsel that I think it sort of behooves you to

22   pick up on if you can, is that one way we might infer on

23   PIB's part more than mere knowledge of who Salem is and

24   what the ATF is doing is that they had incentives, legal

25   or prudential, to stay out of the terrorism financing

29

Proceedings

1   business.  If they had absolutely no such incentives,

2   then defendant may be right that the most plausible

3   reading of the complaint is that PIB knew but had no

4   reason to care one way or the other.

5        If on the other hand PIB had a strong

6   incentive, legal or prudential, to avoid facilitating,

7   you know, providing banking services to people who are in

8   the terrorism financing business, then that makes a much

9   stronger implied case for intent, a desire to see the

10  venture succeed, whatever exactly *Twitter* requires.

11       MR. RADINE:  Sure.  Well, in addition to our

12  obligations, I think the prudential certainly incentives

13  that a bank has are pretty clear.  There's enforcement

14  from its regulator, especially during -- which ultimately

15  is --

16       THE COURT:  What regulator?  The PMA?

17       MR. RADINE:  The PMA, but we allege in the

18  complaint that Israel is the ultimate authority at that

19  time certainly of the Palestinian territories.  Sorry,

20  gotten too far.

21       THE COURT:  Well, is that right?  So did Israel

22  have KYC requirements or other AML rules to which PIB

23  would have been subject?

24       MR. RADINE:  We allege that they would have

25  been subject to the proclamations that Israel made and

30

Proceedings

1  those were provided.  They had knowledge.  That's why

2  they were there being made in the Palestinian

3  territories.  They weren't just --

4            THE COURT:  But you're back to the subject of

5  knowledge rather than intent.  You're talking about

6  proclamations Israel made to the effect that ALF was a

7  terrorist organization or to the effect that banks had to

8  stay out of the terrorism financing business?

9            MR. RADINE:  I mean that it's illegal to

10  participate with terrorist organizations.  That's why the

11  announcements are being made.  They're illegal for

12  everybody.

13            THE COURT:  Sorry then can you just -- I looked

14  for a second at the Politist declaration.  What is it I'm

15  supposed to be reading here?

16            MR. RADINE:  Well, the declaration walks

17  through in general the process by which Israeli rules are

18  proclaimed in the Palestinian territories which are

19  proclaimed for the purpose of stating that it's illegal

20  to engage or otherwise do business with these terrorist

21  groups.

22            THE COURT:  Can you show me what paragraph I

23  should be reading?

24            MR. RADINE:  It says -- so in 18, this is a

25  1967 version of proclamations, orders and notices, are

Proceedings

1  published into the public and manner at large in the

2  Palestinian territories.  And then I believe that is

3  increased in -- 21 explains they do this because the

4  penal provisions of the occupying power, which is to say

5  punishments for working with a terrorist group, will not

6  come into force until it's brought to the knowledge of

7  the inhabitants in their language.  That is why Israel

8  published these proclamations in the Palestinian

9  territories.

10         THE COURT:  The penal provisions enacted by the

11  operating power don't come into force until there is

12  knowledge, but don't you then need to tell me that the

13  penal provisions include AML or KYC regulation?

14         MR. RADINE:  Well, they include not assisting

15  terrorist groups.

16         THE COURT:  Where do I see that in them?

17         MR. RADINE:  I don't have the exact cite in

18  front of me, your Honor, but I think the Court will find

19  that that is the thrust of the Politist declaration.

20         But I would add, as your Honor said, especially

21  while my colleague looks at the Politist declaration,

22  that this is also during the second intifada of course.

23  That is the context.  The context is in a time of

24  incredible violence against civilians in Israel to the

25  time against Israeli incursions into the Palestinian

Proceedings

1   territories.  This is not something that would have been

2   lost on anyone in that region whatsoever.

3           THE COURT:  The PIB was in the West Bank,

4   not Gaza?

5           MR. RADINE:  And Gaza.

6           THE COURT:  West Bank and Gaza.  Okay.

7           MR. RADINE:  Various branches.

8           THE COURT:  Which branch was Mr. Salem alleged

9   to be a customer of?

10          MR. RADINE:  I believe Ramallah al-Bireh.

11          THE COURT:  Which is?

12          MR. RADINE:  In the West Bank.

13          THE COURT:  Okay.

14          MR. RADINE:  Again these are not -- you know,

15   the allegation is that the assistance is being provided

16   affirmatively.  And to the issue of what the Supreme

17   Court said about knowledge, it said that it is in cases

18   of passive nonfeasance that a strong showing of

19   assistance and scienter would thus be required.

20          In cases of affirmative assistance such as

21   moving Saddam Hussein's money illegally into ALF's

22   account and then supplying that account with services to

23   issue martyr checks as well as HLF, that is affirmative

24   conduct.  As Judge Amon said in *Zobay*, there's no reason

25   to be leery of scienter allegations where the assistance

33

Proceedings

1    is affirmative as it is here.

2            In *Twitter*, not only did they not know, there's

3    not a single allegation in *Twitter* of knowledge of a

4    specific ISIS use, just that there was a suggestion that

5    it was happening.  In fact, in the Twitter complaint as

6    the Supreme Court points out, plaintiffs there concede

7    that the Twitter would shut down ISIS accounts when it

8    would find them and their allegation is simply they

9    didn't try hard enough to chase down every last one.

10           THE COURT:  Is somebody at your table looking

11   for what I've described in the Politist declaration?

12           MR. RADINE:  So yes, I'm reading now from 31.

13   This is a particular order.  This declaration was

14   prepared for *Linde* right?  For *Linde v. Arab Bank*, the

15   Politist.  Is that right?

16           THE COURT:  It's dated 2014.

17           MR. RADINE:  Yeah.  *Linde v. Arab Bank*, which

18   is a case similar to this one in many ways in that it

19   involves martyr payments.  And in 31, for example, it

20   notes that he affirms that the outlawed various

21   institutions operating in the Palestinian territories

22   deemed to be part of Hamas such as, and he names a number

23   of entities, were published upon their designation.

24           To be clear, this is prepared for another case.

25   It would be just as true for the HLF designation as we

Proceedings

1     alleged that would, for example, have been designated by

2     Israel.  So the point being --

3              THE COURT:  But you're not getting me to what I

4     thought you were saying this declaration was going to get

5     me to which is the conclusion that PIB had some Israeli

6     law obligation to avoid dealings with Mr. Salem or ALF,

7     are you?

