**SQUIRE⌁**
**PATTON BOGGS**

August 13, 2024

Hon. Eric R. Komitee, U.S.D.J.
U.S. District Court, Eastern District of New York
Brooklyn, New York 11201

**Re:**  *Spetner, et al. v. Palestine Investment Bank*, No. 1:19-cv-005-EK-JAM (E.D.N.Y.)
Response of Palestine Investment Bank ("PIB") to the Third Amended Complaint ("TAC," DE 78) per the Court's May 13, 2024 Order (DE 76).

Dear Judge Komitee:

PIB respectfully submits that the answers to the Court's two questions at oral argument,[1] coupled with the TAC's entirely new allegations about four ostensible PIB accountholders, warrant full briefing of a motion to dismiss the TAC or alternatively a targeted motion for summary judgment.

*First*, the checks written by Rakad Salem as presented to PIB for payment did <u>not</u> bear the "martyr" notations that appear in Exhibit A to the TAC and all prior versions of the Complaint. 3d Aghbar Decl. ("Decl.") ¶¶ 20, 24-30.  Contrary to the entire premise of Plaintiffs' claim, PIB personnel never saw or processed checks with "the word 'martyr' in the memo line" (*Spetner v. PIB*, 70 F.4th 632, 638 (2d Cir. 2023)).[2]  Decl. ¶ 29.  PIB checks did not even have a "memo line."  *Id.*

*Second*, during the entire allegedly "Relevant Period" of 2000-2003 (TAC ¶ 22), PIB had no legal or prudential "obligation[] … to avoid being in the terrorism financing business" (*see* Tr. 66:2-3). Decl. ¶¶ 6-19.  Palestinian law and Palestine's bank regulator (the Palestine Monetary Authority ("PMA")) did not impose any such obligation until <u>years</u> later.  *Id.*  Equally, PIB's correspondent banks, including in Israel, did not during those years impose any requirements related to terror-financing, or reject any transaction based on terror-financing concerns.  *Id.* ¶ 11.  Palestinian law at the time required only that: PIB confirm the identity of a prospective accountholder; ensure that the individual or entity did not appear on a PMA blacklist of <u>non-creditworthy</u> persons; and report overseas wire transfers exceeding $10,000.  *Id.* ¶¶ 8-9.  Finally, neither Israeli authorities nor any Israeli bank during those years ever instructed PIB to screen or reject customers or transactions involving Israeli-designated Unlawful Associations or Terrorist Organizations.  *Id.* ¶¶ 11-12.

The TAC's fanciful pleading should not be allowed to evade these dispositive factual issues.  If the Court cannot take account of these dispositive facts on a Rule 12(b)(6) or 12(c) motion, then it should consider them on a targeted summary judgment motion addressing the Court's two questions before consigning this case to protracted and ultimately fruitless discovery.

**The Salem checks presented to PIB did not have the word "martyr" on them.**  PIB did not

---

[1] The Court queried: "(A), the contours and the source of any obligations [PIB] has to know its customers and to avoid being in the terrorism financing business and (B), any factual allegations in respect of whether banking in the ordinary course in [Palestine] in 2001 and '02 can plausibly be understood to have required humans to put eyes on checks." May 13, 2024 Tr. 66:1-7 ("Tr.").  The TAC buries Plaintiffs' position on the second question in a single speculative footnote (TAC ¶ 552 n.15), pleads around the first question by citing inapplicable sources, and exceeds the limited leave to amend (Tr. 65:18-25) with allegations about ostensible new customers (TAC ¶¶ 15, 717-779).

[2] Likewise, the receipt vouchers included in TAC Ex. A are not PIB documents and were not seen by PIB.  Decl. ¶ 28.

