UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

TEMIMA SPETNER, et al.,

                              Plaintiffs,

-against-                                        19-cv-005 (ERK) (JAM)

PALESTINE INVESTMENT BANK,

                              Defendant.

---

## THIRD DECLARATION OF MOHAMMAD SAMI AGHBAR

Mohammad Sami Aghbar declares as follows pursuant to 28 U.S.C. § 1746:

1. My name is Mohammad Sami Aghbar. I live in Ramallah, Palestine.

2. I have been employed at Palestine Investment Bank ("PIB") for the last 14 years. My current position at PIB is Internal Audit Manager, which I have held since 2010.

3. I submit this Declaration in support of PIB's supplemental letter regarding the Third Amended Complaint filed in the above-captioned action.

4. I am familiar with the facts set forth herein based on my work history and experience at PIB as well as my review of relevant PIB records and publicly available information, and on that basis believe them to be true and correct.

5. Because English is not my native language, I have received assistance from PIB's U.S. legal counsel in the correct English phrasing of some of the concepts discussed in this Declaration. However, all of the facts set forth herein are true and accurate to the best of my knowledge.

*Applicable Know Your Customer and Anti-Terror Financing Laws and Regulations*

6. As a commercial bank headquartered in Ramallah, Palestine, PIB is and always has been regulated by the Palestine Monetary Authority (the "PMA"), the regulatory authority for all banks in Palestine. Throughout the 2000-2003 time-period (the "Relevant Period"),[1] the PMA was responsible for formulating and implementing monetary and banking policies in Palestine.

7. Throughout the Relevant Period and for at least three years thereafter, there were no anti-money laundering ("AML") or countering the financing of terrorism ("CFT") requirements for banks operating in Palestine, apart from the requirement outlined in paragraph 9.

8. Throughout the Relevant Period, PIB adhered to the Know Your Customer ("KYC") requirements promulgated by the PMA, as well as PIB's own internal KYC policies. Pursuant to these KYC policies and requirements:

   a. When opening an account for a prospective <u>individual</u> accountholder, PIB required the individual to complete (i) an account opening form and agreement; and (ii) a signature-verification form. PIB would then (i) confirm the identity of the prospective accountholder; and (ii) ensure that the individual was not on a PMA "blacklist" of non-creditworthy customers. The PMA blacklist, which included, for example, individuals previously deemed to have passed checks while having insufficient funds, was not related to AML or CFT.

   b. When opening an account for a prospective <u>organizational</u> accountholder, PIB required one or more representatives of that organization to complete an account opening form and agreement and signature-verification form. PIB would then (i) obtain a copy of the organization or entity's charter (as certified by Palestine's Ministry of Interior); (ii) obtain the approval of the Ministry of Interior, which includes confirming with the Ministry that the organization's signatories were authorized; (iii) confirm the identification of the signatories; and (iv) screen the organization against the PMA's abovementioned "blacklist" of non-creditworthy customers.

9. The only AML regulation promulgated by the PMA during the Relevant Period was the requirement to report to the PMA any wire transfers to and from abroad exceeding USD 10,000 (or its equivalent) in value, and to place such transfers on hold for 24 hours before disbursing the underlying funds. This requirement was promulgated on December 20, 2001.

10. There were no other PMA requirements related to AML or terror-financing during the Relevant Period.

11. During the Relevant Period, PIB's correspondent banks in Jordan (Arab Jordan Investment Bank), Israel (Bank Hapoalim), and elsewhere did not impose additional KYC

---

[1] I understand this definition of the "Relevant Period" appears in paragraph 22 of the Third Amended Complaint. Without agreeing that this time-period is relevant to Plaintiffs' claims, I use it in this Declaration to provide answers to what I understand are the Court's questions.

2

requirements, or any AML/CFT requirements. Moreover, PIB's correspondent bank in Israel did not reject any transactions during the Relevant Period based on KYC, AML, or terror-financing concerns. Finally, PIB never received any communication from any Israeli banks during the Relevant Period requesting or instructing that PIB screen its customers or transaction counterparties against Israel's lists of designated Unlawful Associations or Terrorist Organizations.

12. During the Relevant Period, PIB never received any instructions, inquiries, or warnings from Israeli authorities, including any requests or instructions to close or freeze any customer accounts, to reject transactions involving any specific counterparty, or to screen customers or counterparties against any Israeli government or other blacklists. Additionally, Israeli authorities never took any enforcement actions against, or imposed any sanctions on PIB related to AML or CFT issues with its customers or counterparties.

13. My understanding is that, through the PMA, Palestine began enhancing its efforts to combat money laundering and terrorist financing in 2004, when it established the Financial Follow-up Office (later renamed the Financial Follow-up Unit).

