

190 Moore Street, Suite 272, Hackensack, New Jersey 07601
T: 201 265 6400 F: 201 265 0303

1441 Broadway, New York, New York 10018
T: 212 354 0111
www.osenlaw.com

August 26, 2024

**VIA ECF**
Hon. Eric Komitee, U.S.D.J.
U.S. District Court, Eastern District of New York
Brooklyn, New York 11201

      **Re:    Spetner v. Palestine Investment Bank, No. 1:19-cv-005-EK-JAM (E.D.N.Y.)**

Dear Judge Komitee:

      This letter opposes defendant Palestine Investment Bank's ("PIB") supplemental letter brief ("Ltr.") in support of its motion to dismiss. Plaintiffs also address PIB's arguments relating to the two pleading issues raised by the Court (PIB's legal and prudential reasons for avoiding terror financing and whether PIB employees reviewed the checks PIB processed for Saddam Hussein's "Terrorism Rewards Program"). Finally, PIB's letter also appears to request leave to file full-length briefs and/or move for summary judgment. That "motion" was made on the deadline for filing their letter brief and without consulting Plaintiffs, but as is clear from the discussion below, it is substantively needless – PIB's arguments are groundless and largely fall outside the complaint.

### Justice Against Sponsors of Terrorism Act ("JASTA") Aiding and Abetting (§ 2333(d))

    *The Elements of JASTA*

      The Second Circuit's decisions in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021), addressed the pleading requirements for JASTA aiding-and-abetting claims under § 2333(d) involving banks that provided services to terrorist organizations and their operatives. Under these decisions, the elements are: (1) the act of international terrorism that injured the plaintiff must have been committed, planned, or authorized by a designated FTO; (2) the defendant must have assisted—directly or indirectly – the principal tortfeasor (in this case, payments to the families of suicide bombers and other terrorists); (3) the defendant must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was a foreseeable risk; and (4) the defendant must have knowingly and substantially assisted that illegal activity. *See Honickman*, 6 F.4th at 495-501; *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 486-87 (2003).

      As previously set forth, PIB's conduct satisfies all of these elements. *See* Pls. Opp., ECF No. 71, at 13-27. *Taamneh* does not alter that analysis because its core holding is that "[t]o impose aiding-and-abetting liability for *passive nonfeasance*, plaintiffs must make a strong showing of assistance and scienter." 598 U.S. at 474 (emphasis added). That is, even "passive nonfeasance" is not fatal to a claim, it only increases the required showings – but given the extraordinary and overtly malevolent assistance PIB provided here, this Court "need not be so 'leery' to impose aiding-and-abetting liability because Plaintiffs have alleged affirmative misconduct, the traditional predicate for liability in tort." *Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 347 (E.D.N.Y. 2023).

      In alleging PIB's scheme to launder millions of dollars for the Terrorism Rewards Program, Plaintiffs have not alleged "passive nonfeasance." Rather, they alleged that PIB performed

*extraordinary*, criminal services for the express purpose of helping reward and encourage mass murder. Plaintiffs have also established Defendant's knowledge by citing a vast array of public sources contemporaneously reporting on the bank's customers and their core roles in both Saddam Hussein's Terrorism Rewards Program (the Arab Liberation Front, or "ALF") and HAMAS's fundraising activities (principally, the Holy Land Foundation or "HLF"). And whereas Twitter had "little to no front-end screening" of its users, PIB is a financial institution that is alleged to have actively engaged in a complex money laundering scheme in order to help the Saddam Hussein regime divert funds from oil sales overseen by the U.N. to fund its mass murder incentive program.

*Taamneh* also distinguished Twitter's and Facebook's "passive nonfeasance" from Google's alleged sharing of revenue with ISIS, earned from ads viewed alongside ISIS videos. The Court's concern with these allegations was *not* that they were "passive" or did not qualify as "conscious, capable" conduct, but that "they were devoid of any allegations about *how much* assistance Google provided and therefore did not plausibly allege that Google's assistance was substantial." 598 U.S. at 505 (emphasis added). The Court faulted the allegations because without more, it was possible that Google "shared only $50 with someone affiliated with ISIS…." *Id.*

Here, the sums of money PIB provided to recipients of Saddam Hussein's Terrorism Rewards Program alone were *at least* $9.5 million. TAC ¶ 7, 601. Plaintiffs therefore need not make the "strong showing of assistance and scienter" necessitated by a claim predicated on a defendant's "passive nonfeasance," as the *Zobay* court explained. Nonetheless, Plaintiffs *do* make that "strong showing," as discussed below.

