UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------x

TEMIMA SPETNER et al.,

Plaintiffs,

**MEMORANDUM & ORDER**
19-CV-5 (EK)(JAM)

-against-

PALESTINE INVESTMENT BANK,

Defendant.

-----------------------------------x

ERIC KOMITEE, United States District Judge:

The plaintiffs in this case are American victims of terrorist attacks, their families, and their estates. They allege that defendant Palestine Investment Bank ("PIB") facilitated the transfer of U.S. dollar-denominated funds to terrorist groups. These funds included "martyr payments" made by terrorist groups to the families of suicide bombers that incentivized and rewarded such attacks. Plaintiffs bring claims under several provisions of the Anti-Terrorism Act, as amended by the Justice Against Sponsors of Terrorism Act.

PIB has moved to dismiss for failure to state a claim upon which relief can be granted, and for lack of subject matter jurisdiction as to certain plaintiffs' claims. For the reasons that follow, the claims brought by the plaintiffs who are foreign-resident relatives of surviving American victims are dismissed, as the statutes provide them no cause of action.

Count I — asserting that PIB is liable for conspiring to provide material support to terrorists — is also dismissed, as the complaint does not plausibly allege that PIB entered a conspiracy. Lastly, Count III — alleging that PIB aided and abetted the terror attacks at issue — is dismissed because the complaint does not plausibly plead that PIB intended to facilitate those attacks. PIB's motion is otherwise denied: Count II may proceed because plaintiffs have plausibly pled that PIB knowingly provided material support to terrorists.

## I. Background

This is the second time this case has come before the Court on a motion to dismiss. Previously, the Court determined that plaintiffs had not established personal jurisdiction over PIB, and dismissed the case on that basis. *See generally* Mem. & Order, ECF No. 53. The Second Circuit reversed and remanded, holding that New York's long-arm statute reached PIB and that exercise of long-arm jurisdiction comported with due process. *See Spetner v. Palestine Inv. Bank*, 70 F.4th 632 (2d Cir. 2023). The facts were recited in this Court's prior order; familiarity with them is assumed.

To briefly summarize, we assume the following allegations to be true. The terrorist attacks at issue occurred in Israel during the Second Intifada, between November 2001 and October 2002. The complaint describes multiple murders of

civilians and grievous injuries inflicted on other civilians. Plaintiffs allege that these attacks were incentivized by Saddam Hussein, who diverted money sent to Iraq under the United Nations' "humanitarian" Oil-for-Food Program to pay the families of terrorists killed in suicide missions. *See* Third Am. Compl. ("TAC") ¶¶ 596-600, ECF. No. 78.

As explained in the Court's prior order, PIB allegedly facilitated these "martyr payments" through the account of a customer, Rakad Salem. Salem led an organization called the Arab Liberation Front ("ALF"), the Palestinian proxy for Saddam Hussein's regime. TAC ¶ 2. Plaintiffs attach copies of two checks dated January 22, 2002, allegedly drawn on Salem's account at PIB, in the amount of $15,000 each. *See id.* Ex. A. These are made out to the families of two suicide bombers who carried out the Ben Yehuda Street attack in Jerusalem on December 1, 2001. Both checks are marked with the notation "martyr" in Arabic.[1] *See id.*

Plaintiffs allege that PIB employees "manually reviewed checks," as "banks must review checks to process them" and "[optical character recognition] technology could not," at that time, "accurately process handwriting." *Id.* ¶ 552 n.15.

[1] Also attached to the Complaint are two checks drawn on the same account at PIB, in the amount of $10,000 each, which are marked with the same notation. *See* TAC Ex. A. The Complaint does not connect these two payments to any of the specific attacks that injured plaintiffs.

ALF handed out checks like these at well-attended ceremonies that were reported on widely in the Palestinian press and elsewhere. *See id.* ¶¶ 512-25. These ceremonies "focused on incentivizing and glorifying terrorism . . . and often involved" families receiving certificates "on behalf of Saddam Hussein" as well as checks issued by PIB. *Id.* ¶ 533.

Based on PIB's alleged role in processing martyr payments and other funds transfers, plaintiffs bring claims under the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"). 18 U.S.C. § 2333(a) and (d). Plaintiffs bring two "primary liability" claims against PIB under 18 U.S.C. § 2333(a), alleging that the bank both conspired to commit, and actually committed, the offense of providing material support for international terrorism. Plaintiffs also bring a "secondary liability" claim under 18 U.S.C. § 2333(d), alleging that PIB aided and abetted the terrorist groups that perpetrated the attacks detailed in the complaint. TAC ¶ 840.

After oral argument, PIB claimed it could not have processed the attached "martyr" checks because the checks lacked the stamps that would indicate PIB had done so. Def.'s Ltr. in Supp. of Mot. to Dismiss Third Am. Compl. ("Ltr. Br.") 2, ECF No. 80. PIB submitted what it says are the "actual" versions of the checks Plaintiff attached. *Id.*; ECF No. 80-2 ("PIB

Checks”). The documents submitted by PIB do not include the “martyr” designation. *See* PIB Checks. PIB has also provided a declaration from its internal audit manager, indicating that PIB checks did not include a memo line, and that PIB did not process the checks plaintiffs provided. Aghbar Decl. ¶¶ 27, 29, ECF No. 80-1. For now, however, the Court will not consider the documents PIB has provided. *See Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017) (“[I]t is not our task at the motion to dismiss stage to weigh the evidence and evaluate the likelihood that [the plaintiff] would prevail[.]”).

## II. Standard of Review

“A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.” *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).[2] The plaintiff bears the burden of establishing subject matter jurisdiction. *Id.* One component of federal jurisdiction is standing to sue. In that regard, the plaintiff is obligated to “demonstrate standing for each claim that they press and for each form of relief that they seek.” *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). In assessing the standing question at the motion-to-dismiss stage, the Court takes all uncontroverted

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

facts in the complaint as true and draws all reasonable inferences therefrom in favor of the plaintiff. *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016).

To overcome a motion to dismiss under Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Lundy v. Catholic Health Sys. Of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013). However, the court need not construe legal conclusions dressed as facts in favor of the plaintiff. *See Iqbal,* 556 U.S. at 663 ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements.").