8              MR. RADINE:  As opposed to HLF?

9              THE COURT:  Yes, that's what I'm asking about.

10             MR. RADINE:  Right.  Yeah.  I think it's safe

11    to say that the Israeli position in that time was that it

12    was illegal to provide martyr payments and that there

13    would be presumptive consequences for.

14             THE COURT:  But you don't allege that in

15    anything that I can see explicitly?

16             MR. RADINE:  No.  I mean it's inherently

17    illegal to provide martyr payments.  It violates American

18    law, it violates -- I can't think of a place where it's

19    not --

20             THE COURT:  The bank is not subject to American

21    law.  Or maybe it is.

22             MR. RADINE:  I can't think of a place, maybe

23    outside of Iran, where that would be possibly legal.

24             THE COURT:  I think you need to make that point

25    explicit.  I don't know if -- you had two efforts to

Proceedings

1   amend here.  I don't know that I would go through the

2   entire process of writing an opinion.  I don't know

3   whether dismissal would be with prejudice or without.

4   But if you think you might want leave to amend, you

5   should be asking for it now rather than after an opinion

6   on this subject comes out.  I don't really see anything,

7   other than these -- yes, you have paragraph 648 in the

8   complaint that says that PIB was aware of international

9   banking standards including the above referenced KYC

10   guidelines.  You say the U.S. is a member of the Basel

11   Committee.  I don't know what that tells us.  And you

12   have paragraph 650 which says PIB was subject to the

13   rules promulgated by FATF.  I'm not sure that FATF rules

14   have the force of law independently.  Do they?  They have

15   to be referenced by or incorporated into regulations by

16   some governmental authority.  FATF is just a task force,

17   right?  Does it make law for anybody?

18              MR. RADINE:  I don't know the legal effect of

19   FATF proclamations.

20              THE COURT:  I think it might be your job to

21   know more about bank regulation than --

22              MR. RADINE:  Okay.

23              THE COURT:  -- it seems like we do right now.

24              MR. RADINE:  But again --

25              THE COURT:  And to seek permission to amend the

36

Proceedings

1    complaint and/or supplement the Politist declaration on

2    that subject.

3            MR. RADINE:  We'd be happy to do that.  You

4    know, I'll make that request.  It certainly seems like

5    the safe route.

6            Again, it's our position that there is nothing

7    in *Kaplan* or *Honickman* that suggests that's a

8    requirement.  *Kaplan* --

9            THE COURT:  I'll tell you where I think the

10   requirement comes from.  You can tell me if you don't

11   agree.  And I just randomly opened the *Twitter* case to

12   headnotes 8, 9, and 10.  "To keep aiding and abetting

13   liability grounded in culpable misconduct, the criminal

14   law of the United States," which I understand we're not

15   dealing with here, "thus requires that a defendant in

16   some sort associate himself with the venture, that he

17   participate in it as something he wishes to bring about

18   before he can be held liable.  In other words, the

19   defendant has to take some affirmative act with the

20   intent of facilitating the offense's commission such as

21   through words of encouragement or driving the getaway

22   car."

23           And the *Twitter* opinion goes on to say that the

24   key question is whether the defendants in the *Twitter*

25   case gave such knowing and substantial assistance to ISIS

37

Proceedings

1    that they culpably participated in the Reina attack.

2    Justice Thomas summarizes the applicable framework from

3    *Halberstam* and the common law generally, "as a framework

4    designed to hold defendants liable when they consciously

5    and culpably participated in a tortious act in such a way

6    as to help make it succeed."

7           And the opinion summarizes Twitter's

8    relationship with ISIS and its supporters as follows.

9    "It appears to have been the same as Twitter and

10   YouTube's relationship with their billion-plus other

11   users, arm's length, passive, and largely indifferent."

12   Arm's length, passive, and largely indifferent.  No act

13   of encouraging, soliciting, or advising, rather the

14   plaintiffs, Justice Thomas says, "Essentially portrayed

15   the defendants as bystanders."

16          And then he goes on to say at some length that

17   the plaintiff's claims in the *Twitter* case "might have

18   more purchase if they could identify some independent

19   duty that would have required the defendants to remove

20   ISIS's content.  But plaintiffs identify no duty that

21   would require defendants or other communication-providing

22   services to terminate customers after discovering that

23   the customers were using the service for illicit ends."

24          Let me just read that sentence one more time.

25   "Plaintiffs identify no duty that would require the

38

Proceedings

1    defendants or any other communication-providing service

2    to terminate customers after discovering that the

3    customers were using the service for illicit ends."

4            So to me, I mean I could be misinterpreting my

5    mandate here entirely but that makes it seem very

6    relevant to me what the state of PIB's legal obligations,

7    if not prudential ones, was.

8            MR. RADINE:  But if I may, your Honor,

9    obviously it's our view that they consciously and

10   culpably assisted these terrorist attacks, did so

11   knowingly and substantially to use the phrase.  As for

12   whether it was illegal, we can supply additional

13   allegations of briefing on that but was it illegal to

14   write the checks as in for Mr. Salem to write?  Would we

15   have to allege that it's illegal to pay the martyr

16   payments?

17           The allegation is that they know, right?  It's

18   not an issue where they don't know there's a question

19   of --

20           THE COURT:  No, the Twitter -- Twitter is

21   alleged to have known.  Twitter knows ISIS has an

22   account, a Twitter account.  And YouTube knows that ISIS

23   has a YouTube account --

24           MR. RADINE:  Right.

25           THE COURT:  -- on which it is recruiting the

39

Proceedings

1   next generation of suicide bombers.  That's the

2   allegation.  It was undisputed at the --

3             MR. RADINE:  Well, it's alleged --

4             THE COURT:  The point is --

5             MR. RADINE:  -- that they shut down the

6   accounts when they find them.

7             THE COURT:  No.  I mean maybe but I think

8   you're misreading the Twitter case.  What Justice Thomas

9   is saying is absent some affirmative duty to screen your

10  content, that if all Twitter is doing is providing the

11  same service or all YouTube is doing is providing the

12  same communication service to ISIS as they provide to

13  anyone else, that's not enough for aiding and abetting

14  liability.  There has to be some manifestation that they

15  were doing so culpably, meaning that they manifested a

16  desire to see ISIS's activities succeed.  No?