- 1 -

process Salem's checks with the "martyr" notations that Plaintiffs present in TAC Exhibit A (the "Exhibit A Checks"). Decl. ¶¶ 20, 24-30. The actual Salem checks corresponding to the Exhibit A checks (as processed and archived by PIB) do not bear any "martyr" notation, and (like all PIB checks) do not contain a "memo" line. *Id.*, Ex. 1 ("Archived Checks"). During the Relevant Period, checks presented to PIB for payment were reviewed by PIB solely to ensure that (i) the check was properly formatted, (ii) the signature matched that of the payor, and (iii) the payor's account had sufficient funds. *Id.* ¶ 22. PIB then would apply three different stamps to the check reflecting that each of these requirements was satisfied. *Id.* The Archived Checks include stamps and other notations confirming they were reviewed and processed by PIB without the "martyr" notations on the Exhibit A Checks. *Id.* ¶¶ 25, 27. The Archived Checks do not include the word "martyr" anywhere. *Id.* PIB indisputably did not review or process Salem's checks in the form of the Exhibit A Checks, which do not include PIB's processing stamps and notations. *Id.*

Plaintiffs do not explain how they obtained the Exhibit A Checks (or vouchers, *supra* n.2), why they have "martyr" notations on them, or why they allowed this Court and the Court of Appeals to operate on the false premise that checks processed by PIB contained the "word 'martyr' in the memo line" (*Spetner*, 70 F.4th at 638). The Court can base its assessment of Plaintiffs' claims on the checks as actually presented to PIB because they are "integral" to the TAC and "incorporated by reference" therein. *Reid v. Toyota Motor Credit Corp.*, 2013 WL 1397143, at *4 (S.D.N.Y. Apr. 8, 2013) (considering copy of processed check appended to motion to dismiss without converting the motion into one for summary judgment where plaintiff attached a pre-deposit copy of the check to the complaint), *R&R adopted*, 2013 WL 3776201 (July 18, 2013).

**PIB adhered to applicable regulatory requirements.** PIB complied with Know Your Customer ("KYC") requirements promulgated by the PMA, and with its own internal KYC policies, which were the only KYC requirements applicable to PIB during the Relevant Period. Decl. ¶¶ 8, 11. These KYC requirements and policies mandated that an individual seeking to open a PIB account complete (i) an account opening form and agreement, and (ii) a signature verification form. *Id.* ¶ 8. PIB would then confirm (i) the individual's identity, and (ii) that the individual did not appear on a PMA blacklist of non-creditworthy customers. *Id.*

The TAC fails to identify "the contours and the source" (Tr. 66:1) of any Anti-Money Laundering or Countering the Financing of Terrorism ("AML/CFT") obligations that actually applied to PIB during the Relevant Period. In fact, there were no CFT requirements during the Relevant Period. Decl. ¶ 7. There was only one AML requirement during the Relevant Period, that banks report to the PMA, and place a 24-hour hold on, any overseas wire transfer exceeding $10,000. *Id.* ¶ 9. The TAC alleges unspecified "regulatory demands aimed at combating terrorism financing" (TAC ¶ 556) and speculates that PIB "would have had both legal and prudential reasons" (TAC ¶ 565 (emphasis added)) to implement KYC and due diligence procedures. These vague and speculative allegations cannot overcome PIB's sworn showing of the actual regulatory requirements under which it operated at the time.

The Court directed the parties to address "the contours and the source of any obligations [PIB] has to know its customers and to avoid being in the terrorism financing business" at the relevant time. Tr. 66:1-3. The TAC does not make such a showing. PIB's accompanying Declaration, by contrast, demonstrates the very limited KYC and AML regulatory requirements under which PIB operated

during the Relevant Period, none of which related to terror-financing.  Decl. ¶¶ 6-12.  Further, as a prudential matter, PIB's correspondent banks in Israel, Jordan, and elsewhere did not impose additional KYC, AML, or CFT requirements.  *Compare id.* ¶ 11 *with* TAC ¶ 566.