14. In 2006, Palestine joined the Middle East & North Africa Financial Action Task Force ("MENAFATF") as an observer. MENAFATF describes itself as a voluntary organization that works to combat money laundering and the financing of terrorism by, among other things, implementing the Financial Action Task Force ("FATF") 40 Recommendations on Combating Money Laundering and Financing of Terrorism and Proliferation.[2]

15. In 2007, Palestine enacted the Anti-Money Laundering Law (Law No. 9) which, to my understanding, was prepared with assistance from the International Monetary Fund and USAID, and was in accordance with international standards. Before Law No. 9 was enacted, there were no anti-money laundering requirements in Palestine other than those described above.

16. In 2010, a Banking Law was enacted to bring the PMA's regulatory capabilities in line with the Basel Accords. For example, Article 32 of that law clarified that Palestinian banking-secrecy would not restrict the disclosure of information according to AML regulations issued by the PMA. The law also gave the PMA regulatory authority over the microfinance sector, and provided a legal framework for the establishment of deposit insurance, management of the Real Time Gross Settlement system, and the treatment of weak banks.

17. In 2015, Palestine enacted AML/CFT Law No. 20, which criminalized money laundering and terrorist financing based on its commitment to the international standards issued by FATF. Law No. 20, among other things, defined terrorists, terrorist acts, terrorist organizations, and terrorist financing, and made terrorist financing a criminal offense in Palestine.

18. MENAFATF admitted Palestine as a full member in 2015.

19. Palestine continues to develop its AML/CFT regulatory scheme, with AML/CFT Law No. 39 enacted in 2022 to replace AML/CFT Law No. 20 of 2015.

---

[2] *See* MENAFATF Overview, at https://www.menafatf.org/about.

*PIB's Procedures for Check-Processing*

20. I have reviewed the copies of the four checks appended as part of Exhibit A to the Third Amended Complaint (the "Exhibit A Checks"). As explained further below, PIB did not process the checks with "martyr" notations as depicted on the Exhibit A Checks.

21. During the Relevant Period, a check deposited by a Palestinian-bank customer and drawn on an account at a different Palestinian bank would be processed using the PMA's clearinghouse system, as was required under the PMA's regulations. In advance of the PMA clearinghouse's daily clearing sessions, each participating bank would, using Magnetic Ink Character Recognition ("MICR") technology, scan checks deposited by its customers and drawn on other Palestinian banks and generate an electronic summary file for reconciliation purposes. The PMA clearinghouse would then, based on the aggregate summary files it received, determine the net debits and credits to be cleared and settled among the participating banks. As part of that process, a check would be transferred from the payee bank to the payor bank in a sealed envelope, along with any other checks drawn by the payee bank's customers on accounts at the payor bank. The payor bank's representative would then compare the checks in the envelope with the total net amount requested by the payee's bank for settlement and acknowledge receipt of the checks in writing.

22. A different process applied to checks presented directly to a payor bank with the payee requesting payment in cash (*i.e.*, "cashed checks"), or for checks written from one bank customer to another customer at the same bank. For such checks, PIB policies required that a PIB employee (typically a teller) review the check and confirm that the identity of the person requesting payment matched the beneficiary named on the check. After confirming the beneficiary's identity, the employee would then confirm that (i) the check was properly formatted, such that it included all required information to make it valid commercial paper under Palestinian law; (ii) the signature on the check matched that of the payor on file; and (iii) there was a sufficient balance in the payor's account to cover the check. Once that information was confirmed, the PIB employee would stamp and sign the check, using three separate stamps which indicated that each of the abovementioned requirements was met. The check would later be brought to a back-office employee or branch manager, who would review it and ensure it was processed correctly.

23. Per PIB policy, for a check presented to PIB for payment, a PIB employee would apply a fourth stamp indicating that the check had been presented to PIB, and also indicating the date on which the check was presented to PIB. Furthermore, a PIB employee would hand-write two numbers on the check for identification purposes: (i) an Employee Number, and (ii) a Transaction Serial Number generated by PIB's core-banking system. For example, an annotation of "199/51" would indicate that the check was processed by an employee with Employee No. 199, and that the underlying transaction was assigned Transaction Serial No. 51 upon entry of the transaction into the core-banking system. If a check written by a PIB accountholder bore a PIB stamp, that means that the payee either cashed the check at a PIB branch or deposited it at a PIB branch to be credited to his or her own PIB account. Checks deposited at other Palestinian banks and drawn on PIB accounts would bear the stamp of the payee bank, and not a PIB stamp.

4

*The Exhibit A Checks*

24.     I have reviewed the Exhibit A Checks.  Using the transactional information on the face of the Exhibit A Checks, PIB personnel located within PIB's archives the four original checks that were presented to PIB by the check payees ("PIB's Archived Checks").  True and accurate copies of PIB's Archived Checks, and certified translations thereof, are appended as Exhibit 1 to this Declaration.