### *The Legal Standard for Pleading Scienter Under the ATA/JASTA*

The Second Circuit has clearly held that plaintiffs may rely on public sources that plausibly support the inference that a bank was aware of its customers' affiliations with a terrorist group or with terrorism to establish JASTA's general awareness requirement. *Honickman*, 6 F.4th at 501 (citing *Kaplan*, 999 F.3d at 865). It also expressly rejected the line of argument that plaintiffs must allege the bank "read or was aware of such sources." *Kaplan*, 999 F.3d at 865; *Honickman*, 6 F.4th at 501. The complaint in *Kaplan* sufficiently pled general awareness and knowing substantial assistance based on 15 public sources (10 news/website articles, a Hezbollah broadcast report, a press release, a Library of Congress report, a reference in a New York lawsuit, and a transcript of congressional testimony). Contrary to PIB's invented requirement that media reports must tie payments to PIB itself and not just its customers, Ltr. at 5, *none* of the articles cited in the *Kaplan* complaint linked the defendant in that case to its alleged Hezbollah-affiliated customers.

By comparison, the TAC references 34 public sources (30 news articles, 2 White House press statements, an Israeli Foreign Ministry Press Statement, and an Associated Press video) concerning the Terrorism Rewards Program. *See* TAC ¶¶ 502-48, 553. This is more than sufficient for Plaintiffs' ALF allegations – *Kaplan*'s holding that plaintiffs need not plead the bank "read or was aware of such sources" is equally applicable to the question of whether PIB employees reviewed any of the checks the Saddam Hussein regime issued to the families of suicide bombers and other terrorists. The TAC also describes 48 articles concerning HLF that pre-date the attacks at issue, including Israel's designations of HLF in 1997 and 1998 as a HAMAS organization (PIB skips the HLF allegations in its letter). *See, e.g.*, TAC ¶¶ 653-90.

Without recourse to public sources *at the pleading stage*, "it would be virtually impossible" for Plaintiffs to provide evidence of "actual knowledge." *Estate of Henkin v. Kuveyt Turk Katilim*

*Bankasi, A.S.*, 495 F. Supp. 3d 144, 157 (E.D.N.Y. 2020).[1] As Judge Cogan correctly observed in *Henkin*: "terrorist victims … understandably do not have conclusive evidence that bank officials or compliance staff had actual knowledge of various red flags that could have apprised them of their customer's nefarious activities." *Id.* at 156. A complaint may contain general allegations as to a defendant's knowledge, "because 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind,'" and Plaintiffs have "include[d] allegations of the facts or events they claim give rise to an inference of knowledge." *Kaplan*, 999 F.3d at 864.

### Anti-Terrorism Act Primary Liability for Material Support and Conspiracy (§ 2333(a))

In *Linde v. Arab Bank, PLC*, the Second Circuit held that primary liability may lie where banking services "were [for] violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments," such as where "bank transfers were explicitly identified as payments for suicide bombings." 882 F.3d 314, 321, 327 (2d Cir. 2018). *See also Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 416 (S.D.N.Y. 2021); *King v. Habib Bank Ltd.*, No. 20-cv-4322 (LGS), 2022 U.S. Dist. LEXIS 176536, at *24-25 (S.D.N.Y. Sept. 28, 2022).

Moreover, *Linde* was a post-trial decision relying on *lists* of transactions kept by the bank and *produced in discovery*, not on transfers that themselves said "martyr" on them. In *Miller v. Arab Bank, PLC*, the plaintiffs had the benefit of the *Linde* trial record and were therefore able to plead primary liability claims based on the fact that the defendant "received lists for the Insurance Scheme that identified violent causes of death—including 'Martyr Operation'" and provided payments "reward[ing] acts of terrorism" and "incentiviz[ing] prospective 'martyrs.'" 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019). The TAC's allegations that PIB helped Saddam Hussein "reward acts of terrorism" and "incentivize prospective 'martyrs'" are facially plausible. But the TAC also quotes the 2001 FBI report assessing PIB customer *HLF*'s (smaller) reward payments to HAMAS operatives' families: "It is believed that by providing these annuities to families of HAMAS members, [HLF] assists HAMAS by providing a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populace." TAC ¶ 705.