## III. Discussion

Because subject matter jurisdiction is a threshold matter, we begin there. We then proceed to consider whether the complaint plausibly states a claim.

**A. Standing Disputes**

PIB has moved to dismiss the claims of two sets of plaintiffs for lack of standing. First, PIB has moved to dismiss all claims brought by members of the Steinherz family. PIB argues that the Steinherz family has not adequately alleged that their injuries are fairly traceable to PIB's conduct (or to a terror attack at all).

Second, several plaintiffs are foreign-national relatives of American nationals who were injured in — but survived — terror attacks. PIB argues that the ATA provides no cause of action for these plaintiffs. Though PIB refers to "standing" on this issue, their arguments actually invoke what has been termed the "misleading" concept of "statutory standing" — that is, "whether the particular plaintiff has a cause of action under the statute." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016). This argument does not implicate Article III.

The first motion is denied; the second is granted.

1. The Steinherz Family Claims (Altea, Jonathan, Temima, Joseph, Peter, and Laurel Steinherz)

PIB challenges the Steinherz family's Article III standing, arguing that their injuries are not "fairly traceable" to terror attacks "or PIB's conduct." Def.'s Mem. in Supp. of Mot. to Dismiss Second Am. Compl. ("Def.'s Br.") 42-43, ECF No.

70-1.[3] Plaintiffs Altea Steinherz and her husband Jonathan were at a restaurant in December 2001. TAC ¶ 78. After two bombs exploded nearby, they left to walk home, thinking the bombing had ended. *Id.* ¶ 80. While walking home, they "saw a crazed-looking man run past them." *Id.* ¶ 81. Thinking this individual might be a terrorist, Altea turned to flee. *Id.* She fell while running and broke her arm. *Id.* ¶ 82. Jonathan "felt tremendous anxiety and stress, had significant difficulty sleeping, and underwent psychological counseling." *Id.* ¶ 87. Other members of the Steinherz family — Temima, Joseph, Peter, and Laurel — suffered "mental anguish and extreme emotional distress" as a result of the attack. *Id.* ¶¶ 91, 93, 96. The complaint does not allege that these four plaintiffs were at the scene of any attack.

PIB argues that the complaint does not identify the "crazed-looking man" as a beneficiary of PIB's services, or even as a terrorist. Def.'s Br. 42-43.

Altea has met the relatively low bar to establish traceability at this point. Traceability requires a plaintiff to plead "that the injury was likely caused by the defendant." *TransUnion*, 594 U.S. at 423. However, "[t]he fairly traceable

[3] The TAC is the operative complaint. However, when it was filed, the motion to dismiss for the second amended complaint was already fully briefed. The Court directed the parties to brief only the new allegations. This Order therefore draws from briefs submitted in connection with both motions to dismiss.

standard is lower than that of proximate cause." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013). And substantiating traceability is "a burden that is relatively modest at the motion-to-dismiss stage." *Moreira v. Societe Generale, S.A.*, 125 F.4th 371, 386 (2d Cir. 2025).

As discussed below, plaintiffs have plausibly alleged that PIB facilitated the transfer of money to pay suicide bombers. Taking the complaint's allegations as true, Altea fell in the chaos and aftermath of a coordinated suicide attack. Such injury, indirect as it may be, suffices for traceability purposes. *See Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 55-56 (2d Cir. 2016) ("A defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing.").

As one court explained when considering a similar motion to dismiss claims by the Steinherz family, "the very nature of terrorism is the use of violence or the threat of violence to create a climate of fear in a population, impacting the psyches of all those around the event not just the immediate victims." *Averbach v. Cairo Amman Bank*, No. 19-CV-4, 2020 WL 486860, at *10 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted sub nom. Averbach for Est. of Averbach v. Cairo Amman Bank*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).

It is for this reason that the remaining members of the Steinherz family have plausibly alleged traceability as well. "[A] terrorist attack — by its nature — is directed not only at the victim but also at the victims' families." *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009). Courts consistently hold that the ATA allows family members who were not present at the scene of an attack to recover for emotional distress. *See Raanan v. Binance Holdings Ltd.*, No. 24-CV-697, 2025 WL 605594, at *10 (S.D.N.Y. Feb. 25, 2025) (collecting examples).

Thus, the Steinherz family members have, at this stage, established standing. PIB's motion to dismiss their claims is denied.

2. <u>Claims of Foreign Relatives of Victims</u>

Six plaintiffs are non-U.S. national family members of Steven Braun, a plaintiff who was injured in a suicide bombing but survived. TAC ¶¶ 184-99.[4] The complaint also includes claims brought by Revital Bauer, a non-U.S. national, who is the wife and mother to two other plaintiffs injured in a suicide bombing. *Id.* ¶¶ 382-87.

[4] The ATA defines "national of the United States" as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 18 U.S.C. § 2331(2) (incorporating 8 U.S.C. § 1101(a)(22)).

These seven non-U.S. nationals must be dismissed. The ATA provides a cause of action for "[a]ny *national of the United States* injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a) (emphasis added). These non-U.S. nationals are neither survivors, nor heirs, of American nationals.[5] Thus, the plain text of the ATA does not allow them to proceed. *See Jesner v. Arab Bank, PLC*, 584 U.S. 241, 267 (2018) (explaining that the ATA "excludes [non-U.S.] nationals (with the possible exception of foreign survivors or heirs)" from its cause of action). In fact, several of these seven plaintiffs were dismissed for similar reasons in a different case. *See Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 42 (E.D.N.Y. 2019).

Plaintiffs ask the Court to conclude that the ATA "intends to reach the family members of a U.S. national . . . regardless of citizenship." Pls.' Opp. 44, ECF No. 71. But because "the statute's language is plain," "that is . . . where the inquiry should end." *Culbertson v. Berryhill*, 586 U.S. 53, 58 (2019) (interpreting 42 U.S.C. § 406(b)(1)(A)). And the pre-*Jesner* authority that plaintiffs

[5] As to the Brauns, Steven Braun, an American national, was injured in a suicide bombing. TAC ¶¶ 184-186. He is a plaintiff in this case. *Id.* ¶ 184. And as to Ms. Bauer, Alan and Yehonaton Bauer, American nationals, were injured in a suicide bombing in 2002. *Id.* ¶¶ 370-381. They are both plaintiffs in this case. *Id.* ¶¶ 370-71.

cite is not persuasive. For example, plaintiffs cite a case in which the plaintiffs *were* U.S. nationals and were suing for "emotional distress and loss of consortium, after their family members, who were not U.S. nationals, became victims of acts of international terrorism." *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005). That case is inapposite.