17            MR. RADINE:  I just want to read the -- this is

18  the lines I have on the record here from *Taamneh* is that

19  the plaintiffs, sorry the defendants, "attempted to

20  remove at least some ISIS sponsored accounts and content

21  after they were brought to their attention."  The

22  allegation is that -- I believe this is also -- that's at

23  1226 note 13.  I believe it is also a direct quote that

24  Twitter is accused of having "failed to detect ISIS

25  accounts."  That I'm not --

Proceedings

1          THE COURT:  I think you misunderstand.  I'm

2   talking about the *Twitter* case.  You're reading from

3   other cases.

4          MR. RADINE:  That's *Twitter*.  Sorry.

5          THE COURT:  I think you're misreading the

6   *Twitter* case.

7          MR. RADINE:  Your Honor, that's a line from

8   *Twitter*.

9          THE COURT:  What is the line?

10          MR. RADINE:  The defendants, and I'm adding

11   that, "attempted to remove at least some ISIS sponsored

12   accounts and content after they were brought to their

13   attention."  That's at 1226 --

14          THE COURT:  But so what?  And the court in

15   *Twitter* makes what of that fact?

16          MR. RADINE:  That they were not consciously and

17   culpably assisting ISIS's actions.  They had at best very

18   generalized -- sorry, at best very generalized knowledge

19   that --

20          THE COURT:  Do you think that if not for the

21   allegation that Twitter, YouTube on occasion had removed

22   or suppressed content by ISIS the complaint would have

23   gone forward past the motion to dismiss stage?  That's

24   how you read *Twitter*?

25          MR. RADINE:  I think combined with the fact

41

Proceedings

1    that they had billions of customers and that the

2    allegation is that they failed to detect ISIS's accounts,

3    I do think so.  I think it's a far cry from, you know,

4    helping cut checks that say martyr on them that are being

5    given in public ceremonies.

6             THE COURT:  What does that mean helping -- they

7    didn't cut the checks.  They processed the checks.

8             MR. RADINE:  No, they processed the checks.

9    Right.  So they know that the checks were being written.

10   They receive them back when they're --

11            THE COURT:  How do you know that?  How do you

12   know a computer is not the one arranging all these

13   payment processing?

14            MR. RADINE:  A computer?  You mean --

15            THE COURT:  How do you know a human puts eyes

16   on a check that says martyr on it?

17            MR. RADINE:  Well, I think that knowledge on a

18   computer is imputed to their corporation.  I don't think

19   that they're allowed to robotically ignore it.  But

20   they --

21            THE COURT:  No, but then you would have the

22   same rule apply to *Twitter*?  That every single thing

23   that -- or to YouTube, that every single thing that was

24   said on a YouTube video --

25            THE COURT:  Even if they were -- the checks, we

42

Proceedings

1   explain in the brief, the checks come back when they're

2   cancelled.  But even if --

3           THE COURT:  And who looks at them and for what

4   purpose?

5           MR. RADINE:  A PIB staffer because they're not

6   going to pay the counterparty bank if they think that the

7   transaction is one that, for example, Rakad Salem can't

8   cover in his account.  Or if it's a fraud.

9           THE COURT:  Where do you allege in the

10  complaint that a human puts eyes on these cancelled

11  checks?

12          MR. RADINE:  I don't know exactly where I have

13  the allegation that it's a human versus a computer.

14          THE COURT:  Is somebody at your table trying to

15  find that now?

16          MR. RADINE:  I doubt it.  But in addition to

17  that, I would add that they know who their customer is

18  and they see that Rakad Salem, a popular figure according

19  to the press, is handing out these checks in public

20  ceremonies to great fanfare.  There's not even, to use

21  your Honor's word, a prudential interest and maybe just

22  taking a quick look at that account and seeing if the

23  checks say martyr on them for example

24          THE COURT:  Where does the interest come from

25  that they may be cut off from being able to do business

43

Proceedings

1   with Jordanian banks?

2           MR. RADINE:  That or maybe closed by Israel or

3   perhaps they simply believe in the value of human life.

4           THE COURT:  No, but Google and Twitter should

5   also believe in the value of human life given that human

6   life is precious.  And yet the Supreme Court says that

7   despite -- so here are the allegations.  It's Facebook,

8   YouTube, and Twitter.  Plaintiffs allege that ISIS and

9   its adherents have used these platforms for years for

10  recruiting, fund raising, and spreading propaganda.  ISIS

11  and supporters opened accounts on Facebook, YouTube, and

12  Twitter and uploaded videos and messages for others to

13  see.  Those videos and messages were then matched with

14  other users based on those users' information and

15  history.  And ISIS's videos and messages both celebrated

16  terrorism and recruited new terrorists.

17          MR. RADINE:  If I may, your Honor --

18          THE COURT:  ISIS uploaded videos that fund

19  raised for weapons of terror and that showed brutal

20  executions of soldiers and civilians alike.  These

21  platforms plaintiffs allege were crucial to ISIS's growth

22  allowing it to reach new audiences, gain new members, and

23  spread its message.  And plaintiffs also allege that the

24  defendants have known that ISIS has used their platforms

25  for years.  And plaintiffs aver that the defendants have

44

Proceedings

1    failed to implement even a basic account detection

2    methodology.  Not only have they failed to implement that

3    basic account detection methodology, the platforms have

4    knowingly allowed ISIS and its supporters to benefit from

5    the platform's recommendation algorithms.

6              You need to show something more than knowledge.

7    You keep saying knowledge, but you need to show something

8    more, you know, that their interest in the venture was

9    something more than passive.

10             MR. RADINE:  I think if that's the case, then

11   this Court will have to find that *Twitter* overruled

12   *Honickman* and *Kaplan* which has not been the case.

13             For example, this Court, as in the eastern

14   district in *Zobay*, found that *Kaplan* and *Honickman* still

15   stand.  And *Bonacasa*, where they decided they didn't have

16   to find --

17             THE COURT:  So if *Twitter* requires that you do

18   something more for a given client than you would do for

19   all your clients, then *Kaplan* satisfies that requirement

20   because the Kaplan plaintiffs pleaded that the alleged

21   terrorists who were clients of LCB were accorded special

22   treatment.