The U.S. Anti-Terrorism Act similarly is not a source of substantive banking requirements (*e.g.*, KYC or AML/CFT); rather, 18 U.S.C. § 2339B "is a [] statute that imposes civil and criminal penalties for providing material support to [U.S.-designated] FTOs."  *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 451 (E.D.N.Y. 2013).  The TAC does not make a § 2339B claim, and thus does not allege that PIB provided material support to any FTO.[3]  Plaintiffs also cite the Basel Committee on Banking Supervision and the Financial Action Task Force ("FATF").  TAC ¶¶ 557-560, 579, 581.  The TAC does not and cannot allege that PIB was subject to either Basel or FATF guidelines during the Relevant Period; it was only in 2010 and 2015, respectively, that Palestine enacted laws complying with Basel Accords and FATF[4] recommendations.  Decl. ¶¶ 16-18.

Finally, the TAC (¶¶ 15, 717-779) makes entirely new allegations that PIB provided services to four ostensible accountholders: (1) Beit Fajar Zakat Committee ("BFZC"), (2) Orphan Care Society Bethlehem, (3) al-Islah Charitable Society, and (4) Al-Khader Zakat & Sadaqat Committee.  The TAC alleges that these entities were, at certain times, designated "unlawful associations" by Israel (*id.*).[5]  But, to have legal effect in Palestine, a declaration of an "unlawful association" is made by the Israeli military commander with oversight responsibilities over Palestine.[6]  Dispositively, the TAC does not allege: (i) that the Israeli commander took any action against these entities before or during the Relevant Period;[7] (ii) that Israel took any enforcement action, including seizing property or assets or otherwise instructing PIB to freeze their accounts[8] (Decl. ¶¶ 11-12); or (iii) that PIB knew that Israel designated these entities as "unlawful associations" (*id.*).  Moreover, two of the entities were designated <u>two years after the Relevant Period</u>, and one was permitted to operate for an additional two years after designation before being

---

[3] TAC ¶¶ 563-64 cite instances where the United States "designat[ed] two Palestinian financial institutions as [Specially Designated Global Terrorists]" following the September 11 attacks.  PIB has never been designated or otherwise implicated in the U.S. government's "pursu[it] [of] the bankers who finance [] terrorists" (TAC ¶ 564).

[4] In 2006, Palestine joined the Middle East & North Africa Financial Action Task Force ("MENAFATF") as an observer.  In 2015, Palestine enacted AML/CFT Law No. 20, and Palestine became a full member of MENAFATF that same year.  Decl. ¶¶ 14, 17-18.

[5] Israel's use of an "over-broad and vague definition[]" of "unlawful association," as well as "the power and discretion provided to both Israel's Minister of Defense and the Israeli military commander in issuing the designations and declarations, the legal consequences of such designations and declarations . . . , and the difficulty in challenging designations and declarations" have been the subject of much controversy.  Human Rights Council Report at 13 (June 2, 2023), https://tinyurl.com/chznhwn7.  For example, Israel has banned "all major Palestinian political parties, including the ruling Fatah party."  Human Rights Watch (Dec. 17, 2019), https://tinyurl.com/yajrr2k7.

[6] *See, e.g.*, Adalah's Expert Opinion (Nov. 23, 2021) at 4, https://tinyurl.com/3ssfn98e; *see also* Report of the Special Rapporteur at 3 n.7, https://tinyurl.com/3xdw7mkv.

[7] *See* DCIP demands Israeli military cancel declaration as "unlawful association" (Feb. 3, 2022), https://tinyurl.com/55hx5b4s (distinguishing declaration by defense minister of "terrorist organizations," which banned activities in Israel, from declaration of an "unlawful association" by Israel's Chief Military Commander, which banned activities in Palestine).

[8] Israeli law authorizes the seizure of an unlawful association's property.  Fighting Terror in the Legal Arena, https://tinyurl.com/4msrs5xk.

shuttered by Israel.[9] In fact, it was not uncommon for an unlawful association itself not to be "aware of the fact that the military commander had declared the organization" as such, and for it to "continue[] its work without any significant changes in activities" for lengthy periods between its designation and any Israeli enforcement action. *See Adalah, supra* n.6 at 6, 12.