25.     I have compared the Exhibit A Checks to PIB's Archived Checks.  Based on my review, I confirm the Exhibit A Checks and PIB's Archived Checks reflect the same transactions.  I also confirm that the Exhibit A Checks were not presented to, or processed by, PIB in that form.  That is, the checks as presented to PIB did not contain the word "martyr" or the related annotations that appear on the Exhibit A Checks.  Instead, the checks as presented to, and processed by, PIB were in the form shown in PIB's Archived Checks as depicted in Exhibit 1 to this Declaration, and do not contain the word "martyr" or any annotation suggesting they were payments for the benefit of "martyrs" or any other variation of that word.

26.     The Exhibit A Checks and PIB's Archived Checks share certain features in common, which, taken together, confirm that the two sets of checks reflect the same transactions:

   a.   Both sets of checks share the same check serial numbers (20000077 through 20000080, inclusive).  These serial numbers are printed on the bottom left-hand corner of each check, as well as below the Palestine Investment Bank logo at the top left-hand portion of each check.

   b.   Both sets of checks feature the same branch number, printed at the bottom left-hand portion of each check as 7689902, as well as in truncated form at the top left-hand portion of each check as 899.

   c.   Both sets of checks feature the same account number, printed in full at the top right-hand side of the check, and in truncated form at the bottom center portion of the check.

   d.   The payee names, payment amounts, check dates, and payor signatures, all handwritten in Arabic or Arabic numerals, are identical across both sets of checks.

27.     The differences between the two sets of checks confirm that the Exhibit A Checks could not have been presented to, or processed by, PIB, for the following reasons:

   a.   The Exhibit A Checks do not bear any stamps applied by any Palestinian bank.  A check drawn on a PIB account would, according to PIB's policies at the time, bear at least three distinct stamps.  As explained above in paragraph 22, these three stamps would consist of (i) a stamp indicating the check was properly formatted; (ii) a stamp indicating the payor signature matched that on file; and (iii) a stamp indicating the payor's account had a sufficient balance to cover the check.  These three stamps are found on each of PIB's Archived Checks at the bottom center portion of each check, to the right-hand side of the check's "Signature" field.

5

   b. A check drawn on a PIB account would also bear a fourth, typically larger, stamp, indicating the date the check had been presented by the check beneficiary for payment and specifying the bank where the check had been presented, as explained above in paragraph 23.  The Exhibit A Checks do not bear any such stamps, while each of PIB's Archived Checks bears such a stamp at the left-hand portion of each check.

   c. The Exhibit A checks do not bear any handwritten Employee Numbers or Transaction Serial Numbers.  As explained above in paragraph 23, a PIB employee would, per PIB policy, hand-write these two numbers to help identify this transaction within PIB's records.  The Exhibit A Checks do not feature any such numbers, while each of PIB's Archived Checks features these numbers at the top right-hand portion of the check.

   d. The handwritten Arabic notes at the left- and right-hand margins of the Exhibit A Checks, including the Arabic word for "martyr," do not appear anywhere on PIB's Archived Checks.  As shown in the checks attached to this declaration, the margins on the face of each check processed by PIB are too narrow to accommodate the annotations depicted in the Exhibit A checks.

  28. I have reviewed the two "Receipt Vouchers" included within Exhibit A to the Third Amended Complaint.  Based on my knowledge of PIB's policies and procedures, PIB never generated any such vouchers for its customers or transaction counterparties, nor would PIB have viewed, requested, possessed, or retained any copies of such vouchers when processing a transaction.

  29. Footnote 15 of the Third Amended Complaint alleges that an issuing, or payor, bank would "manually review[]" a check's "memorandum line, particularly when the value of the check is unusually high."  As is clear from the face of both the Exhibit A Checks and PIB's Archived Checks, checks issued by PIB during the Relevant Period do not have a "Memorandum" or "Memo" line or field.  Palestinian law during the Relevant Period did not require a check to contain any description of the commercial transaction underlying a check in order for the check to be legally valid.  Further, and as explained above in paragraphs 7 through 10, there was no law or regulation promulgated by the PMA during the Relevant Period that would have required a bank to investigate the nature of a check transaction regardless of the amount of the payment.

  30. Paragraph 602 of the Third Amended Complaint alleges that "photocopies of a large number of checks transferred by [PIB] to the relatives or representatives of 'martyrs' and [] wounded Palestinians" were "captured by Israeli forces."  PIB stores checks drawn on PIB accounts (like PIB's Archived Checks) within its own archives.  Israeli authorities have never taken documents from PIB's archives.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Ramallah, Palestine, on the 4th day of August, 2024.

Mohammad Sami Aghbar