PIB correctly states that "the objective of a § 2339A conspiracy must be 'to provide material support for terrorism.'" Ltr. at 4 (quoting *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018)). However, PIB *incorrectly* argues that Plaintiffs must allege it not only knowingly assisted the conspiracy but had the "specific intent" to further its co-conspirators' ultimate goals and was not "indifferen[t]" to them. *Id.* Motivation is irrelevant in the Second Circuit. *See, e.g.*, *United States v. Capanelli*, 479 F.3d 163, 166-67 (2d Cir. 2007) ("conspirators can have incongruent intentions as to particular details or specific goals of the conspiracy, so long as the coconspirators share a 'common purpose' and agree on the 'essential nature' of the enterprise").

---

[1] Indeed, the Circuit identified (non-exhaustively) several types of "public sources" of information that can help plead a bank's knowledge of its customers' affiliation with a terrorist group: (1) the location of the bank's operations in an area where the terrorist organization(s) operate openly, *see Kaplan*, 999 F.3d at 865; (2) "English-language articles that recounted the connection between the FTO and bank customers," id. at 850; *see also Honickman*, 6 F.4th at 502 n.18 (crediting "public sources such as media articles"); (3) "statements" by the FTO or events linking a terrorist group to a bank customer, although "[a]ny further needed specificity can be sought in discovery," *Kaplan*, 999 F.3d at 864; (4) government designations of persons or entities as affiliated with a terrorist group, although designations are not "a prerequisite for knowledge … and it would defy common sense to hold that such knowledge could be gained in no other way," *id.* at 864; and (5) banking regulations and internal bank due diligence rules and procedures, *see Honickman*, 6 F.4th at 502 & n.20.

*See also United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) ("The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes."); *Ocasio v. United States*, 136 S. Ct. 1423, 1429-30 (2016) (similar).

The core allegations of Plaintiffs' § 2339A conspiracy claim is that PIB joined the Hussein regime's conspiracy to divert U.N.-approved oil sales revenue to fund its high-profile reward payments to suicide bombers' families and other terrorists. *See* TAC ¶¶ 582-607. PIB not only knowingly helped facilitate the illicit transfers from Jordan to the Palestinian Territories; it also helped facilitate the actual payments made under the Terrorism Rewards Program. That Saddam Hussein was motivated by improving his image and PIB was motivated by sympathy for Palestinian terrorists or "just" to gain additional fees is irrelevant. A § 2339A conspiracy merely requires allegations that PIB agreed to join the Saddam Hussein regime's conspiracy and engaged in predicate acts toward the common objective of providing material support used in preparation for, or in carrying out acts of, terrorism – the very essence of the Terrorism Rewards Program.

Also contrary to PIB's assertion that § 2339A claims "required [a] heightened state of mind," Plaintiffs' second claim requires a showing of knowledge *or* intent. *See, e.g.*, *Boim v. Holy Land Found.*, 549 F.3d 685, 709 (7th Cir. 2008) ("The language of section 2339A(a) requires that the material support or resources be given with the knowledge or intent that they '*are to be used* in preparation for, or in carrying out' one of a number of specified crimes, including as relevant here the killing of American citizens."). Knowledge of that use is thus sufficient.

## PIB Had Legal and Prudential Reasons to Exit the Terror Financing Business

Plaintiffs alleged various legal and prudential reasons PIB would avoid financing terrorism, including U.S. law (TAC ¶¶ 561-64, 574-78) and international banking standards (TAC ¶¶ 556-81) – some of these, like the reach of Israeli law (TAC ¶¶ 566-71), PIB contests with extra-complaint materials that are inappropriate for its Rule 12 motion. PIB also asserts that: (1) the ATA "is not a source of substantive banking requirements (e.g., KYC or AML/CFT)"; (2) the "TAC does not make a § 2339B claim, and thus does not allege that PIB provided material support to any FTO"; and (3) the "TAC does not and cannot allege that PIB was subject to either Basel or FATF guidelines during the Relevant Period." Ltr. at 3.

First, while it is debatable as to whether the ATA is "a source of substantive banking requirements" – whatever that precisely means – it is not in dispute that PIB is subject to the extraterritorial reach of both §§ 2339A and 2339B. Both the TAC and case law make clear that the material support statutes (i.e., §§ 2339A and 2339B) apply extraterritorially and no party subject to the jurisdiction of a U.S. court is exempt from these criminal laws. *See, e.g.*, *United States v. Mustafa*, 753 F. App'x 22, 26 (2d Cir. 2018); *Ali Hamza Ahmad Suliman Al Bahlul v. United States*, 767 F.3d 1, 30 n.23 (D.C. Cir. 2014); 18 U.S.C. § 2339B(d). PIB does not dispute this. Rather, both at oral argument and in its supplemental brief, PIB downplays the criminal and tortious nature of its role facilitating Saddam Hussein's Terrorism Rewards Program, arguing that this egregious criminal conduct was "ordinary-course checking services." Ltr. at 5.