So too is *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 620 (E.D.N.Y. 2006). There, the non-U.S. national plaintiffs "sufficiently alleged that they [were] the heirs or survivors of U.S. nationals." *Id.* That case did not involve victims who *survived* terrorist attacks. Of course, "under the ATA, someone who survived the attack . . . has no 'survivors' or 'heirs' that can recover for his injuries on his behalf." *Miller*, 372 F. Supp. 3d at 41.

**B. Primary Liability Pursuant to 18 U.S.C. § 2333(a)**

The ATA provides a private right of action for American nationals "injured . . . by reason of an act of international terrorism." 18 U.S.C. § 2333(a). To survive a motion to dismiss, a primary liability claim "must allege: (1) an injury to a U.S. national, (2) an act of international terrorism [perpetrated by the defendant], and (3) causation." *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 82 (E.D.N.Y.

2019). Plaintiffs allege that PIB's financial services constituted acts of international terrorism.

PIB acknowledges that the complaint alleges injuries to U.S. nationals, but disputes both that its financial services meet the elements of international terrorism and that they caused the plaintiffs' injuries.

1. <u>An Act of International Terrorism</u>

To qualify as international terrorism, PIB's alleged conduct "must satisfy four separate requirements: (1) it must involve violent acts or acts dangerous to human life; (2) it must qualify as a violation of the criminal laws of the United States or of any State if it were committed within a United States jurisdiction; (3) it must appear to be intended to intimidate a civilian population, influence government policy, or affect the conduct of government by certain specified means; and (4) it must occur primarily outside the United States or transcend national boundaries." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 68 (2d Cir. 2012) (citing 18 U.S.C. § 2331(1)(A)-(C)).

Plaintiffs submit that PIB's financial services give rise to two predicate violations satisfying the second element: (i) knowingly providing material support for terrorist attacks

within the meaning of 18 U.S.C. § 2339A, and (ii) conspiring to provide such support.

a. Provision of Material Support to Terrorists (Count II)

First, plaintiffs argue that the complaint plausibly pleads an act of international terrorism predicated on knowing material support for terrorist attacks under 18 U.S.C. § 2339A.

i. PIB's alleged conduct plausibly involved acts dangerous to human life.

The Second Circuit has instructed that "providing routine financial services to members and associates of terrorist organizations" is not enough to "compel a finding that as a matter of law, the services [are] violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018). PIB argues that its services to Salem were of this routine sort. *See* Def.'s Br. 20.

But the Second Circuit has recognized that the type of payments at issue here, even if routine, *can* constitute acts of terrorism. In *Linde*, the Second Circuit recognized that a bank processing transfers "explicitly identified as payments for suicide bombings" could be held liable under Section 2333(a) because a jury could find that they were life-endangering acts. *Id.* at 321, 327.

In *Linde*, the bank manually processed transfers "As Per the Request of the Saudi Committee For Support of the Intifada Al Quds" to the families of those killed in what the request called "martyrdom operations." *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 304-05 (E.D.N.Y. 2015), *vacated on other grounds*, 882 F.3d 314 (2d Cir. 2018). As the Circuit has since explained, "[t]he evidence in *Linde* thus sufficed to present a triable issue as to whether [the bank] had committed an act of international terrorism by processing transfers that involve violence and that appear to intend intimidation or coercion of a population or government." *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 162 (2d Cir. 2021).

Since *Linde*, "numerous district court cases . . . have suggested that primary liability may still lie where banking services are directed at a specifically identifiable violent or dangerous act." *King v. Habib Bank Ltd.*, No. 20-CV-4322, 2022 WL 4537849, at *5 (S.D.N.Y. Sept. 28, 2022) (collecting cases).

Here, the complaint pleads that two checks drawn from Salem's account bore the notation of "martyr." PIB Checks. Those checks are made out to the families of two suicide bombers. Thus, plaintiffs have plausibly pled that the services were explicitly identified as involving discrete acts of violence.

ii. PIB's provision of financial services qualifies as a violation of 18 U.S.C. § 2339A.

To satisfy an act of international terrorism's second element, plaintiffs allege that PIB's provision of financial services qualifies as a violation of 18 U.S.C. § 2339A.

Section 2339A criminalizes "provid[ing] material support . . . knowing or intending that [it is] to be used in preparation for, or in carrying out" violations of various enumerated criminal statutes. 18 U.S.C. § 2339A(a). One such statute that plaintiffs point to — 18 U.S.C. § 2332 — penalizes the "kill[ing] a national of the United States, while such national is outside the United States." To prevail at this stage, plaintiffs must plausibly plead that PIB (a) provided material support and (b) knew or intended that its material support be used to prepare for, or carry out, a violation of an enumerated statute. 18 U.S.C. § 2339A(a). As to the first element, "material support" to terrorists includes the provision of "financial services." *Id.* § 2339A(b)(1). PIB argues that the complaint does not plausibly allege that it knew or intended the checks would be used to facilitate a crime. *See* Def.'s Br. 12-15.

On this point, Section 2339A's use of "or" is noteworthy: while Title 18 violations generally require knowledge *and* intent, this one explicitly requires only one or

the other. With that in mind, plaintiffs have met their burden at this stage. The complaint attaches checks made out to the families of suicide bombers in Palestine, which (as discussed above) included the "martyr" notations. They have also plausibly alleged that PIB employees would have seen these checks when processing them — among other things, the lack of optical character recognition meant that the checks would have had to have been reviewed manually. TAC ¶ 552 n.15. The knowledge of these employees is imputed to PIB because "manually reviewing . . . the memorandum line," *id.*, plausibly fell within the scope of their duties. *See* Restatement (Third) of Agency § 5.03 cmt. *c* (2006); *cf. Torres v. Pisano*, 116 F.3d 625, 636 (2d Cir. 1997) ("An official's actual or constructive knowledge . . . will be imputed to the employer when principles of agency law so dictate.").