23             MR. RADINE:  Well, *Taamneh* says that there's

24   some things you can provide.  They give you an example

25   of -- I think they have the pharmaceuticals to a drug

Proceedings

1  dealer that are inherently dangerous enough.  I think

2  martyr payment checks meet that requirement pretty

3  easily.  Otherwise you can have someone walk into your

4  gun shop, say I'm off to kill somebody --

5        THE COURT:  I don't think that's the level of

6  specificity.  The gun is inherently dangerous.  A check

7  is not inherently dangerous.

8        MR. RADINE:  But it says martyr on it.

9        THE COURT:  But then you're just back to the

10 question of whether somebody looked at the check or not

11 and you're not --

12       MR. RADINE:  No, the --

13       THE COURT:  Like you can't -- do you allege, I

14 ask again, anywhere in the complaint that somebody put

15 eyes on these checks, some human at PBI put eyes on these

16 checks?

17       MR. RADINE:  No.  The *Honickman* requirement,

18 you do not have to show that they were read or were aware

19 of knowledge facts.  That's a quote I can give to the

20 Court.

21       THE COURT:  Well, but you're telling me a check

22 is inherently dangerous when it says the word martyr on

23 it and I'm saying that as a matter of common sense that's

24 only the case if somebody, some human is reading the word

25 martyr.

Proceedings

1           MR. RADINE:  Or reading --

2           THE COURT:  Otherwise it's just a check.  It's

3    not the provision of guns or, you know, whatever the

4    fertilizer is that's used in explosives.  It's just a

5    check.

6           MR. RADINE:  Except that it is in dozens and

7    dozens of news articles which is sufficient under

8    *Honickman* that says that these checks are being handed

9    out as martyr payments.  And under *Honickman* it says that

10   the, sorry, page 11, "As explained in *Kaplan*, plaintiffs

11   did not need to allege that defendant bank knew or should

12   have known of the public sources at the pleading stage.

13   Such a requirement at this juncture would be too

14   exacting."

15          THE COURT:  This is pre-*Twitter*?

16          MR. RADINE:  Yes, but *Twitter* did not change

17   the standard of knowing the facts.  It changed what we

18   allege nothing, but presumably introduced this passive

19   versus affirmative conduct distinction whereas here it's

20   affirmative conduct, as much as we did in -- or sorry, as

21   much as the plaintiffs to in *Bonacasa* where it's

22   sufficient, or *Zobay* where it's sufficient, or *King* where

23   it's sufficient.

24          In *Bonacasa*, the defendant is giving the

25   argument, from the defendant at least, is that they're

47

Proceedings

1   providing financial services to a completely legal

2   fertilizer company that they were warned was producing

3   fertilizer that was being used in bombs in Afghanistan.

4   Well, we allege that PIB is providing illegal services to

5   illegal entities to provide martyr payments much as they

6   were in *Linde*, your Honor.

7           THE COURT:  Illegal under what law?  U.S. law?

8           MR. RADINE:  Certainly under U.S. law.  I have

9   to imagine it's illegal under Israeli law.  I don't think

10  there's a single place where it's not.

11          I point out that in *Twitter*, by the way, the

12  phrase is, "As *Halberstam* makes clear, people who aid in

13  abet a tort can be held liable for other torts that were

14  a foreseeable risk of the intended tort."  It's illegal

15  or tortious conduct.

16          So even in the universe, your Honor, where it

17  is somehow legal to pay for suicide bombing, bounties,

18  which I don't think is true anywhere, it must be

19  tortious.  It can't possibly be an innocent act.  It's an

20  evil act, your Honor, to pay suicide payment bounties or

21  to help move Saddam Hussein's money, an allegation the

22  Second Circuit credited in our appeal.

23          THE COURT:  I think you're saying, if I

24  understand you correctly, that once you establish

25  knowledge, thank you, that once you establish knowledge,

48

Proceedings

1    intent follows like day follows night.  There's no

2    additional step from knowledge.

3            MR. RADINE:  They act on it certainly.  Right?

4    They have the -- they're continuing to let the checks, to

5    pay on the checks, right?  The check goes out --

6            THE COURT:  But how is that different from

7    YouTube and Twitter?

8            MR. RADINE:  In fact, the Supreme Court

9    distinguished Google from YouTube and Twitter by saying

10   that Google was sharing revenue with ISIS and did not

11   call that conduct passive.  It simply said it didn't have

12   any sense of what the amount was and said it might have

13   been as little as $50 is what Justice Thomas wrote.  But

14   we've alleged $9.5 million for PIB alone, if not more,

15   because the total of Saddam Hussein's payments to ALF was

16   $35 million.

17           THE COURT:  Point me to the part of *Honickman*

18   that you want me to read here.

19           MR. RADINE:  It is page 501.

20           THE COURT:  Which paragraph?

21           MR. RADINE:  Sorry, I'm looking at it in

22   quotation form here, your Honor.  It says, "As we

23   explained in *Kaplan*, plaintiffs do not need to allege

24   that LCB knew or should have known the public sources at

25   the pleading stage.  Such a requirement at this junction

49

Proceedings

1  would be too exacting."

2          THE COURT:  Right.  So in other words, when you

3  say public sources, you mean public media sources.

4          MR. RADINE:  Right.

5          THE COURT:  So at this stage we don't require,

6  you allege, that a human inside PIB read the daily

7  telegraph --

8          MR. RADINE:  Correct.

9          THE COURT:  -- or the French press agency.  I

10  get that.  But that's different from the requirement that

11  somebody inside PIB read the Salem checks.  No?

12          MR. RADINE:  I don't think so, your Honor.  I

13  have no -- it's too exacting, your Honor, because I don't

14  have any --

15          THE COURT:  Maybe not.  Yes.  Maybe --

16          MR. RADINE:  I have no insight into the

17  operations of PIB at the pleading stage.  We will ask

18  them during discovery how they look at their checks.

19          THE COURT:  So you think it's a reasonable

20  inference that a human is putting eyes on every cancelled

21  check that comes back to PIB?