**Count I fails to state a claim for conspiracy to violate 18 U.S.C. § 2339A.** The TAC does not allege that PIB acted with the "'specific intent that' the conspiratorial goal be completed," as required for a § 2339A conspiracy. *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018). Specific intent is the touchstone of the "agreement" element of a conspiracy. *Id.*; *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 80 (2d Cir. 2023) (conspiratorial agreement requires "common intent" or "common goal"); *U.S. v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002) (conspiratorial agreement requires proving that "defendant 'knowingly' engaged in the conspiracy with the 'specific intent to commit the offenses that were the objects of the conspiracy'"). Moreover, the objective of a § 2339A conspiracy must be "to provide material support for terrorism," *Kemper*, 911 F.3d at 395, and the TAC makes no factual allegations from which the Court could infer a specific intent by PIB to commit or support terrorism. Mere knowledge of a conspiracy's goals is not enough. As *Kemper* explained, "'[a] person who is indifferent to the goals of an ongoing conspiracy does not become a party to this conspiracy merely because that person knows that his or her actions might somehow be furthering that conspiracy.'" *Id.* The TAC does not plausibly allege that by providing banking services or "knowingly maintain[ing] banking relationships" (TAC ¶ 578), PIB had the specific intent that terroristic acts be carried out.

**Count II fails to state a claim for material support under 18 U.S.C. § 2339A.** The TAC does not plausibly allege: (i) the required heightened state of mind; (ii) that PIB itself engaged in an act of international terrorism by providing financial services; or (iii) that PIB's financial services proximately caused the attacks at issue. *See* DE 70-1 at 12-30; DE 72 at 7-15. The statute requires that the defendant "must have known or intended that [its] support would be used in preparation for, or in carrying out," a criminal act of terrorism. *Ahmad v. Christian Friends of Israeli Cmtys.*, 2014 WL 1796322, at *3 (S.D.N.Y. May 5, 2014). "[T]he mental state in section 2339A extends both to the support itself, and to the underlying purposes for which the support is given." *U.S. v. Stewart*, 590 F.3d 93, 113 n.18 (2d Cir. 2009). The TAC (¶ 831) alleges only knowledge, not intent, and even there fails to plausibly allege that PIB had "specific knowledge" its financial services would be used to prepare for or carry out terrorist acts. *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1309 & n.22 (S.D. Fla. 2018). The § 2339A state-of-mind requirement cannot be satisfied unless PIB knew that Salem had "publicly stated terrorist goals" or was an "associate[] of [an] established terrorist organization[]," *Ahmad*, 2014 WL 1796322, at *3, and here, ALF and Salem were not designated terrorists anywhere in the world during the Relevant Period, nor are they so designated today, and Salem was acquitted of terror-financing charges. *See* DE 70-1 at 4-5, 11, 13-14, 22-23, 39; DE 72 at 3, 8-13. Indeed, the TAC (¶¶ 598-600) cites an *Independent* article that refutes the notion entirely, reporting that "[t]he money was distributed by the Arab Liberation Front (ALF) … which has not been involved in carrying out any suicide bombings or other militant attacks."[10] Rather than plead specific knowledge, as required for a § 2339A claim,

---

[9] Al-Khader Zakat & Sadaqat Committee was designated an unlawful association on November 15, 2005. TAC ¶ 771. BFZC was designated in February 2005 (TAC ¶ 720), searched by Israel in July 2006, and closed in March 2007. UN Special Focus Report, https://tinyurl.com/2av5fuz7; UN Weekly Report, https://tinyurl.com/yvnshrkm.

[10] Palestinians mourn fall of their hero Saddam after flow of dollars for 'martyrs' dries up, *Independent* (May 7, 2003), https://tinyurl.com/2p9mx3p9.

the TAC alleges more generally that PIB knew from public reports (*e.g.*, ¶¶ 517-528, 532-549, 823-824) that Salem distributed checks to the families of "martyrs" (¶ 503) and "Palestinian[s] killed in … clashes with Israel" (¶ 504), and that these checks were sometimes presented at "public ceremonies" (¶ 540).  Here too the allegations fall short.  Unlike articles cited in *Averbach v. Cairo Amman Bank*, 2022 WL 2530797, at *13 (S.D.N.Y. Apr. 11, 2022), *R&R adopted*, 2024 WL 3677339 (Aug. 6, 2024),[11] which reported that ALF "held public ceremonies where checks were cut from CAB bank and were distributed to 'martyrs'' families," the TAC cites no media report that ties these payments to PIB in any way.  *See, e.g.*, TAC ¶¶ 534-35.