Second, while the TAC does not state a separate civil claim predicated on primary liability for a violation of § 2339B, the Court's question was whether PIB was violating any laws *at the time*. And it is flatly false to assert that the TAC "does not allege that PIB provided material support to any FTO." *Id.* at 3. Not only does the TAC allege that PIB knowingly provided support to wounded FTO operatives and the families of "martyred" FTO operatives under the Terrorism

Rewards Program (with a bonus for successful suicide bombings), *see, e.g.*, ¶¶ 499-500, 507-11, 524, but the TAC also details how PIB knowingly provided material support to *five* HAMAS institutions, including two specifically identified by the FBI as "controlled by HAMAS" – HLF and Orphan Care Bethlehem (see **Exhibit F** to the TAC). *See* TAC ¶¶ 691-779. As shown above, Plaintiffs have alleged Israeli (and U.S.) designations and dozens of media sources linking HLF to HAMAS. *See supra* and, *e.g.*, TAC ¶¶ 666-674.

The Palestinian Authority's ("PA") lack of adherence to the Basel or FATF guidelines during the Relevant Period, raised by PIB, is wholly irrelevant. The PA is hardly a source of "prudence" – indeed, it has expressed no moral or legal objections to the October 7, 2023, massacres perpetrated by HAMAS and has been engaged in ongoing negotiations with HAMAS to form a "unity government."[2] The TAC's allegations concerning Basel or FATF guidelines simply reflect the *expectations of what a responsible financial institution* operating within the international financial system was expected to undertake in the wake of the September 11, 2001, attacks – necessary steps for a bank looking to open or maintain correspondent accounts in the U.S., Europe, or elsewhere or avoid punitive measures against it (including designation – the U.S. designated two Palestinian banks in 2001, *see* TAC ¶¶ 563-64 & nn. 17-18). That PIB asserts that it failed to adhere to global industry practice is hardly shocking given its documented conduct.

To be clear, the TAC alleges that PIB actively and knowingly assisted the Saddam Hussein regime in violating U.N. and U.S. sanctions and actively and knowingly facilitated the morally grotesque rewards program for mass murder. In sum, Plaintiffs allege that PIB had *actual knowledge* of the Terrorism Rewards Program, not that it *could have* known had it been more fastidious about adhering to international banking practices.

## PIB Knew It Was Assisting Saddam Hussein's Terrorism Rewards Program, Regardless of How It Reviewed Checks

PIB asserts that it did not see the word "martyr" on the checks attached as **Exhibit A** to the TAC, providing a declaration and its own purported copies of the checks it processed for the families of suicide bombers and other terrorists. PIB claims "Plaintiffs do not explain how they obtained the Exhibit A Checks" or "why they have 'martyr' notations on them." Ltr. at 2. The checks were seized by the IDF in a raid on PIB's customer, ALF (several of PIB's clients were either shut down or raided by Palestinian or Israeli security services for their ties to terrorism) and Plaintiffs have merely attached the copies of checks and payment vouchers as they presumably were copied by ALF. Although Plaintiffs have included these checks in every single complaint going back five years, PIB now asserts that its copies of these checks do not show the same Arabic notations (including the word "martyr"). And although its assertions fall outside the complaint, Plaintiffs have no additional evidence at the moment to prove otherwise. That said, Plaintiffs are gratified to learn that PIB has preserved important evidence confirming core TAC allegations.

In any event, this "revelation" is irrelevant – Plaintiffs have more than sufficiently alleged PIB's knowledge as to ALF by citing public source evidence from the relevant period showing that ALF ran the Terrorism Rewards Program, *see supra*, and that the Program was *intended* to garner attention for the Saddam Hussein regime, not hide it, *see* TAC ¶¶ 476-79, 494-549.

---

[2] The PA has also been found liable by a New York jury for its role in perpetrating six attacks during the Second Intifada. *See Sokolow v. PLO*, No. 04-cv-00397 (GBD), 2015 U.S. Dist. LEXIS 178119 (S.D.N.Y. Oct. 1, 2015) (subsequent history, which relates to personal jurisdictional issues, omitted).

Respectfully submitted,

**OSEN LLC**

/s/ Michael J. Radine
Michael J. Radine

cc: All Counsel (via ECF)