Taking these allegations together, the plaintiffs have plausibly pled that PIB knew the financial services it provided Salem would be used to incentivize terrorist attacks. Whether the checks did not actually indicate that they were for "martyrs," as PIB contends, is an issue that involves a factual dispute that cannot be resolved on the motion to dismiss. *See* Ltr. Br. 1.

PIB cites *Ahmad v. Christian Friends of Israeli Communities*, No. 13-CV-3376, 2014 WL 1796322 (S.D.N.Y. May 5,

2014), *aff'd,* 600 F. App'x 800 (2d Cir. 2015), for the contention that Section 2339A's knowledge requirement "cannot be satisfied unless PIB knew that Salem had publicly stated terrorist goals or was an associate of an established terrorist organization." Ltr. Br. 4. But this misreads *Ahmad*, which described this knowledge as a *type of evidence* "from which a finder of fact could conclude that the defendant either knew, or was deliberately indifferent to the possibility, that it was supporting international terrorism." 2014 WL 1796322, at *3. *Ahmad* explained that plaintiffs "allege[d] no facts suggesting that Defendants were aware — or even deliberately indifferent to the possibility — that the financial support they provided to [the purported terrorists] would be used to support any violent activity." *Id.* That is not so here. And, in any event, plaintiffs do allege that Salem's affiliations were common knowledge. *See* Compl. ¶ 823 ("[PIB] knew Rakad Salem was the well-known leader of the ALF, a group well-known for its financial support for terrorist operatives.").

iii. PIB's life-endangering acts plausibly "appear" intended to intimidate a civilian population.

Finally, just as we cannot conclude that PIB's financial services did not "involve . . . acts dangerous to human life," neither can we conclude — at this stage — that PIB's alleged conduct did not "appear to be intended to

intimidate a civilian population." *Licci*, 673 F.3d at 68. "Whether a defendant appeared to have intended its activities to intimidate or coerce is not a question of the defendant's subjective intent but rather a question of what its intent objectively appeared to be." *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d at 161. And that question "depends on whether the consequences of the defendant's activities were reasonably foreseeable." *Id.* The complaint plausibly pleads that PIB facilitated payments explicitly identified for suicide bombings, attacks which foreseeably and "objectively would appear intended to intimidate a population or government." *Id.* at 162.

For the foregoing reasons, and because PIB's alleged conduct took place primarily outside the United States — satisfying the act of international terrorism's fourth element — Plaintiffs have met their burden, at this stage, to allege an act of international terrorism premised on the violation of 18 U.S.C. § 2339A.

b. Conspiracy to Provide Material Support to Terrorists (Count I)

In addition to their primary liability claim predicated on material support for terrorism under 18 U.S.C. § 2339A, plaintiffs also bring a primary liability claim alleging that PIB conspired to do the same.

"The crux of any conspiracy is an agreement between the co-conspirators." *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018) (citing *Ocasio v. United States*, 578 U.S. 282, 286 (2016)). Although "a conspirator need not agree to commit or facilitate each and every part of the substantive offense," she must "reach an agreement with the *specific intent* that" the conspiratorial goal be completed. *Ocasio*, 578 U.S. at 288 (emphasis added); *see also United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) ("[T]he fundamental legal question is . . . whether the evidence establishes . . . an agreement with others with knowledge of the criminal purpose of the scheme and with the specific intent to aid in the accomplishment of those unlawful ends.").

This requirement of specific intent marks a meaningful distinction between this count and the underlying material support count that required only a showing of knowledge *or* intent.

Moreover, plaintiffs' plausible allegation of the fourth element of an act of international terrorism — that PIB's conduct "appear[ed] to be intended to intimidate a civilian population" — does not necessarily suffice to plausibly allege specific intent to join a conspiracy. The two inquiries require different factual allegations. The Circuit has held that international terrorism's fourth element implicates a

defendant's *objective* intent and is satisfied when the "consequences of the defendant's activities were reasonably foreseeable." *Weiss*, 993 F.3d at 161. Whether a defendant intends to join a conspiracy is a question of *subjective* intent — what the defendant actually intended. *See United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004) ("Conspiracy is a specific intent crime."). A defendant's conduct can therefore 'appear to be intended to intimidate a civilian population' without the defendant actually intending to do so — a fine distinction, perhaps, but an important one all the same. Indeed, "[p]roof that [a] defendant knew that some crime would be committed is not enough" to sustain a conspiracy conviction. *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004).

Here, plaintiffs purport to allege a conspiracy among Saddam Hussein's regime, the ALF, Salem, and PIB to incentivize and reward suicide attacks. The complaint alleges that PIB "knowingly accepted U.S. dollar-denominated assets from Iraqi regime-controlled banks" in Jordan and transferred them to Salem's account. TAC ¶ 821. It further alleges that PIB knew Salem "was distributing and providing" checks to "terrorist operatives and their families" and that Salem "was the well-known leader of the ALF." *Id.* ¶¶ 822-23. Relying on media reports, the complaint alleges that ALF was "well-known" for "distributing checks with certificates describing their

purpose." *Id.* ¶ 823. "For the same reasons," that is, that PIB knew that payments were being made in exchange for suicide bombings, the complaint also alleges that PIB "knew and *agreed to serve* as the mechanism" whereby the Hussein regime "made U.S. dollar-denominated payments to reward and incentivize suicide terrorist attacks." *Id.* ¶ 824 (emphasis added).[6]

But this all would plausibly establish — at most — that PIB knew about the conspiracy. The conclusion that PIB *agreed to join* the conspiracy or that it sought to "promote [the illegal] venture" does not follow from the facts plaintiffs have alleged. *See United States v. Falcone*, 109 F.2d 579, 581 (2d Cir. 1940). At best, plaintiffs have alleged that PIB's conduct is consistent with a conspiracy because that conduct furthered the interests of the other purported conspiracy members. That is not enough. "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. *See Twombly*, 550 U.S. at 556-57.

[6] The complaint also alleges PIB "worked with [the Arab Jordan Investment Bank] to 'break the sanctions' to 'transfer money from Iraq.'" *Id.* ¶ 600 (quoting Justin Huggler, *Palestinians Mourn Fall of Their Hero Saddam After Flow of Dollars for 'Martyrs' Dries Up*, The Independent (May 7, 2003), https://perma.cc/Y859-RJUH). The quoted article, however, makes no such assertion. At most, it says that some Jordanian banks coordinated with entities in Palestine to circumvent sanctions against Iraq. The article does not speak to PIB's conduct and therefore does not render plaintiffs' relevant allegation plausible.