22          MR. RADINE:  Yes.  And I think it's a

23  reasonable inference that when you have the imputable

24  knowledge under *Honickman* that you're holding an account,

25  a checking account, for a popular figure who issues

50

Proceedings

1   martyr checks, that you would then put eyes on those

2   checks.

3           THE COURT:  Yes.  I still say that is eminently

4   more plausible if the bank has some legal or prudential

5   incentive to care who its clients are rather than just a

6   moral incentive that you're positing.  It may be that

7   there's more you can say on that subject by way of an

8   amended complaint or an update Politist declaration.

9           But otherwise, I think you may have a

10  *Twitter* -- you may bump up against *Twitter's* knowledge

11  versus -- *Twitter*, I read *Twitter* rightly or wrongly to

12  say that we need to see some manifestation of rooting

13  interest, rooting R-O-O-T-I-N-G, interest.  And that if

14  they are otherwise just treating this customer the same

15  way they treat all their other customers, then you don't

16  get that.

17          MR. RADINE:  I'm not sure how that would be

18  distinguished.  I mean not that you're bound by that, but

19  by any of the other decisions that have survived the

20  *Twitter* analysis like *Zobay* or *Bonacasa*.

21          THE COURT:  What do you mean when you say they

22  survived the *Twitter* analysis?

23          MR. RADINE:  I mean that the defendants in

24  those cases have moved either for reconsideration or some

25  other device and the court has ruled on them.

Proceedings

1      THE COURT:  What's the most reasoned opinion in

2  that vein where a judge is explaining why *Twitter* doesn't

3  change anything or doesn't change that analysis?

4      MR. RADINE:  Let me bring up the line here from

5  *King*.  I can give you a few quotes.  In *King* the court

6  said the holdings in *Twitter* largely align with the

7  Second Circuit precedent and cited in *King I*, which is

8  *Linde, Honickman,* and *Kaplan*.  There's another analysis

9  in *Zobay* which is Judge Amon's case.  I can give you the

10  cite.  It's a Lexis cite.  2023 U.S. Dist. Lexis 176598.

11  And then *Bonacasa*, which says that it doesn't have to

12  change, it doesn't have to review the effect on Second

13  Circuit law because the allegations there were sufficient

14  under *Twitter* -- I happen to have the Westlaw one here.

15  A little variety.  2023 WL 7110774.

16      THE COURT:  That's *Zobay* you're --

17      MR. RADINE:  That last one was *Bonacasa*.

18      THE COURT:  Okay.

19      MR. RADINE:  The *Standard chartered*.  The

20  second one was *Zobay*.  The first one was *King v. Habib*

21  *Bank*.

22      So those are all cases in which the issue of

23  knowledge isn't coming from a duty, it's coming from

24  evidence that the plaintiffs had whether it was a warning

25  given to Standard Chartered in *Bonacasa*, whether it was

52

Proceedings

1   language I believe in an agreement in *Zobay*, or here

2   whether it's publicly available information that

3   *Honickman* explained was sufficient.

4              THE COURT:  Okay.  All right.  We've gone over

5   by time.

6              So I'm interested in everything that defendant

7   wants to say by way of rebuttal and also whether you want

8   to be heard at this point on the question of leave to

9   amend or not.

10             MR. BERGER:  If your Honor has time, I would

11  like to try to address all the Court's questions.

12             Number one, your Honor is correct FATF

13  standards are not self-executing.  They must be adopted

14  by the jurisdiction in question.  There's no allegation

15  in the second amended complaint that that happened.

16             THE COURT:  Well, there is.  There's an

17  allegation, it may not be plausible, in paragraph 60 that

18  PIB was subject to the rules promulgated by FATF.

19             MR. BERGER:  Well --

20             THE COURT:  You're just saying that's wrong.

21             MR. BERGER:  It is wrong, your Honor.  And the

22  Court is entitled to take judicial notice.  Part of the

23  problem, your Honor, is what we're hearing in argument

24  and in the brief are things that are not in the second

25  amended complaint.  Let me give you the example.  Your

53

Proceedings

1  Honor said where's the allegation that somebody at PIB

2  puts eyes on the check?  It's not there.  Everybody at

3  their table could look and everybody at this table could

4  look.  Footnote 2 at page 11 --

5        THE COURT:  Just pause on that for a second.

6  All this Second Circuit law that is very specific that

7  there's look, you don't have to have an allegation that

8  somebody inside the bank is reading a particular

9  newspaper article at this stage.  That would be too much

10  to ask for.  Why wouldn't that same principle apply to

11  the plausibility analysis regarding whether some human at

12  PIB puts eyes on the check?

13        MR. BERGER:  Because -- and your Honor, there's

14  a couple of parts to this.  I'll do it as quickly as

15  possible.  The error -- *Honickman* is inconsistent with

16  *Twitter*.  It cannot be reconciled.  It says there's no

17  difference.  *Taamneh* says that's wrong.  That's the Ninth

18  Circuit's error.  What *Kaplan* and *Honickman* could be said

19  still to stand for is that public reports, and then we'll

20  get to your Honor's analogy, are probative of general

21  awareness but they cannot be probative of the actual

22  knowledge required for knowing and substantial

23  assistance.  I understand the Second Circuit hasn't yet

24  said you know, *Honickman* is inconsistent with *Twitter* but

25  it's going to say that my next point.

54

Proceedings

1        In the *Wildman* decision, as your Honor probably

2   knows, *Wildman* is the first post *Twitter* bank liability

3   case that has gone to the Second Circuit.  It was argued

4   on March 13th or 14th.  And there, the Second Circuit is

5   grappling with how to reconcile the inconsistent aspects

6   of *Honickman* in particular and *Kaplan* with *Wildman*.

7        THE COURT:  How do you know that, that they're

8   grappling with that?  Did you listen to the oral

9   argument?

10       MR. BERGER:  I listened to the oral argument.

11  But none of us has to guess, your Honor.  What I was

12  going to say, your Honor asked me my view of that

13  amendment.  If you're going to amend and we care what the

14  rules of the road are, as we all do, then perhaps the

15  thing to do is wait to see what *Wildman* tells us and let

16  them make their amendments, and then we won't have to

17  guess.