**Count III fails to state a claim for aiding and abetting liability under 18 U.S.C. § 2333(d).**  *Twitter v. Taamneh*, 598 U.S. 471, 490, 500 (2023) holds that JASTA requires that the defendant act with the "intent of facilitating" the terrorist act at issue.  To safeguard against holding "mostly passive actors like banks … liable for all of their customers' crimes by virtue of carrying out routine transactions," *Taamneh* requires two showings for "knowing and substantial assistance": (i) actual knowledge of customer "wrongdoing," and (ii) active bank misconduct in support thereof.  *Id.* at 491, 503-05; *see Bonacasa v. Standard Chartered*, 2023 WL 7110774, at *7 (S.D.N.Y. Oct. 27, 2023).  Plaintiffs fail to satisfy either element.  Plaintiffs' allegations that PIB should have known that Salem was writing checks to "martyrs" do not satisfy *Taamneh*'s actual knowledge requirement.  The "common conceptual core" of aiding-and-abetting law applies fully to JASTA.  *Taamneh*, 598 U.S. at 484, 493, 504; *Amazon Servs. v. Dep't of Agric.*, 2024 WL 3546385, at *4-8 (D.C. Cir. July 26, 2024).  Under that body of law, "[a]lleging that a bank disregarded 'red flags'" or "should have known" is "insufficient to establish knowledge," particularly when (as with PIB, Decl. ¶ 29) banks have no duty to investigate customer transactions.  *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 950 (11th Cir. 2014); *see Zamora v. JPMorgan Chase*, 2015 WL 4653234, at *3 (S.D.N.Y. July 31, 2015).  Here, the Salem checks presented to PIB did not contain "martyr" notations, negating the fulcrum for the TAC's actual knowledge allegations.  Decl. ¶¶ 20, 25.  The TAC cites media reports, but public reports do not show actual knowledge, and thus can relate only to the separate JASTA "general awareness" element.  *See Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842, 863-65 (2d Cir. 2021).  Regardless, the reports do not mention PIB or the distribution of PIB checks at "public ceremonies"; by contrast, media reports in *Averbach* expressly referenced checks drawn on Cairo Amman Bank.[12]  On the substantial assistance element, "[r]outine banking services, including … processing checks do not constitute 'substantial assistance.'" *Zamora*, 2015 WL 4653234, at *3; *see Bonacasa*, 2023 WL 7110774, at *11.  Substantial assistance requires "atypical bank activities" or "out-of-the-ordinary activities that lack a business justification." *See Rusty115 Corp. v. Bank of America*, 2023 WL 6064518, at *6, 8 (S.D. Fla. Sept. 18, 2023).  For example, a court in this District upheld aiding-and-abetting liability because a bank's "funding arrangement [was] in violation of its own corporate policies." *HSA Residential Mortg. Servs. v. State Bank of L.I.*, 2006 WL 2938826, at *6 (E.D.N.Y. Sept. 28, 2006).  Here, the TAC (i) alleges only ordinary-course checking services to Salem that—by contrast to *Averbach*, 2022 WL 2530797, at *3, 21—post-dated the attacks, and (ii) does not allege that PIB processed any "martyr" payments for the newly alleged customers.

---

[11] *See Averbach* SAC ¶ 1230 (media reporting that "the checks were cut at a Gaza branch of the Cairo-Amman Bank").

[12] In light of *Taamneh*, the portion of the R&R relied on by Plaintiffs to support their JASTA claim (DE 71 at 11, 20) was returned to the magistrate for further briefing on, and consideration of, that claim.  2024 WL 3677339, at *2-3.

                          Respectfully submitted,

                          Squire Patton Boggs (US) LLP

                          */s/ Gassan A. Baloul*
                          Gassan A. Baloul