In *Kemper*, the Seventh Circuit rejected a plaintiff's argument that a bank defendant had joined a conspiracy with Iranian financial institutions, companies, and the "various terrorist organizations that committed" an attack. *Kemper*, 933 F.3d 395. That was because the complaint there — like the one here — did not "suggest that [the bank] cared how its [ ] customers obtained or spent the funds that it processed." *Kemper*, 911 F.3d at 395; *cf. Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 80 (2d Cir.) (explaining that under JASTA's conspiracy provision, "[i]n the absence of any allegation that the Banks and the terrorist groups engaged in a common pursuit, we cannot identify any agreement that could form the basis of a JASTA conspiracy between the Banks and the terrorist groups, whether they conspired directly or indirectly with one another"). All that the complaint plausibly alleges is that PIB engaged in market transactions, which "by definition . . . benefit both parties[.]" *Kemper*, 911 F.3d at 395. Thus, it cannot be assumed, "*ab initio*, that [these transactions] carry with them the excess baggage of conspiracy." *Id.*

Plaintiffs cite *United States v. Gurary*, 860 F.2d 521 (2d Cir. 1988), for the proposition that "PIB's own 'motivations' and 'primary purpose' in participating in the conspiracy are irrelevant to their liability as long as they possessed 'some knowledge' of the Hussein's regime's unlawful

aims and objectives." Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss 45, ECF No. 42. But, in *Gurary*, the defendants sold fictitious invoices to corporations that enabled the corporations to illegally lower their taxable income. These were not ordinary market transactions — they had no underlying economic substance beyond enabling corporate tax fraud. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 294-95 (2025) (secondary liability may run if the defendant "actively stimulates" illegal sales, but not if it simply "sells a product to a known lawbreaker, as it would to all others"). That is unlike this case, in which PIB is plausibly accused only of providing ordinary banking services.

Finally, plaintiffs' theory of liability has a more fundamental flaw. Plaintiffs assert a primary liability claim premised on an underlying conspiracy to provide material support in violation of 18 U.S.C. § 2339A. When the ATA was enacted, courts were divided on whether a primary liability claim under the ATA could rest on a predicate violation premised on secondary liability. *Compare Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 691 (7th Cir. 2008) (claiming the ATA authorized secondary civil liability), *with Rothstein v. UBS AG*, 708 F.3d 82, 97-98 (2d Cir. 2013) (opposite). Thus, in 2016, Congress enacted JASTA to explicitly provide a limited form of secondary civil liability. *See* Pub. L. No. 114-222, 130

Stat. 852 (2016) (amending 18 U.S.C. § 2333 by adding subsection (d)).

If litigants could proceed under a primary liability theory by alleging a conspiracy "including a state sponsor of terror, a designated terrorist organization, or anyone else," they "would never need to use the more limited conspiracy liability authorized by [JASTA in Section 2333(d).]" *Kemper*, 911 F.3d at 396. Allowing such a theory to proceed would thus run afoul of "one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018).

In sum, plaintiffs have satisfied the second element of an ATA claim — an act of international terrorism — as to their claim predicated on material support of terrorism, but not for conspiracy to do the same.[7] For liability to run for the material support claim, however, plaintiffs still need to plausibly plead the ATA's third element — that PIB's act of international terrorism caused the plaintiffs' injuries.

[7] The first element, an injury to a U.S. national, is uncontested as to the remaining plaintiffs.

2. Causation

To recover under the ATA, a plaintiff must have been injured "*by reason of* an act of international terrorism." 18 U.S.C. § 2333(a) (emphasis added). That requires "a showing that defendant's conduct was a proximate cause of plaintiff's harm." *Miller*, 372 F. Supp. 3d at 46.

Proximate cause exists where a defendant's actions were a "substantial factor in the sequence of responsible causation" that caused injuries to the plaintiff which were "reasonably foreseeable or anticipated as a natural consequence." *Rothstein*, 708 F.3d at 91. The usual rule, however, is that "[t]he act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom." Restatement (Second) of Torts § 448. But when a defendant negligently creates a situation that affords a third party the opportunity to commit a tort or crime, the proximate-cause requirement is satisfied when the defendant "realized or should have realized . . . that a third person might avail himself of the opportunity to commit such a tort or crime." *Id.*; *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) ("A cause can be thought superseding only if it is a cause of independent origin that was not foreseeable.").

Plaintiffs have adequately alleged proximate cause. As discussed in the previous section, the complaint adequately

pleads that PIB knew it was processing payments that incentivized terrorists to perpetrate suicide bombings. *See* TAC ¶ 549 (quoting an ALF officer who explained that "support payments for relatives ma[d]e it easier for some potential bombers to make up their minds"). It was therefore reasonably foreseeable that PIB's conduct would lead to plaintiff's injuries because PIB made it more likely that a terrorist might carry out a suicide bombing.

PIB protests that "after-the-fact" processing of payments cannot "cause" an attack. Def.'s Br. 28-29. PIB largely cites cases outside the proximate cause context,[8] at the summary-judgment stage,[9] or that involved only one or two attacks.[10] None of these cases are on point at this preliminary stage, in which plaintiffs have alleged a *campaign* of attacks made possible, in part, because terrorists knew (based on past

---

[8] *See, e.g.*, Def.'s Br. 29. (citing *Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 517 n.11 (S.D.N.Y. 2014) (evidence of a bank's post-attack ratification of its employee's actions is admissible to prove that the bank employees were acting within the scope of their employment but was not itself evidence of a violation of the ATA).

[9] *Id.* (citing *Shatsky v. Palestine Liberation Org.*, No. 02-CV-2280, 2017 WL 2666111, at *10 (D.D.C. June 20, 2017), *vacated and remanded,* 955 F.3d 1016 (D.C. Cir. 2020) (granting summary judgment because "plaintiffs have pointed to no evidence suggesting that Hafez knew his family would receive martyrdom payments, or that Hafez was motivated by the prospect of such payments," but not suggesting, as a matter of law, that after-the-fact payments cannot cause an attack).