18       THE COURT:  When was the argument?

19       MR. BERGER:  March 13th or 14th.  14th or 15th.

20       THE COURT:  Second Circuit.  I mean think about

21  how long the Second Circuit took in this case.

22       MR. BERGER:  Right.

23       THE COURT:  I'll listen to the argument though.

24       MR. BERGER:  So here -- I apologize, your

25  Honor.

Proceedings

1          THE COURT:  Let me just make a note here.  You

2   want me to mind the distinction between general

3   awareness, between what is too much to ask at the

4   pleading stage, you say that applies to the general

5   awareness question but not the specific --

6          MR. BERGER:  Precisely, precisely.  And I think

7   part of the reason is one of the things that *Twitter*

8   said, and it's very important, and your Honor was reading

9   a number of these points, which is that aiding and

10  abetting has to be interpreted based on the sort of

11  common conceptual core of aiding and abetting liability

12  as it has existed for a long time.  I can give your Honor

13  the cite to that if you want.

14         But my point here is by doing so -- that's at

15  598 U.S. 493.

16         THE COURT:  You're talking about the language

17  in, I'm calling it the *Twitter* case, you're calling it

18  *Taamneh*.

19         MR. BERGER:  I'll call it whatever your Honor

20  wants.

21         THE COURT:  At the beginning of page 504, it

22  says the knowledge and substantial assistance components

23  should be considered relative to one another.  The

24  knowing part of that inquiry is not the same as the

25  general awareness that defines *Halberstam's* second --

Proceedings

1        MR. BERGER:  Precisely, your Honor.  And that

2    is the -- they can say all they want, that the Second

3    Circuit has not formally said that *Honickman* is wrong

4    when it said nothing more is required for knowing

5    substantial assistance than is required for general

6    awareness.

7        THE COURT:  Thank you.

8        MR. BERGER:  But the law is quite clear that

9    when the Supreme Court decision undermines the basis for

10   an appellate opinion, it is no longer sound to rely on

11   that.

12       The other key part of *Taamneh* is that it said

13   you got to interpret JASTA not so it's text that has to

14   be interpreted in light of *Halberstam*, but in light of

15   the common core of aiding and abetting liability.  And I

16   would say that one of the things that's highly

17   instructive, particularly since *Twitter* said one of our

18   concerns is to avoid imposing liability on mostly passive

19   actors like banks for processing routine transactions of

20   their customers.

21       THE COURT:  *Twitter* did not say like banks, did

22   it?

23       MR. BERGER:  Yes, your Honor.  I'll give you

24   the precise quote.  The quote in -- it's at page 143,

25   Supreme Court 1222, but it's -- and I'll get the U.S.

Proceedings

1    cite in a moment --

2              THE COURT:  No, I'll get there.

3              MR. BERGER:  It says that the whole purpose of

4    these safeguards is to prevent mostly passive actors like

5    banks being, I'm adding that, liable for all of their

6    customers' crimes by virtue of carrying out routine

7    transactions.

8              So it did specifically express the concern that

9    we're wrestling with here.  The answer to that concern is

10   two things are required, actual knowledge, which we've

11   talked about quite a bit today, and affirmative

12   misconduct.  Your Honor pointed it out, there has to be

13   some manifestation of a set or support --

14             THE COURT:  I'm looking at -- you said 1222?

15             MR. BERGER:  Yes, your Honor.

16             THE COURT:  I'm still missing --

17             MR. BERGER:  That's the Supreme Court, the

18   Supreme Court Reporter.

19             THE COURT:  Yes.

20             MR. BERGER:  I will get the U.S. citation right

21   now.

22             THE COURT:  Oh, passive actors like banks.  I

23   got it.  That's mostly passive actors like banks.  I had

24   missed that.

25             MR. BERGER:  There's a rich body of aiding and

Proceedings

1   abetting law developed in the Second Circuit and

2   elsewhere on aiding and abetting liability for banks.

3   That's immediately relevant.

4          THE COURT:  The Supreme Court is not saying

5   this though.  The Supreme Court is just talking about

6   what other courts have said maybe with a little bit of

7   approval.  Still others, meaning other courts, have

8   explained the culpability of some sort is necessary to

9   justify punishment of a secondary actor lest mostly

10  passive actors like banks become liable.  And they cite

11  this Third Circuit case from 1978.

12          I don't draw that much comfort for your client

13  from that because (A), banking regulation in 1978 was a

14  very different thing.  You could walk in 1978, you know,

15  into a bank with a suitcase full of cash and they would

16  accept the deposit.  And the *Twitter* case goes on to say

17  all that stuff that I quoted about how the *Twitter* case

18  might be different if there was some affirmative duty.

19          MR. BERGER:  Right.  And so your Honor, I think

20  that immediately takes us to the language in *Twitter*.

21  Forget about reasoning by analogy from that language

22  about holding banks liable.  This is to quote 143 Supreme

23  Court at 1221.  "The defendant must take some affirmative

24  act with the intent of facilitating the offense's

25  commission."  And on page 1227, it rules out relying on

Proceedings

1 passive nonfeasance.  Absent a duty, as your Honor has

2 been --

3          THE COURT:  Well, that's just saying that you

4 can't be a bystander.  But obviously, somebody who's

5 providing -- you know, PIB's taking affirmative acts.  I

6 think what we're talking about is whether it's with the

7 intent of facilitating the offense's commission.

8          MR. BERGER:  No, your Honor.  I don't think

9 we're even trying to say that they're taking an

10 affirmative act.  And this is a point, and let me just --

11 I don't know --

12          THE COURT:  Clearing and settling -- writing,

13 processing checks.  Southern District of New York

14 decision on aiding and abetting liability.  And I'm

15 quoting here from *Zamora v. JPMorgan Chase Bank*, 2015 WL

16 4653234 *3 (SDNY Jul. 31, 2015).  And this is in the

17 context of bank aiding and abetting liability made

18 germane by *Twitter*.  "Routine banking services including

19 processing checks do not constitute substantial

20 assistance."

21          THE COURT:  Can you just -- I'm finding it hard

22 to follow you from one step of your logic to the next.

23 You were talking about whether your client had taken any

24 affirmative act.