[10] *Id.* (citing *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-1570, 2021 WL 5449825, at *4 (S.D.N.Y. Nov. 22, 2021) (concerning only a single terrorist attack); *Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 98 (D.D.C. 2017), *aff'd,* 897 F.3d 266 (D.C. Cir. 2018).

events) that their family's martyr payments would be processed in the future.

PIB also relies on *Averbach v. Cairo Amman Bank*, No. 19-CV-4, 2022 WL 2530797, at *21 (S.D.N.Y. Apr. 11, 2022), in which the court found proximate cause inadequately pled. Def.'s Br. 28. But unlike in *Averbach*, there are present in this case "allegations that specific funds processed by [PIB] were designated for terrorist purposes," that PIB "was on actual notice that funds it was processing were in fact going to [terrorist purposes]," and allegations that the attacks "were only possible due to [PIB's] actions." *Averbach*, 2022 WL 2530797, at *21.

Accordingly, plaintiffs have plausibly pled all elements of 18 U.S.C. § 2333 and their primary liability claim predicated on PIB's provision of material support may proceed past this stage.

**C. Secondary Liability Pursuant to 18 U.S.C. § 2333(d)**

As previously explained, JASTA establishes liability for "any person who aids and abets [an act of international terrorism], by knowingly providing substantial assistance." 18 U.S.C. § 2333(d)(2). Plaintiffs allege that PIB aided and abetted the terrorists who perpetrated the nine terrorist attacks detailed in the complaint. *See* TAC ¶ 839.

In passing JASTA, Congress "explicitly endorsed the D.C. Circuit's analysis in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as the proper legal framework for assessing aiding-and-abetting claims." *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 435 (2d Cir. 2025). As summarized by the Second Circuit, *Halberstam* outlined three elements:

First, the party whom the defendant aids must perform a wrongful act that causes an injury. *Id.*

Second, the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance. *Id.*

Finally, the defendant must knowingly and substantially assist the principal violation. *Id.*

The first element is — unsurprisingly — uncontested. PIB instead argues that it lacked general awareness of its role in any tortious activity related to international terrorism and that it did not knowingly or substantially assist any attack.

1. <u>The Complaint Plausibly Pleads that PIB Was Generally Aware of Its Role</u>

To be liable under an aiding-and-abetting theory, a defendant must be "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Twitter, Inc. v. Taamneh*, 598 U.S.

471, 486 (2023). Though the "defendant need not be aware of its role in the specific terrorist attack that caused the plaintiff's injury, it must be generally aware of its role in some illegal activity from which the terrorist attack was foreseeable." *Ashley*, 144 F.4th at 438.

In cases involving allegations that a bank indirectly aided the principal via its customers, the Second Circuit has instructed district courts to focus on two inquiries. First, "whether the bank was aware of the customers' connections with the terrorist organization before the relevant attacks." *Id.* Second, "whether the customers were so closely intertwined with the terrorist organization's violent terrorist activities that one can reasonably infer that the bank was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services to those customers." *Id.*

"Plaintiffs typically seek to establish a bank's awareness of its customers' ties to terrorist organizations by citing public sources, such as media articles predating the attacks." *Id.* In *Kaplan v. Lebanese Canadian Bank, SAL*, for example, a plaintiff successfully relied on media reporting that a bank's customers were "integral parts of Hizbollah" to establish the bank's general awareness. 999 F.3d 842, 862 (2d Cir. 2021).

The complaint plausibly alleges PIB's general awareness. It invokes reporting by dozens of news sources — much of it predating the attacks described in the complaint — alleging that Salem helped induce violent terrorist activities. For example, in January 2001, *Agence France Presse* reported that:

> [Salem] . . . told AFP that the families of 300 "martyrs" of the intifada . . . have each been bestowed 10,000 dollar checks . . . . "President Saddam Hussein pledged a billion euros (940 million dollars) to the Palestinian people in addition to an open amount for the martyrs and the injured," [Salem] said.

TAC ¶ 505.

The next month, *The Daily Telegraph* reported:

> Mr. Salem is a popular figure himself. He is charged with handing out sizeable compensation payments on behalf of Saddam to the families of the dead and wounded in the uprising. For every martyr, the family receives $10,000 . . . about six years' average salary . . . . "Even if there were 2,000 martyrs, His Excellency would continue to pay," [Salem] said.

*Id.* ¶ 507.

Other reporting described the Hussein regime's decision in August 2001 to increase compensation for "Palestinians who carried out martyrdom attacks" specifically, quoting a representative in Gaza. *Id.* ¶ 512.

This level of detail is sufficient. Like in *Kaplan*, the sources clearly identify Salem as an "integral part" of the ALF. This is not a case in which the defendant bank provided

"services to customers that appeared to have legitimate business purposes and without any direct link to terrorist organizations beyond the plaintiff's conclusory allegations." *Moses v. BNP Paribas, S.A.*, 802 F. Supp. 3d 567, 585 (S.D.N.Y. 2025). Additionally, the complaint alleges sufficient details about these statements, namely the "status of the speaker" (often Salem himself), the circumstances in which statements were made, and the media in which they were made. *Kaplan*, 999 F.3d at 864.

PIB argues that the complaint must allege that it reviewed these sources. Def.'s Br. 14; *see also* Tr. of Proceedings on May 13, 2024, ECF No. 77 ("There has to be a reason to infer, even under *Kaplan*, that the bank would have read media outside of Palestine."). But the Second Circuit has instructed otherwise: namely, that a "plaintiff does not have to allege that the bank actually knew of or should have seen those public sources." *Ashley*, 144 F.4th at 438. "Such a requirement at this juncture would be too exacting." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021).

2. The Complaint Does Not Plausibly Plead That PIB Knowingly and Substantially Aided Any Principal

The final issue is whether PIB knowingly and substantially assisted the terrorists who perpetrated the attacks described in the complaint. These twin requirements exist "lest mostly passive actors like banks become liable for

all of their customers' crimes by virtue of carrying out routine transactions." *Twitter*, 598 U.S. at 491. Knowledge and substantial assistance function on a sliding scale: "a lesser showing of one" demands "a greater showing of the other." *Id.* at 491-92.