25          MR. BERGER:  Right.

60

Proceedings

1      THE COURT:  Not whether they provided

2  substantial assistance which is a whole other can of

3  worms.  And I said it seems obvious to me that

4  maintaining accounts and clearing check payments is an

5  affirmative act.  And then you switched to some analysis

6  of substantial assistance.

7      MR. BERGER:  That's because substantial

8  assistant is the affirmative act that the Supreme Court

9  has in mind in *Twitter*.  Substantial assistance.  There's

10  two aspects, right?  This is what *Twitter* is talking

11  about.  Knowing, substantial assistance.  The actual

12  knowledge piece, first requirement, is the knowledge

13  piece.  The substantial assistance piece is the same

14  thing as an affirmative act.  That's the whole purpose of

15  saying substantial assistance and knowing substantial

16  assistance.

17      THE COURT:  Say the name of the district court

18  case you're saying again?

19      MR. BERGER:  *Zamora*, Z-A-M-O-R-A, *v. JPMorgan*

20  *Chase Bank*.

21      THE COURT:  It stands for the proposition you

22  say that clearing checks can never be substantial

23  assistance?

24      MR. BERGER:  It says routine banking services,

25  including processing checks, do not constitute

Proceedings

1   substantial assistance.

2          THE COURT:  And it says that based on what?

3          MR. BERGER:  It says that based on the fact

4   that banks have to do something more than engage in

5   routine activity.

6          THE COURT:  Who says?  Like what's the

7   authority?  *Zamora* is not binding on me, right?

8          MR. BERGER:  None of this, your Honor, is going

9   to be binding until *Wildman* comes out.  But what is

10  binding from Twitter is that the body of aiding and

11  abetting case law that exists out there for which there

12  are particularized applications to banks is to be

13  consulted in determining both the knowing element --

14         THE COURT:  Yes, consulted to the extent it

15  might be persuasive.  But if you just says --

16         MR. BERGER:  But here's what it says --

17         THE COURT:  -- this is not substantial

18  assistance and doesn't explain why, then what utility is

19  there?

20         MR. BERGER:  Because it leads to the next point

21  which resonates with something your Honor has pointed out

22  repeatedly, and I want to make sure this is the Politist

23  declaration as well, which is that the line drawn in this

24  case law is the same line drawn in *Kaplan* which is in

25  order to determine if something is an affirmative act by

62

Proceedings

1   a bank, there has to be atypical bank behavior that lacks

2   business justification --

3           THE COURT:  Where do you see that in *Kaplan*,

4   atypical business behavior?

5           MR. BERGER:  I will turn to that right now,

6   your Honor.  Where I see that is in *Kaplan* at 999 F.3d

7   858 talking about the special exceptions that LCB made to

8   favor its customers, that reference about special

9   exceptions.

10           THE COURT:  So you're saying that the Second

11   Circuit just noted the fact.  I thought you were going to

12   point me to the place where the Second Circuit says you

13   have to have atypical business activity, that business as

14   usual is not enough.

15           MR. BERGER:  Well, I don't think the Second

16   Circuit has said that yet, but a whole body of case law,

17   including an Eastern District of New York case and a

18   Southern District of Florida case I could cite to your

19   Honor that deals with bank aiding and abetting liability

20   makes it clear that substantial assistance for aiding and

21   abetting requires, and here I'm quoting, "atypical bank

22   activities."

23           THE COURT:  What are you quoting?

24           MR. BERGER:  I'm quoting Southern District of

25   Florida 2023 case that is consistent also with an Eastern

63

Proceedings

1    District of New York case.  I'll give the Court both

2    citations if the Court would like.

3                THE COURT:  Just give me the names.

4                MR. BERGER:  *Rusty115 Corp. v. Bank of America*.

5                THE COURT:  That's the Florida case?

6                MR. BERGER:  That's the Florida case.  The

7    Eastern District of New York case is *HSA Residential*

8    *Mortgage Services v. State Bank of Long Island*.  That's

9    2006.

10               THE COURT:  Those don't sound like terrorism

11   financing cases to me.

12               MR. BERGER:  No, they're not, your Honor.  They

13   are precisely what I said they were which is bank aiding

14   and abetting liability cases that *Twitter* makes directly

15   germane to JASTA when *Twitter* says you have to interpret

16   JASTA against the common core of aiding and abetting

17   liability as it has existed for decades.  That is not an

18   idle reference.  That's where Justice Thomas is saying

19   don't engage in sort of some text parsing of JASTA or of

20   analogizing to *Halberstam* consider the body of aiding and

21   abetting law as it has existed for decades.

22               THE COURT:  Okay.

23               MR. BERGER:  That drove us back to looking at

24   the aiding and abetting law as it existed for decades.

25               THE COURT:  All right.  Do you want to be heard

64

Proceedings

1   on the subject of leave to amend?

2           MR. BERGER:  Yes, your Honor.  I mean I --

3           THE COURT:  You can be heard in writing if you

4   prefer.

5           MR. BERGER:  If they want to amend, then let's

6   make sure we're addressing the allegations they have.

7   We're not going to -- if your Honor is inclined to grant

8   them leave to address the points your Honor's talking

9   about, then let's get that done now so that we don't have

10  to be taking up more of the Court's resources dealing

11  with what will be a dead complaint.

12          THE COURT:  Agreed.  Yes, I don't want to write

13  a long opinion on the subject only to then have to deal

14  with a request for leave to amend on this point about the

15  bank's obligations, legal and prudential.  I'm trying to

16  think whether there was anything else today that might --

17          MR. BERGER:  The Politist declaration.  I think

18  your Honor had that in mind.

19          THE COURT:  Yes, the --

20          MR. BERGER:  Which is -- it's important to note

21  the Politist declaration --

22          THE COURT:  That's the same subject though.

23  I'm trying to think whether there was a second subject.

24  The second subject is the question of whether anybody

25  inside a bank as a matter of fact would be likely to put

Proceedings

1   eyes on the memo section of a check in the ordinary

2   course of clearing and settling check payments.  Is that

3   clear enough?

4            MR. RADINE:  Yes, your Honor.  Do you, since

5   you mentioned doing it in writing, do you mind if we --

6            THE COURT:  I think we just heard that leave to

7   amend is not opposed.

8            MR. RADINE:  All right.

9            THE COURT:  So I'm granting leave to amend.

10           MR. RADINE:  Okay.

11           THE COURT:  Correct?  You do not oppose leave

12   to amend?