Despite the need for "conscious, culpable conduct," the act requirement is not stringent. *Id.* at 492. "The quantity of assistance [is] immaterial, so long as the accomplice did *something* to aid the crime." *Rosemond v. United States*, 572 U.S. 65, 73 (2014) (emphasis in original). Further, the aid need not be direct; it may be supplied through an intermediary. *See Kaplan*, 999 F.3d at 856.

The mental state requirement depends on the degree of substantial assistance. The core inquiry is whether the defendant "intend[ed] to facilitate the offense's commission." *Smith & Wesson*, 605 U.S. at 291. But because substantial assistance and knowledge operate on a sliding scale, "[i]f the assistance [is] direct and extraordinary, then a court might more readily infer conscious participation in the underlying tort." *Id.* at 492. In other words, intent can sometimes be inferred from knowledge when the degree of assistance is substantial. That is especially so when the defendant gave the principal some sort of "special treatment." *Id.* at 498; *see also Direct Sales Co. v. United States*, 319 U.S. 703, 711-12

(1943) (inferring mail-order pharmacy intended to facilitate illegal morphine sales because it used "high-pressure sales methods" and steep bulk discounts). It follows then that "less substantial assistance require[s] more scienter before a court [can] infer conscious and culpable assistance."[11] *Twitter*, 598 U.S. at 492.

In the *Twitter* case, Twitter (and other companies) were alleged to have aided and abetted an ISIS terrorist attack. The social media companies "allegedly knew that ISIS was using their platforms" to recruit and to spread propaganda, but "failed to stop it from doing so." *Twitter*, 598 U.S. at 478. The Supreme Court concluded that the plaintiffs' allegations were insufficient to establish aiding and abetting liability. Even if Twitter knew that ISIS was using its platform, the complaint was devoid of any "allegations that [Twitter] treated ISIS any differently from anyone else" or that Twitter "[was] consciously trying to help or otherwise participate in the [ISIS] attack." *Id.* at 500. In fact, "there [was] not even

[11] The D.C. Circuit recently interpreted *Twitter* as establishing a virtually *per se* rule that a "conscious intent may be required to impose liability on one who aids and abets a tort by silence and inaction, but a lesser degree of knowledge can support liability for one who aids and abets by affirmative assistance toward commission of a tort." *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 608 (D.C. Cir. 2026) (citing *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96-97 (5th Cir. 1975)). Other courts have gone almost this far, demanding a showing of conscious intent where — despite the defendant rendering affirmative assistance — the "evidence shows no more than transactions constituting the daily grist of the mill." *Woodward*, 522 F.2d at 97.

reason to think that [Twitter] carefully screened any content before allowing users to upload it onto their platforms." *Id.* at 498-99. Intent, therefore, could not be inferred from knowledge.

The plaintiffs in *Twitter* had an especially difficult time establishing liability because "aiding and abetting is inherently a rule of secondary liability for specific wrongful acts." *Id.* at 494. Even though Twitter may have aided ISIS generally, the plaintiffs did not allege that Twitter aided ISIS in the *specific* nightclub terrorist attack that led to their harm. That was not to say, however, that Twitter needed to have known "all particulars of [ISIS's] plan" for liability to run. *Id.* at 495. The "specific wrongful act" requirement does not demand "a strict nexus between the alleged assistance and the [principal's wrongful] act." *Id.* at 497.

Here, the complaint does plausibly allege that PIB substantially assisted specific terror attacks. It contains allegations of case-specific, affirmative behavior by PIB — via review and processing of the checks at issue in the specific terrorist attacks alleged — rather than mere "passive nonfeasance." *Id.* at 500. Reflecting this distinction in *Twitter*, the Court distinguished and separately addressed allegations brought against Google, which — unlike the other

defendants — had "reviewed and approved ISIS videos" in connection with its revenue-sharing system. *Id.* at 505.

The *Twitter* Court still held that the complaint did not plausibly plead substantial assistance as to Google because it was "devoid of any allegations about how much assistance Google provided," such as the amount of money shared with ISIS or the content of the videos that were approved. *Id.* But here, as discussed above, the complaint alleges systematic aid in the form of financial services to process martyr payments of substantial sums that "ma[d]e it easier for some potential bombers to make up their minds." TAC ¶ 549.

Moreover, the allegations here speak to a far tighter nexus between PIB's conduct and the attacks than in other cases that did not proceed past the motion to dismiss. PIB processed the very checks that rewarded the families of the suicide bombers.

The complaint fails, however, to allege that PIB "intend[ed] to facilitate the offense's commission." *Smith & Wesson*, 605 U.S. at 291. As discussed above, the complaint does not plausibly "suggest that [PIB] cared how its [ ] customers obtained or spent the funds that it processed." *Kemper*, 911 F.3d at 395. Plaintiffs cite *Force v. Palestinian Authority*, No. 25-CV-8582, 2026 WL 2295893, at *11 (S.D.N.Y. Aug. 10, 2026), to resist this conclusion, but that case is inapposite

because the defendants there were alleged to have actually created and promoted a martyr payments program that benefited Hamas terrorists. *See* Ltr. from plaintiffs dated Aug. 12, 2026, ECF No. 109.

At best, plaintiffs in the instant case have alleged that PIB had intimate knowledge of its customers' illegal schemes and yet chose to transact with them anyway. That is not enough to substantiate intent where, as here, PIB is not alleged to have afforded "special treatment" to the terrorists at issue. *Twitter*, 598 U.S. at 498.

Special treatment would suggest that PIB intended the attacks to be completed so that it could process — and profit from — future martyr payments. Or it might suggest that PIB intended the attacks to succeed simply because it was sympathetic to the aims of the terrorist groups described in the complaint. In *Kaplan*, for example, the Second Circuit held that the defendant-bank gave special treatment by allowing some customers to "deposit large sums in various accounts at different [bank] branches . . . without disclosing their source, thereby circumventing sanctions imposed in order to hinder terrorist activity." 999 F.3d at 866. And in *Direct Sales*, as discussed above, the defendant mail-order pharmacy stimulated illegal sales of morphine by offering steep bulk discounts for such enormous quantities of drugs that the Court found a jury

could conclude the defendant "join[ed] both mind and hand with [the distributor] to make its accomplishment possible." 319 U.S. at 713.