13           MR. BERGER:  That is correct, your Honor.

14           THE COURT:  Okay.  So leave to amend is

15   granted.  I think you've seen my individual rules about

16   submitting a blackline --

17           MR. RADINE:  Okay.

18           THE COURT:  Leave to amend is granted for the

19   purposes that we've discussed today.  And if you have any

20   questions or confusion about that, let me know and we'll

21   get on a phone call.  I'm not anticipating that you're

22   going to add additional counts or additional defendants

23   or --

24           MR. RADINE:  No, not at all.

25           THE COURT:  -- anything like that.  But the two

66

Proceedings

1   subjects I mentioned are (A), the contours and the source

2   of any obligations this bank has to know its customers

3   and to avoid being in the terrorism financing business

4   and (B), any factual allegations in respect of whether

5   banking in the ordinary course in the Palestinian

6   territories in 2001 and '02 can plausibly be understood

7   to have required humans to put eyes on checks.

8           Anything else that I'm missing from the

9   plaintiff's perspective?

10          MR. RADINE:  We have a question we'll write to

11  the Court on that.

12          THE COURT:  Okay.

13          MR. RADINE:  60 days for the amended complaint.

14  We have to dig around in historical Israeli and

15  Palestinian records I imagine.

16          THE COURT:  60 days is fine.  Let's set a

17  schedule now whereby -- what's a reasonable amount of

18  time for the defendants?  You don't need to submit a full

19  blown motion to dismiss if you think that would be less

20  efficient than just a supplemental letter.

21          MR. BERGER:  Your Honor, obviously I don't know

22  until I see their amended complaint.  And I'm happy not

23  to have your Honor lock into either a schedule or

24  whatever at this point or a format.  All I know is that

25  they're going to take 60 days for a second amended

67

Proceedings

1   complaint and we'll need a minimum of 60 days to file

2   whatever our response is.

3          THE COURT:  Well, you can be doing the same

4   research during those 60 days that they are about state

5   of bank regulation.  I think we should plan to hear from

6   the defense within 30 days after the plaintiff's amended

7   complaint comes in in a letter not to exceed five single

8   spaced pages telling me whether in your view the amended

9   complaint, the amendments do or do not make a difference.

10  And I suppose as a theoretical matter you can answer the

11  complaint if you decide they do make a difference such

12  that you no longer wish to pursue a 12(b)(6) motion.  But

13  if you need additional time, you can ask for it.

14         MR. BERGER:  Thank you, your Honor.  And their

15  response to the letter or is there a schedule to --

16         THE COURT:  Yes.  And then a response also five

17  pages or less from the plaintiffs let's call it two weeks

18  after you get the defense letter.  So 60 days, just put

19  specific dates to all of this, 60 days from today is July

20  12th.  Thank you.

21         MR. RADINE:  We might file the complaint early

22  if you want to just set out the amount of time between

23  like you did, the 30 days and two weeks rather than give

24  those dates because if we file the complaint early --

25         THE COURT:  All right.  And then 30 days post

68

Proceedings

1   the filing of the complaint for the defense letter and

2   then 14 days post that for the plaintiff's response.  I

3   don't think we need --

4           MR. BERGER:  At risk of wearing out whatever is

5   left of my welcome mat, do I get a reply?

6           THE COURT:  You do not.

7           MR. BERGER:  Thank you.

8           THE COURT:  We're, you know, really zooming in

9   here on a pretty specific issue and I think these two

10  letters will get us where we need to go.

11          All right.  Anything, not argument wise, but

12  just logistically, anything else we need to do in terms

13  of setting dates or managing the calendar from the

14  defense perspective?

15          MR. BERGER:  I don't think so, your Honor.  If

16  the *Wildman* decision comes out in the midst of all these

17  of course I'm sure both sides will inundate the Court

18  with their views on it.

19          THE COURT:  Yes.  And any other supplemental

20  authority.  I assume there are JASTA cases pending in

21  other circuits as well.  You know, if there are district

22  court decisions, I'm interested in them to the extent

23  they set out their reasoning in a way that I might find

24  persuasive.  Circuit Court decisions I'm interested in

25  regardless.

Proceedings

1          Anything else logistically from the plaintiff's

2    side?

3          MR. RADINE:  No, your Honor.

4          THE COURT:  All right.

5          MR. BERGER:  One question, your Honor, if I

6    may, just on logistics.  The disposition of the motion

7    then is that it's either held in abeyance or denied

8    without prejudice?  It's unclear to me what the outcome

9    is.

10          THE COURT:  I would think the only reason

11    anybody in this room would care is because judges have

12    the six month list as a shaming device.  If you have a

13    preference between denied without prejudice or, you know,

14    what do you prefer?

15          MR. BERGER:  Well, I prefer it be granted with

16    prejudice, but since that's not on the table, I would say

17    how about granted with leave to amend?

18          THE COURT:  Your motion to dismiss is granted

19    with leave to amend?  No.  The question is whether -- the

20    decision is under advisement for the time being and -- so

21    I'm sorry, what was the last day in all this that we --

22          THE CLERK:  So it would be 60 days, so July

23    12th and then 30 days from that is --

24          THE COURT:  August, like end of August.  That

25    will give us a month to decide this.  I'll think about

70

Proceedings

1    that.  But everybody will know that whatever technical

2    disposition is recorded is of limited import all around.

3            All right.  Thank you, all.  I've kept you way

4    beyond your appointed lunch hour.  I think we were

5    supposed to have had a trial going on this week which is

6    why we scheduled oral argument for the fairly unusual 12

7    noon slot.

8            Thank you.  This has been I think well briefed

9    and argued all around and I think the supplemental

10   briefing will only sharpen the issues.  We'll endeavor to

11   get something out in response as quickly as I can once

12   the briefing is full.  And with that, we'll be adjourned.

13           MR. BERGER:  Thank you, your Honor.

14           MR. RADINE:  Thank you, your Honor.

15           THE COURT:  Thank you.

16                   (Matter concluded)

17                      -oOo-

18

19

20

21

22

23

24

25

71

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **15th** day of **May**, 2024.

*Mary Greco*

Transcriptions Plus II, Inc.