But *Kaplan* and *Direct Sales* are unlike this case, in which PIB is essentially alleged to have treated its terror-affiliated customers like all other customers — "selling to everyone, and on equivalent terms." *Smith & Wesson*, 605 U.S. at 295.

Plaintiffs argue that PIB did provide services in an unusual way because processing martyr checks flouted the recommendations of international banking bodies, violated U.S. and Israeli law, and risked PIB losing access to U.S. and Israeli banks on which it relied. TAC ¶ 556-81. None of their arguments succeed.

First, plaintiffs say that it was unusual for PIB to disregard the recommendations of international banking bodies such as the Basel Committee on Banking Supervision — "a consortium of central banks" that "was established to enhance financial stability by improving the quality of banking supervision worldwide." *Id.* ¶ 559 n.16. But the complaint acknowledges that the recommendations from the international banking bodies it identifies — such as implementing 'Know Your Customer' procedures — are non-binding. *See id.* ¶ 556-656; *see also id.* ¶ 559 n.16 ("[The Basel Committee] issued the industry-

standard and highly influential 'Basel Accords' policy recommendations."). In the end, it is not enough to say that PIB "could" have adopted "measures to reduce [its] users' downstream crime." *Smith & Wesson*, 605 U.S. at 293 (no aiding and abetting liability where gun manufacturers had no legal duty to design serial numbers resistant to defacement by cartels).

Second, plaintiffs maintain that PIB violated extraterritorial U.S. and Israeli law when it provided services to known terrorist-affiliates. *See* TAC ¶ 578. Their argument reflects the Supreme Court's guidance in *Twitter* that even "inaction can be culpable in the face of some independent duty to act." 598 U.S. at 489. Setting aside the reach of Israeli law, the ATA does apply extraterritorially to PIB. The U.S. may exercise extraterritorial criminal jurisdiction over foreign actors who harm U.S. nationals. *See United States v. Yousef*, 327 F.3d 56, 91 n.24 (2d Cir. 2003) ("Customary international law recognizes . . . the 'passive personality principle,' which provides for jurisdiction over acts that harm a State's citizens abroad."). And plaintiffs ATA claim is predicated on the violation of a statute that is explicitly extraterritorial: killings of Americans abroad in violation of 18 U.S.C. § 2332(a). *Cf. RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 338-39 (2016) (RICO statute applies extraterritorially at least for claims predicated on a violation of Section 2332(a)).

But the *Twitter* Court did not go so far as to hold that the knowing violation of any legal duty is enough to substantiate aiding and abetting liability. The Court explained that "[e]ven if there were such a [legal] duty" owed by the social media companies to remove ISIS content from their platforms, "it would not transform [their] distant inaction into knowing and substantial assistance that could establish aiding and abetting the [ ] attack." *Twitter*, 598 U.S. at 501.

That makes good sense. A knowing violation of a legal duty can support an inference that the defendant "intend[ed] to facilitate the offense's commission." *Smith & Wesson*, 605 U.S. at 291. But this inference does not invariably follow — particularly when the legal duty is remote from the underlying conduct.

Here, PIB's alleged violation of an independent legal duty does not support the plausible inference that it intended to bring about the attacks described in the complaint. The better inference is that PIB "executed financially suspect transactions writ large, not in a manner that actively sought to 'associate [itself]' with the [principals'] 'operations.'" *Ashley*, 144 F.4th at 445; *see also Freeman v. HSBC Holdings PLC*, No. 18-CV-7359, 2026 WL 880107, at *16 (E.D.N.Y. Mar. 31, 2026) ("[E]ven assuming Defendants' aid was pervasive and systemic, the [complaint] does not support the inference that their money

laundering operations were designed or performed with the intent to aid Hezbollah.”). True, PIB’s conduct is less remote than that of the social media companies in *Twitter*. Nevertheless, without more, PIB’s violations of U.S. law suggest only a desire to profit from illicit transactions generally.

For the same reason, plaintiffs’ final argument fails. Plaintiffs contend that PIB was “highly dependent” on transacting with U.S. and Israeli banks and that processing payments on behalf of terrorist affiliates came at the “considerable risk of losing its access to either or both Israeli and U.S. correspondent banking privileges.” TAC ¶¶ 571-72, 578. The complaint is compatible with the theory that PIB processed funds destined to terrorists at great financial risk to itself because it wished the terror attacks to succeed. But the complaint is at least equally compatible with the theory that PIB did not care what happened to the money it processed and simply did not think it would be caught despite the commercial risks. *See Freeman*, 2026 WL 880107, at *16 (“[T]he financial services Defendants provided suggest a general desire to obtain the business of *any* sanctioned entity, Iranian or otherwise, rather than the desire to ‘form a near-common enterprise’ with *Hezbollah*-affiliated entities, such as the IRGC.”) (emphasis in original) (quoting *Ashley*, 144 F.4th at 445). Intent, therefore, cannot be plausibly inferred.

Plaintiffs "need to allege more by way of factual content to nudge [their] claim . . . across the line from conceivable to plausible." *Ashcroft*, 556 U.S. at 683.

* * *

Knowledge and substantial assistance operate on a sliding scale, as noted above. PIB provided substantial assistance, at least insomuch as it manually approved checks marked "martyr." But the assistance was not so substantial as to excuse the complaint's failure to plausibly allege that PIB had the *requisite* intent to see through to fruition the terror attacks it helped incentivize. Nor does the complaint plausibly allege any "special treatment" by PIB that would allow intent to be inferred from knowledge absent an actual plausible allegation of what PIB intended. For this reason, plaintiffs' secondary liability claim cannot proceed.

## IV. Conclusion

PIB's motion to dismiss is granted in part and denied in part. The motion to dismiss plaintiffs Chaviva Braun, Yehuda Braun, Yoni Braun, Eliana Braun Peretz, Oriella Braun, Matanya Braun, and Revital Bauer as well as Count I is granted with prejudice. The motion to dismiss Count III of the complaint is granted without prejudice. The motion is otherwise denied.

If plaintiffs wish to amend their complaint to cure the defects identified herein, they must do so within twenty-

eight days. The parties are directed to confer and schedule a conference with Magistrate Judge Marutollo for the purpose of adjusting the discovery schedule, if necessary, in light of this Order.

SO ORDERED.

/s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated: August 13, 2026
Brooklyn, New York